No. _____

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

IN RE BLAINE MILAM,

MOVANT.

# OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

*Mr. Milam is scheduled to be executed on September 25, 2025.*

Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
jeremy_schepers@fd.org
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
Tel: (214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
Jennae R Swiergula
Texas State Bar No. 24104466
efollansbee@texasdefender.org
jswiergula@texasdefender.org
Texas Defender Service
9390 Research Blvd., II, Ste. 210
Austin, Texas 78759
Tel: (512) 320-8300

*Counsel for Blaine Milam*

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

*Movant*
Blaine Milam

*Counsel for Movant*
Jennae R. Swiergula
Emily Follansbee
Texas Defender Service

Jeremy Schepers
Naomi Fenwick
Office of the Federal Public Defender, Northern District of Texas

*Respondent*
Eric Guerrero
Texas Department of Criminal Justice, Correctional Institutions Division

*Counsel for Respondent*
Tomee Heining
Office of the Attorney General of Texas

*/s/ Naomi Fenwick*
Naomi Fenwick
Counsel for Movant

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF THE CASE ................................................................ 1

    A.  Carson and Milam's Relationship ................................................ 5

        1.  Carson was undisputedly higher functioning and more
            sophisticated than Milam. ....................................................... 5

        2.  All evidence demonstrated that Milam loved A.C. and had no
            motive to harm her. .................................................................. 7

    B.  Changes in Carson Precipitating the Offense ............................. 9

        1.  Carson's mental health deteriorates and she withdraws from
            A.C. ............................................................................................ 9

        2.  Carson experienced terrifying visual distortions that led her to
            kill A.C. ................................................................................... 11

        3.  Carson fabricated a story and shifted blame away from herself.
            ................................................................................................... 20

    C.  The Investigation Was Unreliable and Designed to Obtain a
    Conviction Against Milam ............................................................. 22

        1.  Despite Carson's bizarre story, the investigation immediately
            focused on Milam. .................................................................. 22

        2.  Scene contamination and bias in the forensic workup. ........... 24

    D.  The State's Case at Trial ............................................................. 33

PROCEDURAL HISTORY .................................................................. 34

STATEMENT REGARDING PENDING LITIGATION ........................ 36

CLAIMS FOR RELIEF ........................................................................ 36

    I.  Milam can make a prima facie showing that he meets the
    requirements of 28 U.S.C. 2244 to proceed on the claim that the
    introduction of prejudicial evidence rendered his trial
    fundamentally unfair, in violation of Due Process. ....................... 37

    A.  The Due Process Clause claim has potential merit. .................... 38

    1.   There is now a scientific consensus that all bitemark opinion testimony is junk science. ...........................................................38

    2.   SWIFS has retracted DNA testimony relied on by the State to convict Milam. ............................................................41

    3.   Forensic testing never confirmed the presence of blood on any clothing known to be worn by Milam. ....................................44

  B.  This claim is based on new science. ...........................................48

  C.  Milam can make a prima facie showing of innocence. ...............51

II.  Milam has made a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to receive authorization on the claim that his death sentence violates the Eighth Amendment because he is intellectually disabled. ...........................................56

  A.  The State's trial expert diagnosed Milam with intellectual disability in 2021. .......................................................................57

  B.  Milam diligently pursued ID evidence. .....................................60

  C.  Milam can make a prima facie showing of innocence of the death penalty. ......................................................................................61

III.   Milam is actually innocent. ........................................................62

IV. Milam can make a prima facie showing that the statute of limitations can be excused based on actual innocence. .................64

PRAYER FOR RELIEF ..............................................................................64

CERTIFICATE OF COMPLIANCE ........................................................66

CERTIFICATE OF CONFERENCE.........................................................66

CERTIFICATE OF SERVICE....................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrew v. White,*
  145 S. Ct. 75 (2025) ................................................................ 37

*Atkins v. Virginia,*
  536 U.S. 304 (2002) ......................................... 34, 35, 56, 58

*Banks v. Dretke,*
  540 U.S. 668 (2004) ................................................................ 61

*In re Campbell,*
  750 F.3d 523 (5th Cir. 2014) ................................................ 64

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ................................................................ 37

*Graves v. Cockrell,*
  351 F.3d 143 (5th Cir. 2003) ................................................ 63

*Hall v. Florida,*
  572 U.S. 701 .............................................................................. 53

*In re Henderson,*
  462 F.3d 413 (5th Cir. 2006) ................................................ 37

*Herrera v. Collins,*
  506 U.S. 390 (1993) ................................................................ 63

*In re Hill,*
  No. 20-3863, 2025 WL 903150 (6th Cir. Mar. 25, 2025) .................. 37

*Johnson v. Dretke,*
  442 F.3d 901 (5th Cir. 2006) ................................................ 48

*Kansas v. Carr,*
  577 U.S. 108 (2016) ................................................................ 37

*Lee v. Glunt*,
    667 F.3d 397 (3d Cir. 2012) ............................................................... 37

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013) ................................................................ 62, 64

*Milam v. Jimerson*,
    No. 25-70015 (5th Cir. Sept. 10, 2025) ................................................ 50

*Milam v. Lumpkin*,
    No. 20-8253 (Aug. 9, 2021) .......................................................... 61

*Milam v. Texas*,
    No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. 2012) .... 34, 38, 57

*Ex parte Milam*,
    2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019) .............................. 34

*In re Milam*,
    883 F. App'x 796 (5th Cir. Oct. 27, 2020) ........................................... 35

*Ex parte Milam*,
    No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App.
    Sept. 11, 2013) .................................................................... 34

*Ex parte Milam*,
    No. WR-79,322-02, 2020 WL 3635921 (Tex. Crim. App.
    July 1, 2020) ....................................................................... 35

*Ex parte Milam*,
    No. WR-79,322-04, 2021 WL 197088 (Tex. Crim. App. Jan.
    15, 2021) .......................................................................... 35

*Ex parte Milam*,
    No. WR-79,322-04, 2024 WL 3595749 (Tex. Crim. App.
    July 31, 2024) ..................................................................... 35

*Moore v. Texas*,
    581 U.S. 1 (2017) ................................................................. 56, 57

*Payne v. Tennessee,*
   501 U.S. 808 (1991) ...................................................... 37

*Sawyer v. Whitley,*
   505 U.S. 333 (1992) ................................................. 51, 62

*State v. Carson,*
   No. CR2009-067 ................................................... *passim*

*In re Swearingen,*
   556 F.3d 344 (5th Cir. 2009) .......................................... 61

*In re Webster,*
   605 F.3d 256 (5th Cir. 2010) .......................................... 62

*In re Will,*
   970 F.3d 536 (5th Cir. 2020) ...................................... 36, 51

**Statutes**

28 U.S.C. 2244 ..................................................... *passim*

28 U.S.C. 2255 .......................................................... 62

42 U.S.C. 1983 .......................................................... 50

Tex. Code Crim. Proc. art. 11.073 ....................................... 34

**Constitutional Provisions**

U.S. CONST. AMEND. VIII ......................................... 34, 56, 63

U.S. CONST. AMEND. XIV ....................................... 37, 38, 56, 63

**Other Authorities**

CNN, *It's like staring at demons,*
   https://www.cnn.com/2024/03/22/health/demon-faces-
   prosopometamorphopsia-wellness; .................................... 15

Jan Blom, et al., *A Century of Prosopometaphopsia Studies,*
   139 Cortex 298 (2021) ................................................ 18

John C. M. Brust and Myles M. Behrens, *"Release Hallucinations" as the Major Symptom of Posterior Cerebral Artery Occlusion: a Report of 2 Cases*, 2 Annals of Neurology 432 (1977) ........................................................................ 18

NBC News, *Rare Disorder Causes Man to See People's Faces as Demonic*, https://www.nbcnews.com/health/health-news/disorder-man-sees-demonic-faces-rcna144533 ......................... 15

NPR, *How Are You Not Seeing This?*, https://www.thisamericanlife.org/840/how-are-you-not-seeing-this ................................................................................ 15, 16

WebMD, Demon Face Syndrome, https://www.webmd.com/brain/prosopometamorphopsia .................. 14

## STATEMENT OF THE CASE

Blaine Milam is innocent and intellectually disabled. He was wrongfully convicted of capital murder and sentenced to death in Rusk County in 2010 for the tragic death of A.C., the thirteen-month-old daughter of his then-fiancée, Jesseca Carson. In fact, it was Carson who caused her daughter's death. There is no credible evidence that Milam played any role in it. However, in seeking Milam's conviction, the State entirely failed to consider that Carson was the perpetrator despite Carson's telling a bizarre story that A.C. was possessed by a demon—a story Carson alone told; her increasingly disturbed beliefs and behaviors in the months leading up to A.C.'s death; and her demonstrable lies that inculpated Milam and exculpated herself. Instead, for the sole stated reason that Milam was the only man in the house, authorities immediately leapt to the conclusion that he—and not Carson—caused A.C.'s death. They persisted on this path even though nothing in their investigation provided any reason why Milam would commit such a horrific crime. Instead, witnesses including Carson, consistently reported that Milam adored A.C., treated her as his own daughter, and had stepped up to take care of her as Carson's mental health deteriorated.

Carson told authorities a story untethered from reality about demon possession and exorcism. Regardless, the State adopted Carson's narrative that Milam had convinced Carson her daughter was possessed and that she merely acquiesced to his brutal assault of A.C. as its theory of the case. But new evidence about a rare, but well-documented, neurological visual-perception disorder called prosopometamorphopsia ("PMO") places Carson's statements (and the State's theory of the case) in an entirely different light. Carson's descriptions of both A.C.'s and Milam's faces during what she believed were demonic possessions are consistent with this disorder. PMO causes people afflicted with it to see people's faces as distorted or "warped." Sufferers often describe the distorted faces as malevolent and "demon"-like.

The experience of PMO is terrifying. It would be especially terrifying for a person who was already experiencing documented religious delusions, who believed in demon possession, and who had no other available explanation for what she was experiencing. PMO provides a reason why Carson—and not Milam—would have beaten and strangled her own daughter to death. Carson herself told authorities that she would rather see A.C. "go to heaven now than to . . . have Satan have

her soul and her go to hell when she gets older . . . when she dies even if she hasn't done anything." Ex. 24 at 29.

However, because the State was singularly focused on Milam, it failed to critically interrogate Carson's story and instead tried to force a square peg into a round hole. The State's prejudgment of Milam's guilt was compounded by Milam's intellectual disability ("ID"), which inhibited his ability to counter Carson's narrative. On IQ testing administered by the defense and the State shortly after Milam's arrest, he obtained IQ scores of 71 and 68 respectively. A psychiatrist retained by the State who examined him pre-trial observed that Milam "clearly has intellectual limitations" and "has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 29 at 13-14.

These characteristics contributed to Milam's inability to tell his side of the story while Carson deftly told her side—an invented story of Milam attempting to perform an exorcism—adopted by the State as its own. Milam's vulnerabilities turned this case from a he-said-she-said case into a she-said case. While Milam spent his time during interviews with authorities naively protecting Carson, Carson spent her time with authorities weaving a tale that placed the blame on Milam and negated

her culpability. Even though authorities established that Carson lied about important details in her story, it nevertheless remained the State's story because it was the only story it had that implicated Milam.

Consequently, law enforcement conducted a forensic investigation designed to produce evidence that supported Carson's narrative that Milam caused A.C.'s death. But new evidence entirely eliminates or undermines the forensic evidence the State used to try to establish that Milam injured A.C. At trial, the State emphasized bitemark opinion testimony that is now considered discredited in its entirety. The State also relied on DNA evidence to corroborate its bitemark opinion testimony. That evidence has since been retracted by the Southwestern Institute of Forensic Sciences ("SWIFS"). SWIFS also rejects the argument that the presence of DNA provides any information about how or when an individual's DNA is deposited on a surface. Likewise, the blood pattern analysis ("BPA") testimony, which the State relied on for its theory of how the offense occurred, was shoddy and demonstrably unreliable.

The only evidence the State currently possesses that Milam played any role—whether as a principal or a party—in causing A.C.'s death is

his vague oral admission to a jail nurse of having done "it." But this admission is most reasonably understood in light of all the evidence as a naïve attempt by an intellectually disabled person to protect Carson. Indeed, in January 2021, the State's trial expert, Dr. Timothy Proctor, agreed that "[b]ased on the information currently available to me and the relevant diagnostic nomenclature and law at this time, it is my opinion that Mr. Milam meets criteria for intellectual disability." Ex. 41 at 6.

The State's case today establishes nothing more than Milam's presence in his own home on the night of A.C.'s death. And the remaining evidence of who was responsible for A.C.'s death—Carson's and Milam's custodial statements—points strongly to Carson as the perpetrator.

## A. Carson and Milam's Relationship

### 1. Carson was undisputedly higher functioning and more sophisticated than Milam.

To convince Milam's jury that Milam had fatally injured A.C. while Carson did nothing to intervene, the State cast him as the dominant person in his relationship with Carson. But the State's theory of their relationship at Milam's trial did not square with its theory at Carson's trial. Nor did it square with reality. At Carson's trial, the State portrayed Carson as the savvier one, whose intelligence far exceeded Milam's.

Carson's mother testified that Carson was "a strong willed girl" who was "significantly more intelligent" than Milam. *State v. Carson*, No. CR2009-067, 14 RR 171-72, 174-76. Likewise, Texas Ranger Kenny Ray—who interviewed both Milam and Carson—testified that Carson was "by far" the more intelligent of the two. *Id.* at 17 RR 117. The State itself characterized Milam as "dumb" and "ignorant[.]" *Id.* at 18 RR 37.

In light of Carson's higher degree of sophistication, the State told Carson's jury that it was implausible that Milam instigated the offense and tricked Carson into not intervening:

> From the objective evidence that you heard, the objective evidence, not just what she said, which is the more likely scenario? That Blaine Milam brainwashed Jesseca Carson into all of this and manipulated her and duped her or that she is the one where all of this originated? Ask yourself that question. Look at the objective evidence . . . . . She's the one. She's the one.

*Id.* at 18 RR 36-37.

The State's presentation about the nature of Milam's relationship with Carson at her trial was consistent with overwhelming evidence. When Milam met Carson, he was a socially isolated eighteen-year-old described by the few who knew him as naïve, awkward, and "slow." 51 RR 14, 32. Even as a young child, his grade-school teachers described him as shy and socially inept. *Id.* He had few friends in school. 53 RR 220. His

social isolation was worsened when his parents removed him from school around the fourth grade. 51 RR 39. Milam spent most of his childhood isolated in his family's rural Rusk County trailer watching tv with his seriously ill father while his mother worked at the Dollar Store to support the family. *Id.* at 259.

Carson earned good grades and graduated high school. *See, e.g.*, *State v. Carson*, No. CR2009-067, 16 RR 122, 125. Milam, on the other hand, has little schooling and has IQ scores in the ID range. A psychiatrist retained by the State who examined him pre-trial observed that Milam "clearly has intellectual limitations" and "has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 29 at 13-14.

### 2. All evidence demonstrated that Milam loved A.C. and had no motive to harm her.

In early 2008, Milam met Carson—his first and only serious girlfriend—through the website MySpace. 51 RR 283. Soon their online relationship developed in the real world. Within a few months, he proposed marriage. After Carson graduated high school, the couple moved into their own apartment, a short drive from Milam's mother's trailer home. 50 RR 33; 51 RR 298.

By all accounts, Milam was "ecstatic about having [A.C.] around" and embraced the role of father. 51 RR 292. No evidence suggested he ever mistreated A.C. Instead, all the evidence reflected that Milam had a loving relationship with her. Carson's mother, Heather Wilkes, testified at Carson's trial that she (Wilkes) had no concerns about Milam's treatment of A.C. and that he helped care for her. *Id.* at 14 RR 160-70. Milam's former boss, who became Carson's friend and assisted with her defense at her trial, likewise observed that Milam "had a good relationship with [A.C.]" *Id.* at 15 RR 44. The most zealous advocate of Milam's loving relationship with A.C. was Carson herself. Throughout her statements to authorities, Carson insisted that Milam loved A.C. and would not have hurt her. *See, e.g.*, Exs. 25 at 13-14, 38; 24 at 36, 38, 42; *see also State v. Carson*, No. CR2009-067, 16 RR 135, 173, 201.

The State had nothing explaining why Milam would abruptly flip from being a loving father figure to A.C. to horrifically assaulting her, causing prosecutors to disclaim "throughout [the trial they are not] required to prove motive." 48 RR 144.

## B. Changes in Carson Precipitating the Offense

### 1. Carson's mental health deteriorates and she withdraws from A.C.

What does have explanatory power, however, are Carson's bizarre beliefs and behavior, which ultimately—and tragically—became focused on A.C. Around September 2008, a few months before A.C.'s murder, Carson's friends and family noticed increasingly strange and erratic behavior from her. 46 RR 41; 51 RR 304. Whereas she had once been outgoing and friendly, she became withdrawn and disheveled. 46 RR 41. Although her friends and family did not recognize this, witness accounts of Carson's demeanor and behavior during this time reflect symptoms consistent with psychosis and depression. 46 RR 261-62. Shortly after Milam's father's died that year, Carson came to believe that she and Milam could communicate with their deceased fathers through a Ouija board. Ex. 25 at 80-81. Carson's father had committed suicide when she was a child, but she claimed the Ouija board revealed to her that her father had been murdered by her mother and that the murder weapon was buried in Alabama. Ex. 25 at 27, 90-92. This delusion is documented in police reports and witness statements in the months leading up to A.C.'s death.

In October, Carson began making harassing phone calls to her mother Heather Wilkes, accusing Wilkes of killing her father. According to a police report filed by Wilkes, Carson threatened her, "[Y]ou'll pay for what you did to my Dad." These calls continued several times a day at all hours of the day and night. Ex. 28 at 1-2. In an email, sent October 4, Carson again accused Wilkes of killing Carson's father and trying to poison her and A.C. Ex. 26.

Later that October, Carson took Milam and A.C. to Alabama on an investigative mission. 46 RR 204. They stayed one night with the family of her best friend, Tiffany Taylor. Lori Taylor, Tiffany's mother, recounted to law enforcement that Carson told her she was using a Ouija board and had proof that her mom had killed her dad and made it look like a suicide. Ex. 27 at 4. Carson said she came to Alabama to look for the gun her mom had used to kill her father, which Carson believed was buried at a relative's house. *Id.* at 5. Taylor further stated that Carson "gave her the names of who helped" and told Taylor that her mom was threatening her and Milam. *Id.* Carson said her mom had put rat poison in Carson's and Milam's food and in A.C.'s bottle. *Id.* at 4-5. Soon after, Carson returned to Texas with Milam and her daughter in tow.

In November 2008, Carson's mother filed another police report complaining that her daughter was harassing and threatening her. *See* Ex. 28 at 6-7. Carson continued to call and text her mother and grandmother several times a night. Frequently, Carson would call and immediately hang up.

That same month, Carson took Milam and A.C. back to Alabama. Friends who saw Carson during this time became concerned that she appeared disinterested and disconnected from her daughter. 46 RR 210-11. Lori Taylor recounted that Milam was the one who fed and changed A.C. 46 RR 209. Carson did not act "like you would expect a new mother to be taking care of her baby." *Id.* at 210-11. Taylor also reported that Carson seemed "weird, hollow," and "empty." *Id.* at 209. She described looking into Carson's eyes was "like looking into a dark space." *Id.*

## 2. Carson experienced terrifying visual distortions that led her to kill A.C.

At about 10:30 a.m. on December 2, 2008, emergency services received a call from Milam reporting that A.C. was not breathing. 42 RR 105. Milam described to the 911 operator that he and Carson had held A.C. after finding her and that he had attempted "mouth-to-mouth and CPR." *Id.* The 911 operator instructed them to bring A.C. to the phone so

the operator could talk them through giving CPR again. *Id.* Based on the operator's instructions, Milam looked into A.C.'s mouth to check that her airway was not obstructed and then pinched her nose and blew breaths into her mouth and to give hard and fast chest compressions. *Id.* Milam and Carson repeated these steps several times. *Id.* A.C. was deceased when law enforcement arrived on the scene.

Soon after arriving at the scene, Ranger Ray interviewed Milam and Carson separately. *See* Ex. 25; SX F-1, 59 RR 148. Both Carson and Milam initially told Ranger Ray that they had left A.C. alone in the trailer and had walked down to look at some property they intended to purchase. Ex. 25 at 73-74; SX F-1, 59 RR 52. When they returned home an hour or two later, they found A.C. in a hole in the floor of the master bathroom. Ex. 25 at 75; SX F-1, 59 RR 152.[1]

When questioning Carson, Ranger Ray told her that he did not believe her initial version of events. Carson expressed anxiety that her real story would not be believed.

> CARSON: I could tell you, but you wouldn't believe me.
> RANGER RAY: I will. I will believe you.

---

[1] Carson later admitted that she fabricated this story and instructed Milam to tell it to law enforcement. Ex. 25 at 109-10.

CARSON: No, you won't.

RANGER RAY: I will believe you. I promise.

CARSON: If you do, none of the other cops won't --

RANGER RAY: I will --

CARSON: Because it's something that they would not believe.

RANGER RAY: I will believe you. I promise you, I will believe you.

Ex. 25 at 78-79. It was at this point, Ranger Ray would later testify, that

Carson's demeanor changed from that of a grieving mother to being coldly

matter-of-fact. 40 RR 31. Carson told Ranger Ray that she believed

Milam was being possessed, "kind of like 'The Exorcist,'" but that Milam

did not "understand" it was happening until she told him. *Id.* at 82.

Carson then came to believe A.C. was also possessed. Ex. 25 at 90, 93.

What Carson went on to describe is consistent with

prosopometamorphopsia ("PMO"). PMO is caused by dysfunction in the

clusters of neurons that are typically housed in the occipital and temporal

lobes of the brain and that are specialized for processing faces. Ex. 7 ¶2.

When this network of neurons does not function properly, conscious face

perceptions and behavioral judgments about faces are disrupted. *Id.* ¶3.

PMO causes faces to "distort in shape, texture, feature position, and/or

color, and faces often transform while being viewed." *Id.* These

distortions can affect only one half of the face (hemi-PMO) or both sides

of the face (bilateral-PMO). *Id.* People with PMO are more likely to see distortions in familiar faces and for some people, the distortions only appear intermittently. *Id.* ¶5. The distortions can be inconsistent in appearance. *Id.* They can also appear when looking at faces on screens. *Id.* People with PMO have also described hearing voice distortions. *Id.* ¶9. While the visual distortions can vary and are described by those who experience PMO in numerous different ways, some of the most common distortions reported are "drooping or melting features." *Id.* ¶4. Some people see features of the face shifted from their usual position. *Id.* at Table 1. Some distortions are static while others change as the individual continues to gaze at a particular face. *Id.*

A substantial proportion of people who have reported their PMO symptoms have described that the distorted faces they see appear malevolent and resemble, especially, "demons." *Id.* Consequently, PMO is colloquially known as "demon-face syndrome."[2] PMO can occur in those who are mentally healthy and those who have psychosis. *Id.* ¶6. Perhaps unsurprisingly, PMO typically has a major impact on the mental health

---

[2] *See, e.g.,* Demon Face Syndrome, WebMD, https://www.webmd.com/brain/prosopometamorphopsia (last visited Aug. 13, 2025).

of those who experience it. *Id.* ¶3. Yet, many people with PMO do not report their experience for fear others will perceive them as being mentally ill. *Id.* ¶6. PMO can last for years but it can also resolve on its own as quickly as a month or two after it starts. *Id.* ¶7. While rarely occurring, it is well documented in medical literature and, at least more recently, has been reported about in several mainstream media sources.[3]

In Carson, PMO caused her to see distorted features on certain familiar faces, including her daughter's face. *See id.* ¶5 (some people with PMO are more likely to perceive distortions in familiar faces than unfamiliar ones). Carson's descriptions of seeing a demon in Milam's face—and later in A.C.'s—are consistent with PMO. Ex. 7 ¶¶10-22. In her statement to Ranger Ray, Carson said the "demon" would come in and out of Milam. Ex. 24 at 38. Over time though, the "demon" began to appear more frequently in Milam and, she told Ray, she could not make it stop happening. Carson described to Ranger Ray her perception that Milam's face changed. She told him about an incident when she was

---

[3] *See, e.g.,* NPR, *How Are You Not Seeing This?*, Sept. 13, 2024, https://www.thisamericanlife.org/840/how-are-you-not-seeing-this; https://www.cnn.com/2024/03/22/health/demon-faces-prosopometamorphopsia-wellness; https://www.nbcnews.com/health/health-news/disorder-man-sees-demonic-faces-rcna144533 (last visited September 15, 2025).

driving her car and "Blaine looks over and starts looking at me, and it was a look that wasn't Blaine's." *Id.* at 12-13.

Thus, while incredible on its face, Carson's account of Milam's "demon possession" becomes coherent through the lens of PMO evidence: she was intermittently experiencing grotesque distortions in Milam's face that she was interpreting as a demon possessing him. She also explained to authorities how Milam would cope with Carson's distress when she experienced PMO in his face: he would remove himself from her view by hiding in the bathroom, sometimes for so many hours that his mother would ask what he was doing in there. *Id.* at 87.

As is common with PMO, the distortions she saw in Milam's face made him appear menacing and frightened her: "[I]t came close to looking like he was going to kill me."[4] Ex. 24 at 84. Similarly, in her trial

---

[4] Carson's statements are similar to those a subject with PMO has used to describe looking at a partner's face:

> So I remember we were sitting at a table at a restaurant. It was outside the movies. We were going to go see a movie that night. And I remember looking at him, and I thought he was snarling at me. . . . I remember looking at his face and thinking, I don't want to be anywhere near this person. He feels like a stranger and like he wants to harm me, to hurt me.

NPR, *How Are You Not Seeing This?*, Sept. 13, 2024, available at https://www.thisamericanlife.org/840/how-are-you-not-seeing-this (last visited September 15, 2025).

testimony, Carson told her jury about an incident while Blaine was driving:

> I turned over to look at him, and he's just got this expression on his face like he's about to kill me, like he's just about to jump over, you know, in the middle of the car and attack me. And, you know, I'm sitting there, and I'm driving while I'm doing this, but I'm asking him, "What's wrong?" And I'm crying and everything. And his voice is not even the same octave as Blaine's voice was. It was completely different. And his eyes just -- they just looked so evil.

*State v. Carson*, No. CR2009-067, 16 RR 158.

Carson told Ranger Ray that, after some period of time, the "demon" had not returned in Milam "for a while." Ex. 24 at 12. That changed on December 1, when the demon returned, this time appearing in her child A.C. At the time, she and Milam were alone with A.C., as Milam's mother had gone out of town. Carson described the changes she observed to A.C.'s appearance: one side of A.C.'s face was "warped down, and her eye was like stretched and stuff, and it was really freaky." Ex. 25 at 90. Carson later described that "one whole side [of A.C.'s] eyelids were, like, this long on this side and her whole face on this side was stretched out. And her lip, her top lip looked like she had a cleft palate." Ex. 24 at 19.

In a photo Milam took of A.C., Carson described seeing one side of A.C.'s face "warped down, and her eye was like stretched and stuff," *id.*

at 90: a classic description of a "drooping" face seen in hemi-PMO.[5] Carson told authorities it was "frightening" to her "to see [A.C.] look like that." *Id.* at 93. She also described the distortions as dynamic: "even when it would come to be [A.C.] for a couple of minutes, her face was still warped, and then, you know, it would go back to the demon possessing her or whatever." *Id.* Carson would try to look at A.C. from time to time: "it would be her for a little while, and then it would start getting mean again. And then I was like, 'Is it coming back?'" *Id.* at 108. Carson's account of experiencing dynamic distortions in a face as she continued to look at it is a common feature in PMO. Ex. 7 ¶4.

Lacking any readily available explanation for what she was experiencing, Carson, who believed in demon possession, Ex. 25 at 82, interpreted her experience of PMO literally and became convinced her daughter was being possessed by a menacing demon. She described A.C. during this period as being "mean" and "not my baby," which caused her

---

[5] *See* John C. M. Brust and Myles M. Behrens, *"Release Hallucinations" as the Major Symptom of Posterior Cerebral Artery Occlusion: a Report of 2 Cases*, 2 Annals of Neurology 432 (1977) (describing subject who "experienced transient visual illusions: the right half of people's faces (i.e., to the patient's left) seemed to melt, 'like clocks in a Dali painting'"); Jan Blom, et al., *A Century of Prosopometaphopsia Studies*, 139 Cortex 298, 301–02 (2021) (systematic literature review determined 23% of hemi-PMO sufferers identified in the literature described the face as "drooping downward").

to "br[eak] down." *Id.* at 93, 102. She likely also experienced vocal distortions, causing her to perceive A.C.'s cries to be her "growling" at her. Ex. 24 at 15; *see also* Ex. 7 ¶¶9, 17. PMO evidence explains that Carson was not simply entertaining an otherwise unexplainable delusion about a demon attempting to possess her child, *she was viscerally experiencing it*. That she was actually experiencing this visceral reality is consistent with her fear during her interrogation by Ranger Ray that she would not be believed and be psychiatrically committed instead. *See, e.g.*, Ex. 25 at 79 ("I could tell you but you wouldn't believe me."); *id.* at 110 ("I didn't want to be sent to an in- -- a mental institution[.]").

Because of its rarity and obscurity, neither the State nor the defense knew about PMO at the time of Milam's trial. The State therefore theorized that the distortions Carson saw were A.C.'s injuries. But this theory does not account for Carson's description of warping that was dynamic, not static. She described how A.C.'s face would return to being herself again. Ex. 24 at 18-19, 24. Nor does it account for Carson seeing Milam's face transform into a demon. As with Milam's face, she interpreted this as an evil spirit or demon trying to get inside A.C.

### 3. Carson fabricated a story and shifted blame away from herself.

Carson recognized that her perception that A.C. was possessed by a demon would not be believed by authorities and that she could face criminal charges for A.C.'s death. Ex. 25 at 79. She admitted that she concocted the fake alibi story and instructed Milam to tell it to the police.[6] She did so because she thought that, if she did not make up a story that would create an alibi, the authorities "wouldn't believe us, and they would either take us to a mental institution or they'd arrest us for murder, when neither one of us would ever do that to that baby." *Id.* at 110. But when her attempt to create an alibi was rebuffed, Carson deftly began to shift blame to Milam. In her interviews with Ranger Ray, Carson made herself a passive witness to what she described as Milam's attempt to exorcise the demon from A.C.—a story the State called a "second cover story" in Carson's trial. *State v. Carson*, No. CR2009-067, 18 RR 87.

---

[6] Ranger Ray assumed Milam had told Carson to give the fake account that they had left A.C. alone in the trailer that morning while they walked down to look at property they were planning to purchase. Carson corrected Ray: "[Milam] didn't tell me to. I actually told him to[.]" Ex. 25 at 109-10.

Moreover, and in addition to the initial alibi story Carson admitted to fabricating, law enforcement established that Carson's "second cover story" included other demonstrable lies that exculpated herself and shifted blame to Milam. First, according to Carson, Milam locked himself and A.C. together in the master bedroom so Milam could perform an "exorcism" on A.C. Ex. 24 at 26. She suggested A.C.'s death may have been caused by Milam "knocking" the "demon" out. *Id.* at 28. In fact, authorities learned that no bedroom in the trailer could be locked from the inside. *State v. Carson*, No. CR2009-067, 12 RR 219. Carson's story of being locked out of an attempted exorcism by Milam was wholly invented. Second, Carson said that Milam had told her that he needed to obtain a metallic cross to successfully perform an exorcism. Ex. 25 at 90. She told Ranger Ray the couple made a trip to a gas station the night of December 1 where she stood outside while Milam entered and purchased such an object. 40 RR 53. But video surveillance of the gas station showed that, while the couple did go to the gas station, Carson—not Milam— entered the store. Milam did not buy a metallic cross. Carson bought snacks and a drink. *Id.*

## C. The Investigation Was Unreliable and Designed to Obtain a Conviction Against Milam

### 1. Despite Carson's bizarre story, the investigation immediately focused on Milam.

Notwithstanding that the story Carson told about Milam exorcising her demon-possessed child evidenced Carson's alarming state of mind, Ranger Ray never conducted an interview aimed at determining whether she had caused A.C.'s death. Instead, he invented a narrative whole cloth that Milam resented A.C. and wanted Carson in his life "without a baby." Ex. 24 at 37. In his very first interview with Milam, before any evidence was collected and before he spoke to Carson, Ranger Ray told Milam, "[A] whole lot of people think you did this." SX F1, 59 RR 166. When Milam asked why, Ranger Ray answered, "you're the only male in this house." *Id.*

Ranger Ray also assumed Milam must be responsible for the injuries Ranger Ray believed to be bitemarks:

> The baby's got bite marks all over her, okay? And those are very, very easy to measure, photograph, and then we're going to get a search warrant, and it -- it will order you to go with -- with us to a dentist, and the dentist is going to make a cast of your teeth, and then we'll match those up.

SX F1, 59 RR 75. Before any evidence was collected, Ranger Ray made clear that he assumed Milam lashed out at A.C. in anger:

RANGER RAY: What did she do to make you hit her?

MILAM: I did not hit that baby.

RANGER RAY: What did you slam her against?

MILAM: I did not slam that baby against nothing.

SX F1, 59 RR 78. Milam consistently denied causing A.C. any harm in his statements and no evidence ever demonstrated that he had any history of responding to her with anger or violence.

Despite the fact that Ranger Ray arrived on the scene just prior to speaking with Milam, and his accusations were made in an investigative vacuum, 39 RR 228, the tone and target of the investigation was set. From this point forward, Carson was used strictly to develop evidence against Milam as the primary actor and she was never seriously considered as the perpetrator. The State would also choose to seek the death penalty against Milam only. This was notwithstanding that (1) Carson admitted seeing and believing that A.C. was possessed by a demon; (2) she had become withdrawn and detached from her daughter; (3) she told a story that authorities later ascertained contained lies; and (4) she told authorities she preferred that A.C. "go to heaven now than to . . . have Satan have her soul and her go to hell when she gets older," Ex. 25 at 98. The investigation's narrow focus biased the subsequent forensic

investigation, producing unreliable opinion evidence against Milam dressed up as science.

## 2. Scene contamination and bias in the forensic workup.

Because the State could obtain no evidence that Milam had any motive to harm A.C., it was forced to hinge its case on shaky inferences from physical evidence it recovered at the scene. But law enforcement's investigation of that scene was so mishandled that the lead detective, Amber Rogers, was subsequently demoted to a public relations role. *See* 41 RR 28. When asked at trial whether mistakes had been made in the processing of the scene, Rogers responded that she could not answer that question. 44 RR 53. Law enforcement failed to document the scene on the day of the offense—December 2, 2008—forcing them to return nine days later to collect much of the physical evidence eventually relied on by the State to tie Milam forensically to A.C.'s death. In the interim, law enforcement had released the scene to Milam's mother and brother who lived there. By the time authorities returned, the scene was so compromised that, as one investigator testified, there was no point in wearing protective shoe coverings as he "would have had to change them every five minutes." 42 RR 191.

The investigation at the scene on the day-of was led by then-detective Rogers. 44 RR 46. She described her training in crime scene investigation as "basic" and she had no training at all in DNA evidence. *Id.* at 58, 122. Rogers agreed at trial the entire home should have been photographed and videoed on the day of the offense, *id.* at 102, but nobody did so. In fact, despite the presence of several officers, no one completed a documented walk-through of the two-bedroom mobile home on that day. Rogers testified that she entered the home, looked at A.C., and then quickly exited again. *Id.* at 93. She did not walk through the home. Consequently, she could not verify whether evidence later relied on by the State was or was not present in certain locations.

Rogers did not verify whether any evidence was present—let alone collect any evidence—in the south bedroom. 46 RR 102. Nor did anyone else.[7] That was true even though Carson identified the south bedroom repeatedly in her interviews with authorities. *See, e.g.,* 7 RR 122; Ex. 25 at 86, 104. She described how Milam allegedly kept A.C. in the south bedroom during parts of the alleged exorcisms. *See* 7 RR 148-49. Instead

---

[7] One investigator did walk to the south end of the home but he "c[ouldn't] remember exactly what [he] did back there," except that he did not observe anything of evidentiary value. 41 RR 65-66.

of conducting a thorough search of the trailer home, the scene was released to Shirley and Danny Milam that same afternoon to occupy.

Eventually, nine days after the offense, law enforcement searched the south bedroom. Rogers was joined by Noel Martin, a crime scene investigator who was called for his knowledge of blood evidence. *See* Ex. 21. Martin observed that "[i]t was obvious, [due] to the fecal matter on the floors and whatnot," that dogs and cats had been inside the home for the past nine days. *Id.* at 155-56. He and another officer tried to remove the animals from the scene, but "short of calling animal control out there . . . or shooting the animals, [he] d[idn't] know any other way to keep them out." *Id.* at 160. Due to the home being released to Milam's family and the presence of animals, the scene had been significantly altered. *See* Ex. 6 ¶¶58-60.

Despite obvious scene contamination and alteration, investigators collected various items for testing. This included a pair of jeans found in the south bedroom that bore "stains . . . consistent . . . with contact transfer bloodstains[.]" 42 RR 203. As he later testified, however, without photographs from December 2, Martin could not know the condition of the south bedroom on the day of the offense. 46 RR 161. He agreed "100%"

that the pair of jeans—which the State later claimed was a critical piece of evidence—were moved from another location in the home to the south bedroom after December 2. *Id.* at 188.

Rogers and others returned again on December 13, 2008, following information that a cell phone with evidentiary value may be located under the home. 44 RR 49-50. The underside of the trailer home had never been documented or searched. After crawling under the trailer, Rogers recovered a wrench wrapped in a plastic bag, SX 40-B, a steel bar, SX 39, a pair of work boots, and a Q-tip, 41 RR 29.

In addition to the physical evidence having been collected without regard to contamination, law enforcement's myopic focus on Milam impacted the forensic testing conducted on that evidence. At the scene on December 2, 2008, authorities decided, prior to any testing, that the injuries present on A.C.'s body were bitemarks. *See, e.g.,* Ex. 17 at 1. The State told the medical examiner ("ME") that "you will find that the body shows bite marks." Ex. 15 at 1. The State contacted the ME again on the day of the autopsy, to inform him that Milam was "the primary suspect" and that the ME should also "please note . . . that the primary suspect,

Blaine Keith Milam, was not the biological father of the child." Ex. 16 at 1.

After receiving this information, the ME immediately agreed with the State's assertion about A.C.'s injuries being bitemarks. 41 RR 170. Consequently, he requested that Dr. Robert Williams, SWIFS' chief forensic odontologist, participate in the autopsy. *Id.* at 167. Together, they tallied 24 injuries which they categorized as human bitemarks. *Id.* The ME swabbed the injuries for DNA analysis, which was also conducted by SWIFS.

At a pre-trial hearing held to determine the admissibility of Dr. Williams's opinions about who caused certain injuries to A.C., Dr. Williams testified that "[m]ost" of the contusion and abrasions on A.C.'s body "were not of evidentiary value" for bitemark comparison purposes. 6 RR 23, 60. He testified to his pattern "matching" methodology on four of the injuries: one on the lower left arm, one on the left knee, one on the right arm or right knee—he could not tell which—and one just above the left buttock. *Id.* at 31, 35, 40, 42. When testifying about the injury on either the right knee or arm, he acknowledged that, after conducting some of the comparisons, he had an expectation that he would conclude

that the pattern of other injuries would match Milam. *Id.* at 41. With regard to the injury on the left knee, he had "a question about, as far as the maxillary arch not fitting [Milam's teeth] uniquely and perfectly[.]" *Id.* at 66. As for the "other two,"[8] he testified "they seem to -- they fit to my subjective opinion." *Id.*

At that same hearing, the State informed Dr. Williams that the DNA analysis of swabs taken from some of the injuries was consistent with Milam's DNA profile. *Id.* at 50. The State emphasized the weight of this finding to Dr. Williams: "If there were swabs taken of some of these bite marks, okay, and if any of those swabs came out consistent DNA-wise with Blaine Milam and inconsistent with Jesseca Carson, would that further corroborate and confirm the results that you came up with?" *Id.* at 51. Dr. Williams responded that this was "a given." *Id.*

By the time of trial, and after being told that Milam's DNA was on certain injuries, Dr. Williams testified he could "match" *eight* of the injuries to Milam "to a reasonable degree of dental certainty," including the injury on A.C.'s left knee which he previously testified he had

---

[8] This appears to be a reference to the injury on the left lower arm and the injury on the left buttocks, as those were the other two injuries discussed during this exchange. 6 RR 66.

"questions" about. 43 RR 238. For several other injuries, he now testified that he could not exclude Milam. *See, e.g.*, 44 RR 266, 270, 273, 275; 45 RR 8. Critically, Dr. Williams testified that he could not exclude Milam—and even that he could match his dentition to a reasonable degree of dental certainty—to injuries he had previously assessed as being "not of evidentiary value." *See, e.g.,* 6 RR 60; *compare, e.g.*, 44 RR 234 *with* 45 RR 31.

Forensic analysis of physical evidence already compromised by law enforcement's poor processing of the scene was likewise infected with suspect-driven bias. SWIFS's analysts were told by the State that this case concerned the death of an infant, that Milam was the primary suspect, and that he was not A.C.'s biological father. Exs. 15 at 1; 16 at 1; 33 at 1; 36 at 1; 37 at 1. The impact of this biasing information is demonstrated by the inconsistency in SWIFS analyst Angela Fitzwater's methodology across various samples, for which there is "no scientifically supportable rationale[.]" Ex. 4 ¶39.

Notably, her interpretation of DNA results from item 20I, a swab from an injury on A.C.'s left elbow, emphasizes how evidence was interpreted to fit the State's theory that Milam was "the primary actor."

The electropherograms corresponding to item 20I established the presence of genetic markers corresponding to A.C., Milam, Carson, and Danny Milam. *See* Ex. 4, Attachment D. Many of these peaks corresponded to alleles shared by Milam and Carson, Carson and A.C. as mother and daughter, and Milam and Danny Milam as brothers. *See* Ex. 1 ¶31. Yet, contrary to SWIFS's SOPs and accepted standards of practice, Fitzwater selected which alleles to include in her calculations about the probability that Milam was a contributor based on whether those genetic markers were present in Milam's reference profile and without accounting for the degree of overlap between all possible contributors. Exs. 1 ¶¶32, 34; 4 ¶54. This approach is "categorically wrong" and amounts to "paint[ing] a target around the arrow." Ex. 1 ¶¶32, 34.

By adapting her process in this way, Fitzwater was able to testify—and the State to argue—that, although Carson could not be excluded in the DNA mixture present on a "bitemark," "the majority of the markers seen were consistent with Blaine Milam." 43 RR 75; 48 RR 39-40 ("[T]hat's the one that you heard from the lab that the DNA from the swab of that bite mark matches the defendant, that the alleles that are present are all his alleles, with a couple of small stray ones."). And, as set

out *infra*, this myopic focus on Milam continues to impact SWIFS's interpretation of the DNA evidence to this day.

The State's tunnel vision on Milam further dictated what testing was conducted. For example, based on Martin's observations of a large blood stain on the front of the jeans collected on December 11, 2008, the State speculated the jeans were worn by the perpetrator. 42 RR 203. Those jeans, however, were not in Milam's size. 48 RR 28-29. The State accordingly developed an unsupported theory that the jeans (which were in Danny Milam's size) belonged to Milam. *Id.* The State put the identity of the wearer of the blood-soaked jeans at issue. Yet, SWIFS did not swab the inside of the jeans to check for epithelial cells from the wearer or to obtain potential DNA. A SWIFS's forensic biologist testified that SWIFS "typically also take[s] a cutting from the inside of the waistband, since that's an area that would rub a bunch against whoever was wearing it, and send that off for DNA analysis." 43 RR 72. She agreed that she could have done so here but did not. *Id.* SWIFS thus omitted routine analysis to identify who may have worn the jeans.

## D. The State's Case at Trial

By the time of trial, witnesses and surveillance video established only that Milam and Carson were seen together at around 9:00 p.m. on December 1, 2008, at the National Truck Stop (where Carson falsely told law enforcement Milam went to purchase a metallic cross). 46 RR 99. A witness saw A.C. with them at that time. *Id.* at 96. The next time Milam and Carson were seen was around 9:00 a.m. on December 2, when they pawned items at Insta Cash Pawn. 42 RR 59-61. Sometime between 9:00 and 9:15, they stopped at On the Run gas station in Henderson, where Carson purchased cigarettes. 42 RR 96. Around 10:30 a.m., Milam called 911 from his mother's home to report that they had found A.C. injured and not breathing. 42 RR 105.

To fill in the gaps and cast Milam as "the primary actor," the State relied on (1) bitemark opinion testimony, (2) DNA evidence, and (3) serology and blood pattern evidence. The State also called a jail nurse who testified that Milam told her he had done "it." It is now known, however, that all this evidence is unreliable and therefore prejudicial.

## PROCEDURAL HISTORY

Milam was convicted of capital murder and sentenced to death in the 4th Judicial District Court of Rusk County, Texas, in May 2010. The Texas Court of Criminal Appeals ("TCCA") affirmed Milam's conviction and sentence on May 23, 2021. *Milam v. Texas*, No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. 2012). In state habeas, the TCCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief. *Ex parte Milam*, No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App. Sept. 11, 2013). Milam also sought federal habeas corpus relief, and this Court denied a Certificate of Appealability on May 10, 2018. *Milam v. Davis*, 733 F. App'x 781 (5th Cir. May 10, 2018).

The trial court set an execution date for Milam of January 15, 2019. On January 7, 2019, Milam filed a subsequent state habeas application raising, *inter alia*, a claim that his execution would violate the Eighth Amendment because he is intellectually disabled (*Atkins* claim) and a claim under Tex. Code Crim. Proc. art. 11.073 challenging the State's purported bitemark comparison evidence under then-current scientific standards. The TCCA stayed Milam's execution, authorized the *Atkins* and 11.073 claims, and remanded them to the trial court for merits

adjudication. *Ex parte Milam*, 2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019). The TCCA adopted the trial court's Findings of Fact and Conclusions of Law with limited exceptions and denied relief on July 1, 2020. *Ex parte Milam*, No. WR-79,322-02, 2020 WL 3635921 (Tex. Crim. App. July 1, 2020).

The trial court set an execution date for Milam of January 21, 2021. On October 2, 2020, Milam filed a Motion for Authorization to proceed in district court on an *Atkins* claim, which this Court denied on October 27. *In re Milam*, 883 F. App'x 796 (5th Cir. Oct. 27, 2020). In January 2021, the State's expert at trial, Dr. Timothy Proctor, produced a Report Addendum in which he opined that based on the available information and current diagnostic and legal standards, Milam met the criteria for an ID diagnosis. On January 13, 2021, Milam filed a subsequent state habeas application raising an *Atkins* claim based on the fact that every expert to have evaluated Milam for ID agreed he met the diagnostic criteria. The TCCA stayed the execution and remanded the *Atkins* claim to the trial court. *Ex parte Milam*, No. WR-79,322-04, 2021 WL 197088 (Tex. Crim. App. Jan. 15, 2021). The TCCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief on July 31,

2024. *Ex parte Milam*, No. WR-79,322-04, 2024 WL 3595749 (Tex. Crim. App. July 31, 2024).

The trial court set an execution date for Milam of September 25, 2025. On September 2, 2025, Milam filed a subsequent state habeas application.

## STATEMENT REGARDING PENDING LITIGATION

Milam's subsequent state habeas application, which includes the due process claim raised below, remains pending in the TCCA. He files this Motion now to comply with Fifth Circuit rule 8.10.

## CLAIMS FOR RELIEF

Under 28 U.S.C. §2244(b)(3)(C), this Court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of § 2244(b)." *In re Will*, 970 F.3d 536, 540-41 (5th Cir. 2020) (internal quotation omitted). At this stage, the petitioner need not prove that he meets §2244(b), nor that he is entitled to relief on the merits of his proposed claim. *Id.* at 541. Under §2244(b)(1)(B) specifically, he must make a prima facie showing that he has not previously presented his claim, that "the factual predicate for the claim could not have been

discovered previously through the exercise of due diligence," and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." The petitioner must also show that his claim has potential merit. *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006).

## I. Milam can make a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to proceed on the claim that the introduction of prejudicial evidence rendered his trial fundamentally unfair, in violation of Due Process.

New science establishes that Milam's conviction rests on unreliable and prejudicial forensic opinion testimony, the admission of which violates the Due Process Clause of the Fourteenth Amendment. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Kansas v. Carr*, 577 U.S. 108, 123 (2016); *Andrew v. White*, 145 S. Ct. 75, 80 (2025). False or unreliable forensic evidence has long been recognized as unduly prejudicial. *See, e.g.*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (observing that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it"); *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012) (remanding due process claim based "on what

new scientific evidence has proven to be fundamentally unreliable expert testimony" for evidentiary development); *In re Hill*, No. 20-3863, 2025 WL 903150, at **8, 14-15 (6th Cir. Mar. 25, 2025) (granting MFA and authorizing second or successive petition raising due process claim based on changes to interpretation of bitemark evidence).

Milam's trial, based on what is now known to be unreliable forensic opinion testimony, was fundamentally unfair. Milam has not previously raised this claim in a prior federal habeas petition. Section 2244(b)(1) therefore does not preclude authorization.

## A. The Due Process Clause claim has potential merit.

### 1. There is now a scientific consensus that all bitemark opinion testimony is junk science.

With a dearth of evidence that Milam played any role in causing A.C.'s death, the State placed tremendous weight on the opinions of its bitemark expert, Dr. Williams. He repeatedly testified that Milam's "unique" dentition matched the patterned impressions he identified. *See, e.g.,* 45 RR 19, 27-28, 52. Dr. Williams opined that Milam's dentition matched eight of these impressions—including at least one which he previously testified had little evidentiary value—with "the highest degree of confidence that [he] [has] in a match of [a] particular dentition

to a bite mark"—a "reasonable degree of dental certainty." *Id.* at 25, 27-28.

The State described this testimony as "the most significant aspect of the evidence here" and "the smoking gun in this case." 48 RR 38. It was Dr. Williams's testimony that "more than anything" told the jury Milam was not an "innocent bystander here at all, that he is truly guilty of capital murder." *Id.* at 41. In the State's words, Dr. Williams's testimony established "proof beyond a reasonable doubt." *Id.* at 42. But Dr. Williams's opinions are junk science.

In 2023, the scientific community reached a consensus that *no* opinion derived from bitemark comparison analysis—regardless of how it is framed—is scientifically reliable. This consensus is rooted in the National Institute of Standards and Technology's ("NIST") 2023 report entitled "Bitemark Analysis: A NIST Scientific Foundation Review."[9] Ex. 8 ¶ 17. That report results from a five-year study of bitemark evidence led by "odontologists, statisticians, legal professionals, forensic scientists, experts in standards and communications," who "reviewed, synthesized

---

[9] Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://nvlpubs.nist.gov/nistpubs/ir/2023/NIST.IR.8352.pdf.

and interpreted over 400 sources of information and considered input from a workshop" made up of "the forensic bitemark analysis community" itself. *Id.* ¶¶13-14. Based on this work, there is now a consensus that a*ny and all* opinions about the source of injuries on human skin based on comparing those injuries to human dentitions are not scientifically supportable. *Id.* ¶17. Specifically, "determinations made by experts in this area—including whether to exclude or not exclude an individual as the source of a bitemark as then-current ABFO guidelines permitted— are not scientifically reliable or valid." *Id.* ¶15.

Consequently, the NIST report "marks a shift from scientific scepticism towards bite mark comparison analysis to the establishment of a scientific consensus that no opinions purporting to individualize any given injury to a potential biter—whether to include or exclude—is scientifically supportable." Ex. 2 ¶27. As such, under "contemporary scientific understanding of bite mark evidence, none of the forensic odontology testimony . . . from Mr. Milam's trial purporting to include or exclude any person's dentition as having left injuries is scientifically reliable." *Id.* at 8. Thus, the State's "smoking gun"—the primary evidence

the State purported to have at his trial linking him to any participation in causing injuries to A.C.—is prejudicial junk science.

### 2. SWIFS has retracted DNA testimony relied on by the State to convict Milam.

To corroborate Dr. Willliams's opinion that Milam repeatedly bit A.C., the State presented extensive DNA testimony by SWIFS that Milam's DNA was on so-called bitemarks on A.C. 43 RR 133-35 (swabs 20A, 20Q, 20R). But, following a complaint to the Texas Forensic Science Commission that SWIFS's interpretations did not comport with current scientific understanding of DNA mixtures, SWIFS now concludes that the genetic markers detected on those swabs correspond to A.C. only. Ex. 12 at 9. Likewise, the State relied on SWIFS's testimony that only A.C.'s DNA was detected on a swab from Milam's shirt to argue that A.C.'s blood was on his shirt on the day of the offense. 48 RR 28. SWIFS now reports the presence of DNA from at least two contributors, with genetic markers corresponding to Milam, A.C., Carson, and Danny Milam. Ex. 12 at 7.

| | Trial | 2025 reinterpretation |
|---|---|---|
| 10AT1 (Milam's shirt) | Single-source profile corresponding to A.C. | Major-minor mixture. A.C., Carson, Danny |

| | | Milam, and Milam are included. |
|---|---|---|
| 20A (anterior neck) | Milam "possible contributor" | Single-source profile. A.C. is included. |
| 20Q (right upper forearm) | Milam "possible contributor" | Single-source profile. A.C. is included. |
| 20R (distal anterior right forearm) | Milam "possible contributor" | Single-source profile. A.C. is included. |

*See* Ex. 12. In short, by SWIFS's own admission, its trial testimony and the State's argument that DNA forensically linked Milam to the offense is false.

The State also emphasized SWIFS's testimony that Milam's DNA was present on a swab (20I) taken from an injury on A.C.'s left elbow. 48 RR 39. Notwithstanding that SWIFS did not conduct any testing to establish the presence of saliva, 43 RR 68-69, the State leaned into 20I as corroborative of Dr. Williams's bitemark opinion. 48 RR 39-40. At the time of trial, SWIFS reported that 20I was a mixture of "at least two contributors" and included Milam, A.C., and Carson as possible contributors. 43 RR 136. SWIFS now reports that 20I is a mixture of only two contributors: A.C. and Milam. Ex. 12 at 7.

But this reinterpretation finds no support in current understanding of DNA mixture interpretation and is demonstrably suspect-driven. *See* Ex. 3A ¶3.[10] Indeed, in its request for reinterpretation on August 1, 2025, the State made its expectations clear to SWIFS: "I know you appreciate everything about this case is weighty; not only because the defendant faces the ultimate punishment, but because I submit it is the most horrific torture ever perpetrated on an innocent baby in our history." Ex. 10. Under current understanding of DNA mixture interpretation, sample 20I should not be interpreted. Exs. 1A at 33; 3A at 2.

SWIFS also now makes explicit that DNA interpretations "do not provide information" regarding "how" or "when" DNA evidence was transferred. Ex. 12 at 8. SWIFS further cautions that:

> It is important to note that an individual who had direct contact with an item may not necessarily leave behind detectable DNA. Alternatively, DNA from an individual who never had direct contact with an Item may still be detected. Therefore, the DNA results presented in this report should be considered within the context of the case facts.

---

[10] Cynthia Cale, a DNA expert, has filed a complaint with the Texas Forensic Science Commission requesting investigation of SWIFS's reinterpretation based on serious scientific and methodological flaws that undermine certain of SWIFS's conclusions. *See* Ex. 3_B. That complaint is pending before the Commission.

*Id.*; *see* Ex. 1A ¶31 ("No DNA tests are currently able to distinguish between secondary transfer (such as the transfer of DNA through contamination events) or DNA present due to direct contact with an object."). SWIFS's corrected report thus establishes that whatever the presence of Milam on A.C. and vice versa, the DNA evidence does not corroborate the bitemark opinion testimony.[11] In short, SWIFS's corrected report establishes that, as well as its own DNA testimony now being known to be false, the State's argument to the jury that DNA evidence tied Milam to A.C.'s injuries is unreliable and prejudicial.

3. **Forensic testing never confirmed the presence of blood on any clothing known to be worn by Milam.**

The State also relied on the testimony of Martin, presented as a BPA expert, and a SWIFS serologist to argue to the jury that presumed blood on Milam's shirt collected on the day of the offense and blood on a

---

[11] That the DNA analysis does not corroborate the "bitemark" opinion testimony is further established by SWIFS' reinterpretation of swab 20C taken from an injury on A.C.'s chin. SWIFS now reports that A.C. and Milam are included and that Carson and Danny Milam are excluded. Ex. 12 at 7. But Dr. Williams testified that Milam was excluded from the corresponding injury, but that Carson was not. 44 RR 285. Hence, while Dr. Williams' testimony purporting to include or exclude individuals from the injuries on A.C. is not scientifically valid, the DNA results from 20C further demonstrates that the State's arguments that the DNA provides evidence about who is responsible for the injuries on A.C.'s body are entirely unsupportable.

pair of jeans collected on December 11 implicated Milam as the primary actor. 48 RR 28-29, 30. Martin testified to these opinions and the State so argued notwithstanding the facts that there was no evidence that Milam ever wore those jeans; that SWIFS could not confirm the presence of blood on Milam's shirt; and that only Carson's jacket had enough blood on it for SWIFS to confirm the presence of blood. 42 RR 34, 42.

Moreover, due to improper scene processing and contamination (including by releasing the scene), BPA cannot establish that the blood supports any activity-level propositions—that is, it cannot determine how the blood was deposited or whether it resulted from any particular offense-related activity. *See* Ex. 6 ¶74 ("[T]he mere presence of blood does not indicate the activity which led to it being deposited."). Yet the State repeatedly conflated the presence of presumed blood with particular supposed actions of Milam's. *See*, e.g., 48 RR 28-29 (State arguing that the presence of presumed blood on Milam's shirt and on the jeans recovered from the south bedroom linked Milam to the bloodletting activity).

Martin testified that the bloodstain on the jeans was a "contact transfer stain," 42 RR 203, and the State argued that this opinion

established that Milam was holding A.C. on his lap while she was bleeding, 48 RR 29-30. But Martin's flawed methodology cannot be used to support this rank speculation as his opinion was not grounded in methodologically sound analysis of the evidence. To permit such a conclusion, Martin's opinion would have required a "careful and systematic examination" to determine whether the jeans were being worn "at the time the blood was deposited" or were merely "present as an object in the location during bloodshed," and whether the stain's characteristics were consistent with "blunt forces applied to a blood source or active bleeding," as opposed to "coming into contact with the blood source or resuscitation efforts." Ex. 6 ¶¶61, 62. Neither Martin's reports, nor SWIFS's documentation, contains such analysis. *Id.* Moreover, denim presents particular interpretive challenges in stain assessment that Martin ignored. Porous textiles, like denim, create "inher[en]t limitations" on reliable BPA conclusions. *Id.* ¶63. Additionally, any reliable BPA conclusions regarding the jeans is prohibited by the fact that they were collected on December 13, nine days after the offense, and were demonstrably not present on December 4 in the location from which they were recovered. *See id.* ¶60.

Martin also did not document the patterns upon which he based his blood-pattern conclusions. BPA is detail-dependent, requiring the precise shape, size, distribution, and patterned appearance of stains to be documented and photographed with scales for comparison. Ex.6 ¶48. But many key items central to the State's narrative were either not photographed—like the jeans the State argued linked Milam to A.C.'s death—or lacked scales for reliable analysis. *Id.* ¶¶61, 67, 76.

Notably, Martin opined on the significance of blood patterns in determining where "blood events occurred" without taking into account any subsequent serology or DNA testing. 46 RR 7-22. In formulating his conclusions, Martin never reviewed "any scientific lab reports." 46 RR 186. For example, he testified he had observed "free-falling" "blood drops," *id.* at 16-17, without confirming that what he observed was indeed blood or accounting for negative DNA testing results of those samples. Ex. 6 ¶52. In other words, Martin offered a BPA opinion without ever confirming that the stains he observed were in fact blood.[12]

---

[12] Presumptive testing for blood was originally developed to detect blood in fecal matter, Ex. 6 ¶53. As Martin described, by the time he went to the scene, "[i]t was obvious, to the fecal matter on the floors and whatnot," that dogs and cats had been inside the home for the past nine days. *Id.* at 155-56.

Martin's investigation demonstrates a lack of competency in BPA procedures, including improper evidence collection methods, inconsistent and selective methodology, and failure to incorporate laboratory testing results. These concerns are compounded by the fact that the Smith County Sheriff's Office was—and remains—an unaccredited laboratory. *Id.* ¶48. Martin's opinions dressed up as forensic science are unreliable and prejudicial.

### B. This claim is based on new science.

Under §2244(b)(2)(B)(i), "due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record." *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). Milam can make a prima facie showing that he was diligent in developing facts establishing his trial was rendered unfair by the admission of prejudicial evidence.

First, the consensus that all bitemark opinion testimony—however it is framed—is junk science did not emerge until the 2023 NIST Bitemark Analysis Report. This report marks "the establishment of a scientific consensus that no opinions purporting to individualize any given injury to a potential biter—whether to include or exclude—is

scientifically supportable." Ex. 2 ¶27. Indeed, in 2020, the CCA concluded

in Milam's case that bitemark opinions that purport to include or exclude

an individual as the source of alleged bitemarks was still admissible.[13]

The NIST report now definitively establishes as a matter of consensus

that such opinions are invalid.

Second, the State did not request reinterpretation of the DNA

evidence until August 2025 and SWIFS accordingly did not recant its

prior testimony until August 12, 2025. *See* Ex. 12. Notably, SWIFS

notified the State in March 2016 of the likely need for reinterpretation of

the DNA evidence in Milam's case based on changes in the interpretation

of DNA mixtures. Ex. 19 at 2-5. In that notice provided only to the State,

SWIFS both recommended reinterpretation and requested that the State

make the same known to Milam. *Id.* The State, however, neither

requested reinterpretation nor informed Milam of this notice.[14] Instead,

---

[13] *See* WR-79,322-02, Second Supplemental Clerk's Record, State's Proposed Findings of Fact and Conclusions of Law ("FFCL") ¶153.

[14] The State responded the next day that the Attorney General's office had provided notice to the defense in 2015. Ex. 19 at 1. But the State could not have notified counsel for Milam in 2015 of SWIFS's reinterpretation notice it received only the day before—in March 2016. Instead, the State had notified Milam of a different issue regarding the FBI's changes to its population database in June 2015. Ex. 38 at 1. Unlike the changes in the mixture interpretation methodology, the correction to the FBI

the State continued to rely on what it knew was unreliable DNA evidence to uphold Milam's conviction in subsequent litigation in 2019-2020. *See, e.g.,* WR-79,322-02, State's Proposed FFCL ¶161.g.1 ("[T]he Court concludes this DNA evidence taken from injuries on her body more strongly points to Applicant as the contributor."). Milam only learned of this notice when the State turned over 4,000+ pages of DNA records on August 13, 2025. Milam had requested—and the State successfully blocked—access to these records in 2018, 2024, and 2025.[15]

Third, the unreliability of the BPA evidence likewise hinges on the formalization of best practices in the field of BPA, Ex. 6 ¶29, as well as recent literature on the vulnerabilities of BPA to bias; *see* Itiel E. Dror, *Bloodstain Pattern Analysis (BPA): Validity, reliability, cognitive bias, and error rate*, 65 Sci. & Just. at 5 (2025) (BPA falls within a "bias danger

---

database had no impact on the inclusion or exclusion of any individual from a given DNA sample.

[15] Based on his inability to access the complete DNA records, Milam brought a civil action under 42 U.S.C. §1983 alleging that the discretion Texas's post-conviction procedural regime affords the District Attorney to withhold evidence in the State's possession that Milam seeks to help prove his innocence operated to deprive him of due process. That litigation is pending on appeal in this Court. *See Milam v. Jimerson*, No. 25-70015.

zone because of its overall subjective nature," where organizational or personal factors have "greater leeway to bias and impact" the outcome).

Milam has thus made a prima facie showing of diligence.

## C. Milam can make a prima facie showing of innocence.

Innocence under §2244(b)(2)(B)(ii) has been described as "a strict form of 'innocence, roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley,* 505 U.S. 333 (1992)." *Will*, 970 F.3d at 544 (internal quotation omitted). At this stage, however, this Court does not need to determine whether Milam is actually innocent; instead, this Court considers "only [] whether there is possible merit to his claim that" §2244(b)(2)(B)(ii) is met. *Id.*

The State's evidence now establishes nothing more than Milam's presence in his home on the night of A.C.'s death. There is no reliable forensic evidence tying Milam to any injury on A.C. There is now a consensus that bitemark opinion testimony is junk science. SWIFS also recants much of the DNA analysis relied on by the State to corroborate the bitemark opinion testimony and rejects any assertion that DNA evidence establishes the "when" or "how" of events. And the BPA opinion testimony was unsupported by any methodology.

Milam's vague statement to a jail nurse at the county jail that he had done "it" also does not preclude a prima facie case of innocence. *See Will*, 970 F.3d at 548 (granting MFA pursuant to §2244(b)(2)(B) where movant had confessed to the offense). In closing, the State characterized this statement as "the gold standard of admissions." 48 RR 150. But, because of his low intellectual functioning, Milam was at heightened risk of doing exactly what he indicated to law enforcement he would do: take the blame for Carson. Indeed, he had openly contemplated doing so during his custodial statement. 59 RR SX E-2 (emphasis added) (And if I tell you, what if I tell you it was me *and I take the blame for somebody else*, will I be in trouble?).

Based on his IQ scores of 68 and 71, it was undisputed at Milam's trial that he had impaired intellectual functioning. *See infra* II. Research shows that individuals with deficits in intellectual functioning are at heightened risk for falsely admitting culpability. Notably, such persons have a propensity to be compliant and agreeable, which puts them at increased risk of "overstat[ing . . .] responsibility or involvement" or "eagerly assuming blame to please or curry favor." Ex. 5 at 4. This population also tends to be gullible, naïve, and overly trusting. *Id.* They

have a "reduced appreciation of the consequences of making false incriminating statements." *Id.* at 4. These characteristics contribute to an increased risk of false confessions, including protective false confessions, which are designed to protect someone else, such as a partner. *Id; see Hall v. Florida*, 572 U.S. 701, 709 (intellectually impaired persons are "more likely to give false confessions").

Milam possessed many of the core characteristics that make people in this population vulnerable to falsely admitting responsibility for something they did not do. A psychiatrist retained by the State at trial described Milam as "very naïve" and "extremely gullible." Ex. 29 at 12. Similarly, at Carson's trial, the State elicited testimony from Milam's former counsel that he was "one of the most naïve 17 or 18-year-old young men that [he] had ever met." *State v. Carson*, No. CR2009-067, 17 RR 141. And his custodial statement makes clear that he did not appreciate the consequences of "taking the blame" because he asked if he would "be in trouble" for doing so. SX E-2, 59 RR 58. Notably, in his vague statement, Milam did not provide any details of the facts of the offense by which a court can judge its reliability and veracity. *See* Ex. 5 at 5 (because of the risk of false confessions by those with intellectual

limitations, it is important for there to be "corroborating and credible evidence to accompany [a] confession").

There is no forensic evidence tying Milam to any of A.C.'s injuries, nor any evidence of a motive. By contrast, PMO evidence explains that Carson, experiencing immense fear from a visual perception disorder that caused her to believe her daughter was possessed, Ex. 24 at 28-29, lashed out and beat her child—or the demon—to death. That Carson was experiencing PMO-induced distortions in her daughter's face is corroborated by the ME's testimony, who described A.C.'s face injuries as one of "the first thing[s]" that "really jumped out" at him upon observing A.C.'s body. 41 RR 166-67.

Carson's genuine belief that A.C. was possessed by a demon—and the terror she experienced as a result—explain why she would harm A.C.[16] There is no comparable evidence about why Milam would commit

---

[16] Moreover, Carson's account of the events of that night—that Milam performed an exorcism that killed her daughter—is further undermined by her description of her behavior that night, which wholly lacks credibility. She insisted that, while Milam purportedly exorcised a demon from her infant daughter in the next room of their tiny trailer, she slept, watched television, and took a bath. Ex. 24 at 26; *State v. Carson*, No. CR2009-067, 16 RR 196. At Carson's trial, the State made clear her alleged behavior was inexplicable. *Id.* at 18 RR 39.

such an offense. Instead, the evidence supports that Milam tried to respond to the circumstances created by his highly distressed fiancée. Importantly, when Carson's blame-shifting statements—including her demonstrable lies that Milam purchased a metallic cross to use for an exorcism and that he locked himself and A.C. in a bedroom without a lock—are properly assessed through the lens of PMO evidence, only one reasonable interpretation of the evidence remains: Milam never attempted to perform an exorcism on A.C. Instead, he unsuccessfully tried to care for and protect A.C. while PMO caused her mother to believe that A.C. was possessed.[17] With this as her reality, Carson preferred that A.C. "go to heaven now [rather] than spend a life with Satan having her soul and her going to hell afterwards for something she hasn't even done." 40 RR 48.

Milam has thus made a prima facie showing that he is innocent by clear and convincing evidence because, but for the State's prejudicial and

---

[17] Instead of letting Carson see A.C. in person, Milam took a picture of A.C. to show it to her "[j]ust in case, you know, it scares you, you won't, you know, actually see her, you'll just see a picture." Ex. 24 at 89-90. But Carson still saw her daughter's features warped down, and her eye was like stretched and stuff, and it was really freaky." *Id.* Carson also reported to authorities that Milam had given A.C. a bottle with sleeping pills so she would sleep, likely an effort to keep A.C. quiet and out of Carson's mind. *See* 41 RR 199.

unreliable evidence, no reasonable juror would have convicted him. Because Milam has made a prima facie showing that he meets §2244(b)(2)(B), this Court should authorize this claim to proceed in district court.

## II. Milam has made a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to receive authorization on the claim that his death sentence violates the Eighth Amendment because he is intellectually disabled.

Milam is intellectually disabled and seeks authorization to proceed on an *Atkins* claim pursuant to §2244(b)(2)(B) because he is innocent of the death penalty. His death sentence therefore violates the Eighth and Fourteenth Amendments. To establish ID, a petitioner must show: (A) deficits in intellectual functioning, (B) deficits in adaptive functioning, and (C) the presence of these deficits in the developmental period. *See Moore v. Texas*, 581 U.S. 1, 20-21 (2017). In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court reasoned that intellectually disabled persons should not be sentenced to death because of their "diminished capacities to understand and process information, to communicate . . . to understand the reactions of others" and because of a heightened risk "of false confessions." *Id.* at 320. These risks were realized in this case: Milam is intellectually disabled and innocent.

Milam has not previously raised an intellectual disability claim in a prior federal habeas petition. Section 2244(b)(1) therefore does not bar authorization.

## A. The State's trial expert diagnosed Milam with intellectual disability in 2021.

In January 2021, the State's trial expert, Dr. Proctor, produced a report concluding that Milam met the criteria for an ID diagnosis. Ex. 41. Dr. Proctor had evaluated Milam pre-trial in 2010 and concluded that, under then-existing criteria, Milam did not meet ID diagnostic criteria because those deficits could be attributed to Milam's low level of education—now recognized to be a risk factor for ID. *See id.* at 5; *see also Moore*, 581 U.S. at 16 ("Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination."). In January 2021, Dr. Proctor revised that opinion based on "the information currently available to [him] and the relevant diagnostic nomenclature and law at this time." Ex. 41 at 6. Thus, every expert who evaluated Milam under current clinical criteria agreed that at the time of trial he had deficits in intellectual and adaptive functioning, and that those deficits were present in the developmental period. After Dr. Proctor revised his opinion, the State jettisoned him and

retained Dr. Antoinette McGarrahan to re-administer IQ testing to Milam in September 2021.

A defense-retained expert and Dr. Proctor administered the WAIS-IV to Milam pre-trial, and he obtained full-scale IQ (FSIQ) scores of 68 and 71 respectively. Ex. 41 at 4. On Dr. McGarrahan's re-administration, Milam obtained a FSIQ of 80, which Dr. McGarrahan adjusted to 75 to account for the WAIS-IV being 14 years past the norming date. 2 SHRR 64-66. [18] Drs. Proctor and McGarrahan, as well as Milam's experts, agree that all of Milam's FSIQ scores on the WAIS-IV fall within the range——75 or below—for establishing deficits in intellectual functioning under the DSM-5-TR. 1 SHRR 53, 150; 2 SHRR 45, 78.

In the course of his pre-trial evaluation and in accordance with clinical standards, Dr. Proctor assessed Milam's adaptive functioning across the three domains of adaptive functioning: conceptual, social, and practical. Dr. Proctor's assessment was based on a clinical interview of Milam, neuropsychological testing, and interviews with lay persons who knew Milam in the developmental period. 1 SHRR 41, 42, 48; 2021

---

[18] The convicting court held an evidentiary hearing over 2 days on Milam's *Atkins* claim in May 2023. He cites to the Reporter's Record from that hearing as [Vol.] SHRR [page].

Application, Ex. 15 at 2, 3, 16. Based on this comprehensive assessment, Dr. Proctor concluded that Milam had deficits in the conceptual domain. 1 SHRR 47-48; Ex. 41 at 5 (describing "significant deficits" in the conceptual domain). A defense-retained expert in post-conviction also administered standardized adaptive functioning testing to Milam's mother and sister, and concluded that Milam had deficits across all three domains of adaptive functioning. 2021 Application, Ex. 5.

Dr. McGarrahan likewise administered neuropsychological testing to Milam, on which she observed "difficulties with planning and problem solving, nonverbal abstract reasoning, making decisions, those sorts of things." 2 SHRR 48. She also reported the presence of moderate to severe impairments in executive functioning. *Id.* She concluded based on a partial IQ score—and despite a FSIQ that fell within the range for ID—that Milam did not have deficits in intellectual functioning. She also did not conduct an adaptive functioning assessment in accordance with current clinical criteria. She concluded that based on Milam's scores on a test of academic achievement, he did not have deficits in the conceptual domain. Her report does not include a discussion of the social and

practical domains. Dr. McGarrahan did "not dispute" Dr. Proctor's testing but ruled out ID.

Dr. Proctor concluded that Milam's deficits in intellectual and adaptive functioning were present in the developmental period. He based this conclusion on the fact that he conducted his assessment in 2010, when Milam was 19 and therefore just beyond the developmental period. Under current clinical criteria, Milam has made a prima facie showing of ID: (A) There is consensus expert testimony that his full-scale IQ scores on the WAIS-IV fall within the range for establishing intellectual functioning deficits; (B) Based on a comprehensive assessment of all domains of adaptive functioning, Dr. Proctor found the presence of "significant deficits" in the conceptual domain; (C) And those deficits were present in the developmental period.

## B. Milam diligently pursued ID evidence.

Dr. Proctor's declaration that Milam did meet the criteria for a diagnosis of intellectual disability could not have been discovered previously through the exercise of due diligence. 28 U.S.C. §2244(b)(2)(B)(i). In prior *Atkins* litigation in 2019-2021, the State represented to the state courts, this Court, and the Supreme Court that

Dr. Proctor's opinion was that Milam did not meet the criteria for an ID diagnosis. Notably, the State argued that Dr. Proctor's opinion was more reliable and credible than opinions offered by Milam's experts to defeat Milam's *Atkins* claim. *See, e.g.*, WR-79,322-02, FFCL ¶232.

Milam reasonably relied on these representations by the State in state and federal courts. *See Banks v. Dretke*, 540 U.S. 668, 692-93 (2004). Milam was, of course, not privy to the State's communications with its expert and accordingly had no notice that Dr. Proctor's opinion had evolved since trial. Milam could not have known that the State had failed to confirm the veracity of its representations concerning its expert's opinion and he can therefore establish a prima facie case that he was diligent in obtaining this evidence. *See In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) ("[T]his claim rests not on the correctness of her testimony (which could have been disputed at any time) but on the State's interactions with its witness, which could not be known before her affidavit.").

### C. Milam can make a prima facie showing of innocence of the death penalty.

Milam acknowledges that §2244(b)(2)(B)(ii) envisages a showing of innocence of "the underlying offense" and that this Court has limited the

application of a like-provision accordingly. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) (holding that 28 U.S.C. §2255(h) requires evidence negating "guilt of the offense"). This Court's precedent was predicated on its assumption that the *Sawyer* exception did not survive AEDPA. *Webster*, 605 F.3d at 258. Two factors, however, weigh in favor of recognizing the application of §2244(b)(2)(B)(ii) to innocence of the death penalty. First, this category of innocence is well established in relevant case law. *See Sawyer v Whitley*, 505 U.S. 333, 344 (1992).

Second, and relatedly, this Court's relevant precedent predates the Supreme Court's holding in *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) that the miscarriage of justice exception based on innocence of the death penalty in *Sawyer v. Whitley*, 505 U.S. 333 (1992) *does* survive AEDPA. Milam therefore asks that this Court revisit its precedent accordingly.

Because Milam has made a prima facie showing that he meets §2244(b)(2)(B), this Court should authorize this claim to proceed in district court.

## III. Milam is actually innocent.

Milam's conviction and sentence violate the Eighth Amendment prohibition against cruel and unusual punishment and the Fourteenth

Amendment's Due Process Clause because he is actually innocent. Milam acknowledges that the Supreme Court has previously rejected actual innocence as a basis for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 393 (1993); *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (accord). The Supreme Court, however, also assumed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. It cautioned that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. For all the reasons stated above, including the absence of any forensic evidence tying Milam to the offense and a clear motive for why Carson killed her daughter, there is potential merit to Milam's claim that he can meet that burden.

He incorporates by reference all evidence and arguments made, *supra*, Claim I in support of making a prima facie showing of diligence and innocence sufficient to satisfy §2244(b)(2)(B).

## IV. Milam can make a prima facie showing that the statute of limitations can be excused based on actual innocence.

Notwithstanding arguments that Milam can meet 28 U.S.C. §2244(d)(1), the statute of limitations may be excused because Milam can show that he is actually innocent. *McQuiggin v. Perkins*, 569 U.S. 383, 392–93 (2013); *see also*, *id.* at 399 (holding that statute of limitations may be excused where petitioner can show that "'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" (quoting *Schlup*, 513 U.S. at 327)). Milam incorporates here by reference all facts and legal arguments made above in support of making a prima facie showing that he can meet 28 U.S.C. §2244(b)(2)(B) as to his claims. Because Milam has alleged a "viable basis" for excusing the statute of limitations, this Court should permit him to proceed on his argument that the statute of limitations can be excused based on his actual innocence. *In re Campbell*, 750 F.3d 523, 533 (5th Cir. 2014).

## PRAYER FOR RELIEF

For the reasons stated, Milam respectfully requests that this Court authorize his claims to proceed in district court.

Respectfully submitted,

DATED: 17 September, 2025

/s/ Naomi Fenwick

Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
jeremy_schepers@fd.org
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
(214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
efollansbee@texasdefender.org
Jennae R Swiergula
Texas State Bar No. 24104466
jswiergula@texasdefender.org
Texas Defender Service
9390 Research Blvd., II, Ste. 210
Austin, Texas 78759
Tel: (512) 320-8300

*Counsel for Mr. Milam*

## CERTIFICATE OF COMPLIANCE

I certify that (1) this Motion was prepared in 14-point Century Schoolbook font using Microsoft Word software, (2) this Motion is 13,743 words, excluding the parts of the Motion exempted by the rules of court, and (3) this Motion has been scanned for viruses and the Motion is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

/s/ Naomi Fenwick
Naomi Fenwick

## CERTIFICATE OF CONFERENCE

I certify that on September 16, 2025, I conferred by email with Tomee Heining, counsel of record for the Respondent. She informed me that the Respondent is opposed to the relief requested.

/s/ Naomi Fenwick
Naomi Fenwick

## CERTIFICATE OF SERVICE

I certify that on September 17, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I have also sent a copy via email to counsel for the Director, Tomee Heining, tomee.heining@oag.texas.gov.

/s/ Naomi Fenwick
Naomi Fenwick

No. _____

# In the
# United States Court of Appeals
## For the Fifth Circuit

In re Blaine Milam,

Movant.

## PROPOSED PETITION IN SUPPORT OF MOTION FOR AUTHORIZATION

Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
jeremy_schepers@fd.org
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
Tel: (214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
Jennae R Swiergula
Texas State Bar No. 24104466
efollansbee@texasdefender.org
jswiergula@texasdefender.org
Texas Defender Service
P.O. Box 82236
Austin, TX 78708
Tel: 512-320-8300
Fax: 512-477-2153

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

**BLAINE MILAM,**                                    Case No.

     Petitioner,

  *v.*

**ERIC GUERRERO, Director,**

Texas Department of

Criminal Justice,

Correctional Institutions Division,

     Respondent.

---

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

---

### THIS IS A CAPITAL CASE

---

Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
jeremy_schepers@fd.org
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
Tel: (214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
Jennae R Swiergula
Texas State Bar No. 24104466
efollansbee@texasdefender.org
jswiergula@texasdefender.org
Texas Defender Service
9390 Research Blvd., II, Ste. 210
Austin, Texas 78759
Tel: (512) 320-8300

*Counsel for Blaine Milam*

**SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254**

Petitioner Blaine Milam, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS....**Error! Bookmark not defined.**

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF THE CASE ............................................................... 1

    A. Carson and Milam's Relationship ...............................................5

        1. Carson was undisputedly higher functioning and more sophisticated than Milam. ..........................................................5

        2. All evidence demonstrated that Milam loved A.C. and had no motive to harm her. ...................................................................7

    B. Changes in Carson Precipitating the Offense .............................9

        1. Carson's mental health deteriorates and she withdraws from A.C. ..............................................................................................9

        2. Carson experienced terrifying visual distortions that led her to kill A.C. ........................................................................................11

        3. Carson fabricated a story and shifted blame away from herself. .......................................................................................................20

    C. The Investigation Was Unreliable and Designed to Obtain a Conviction Against Milam .........................................................22

        1. Despite Carson's bizarre story, the investigation immediately focused on Milam.....................................................................22

        2. Scene contamination and bias in the forensic workup............24

    D. The State's Case at Trial ............................................................33

PROCEDURAL HISTORY....................................................................34

STATEMENT REGARDING PENDING LITIGATION ........................36

CLAIMS FOR RELIEF..........................................................................36

   I. Milam can make a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to proceed on the claim that the introduction of prejudicial evidence rendered his trial fundamentally unfair, in violation of Due Process. .......................37

    A.  The Due Process Clause claim has potential merit. ................... 38

        1.  There is now a scientific consensus that all bitemark opinion testimony is junk science. ........................................... 38

        2.  SWIFS has retracted DNA testimony relied on by the State to convict Milam. ............................................................. 41

        3.  Forensic testing never confirmed the presence of blood on any clothing known to be worn by Milam. ...................................... 44

    B.  This claim is based on new science ............................................. 48

    C.  Milam can make a prima facie showing of innocence. ............... 51

II.  Milam has made a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to receive authorization on the claim that his death sentence violates the Eighth Amendment because he is intellectually disabled. ............................................. 56

    A.  The State's trial expert diagnosed Milam with intellectual disability in 2021. ....................................................................... 57

    B.  Milam diligently pursued ID evidence. ...................................... 60

    C.  Milam can make a prima facie showing of innocence of the death penalty. ...................................................................................... 61

III.  Milam is actually innocent. ....................................................... 62

IV.  Milam can make a prima facie showing that the statute of limitations can be excused based on actual innocence. .............. 64

PRAYER FOR RELIEF ......................................................................... 64

CERTIFICATE OF COMPLIANCE .... **Error! Bookmark not defined.**

CERTIFICATE OF CONFERENCE .... **Error! Bookmark not defined.**

CERTIFICATE OF SERVICE ............. **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrew v. White,*
145 S. Ct. 75 (2025) .................................................................. 37

*Atkins v. Virginia,*
536 U.S. 304 (2002) ....................................... 34, 35, 56, 58

*Banks v. Dretke,*
540 U.S. 668 (2004) ............................................................. 61

*In re Campbell,*
750 F.3d 523 (5th Cir. 2014) ............................................. 64

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ............................................................. 37

*Graves v. Cockrell,*
351 F.3d 143 (5th Cir. 2003) ............................................. 63

*Hall v. Florida,*
572 U.S. 701 ........................................................................ 53

*In re Henderson,*
462 F.3d 413 (5th Cir. 2006) ............................................. 37

*Herrera v. Collins,*
506 U.S. 390 (1993) ............................................................. 63

*In re Hill,*
No. 20-3863, 2025 WL 903150 (6th Cir. Mar. 25, 2025) .................... 37

*Johnson v. Dretke,*
442 F.3d 901 (5th Cir. 2006) ............................................. 48

*Kansas v. Carr,*
577 U.S. 108 (2016) ............................................................. 37

*Lee v. Glunt*,
  667 F.3d 397 (3d Cir. 2012) ............................................................. 37

*McQuiggin v. Perkins*,
  569 U.S. 383 (2013) .................................................................... 62, 64

*Milam v. Jimerson*,
  No. 25-70015 (5th Cir. Sept. 10, 2025) ............................................. 50

*Milam v. Lumpkin*,
  No. 20-8253 (Aug. 9, 2021) ............................................................. 61

*Milam v. Texas*,
  No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. 2012) .... 34, 38, 57

*Ex parte Milam*,
  2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019) ............................. 34

*In re Milam*,
  883 F. App'x 796 (5th Cir. Oct. 27, 2020) ......................................... 35

*Ex parte Milam*,
  No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App.
  Sept. 11, 2013) ................................................................................ 34

*Ex parte Milam*,
  No. WR-79,322-02, 2020 WL 3635921 (Tex. Crim. App.
  July 1, 2020) .................................................................................... 35

*Ex parte Milam*,
  No. WR-79,322-04, 2021 WL 197088 (Tex. Crim. App. Jan.
  15, 2021) ......................................................................................... 35

*Ex parte Milam*,
  No. WR-79,322-04, 2024 WL 3595749 (Tex. Crim. App.
  July 31, 2024) .................................................................................. 35

*Moore v. Texas*,
  581 U.S. 1 (2017) ........................................................................ 56, 57

*Payne v. Tennessee,*
    501 U.S. 808 (1991) ................................................................ 37

*Sawyer v. Whitley,*
    505 U.S. 333 (1992) ............................................................ 51, 62

*State v. Carson,*
    No. CR2009-067 ............................................................ *passim*

*In re Swearingen,*
    556 F.3d 344 (5th Cir. 2009) ................................................. 61

*In re Webster,*
    605 F.3d 256 (5th Cir. 2010) ................................................. 62

*In re Will,*
    970 F.3d 536 (5th Cir. 2020) ............................................ 36, 51

**Statutes**

28 U.S.C. 2244 ................................................................ *passim*

28 U.S.C. 2255 .......................................................................... 62

42 U.S.C. 1983 .......................................................................... 50

Tex. Code Crim. Proc. art. 11.073 ........................................... 34

**Constitutional Provisions**

U.S. CONST. AMEND. VIII ........................................... 34, 56, 63

U.S. CONST. AMEND. XIV ....................................... 37, 38, 56, 63

**Other Authorities**

CNN, *It's like staring at demons,*
    https://www.cnn.com/2024/03/22/health/demon-faces-
    prosopometamorphopsia-wellness; .................................... 15

Jan Blom, et al., *A Century of Prosopometaphopsia Studies,*
    139 Cortex 298 (2021) ......................................................... 18

John C. M. Brust and Myles M. Behrens, *"Release Hallucinations" as the Major Symptom of Posterior Cerebral Artery Occlusion: a Report of 2 Cases*, 2 Annals of Neurology 432 (1977) ........................................................ 18

NBC News, *Rare Disorder Causes Man to See People's Faces as Demonic*, https://www.nbcnews.com/health/health-news/disorder-man-sees-demonic-faces-rcna144533......................... 15

NPR, *How Are You Not Seeing This?*, https://www.thisamericanlife.org/840/how-are-you-not-seeing-this .................................................................. 15, 16

WebMD, Demon Face Syndrome, https://www.webmd.com/brain/prosopometamorphopsia ................. 14

## STATEMENT OF THE CASE

Blaine Milam is innocent and intellectually disabled. He was wrongfully convicted of capital murder and sentenced to death in Rusk County in 2010 for the tragic death of A.C., the thirteen-month-old daughter of his then-fiancée, Jesseca Carson. In fact, it was Carson who caused her daughter's death. There is no credible evidence that Milam played any role in it. However, in seeking Milam's conviction, the State entirely failed to consider that Carson was the perpetrator despite Carson's telling a bizarre story that A.C. was possessed by a demon—a story Carson alone told; her increasingly disturbed beliefs and behaviors in the months leading up to A.C.'s death; and her demonstrable lies that inculpated Milam and exculpated herself. Instead, for the sole stated reason that Milam was the only man in the house, authorities immediately leapt to the conclusion that he—and not Carson—caused A.C.'s death. They persisted on this path even though nothing in their investigation provided any reason why Milam would commit such a horrific crime. Instead, witnesses including Carson, consistently reported that Milam adored A.C., treated her as his own daughter, and had stepped up to take care of her as Carson's mental health deteriorated.

Carson told authorities a story untethered from reality about demon possession and exorcism. Regardless, the State adopted Carson's narrative that Milam had convinced Carson her daughter was possessed and that she merely acquiesced to his brutal assault of A.C. as its theory of the case. But new evidence about a rare, but well-documented, neurological visual-perception disorder called prosopometamorphopsia ("PMO") places Carson's statements (and the State's theory of the case) in an entirely different light. Carson's descriptions of both A.C.'s and Milam's faces during what she believed were demonic possessions are consistent with this disorder. PMO causes people afflicted with it to see people's faces as distorted or "warped." Sufferers often describe the distorted faces as malevolent and "demon"-like.

The experience of PMO is terrifying. It would be especially terrifying for a person who was already experiencing documented religious delusions, who believed in demon possession, and who had no other available explanation for what she was experiencing. PMO provides a reason why Carson—and not Milam—would have beaten and strangled her own daughter to death. Carson herself told authorities that she would rather see A.C. "go to heaven now than to . . . have Satan have

her soul and her go to hell when she gets older . . . when she dies even if she hasn't done anything." Ex. 24 at 29.

However, because the State was singularly focused on Milam, it failed to critically interrogate Carson's story and instead tried to force a square peg into a round hole. The State's prejudgment of Milam's guilt was compounded by Milam's intellectual disability ("ID"), which inhibited his ability to counter Carson's narrative. On IQ testing administered by the defense and the State shortly after Milam's arrest, he obtained IQ scores of 71 and 68 respectively. A psychiatrist retained by the State who examined him pre-trial observed that Milam "clearly has intellectual limitations" and "has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 29 at 13-14.

These characteristics contributed to Milam's inability to tell his side of the story while Carson deftly told her side—an invented story of Milam attempting to perform an exorcism—adopted by the State as its own. Milam's vulnerabilities turned this case from a he-said-she-said case into a she-said case. While Milam spent his time during interviews with authorities naively protecting Carson, Carson spent her time with authorities weaving a tale that placed the blame on Milam and negated

her culpability. Even though authorities established that Carson lied about important details in her story, it nevertheless remained the State's story because it was the only story it had that implicated Milam.

Consequently, law enforcement conducted a forensic investigation designed to produce evidence that supported Carson's narrative that Milam caused A.C.'s death. But new evidence entirely eliminates or undermines the forensic evidence the State used to try to establish that Milam injured A.C. At trial, the State emphasized bitemark opinion testimony that is now considered discredited in its entirety. The State also relied on DNA evidence to corroborate its bitemark opinion testimony. That evidence has since been retracted by the Southwestern Institute of Forensic Sciences ("SWIFS"). SWIFS also rejects the argument that the presence of DNA provides any information about how or when an individual's DNA is deposited on a surface. Likewise, the blood pattern analysis ("BPA") testimony, which the State relied on for its theory of how the offense occurred, was shoddy and demonstrably unreliable.

The only evidence the State currently possesses that Milam played any role—whether as a principal or a party—in causing A.C.'s death is

his vague oral admission to a jail nurse of having done "it." But this admission is most reasonably understood in light of all the evidence as a naïve attempt by an intellectually disabled person to protect Carson. Indeed, in January 2021, the State's trial expert, Dr. Timothy Proctor, agreed that "[b]ased on the information currently available to me and the relevant diagnostic nomenclature and law at this time, it is my opinion that Mr. Milam meets criteria for intellectual disability." Ex. 41 at 6.

The State's case today establishes nothing more than Milam's presence in his own home on the night of A.C.'s death. And the remaining evidence of who was responsible for A.C.'s death—Carson's and Milam's custodial statements—points strongly to Carson as the perpetrator.

## A. Carson and Milam's Relationship

### 1. Carson was undisputedly higher functioning and more sophisticated than Milam.

To convince Milam's jury that Milam had fatally injured A.C. while Carson did nothing to intervene, the State cast him as the dominant person in his relationship with Carson. But the State's theory of their relationship at Milam's trial did not square with its theory at Carson's trial. Nor did it square with reality. At Carson's trial, the State portrayed Carson as the savvier one, whose intelligence far exceeded Milam's.

Carson's mother testified that Carson was "a strong willed girl" who was "significantly more intelligent" than Milam. *State v. Carson*, No. CR2009-067, 14 RR 171-72, 174-76. Likewise, Texas Ranger Kenny Ray—who interviewed both Milam and Carson—testified that Carson was "by far" the more intelligent of the two. *Id.* at 17 RR 117. The State itself characterized Milam as "dumb" and "ignorant[.]" *Id.* at 18 RR 37.

In light of Carson's higher degree of sophistication, the State told Carson's jury that it was implausible that Milam instigated the offense and tricked Carson into not intervening:

> From the objective evidence that you heard, the objective evidence, not just what she said, which is the more likely scenario? That Blaine Milam brainwashed Jesseca Carson into all of this and manipulated her and duped her or that she is the one where all of this originated? Ask yourself that question. Look at the objective evidence . . . . . She's the one. She's the one.

*Id.* at 18 RR 36-37.

The State's presentation about the nature of Milam's relationship with Carson at her trial was consistent with overwhelming evidence. When Milam met Carson, he was a socially isolated eighteen-year-old described by the few who knew him as naïve, awkward, and "slow." 51 RR 14, 32. Even as a young child, his grade-school teachers described him as shy and socially inept. *Id.* He had few friends in school. 53 RR 220. His

6

social isolation was worsened when his parents removed him from school around the fourth grade. 51 RR 39. Milam spent most of his childhood isolated in his family's rural Rusk County trailer watching tv with his seriously ill father while his mother worked at the Dollar Store to support the family. *Id.* at 259.

Carson earned good grades and graduated high school. *See, e.g.*, *State v. Carson*, No. CR2009-067, 16 RR 122, 125. Milam, on the other hand, has little schooling and has IQ scores in the ID range. A psychiatrist retained by the State who examined him pre-trial observed that Milam "clearly has intellectual limitations" and "has very simplistic ideas, is very naïve, extremely gullible, easily led . . . ." Ex. 29 at 13-14.

## 2. All evidence demonstrated that Milam loved A.C. and had no motive to harm her.

In early 2008, Milam met Carson—his first and only serious girlfriend—through the website MySpace. 51 RR 283. Soon their online relationship developed in the real world. Within a few months, he proposed marriage. After Carson graduated high school, the couple moved into their own apartment, a short drive from Milam's mother's trailer home. 50 RR 33; 51 RR 298.

By all accounts, Milam was "ecstatic about having [A.C.] around" and embraced the role of father. 51 RR 292. No evidence suggested he ever mistreated A.C. Instead, all the evidence reflected that Milam had a loving relationship with her. Carson's mother, Heather Wilkes, testified at Carson's trial that she (Wilkes) had no concerns about Milam's treatment of A.C. and that he helped care for her. *Id.* at 14 RR 160-70. Milam's former boss, who became Carson's friend and assisted with her defense at her trial, likewise observed that Milam "had a good relationship with [A.C.]" *Id.* at 15 RR 44. The most zealous advocate of Milam's loving relationship with A.C. was Carson herself. Throughout her statements to authorities, Carson insisted that Milam loved A.C. and would not have hurt her. *See, e.g.*, Exs. 25 at 13-14, 38; 24 at 36, 38, 42; *see also State v. Carson*, No. CR2009-067, 16 RR 135, 173, 201.

The State had nothing explaining why Milam would abruptly flip from being a loving father figure to A.C. to horrifically assaulting her, causing prosecutors to disclaim "throughout [the trial they are not] required to prove motive." 48 RR 144.

## B. Changes in Carson Precipitating the Offense

### 1. Carson's mental health deteriorates and she withdraws from A.C.

What does have explanatory power, however, are Carson's bizarre beliefs and behavior, which ultimately—and tragically—became focused on A.C. Around September 2008, a few months before A.C.'s murder, Carson's friends and family noticed increasingly strange and erratic behavior from her. 46 RR 41; 51 RR 304. Whereas she had once been outgoing and friendly, she became withdrawn and disheveled. 46 RR 41. Although her friends and family did not recognize this, witness accounts of Carson's demeanor and behavior during this time reflect symptoms consistent with psychosis and depression. 46 RR 261-62. Shortly after Milam's father's died that year, Carson came to believe that she and Milam could communicate with their deceased fathers through a Ouija board. Ex. 25 at 80-81. Carson's father had committed suicide when she was a child, but she claimed the Ouija board revealed to her that her father had been murdered by her mother and that the murder weapon was buried in Alabama. Ex. 25 at 27, 90-92. This delusion is documented in police reports and witness statements in the months leading up to A.C.'s death.

In October, Carson began making harassing phone calls to her mother Heather Wilkes, accusing Wilkes of killing her father. According to a police report filed by Wilkes, Carson threatened her, "[Y]ou'll pay for what you did to my Dad." These calls continued several times a day at all hours of the day and night. Ex. 28 at 1-2. In an email, sent October 4, Carson again accused Wilkes of killing Carson's father and trying to poison her and A.C. Ex. 26.

Later that October, Carson took Milam and A.C. to Alabama on an investigative mission. 46 RR 204. They stayed one night with the family of her best friend, Tiffany Taylor. Lori Taylor, Tiffany's mother, recounted to law enforcement that Carson told her she was using a Ouija board and had proof that her mom had killed her dad and made it look like a suicide. Ex. 27 at 4. Carson said she came to Alabama to look for the gun her mom had used to kill her father, which Carson believed was buried at a relative's house. *Id.* at 5. Taylor further stated that Carson "gave her the names of who helped" and told Taylor that her mom was threatening her and Milam. *Id.* Carson said her mom had put rat poison in Carson's and Milam's food and in A.C.'s bottle. *Id.* at 4-5. Soon after, Carson returned to Texas with Milam and her daughter in tow.

In November 2008, Carson's mother filed another police report complaining that her daughter was harassing and threatening her. *See* Ex. 28 at 6-7. Carson continued to call and text her mother and grandmother several times a night. Frequently, Carson would call and immediately hang up.

That same month, Carson took Milam and A.C. back to Alabama. Friends who saw Carson during this time became concerned that she appeared disinterested and disconnected from her daughter. 46 RR 210-11. Lori Taylor recounted that Milam was the one who fed and changed A.C. 46 RR 209. Carson did not act "like you would expect a new mother to be taking care of her baby." *Id.* at 210-11. Taylor also reported that Carson seemed "weird, hollow," and "empty." *Id.* at 209. She described looking into Carson's eyes was "like looking into a dark space." *Id.*

### 2. Carson experienced terrifying visual distortions that led her to kill A.C.

At about 10:30 a.m. on December 2, 2008, emergency services received a call from Milam reporting that A.C. was not breathing. 42 RR 105. Milam described to the 911 operator that he and Carson had held A.C. after finding her and that he had attempted "mouth-to-mouth and CPR." *Id.* The 911 operator instructed them to bring A.C. to the phone so

the operator could talk them through giving CPR again. *Id.* Based on the operator's instructions, Milam looked into A.C.'s mouth to check that her airway was not obstructed and then pinched her nose and blew breaths into her mouth and to give hard and fast chest compressions. *Id.* Milam and Carson repeated these steps several times. *Id.* A.C. was deceased when law enforcement arrived on the scene.

Soon after arriving at the scene, Ranger Ray interviewed Milam and Carson separately. *See* Ex. 25; SX F-1, 59 RR 148. Both Carson and Milam initially told Ranger Ray that they had left A.C. alone in the trailer and had walked down to look at some property they intended to purchase. Ex. 25 at 73-74; SX F-1, 59 RR 52. When they returned home an hour or two later, they found A.C. in a hole in the floor of the master bathroom. Ex. 25 at 75; SX F-1, 59 RR 152.[1]

When questioning Carson, Ranger Ray told her that he did not believe her initial version of events. Carson expressed anxiety that her real story would not be believed.

> CARSON: I could tell you, but you wouldn't believe me.
> RANGER RAY: I will. I will believe you.

---

[1] Carson later admitted that she fabricated this story and instructed Milam to tell it to law enforcement. Ex. 25 at 109-10.

CARSON: No, you won't.

RANGER RAY: I will believe you. I promise.

CARSON: If you do, none of the other cops won't --

RANGER RAY: I will --

CARSON: Because it's something that they would not believe.

RANGER RAY: I will believe you. I promise you, I will believe you.

Ex. 25 at 78-79. It was at this point, Ranger Ray would later testify, that Carson's demeanor changed from that of a grieving mother to being coldly matter-of-fact. 40 RR 31. Carson told Ranger Ray that she believed Milam was being possessed, "kind of like 'The Exorcist,'" but that Milam did not "understand" it was happening until she told him. *Id.* at 82. Carson then came to believe A.C. was also possessed. Ex. 25 at 90, 93.

What Carson went on to describe is consistent with prosopometamorphopsia ("PMO"). PMO is caused by dysfunction in the clusters of neurons that are typically housed in the occipital and temporal lobes of the brain and that are specialized for processing faces. Ex. 7 ¶2. When this network of neurons does not function properly, conscious face perceptions and behavioral judgments about faces are disrupted. *Id.* ¶3. PMO causes faces to "distort in shape, texture, feature position, and/or color, and faces often transform while being viewed." *Id.* These distortions can affect only one half of the face (hemi-PMO) or both sides

13

of the face (bilateral-PMO). *Id.* People with PMO are more likely to see distortions in familiar faces and for some people, the distortions only appear intermittently. *Id.* ¶5. The distortions can be inconsistent in appearance. *Id.* They can also appear when looking at faces on screens. *Id.* People with PMO have also described hearing voice distortions. *Id.* ¶9. While the visual distortions can vary and are described by those who experience PMO in numerous different ways, some of the most common distortions reported are "drooping or melting features." *Id.* ¶4. Some people see features of the face shifted from their usual position. *Id*. at Table 1. Some distortions are static while others change as the individual continues to gaze at a particular face. *Id*.

A substantial proportion of people who have reported their PMO symptoms have described that the distorted faces they see appear malevolent and resemble, especially, "demons." *Id.* Consequently, PMO is colloquially known as "demon-face syndrome."[2] PMO can occur in those who are mentally healthy and those who have psychosis. *Id.* ¶6. Perhaps unsurprisingly, PMO typically has a major impact on the mental health

---

[2] *See, e.g.,* Demon Face Syndrome, WebMD, https://www.webmd.com/brain/prosopometamorphopsia (last visited Aug. 13, 2025).

of those who experience it. *Id.* ¶3. Yet, many people with PMO do not report their experience for fear others will perceive them as being mentally ill. *Id.* ¶6. PMO can last for years but it can also resolve on its own as quickly as a month or two after it starts. *Id.* ¶7. While rarely occurring, it is well documented in medical literature and, at least more recently, has been reported about in several mainstream media sources.[3]

In Carson, PMO caused her to see distorted features on certain familiar faces, including her daughter's face. *See id.* ¶5 (some people with PMO are more likely to perceive distortions in familiar faces than unfamiliar ones). Carson's descriptions of seeing a demon in Milam's face—and later in A.C.'s—are consistent with PMO. Ex. 7 ¶¶10-22. In her statement to Ranger Ray, Carson said the "demon" would come in and out of Milam. Ex. 24 at 38. Over time though, the "demon" began to appear more frequently in Milam and, she told Ray, she could not make it stop happening. Carson described to Ranger Ray her perception that Milam's face changed. She told him about an incident when she was

---

[3] *See, e.g.,* NPR, *How Are You Not Seeing This?*, Sept. 13, 2024, https://www.thisamericanlife.org/840/how-are-you-not-seeing-this; https://www.cnn.com/2024/03/22/health/demon-faces-prosopometamorphopsia-wellness; https://www.nbcnews.com/health/health-news/disorder-man-sees-demonic-faces-rcna144533 (last visited September 15, 2025).

driving her car and "Blaine looks over and starts looking at me, and it was a look that wasn't Blaine's." *Id.* at 12-13.

Thus, while incredible on its face, Carson's account of Milam's "demon possession" becomes coherent through the lens of PMO evidence: she was intermittently experiencing grotesque distortions in Milam's face that she was interpreting as a demon possessing him. She also explained to authorities how Milam would cope with Carson's distress when she experienced PMO in his face: he would remove himself from her view by hiding in the bathroom, sometimes for so many hours that his mother would ask what he was doing in there. *Id.* at 87.

As is common with PMO, the distortions she saw in Milam's face made him appear menacing and frightened her: "[I]t came close to looking like he was going to kill me."[4] Ex. 24 at 84. Similarly, in her trial

---

[4] Carson's statements are similar to those a subject with PMO has used to describe looking at a partner's face:

> So I remember we were sitting at a table at a restaurant. It was outside the movies. We were going to go see a movie that night. And I remember looking at him, and I thought he was snarling at me. . . . I remember looking at his face and thinking, I don't want to be anywhere near this person. He feels like a stranger and like he wants to harm me, to hurt me.

NPR, *How Are You Not Seeing This?*, Sept. 13, 2024, available at https://www.thisamericanlife.org/840/how-are-you-not-seeing-this (last visited September 15, 2025).

testimony, Carson told her jury about an incident while Blaine was driving:

> I turned over to look at him, and he's just got this expression on his face like he's about to kill me, like he's just about to jump over, you know, in the middle of the car and attack me. And, you know, I'm sitting there, and I'm driving while I'm doing this, but I'm asking him, "What's wrong?" And I'm crying and everything. And his voice is not even the same octave as Blaine's voice was. It was completely different. And his eyes just -- they just looked so evil.

*State v. Carson*, No. CR2009-067, 16 RR 158.

Carson told Ranger Ray that, after some period of time, the "demon" had not returned in Milam "for a while." Ex. 24 at 12. That changed on December 1, when the demon returned, this time appearing in her child A.C. At the time, she and Milam were alone with A.C., as Milam's mother had gone out of town. Carson described the changes she observed to A.C.'s appearance: one side of A.C.'s face was "warped down, and her eye was like stretched and stuff, and it was really freaky." Ex. 25 at 90. Carson later described that "one whole side [of A.C.'s] eyelids were, like, this long on this side and her whole face on this side was stretched out. And her lip, her top lip looked like she had a cleft palate." Ex. 24 at 19.

In a photo Milam took of A.C., Carson described seeing one side of A.C.'s face "warped down, and her eye was like stretched and stuff," *id.*

at 90: a classic description of a "drooping" face seen in hemi-PMO.[5] Carson told authorities it was "frightening" to her "to see [A.C.] look like that." *Id.* at 93. She also described the distortions as dynamic: "even when it would come to be [A.C.] for a couple of minutes, her face was still warped, and then, you know, it would go back to the demon possessing her or whatever." *Id.* Carson would try to look at A.C. from time to time: "it would be her for a little while, and then it would start getting mean again. And then I was like, 'Is it coming back?'" *Id.* at 108. Carson's account of experiencing dynamic distortions in a face as she continued to look at it is a common feature in PMO. Ex. 7 ¶4.

Lacking any readily available explanation for what she was experiencing, Carson, who believed in demon possession, Ex. 25 at 82, interpreted her experience of PMO literally and became convinced her daughter was being possessed by a menacing demon. She described A.C. during this period as being "mean" and "not my baby," which caused her

---

[5] *See* John C. M. Brust and Myles M. Behrens, *"Release Hallucinations" as the Major Symptom of Posterior Cerebral Artery Occlusion: a Report of 2 Cases*, 2 Annals of Neurology 432 (1977) (describing subject who "experienced transient visual illusions: the right half of people's faces (i.e., to the patient's left) seemed to melt, 'like clocks in a Dali painting'"); Jan Blom, et al., *A Century of Prosopometaphopsia Studies*, 139 Cortex 298, 301–02 (2021) (systematic literature review determined 23% of hemi-PMO sufferers identified in the literature described the face as "drooping downward").

to "br[eak] down." *Id.* at 93, 102. She likely also experienced vocal distortions, causing her to perceive A.C.'s cries to be her "growling" at her. Ex. 24 at 15; *see also* Ex. 7 ¶¶9, 17. PMO evidence explains that Carson was not simply entertaining an otherwise unexplainable delusion about a demon attempting to possess her child, *she was viscerally experiencing it*. That she was actually experiencing this visceral reality is consistent with her fear during her interrogation by Ranger Ray that she would not be believed and be psychiatrically committed instead. *See, e.g.*, Ex. 25 at 79 ("I could tell you but you wouldn't believe me."); *id.* at 110 ("I didn't want to be sent to an in- -- a mental institution[.]").

Because of its rarity and obscurity, neither the State nor the defense knew about PMO at the time of Milam's trial. The State therefore theorized that the distortions Carson saw were A.C.'s injuries. But this theory does not account for Carson's description of warping that was dynamic, not static. She described how A.C.'s face would return to being herself again. Ex. 24 at 18-19, 24. Nor does it account for Carson seeing Milam's face transform into a demon. As with Milam's face, she interpreted this as an evil spirit or demon trying to get inside A.C.

### 3. Carson fabricated a story and shifted blame away from herself.

Carson recognized that her perception that A.C. was possessed by a demon would not be believed by authorities and that she could face criminal charges for A.C.'s death. Ex. 25 at 79. She admitted that she concocted the fake alibi story and instructed Milam to tell it to the police.[6] She did so because she thought that, if she did not make up a story that would create an alibi, the authorities "wouldn't believe us, and they would either take us to a mental institution or they'd arrest us for murder, when neither one of us would ever do that to that baby." *Id.* at 110. But when her attempt to create an alibi was rebuffed, Carson deftly began to shift blame to Milam. In her interviews with Ranger Ray, Carson made herself a passive witness to what she described as Milam's attempt to exorcise the demon from A.C.—a story the State called a "second cover story" in Carson's trial. *State v. Carson*, No. CR2009-067, 18 RR 87.

---

[6] Ranger Ray assumed Milam had told Carson to give the fake account that they had left A.C. alone in the trailer that morning while they walked down to look at property they were planning to purchase. Carson corrected Ray: "[Milam] didn't tell me to. I actually told him to[.]" Ex. 25 at 109-10.

Moreover, and in addition to the initial alibi story Carson admitted to fabricating, law enforcement established that Carson's "second cover story" included other demonstrable lies that exculpated herself and shifted blame to Milam. First, according to Carson, Milam locked himself and A.C. together in the master bedroom so Milam could perform an "exorcism" on A.C. Ex. 24 at 26. She suggested A.C.'s death may have been caused by Milam "knocking" the "demon" out. *Id.* at 28. In fact, authorities learned that no bedroom in the trailer could be locked from the inside. *State v. Carson*, No. CR2009-067, 12 RR 219. Carson's story of being locked out of an attempted exorcism by Milam was wholly invented. Second, Carson said that Milam had told her that he needed to obtain a metallic cross to successfully perform an exorcism. Ex. 25 at 90. She told Ranger Ray the couple made a trip to a gas station the night of December 1 where she stood outside while Milam entered and purchased such an object. 40 RR 53. But video surveillance of the gas station showed that, while the couple did go to the gas station, Carson—not Milam— entered the store. Milam did not buy a metallic cross. Carson bought snacks and a drink. *Id.*

## C. The Investigation Was Unreliable and Designed to Obtain a Conviction Against Milam

### 1. Despite Carson's bizarre story, the investigation immediately focused on Milam.

Notwithstanding that the story Carson told about Milam exorcising her demon-possessed child evidenced Carson's alarming state of mind, Ranger Ray never conducted an interview aimed at determining whether she had caused A.C.'s death. Instead, he invented a narrative whole cloth that Milam resented A.C. and wanted Carson in his life "without a baby." Ex. 24 at 37. In his very first interview with Milam, before any evidence was collected and before he spoke to Carson, Ranger Ray told Milam, "[A] whole lot of people think you did this." SX F1, 59 RR 166. When Milam asked why, Ranger Ray answered, "you're the only male in this house." *Id.*

Ranger Ray also assumed Milam must be responsible for the injuries Ranger Ray believed to be bitemarks:

> The baby's got bite marks all over her, okay? And those are very, very easy to measure, photograph, and then we're going to get a search warrant, and it -- it will order you to go with -- with us to a dentist, and the dentist is going to make a cast of your teeth, and then we'll match those up.

SX F1, 59 RR 75. Before any evidence was collected, Ranger Ray made clear that he assumed Milam lashed out at A.C. in anger:

RANGER RAY: What did she do to make you hit her?

MILAM: I did not hit that baby.

RANGER RAY: What did you slam her against?

MILAM: I did not slam that baby against nothing.

SX F1, 59 RR 78. Milam consistently denied causing A.C. any harm in his statements and no evidence ever demonstrated that he had any history of responding to her with anger or violence.

Despite the fact that Ranger Ray arrived on the scene just prior to speaking with Milam, and his accusations were made in an investigative vacuum, 39 RR 228, the tone and target of the investigation was set. From this point forward, Carson was used strictly to develop evidence against Milam as the primary actor and she was never seriously considered as the perpetrator. The State would also choose to seek the death penalty against Milam only. This was notwithstanding that (1) Carson admitted seeing and believing that A.C. was possessed by a demon; (2) she had become withdrawn and detached from her daughter; (3) she told a story that authorities later ascertained contained lies; and (4) she told authorities she preferred that A.C. "go to heaven now than to . . . have Satan have her soul and her go to hell when she gets older," Ex. 25 at 98. The investigation's narrow focus biased the subsequent forensic

investigation, producing unreliable opinion evidence against Milam dressed up as science.

## 2. Scene contamination and bias in the forensic workup.

Because the State could obtain no evidence that Milam had any motive to harm A.C., it was forced to hinge its case on shaky inferences from physical evidence it recovered at the scene. But law enforcement's investigation of that scene was so mishandled that the lead detective, Amber Rogers, was subsequently demoted to a public relations role. *See* 41 RR 28. When asked at trial whether mistakes had been made in the processing of the scene, Rogers responded that she could not answer that question. 44 RR 53. Law enforcement failed to document the scene on the day of the offense—December 2, 2008—forcing them to return nine days later to collect much of the physical evidence eventually relied on by the State to tie Milam forensically to A.C.'s death. In the interim, law enforcement had released the scene to Milam's mother and brother who lived there. By the time authorities returned, the scene was so compromised that, as one investigator testified, there was no point in wearing protective shoe coverings as he "would have had to change them every five minutes." 42 RR 191.

The investigation at the scene on the day-of was led by then-detective Rogers. 44 RR 46. She described her training in crime scene investigation as "basic" and she had no training at all in DNA evidence. *Id.* at 58, 122. Rogers agreed at trial the entire home should have been photographed and videoed on the day of the offense, *id.* at 102, but nobody did so. In fact, despite the presence of several officers, no one completed a documented walk-through of the two-bedroom mobile home on that day. Rogers testified that she entered the home, looked at A.C., and then quickly exited again. *Id.* at 93. She did not walk through the home. Consequently, she could not verify whether evidence later relied on by the State was or was not present in certain locations.

Rogers did not verify whether any evidence was present—let alone collect any evidence—in the south bedroom. 46 RR 102. Nor did anyone else.[7] That was true even though Carson identified the south bedroom repeatedly in her interviews with authorities. *See, e.g.,* 7 RR 122; Ex. 25 at 86, 104. She described how Milam allegedly kept A.C. in the south bedroom during parts of the alleged exorcisms. *See* 7 RR 148-49. Instead

---

[7] One investigator did walk to the south end of the home but he "c[ouldn't] remember exactly what [he] did back there," except that he did not observe anything of evidentiary value. 41 RR 65-66.

of conducting a thorough search of the trailer home, the scene was released to Shirley and Danny Milam that same afternoon to occupy.

Eventually, nine days after the offense, law enforcement searched the south bedroom. Rogers was joined by Noel Martin, a crime scene investigator who was called for his knowledge of blood evidence. *See* Ex. 21. Martin observed that "[i]t was obvious, [due] to the fecal matter on the floors and whatnot," that dogs and cats had been inside the home for the past nine days. *Id.* at 155-56. He and another officer tried to remove the animals from the scene, but "short of calling animal control out there . . . or shooting the animals, [he] d[idn't] know any other way to keep them out." *Id.* at 160. Due to the home being released to Milam's family and the presence of animals, the scene had been significantly altered. *See* Ex. 6 ¶¶58-60.

Despite obvious scene contamination and alteration, investigators collected various items for testing. This included a pair of jeans found in the south bedroom that bore "stains . . . consistent . . . with contact transfer bloodstains[.]" 42 RR 203. As he later testified, however, without photographs from December 2, Martin could not know the condition of the south bedroom on the day of the offense. 46 RR 161. He agreed "100%"

that the pair of jeans—which the State later claimed was a critical piece of evidence—were moved from another location in the home to the south bedroom after December 2. *Id.* at 188.

Rogers and others returned again on December 13, 2008, following information that a cell phone with evidentiary value may be located under the home. 44 RR 49-50. The underside of the trailer home had never been documented or searched. After crawling under the trailer, Rogers recovered a wrench wrapped in a plastic bag, SX 40-B, a steel bar, SX 39, a pair of work boots, and a Q-tip, 41 RR 29.

In addition to the physical evidence having been collected without regard to contamination, law enforcement's myopic focus on Milam impacted the forensic testing conducted on that evidence. At the scene on December 2, 2008, authorities decided, prior to any testing, that the injuries present on A.C.'s body were bitemarks. *See, e.g.,* Ex. 17 at 1. The State told the medical examiner ("ME") that "you will find that the body shows bite marks." Ex. 15 at 1. The State contacted the ME again on the day of the autopsy, to inform him that Milam was "the primary suspect" and that the ME should also "please note . . . that the primary suspect,

Blaine Keith Milam, was not the biological father of the child." Ex. 16 at 1.

After receiving this information, the ME immediately agreed with the State's assertion about A.C.'s injuries being bitemarks. 41 RR 170. Consequently, he requested that Dr. Robert Williams, SWIFS' chief forensic odontologist, participate in the autopsy. *Id.* at 167. Together, they tallied 24 injuries which they categorized as human bitemarks. *Id.* The ME swabbed the injuries for DNA analysis, which was also conducted by SWIFS.

At a pre-trial hearing held to determine the admissibility of Dr. Williams's opinions about who caused certain injuries to A.C., Dr. Williams testified that "[m]ost" of the contusion and abrasions on A.C.'s body "were not of evidentiary value" for bitemark comparison purposes. 6 RR 23, 60. He testified to his pattern "matching" methodology on four of the injuries: one on the lower left arm, one on the left knee, one on the right arm or right knee—he could not tell which—and one just above the left buttock. *Id.* at 31, 35, 40, 42. When testifying about the injury on either the right knee or arm, he acknowledged that, after conducting some of the comparisons, he had an expectation that he would conclude

that the pattern of other injuries would match Milam. *Id.* at 41. With regard to the injury on the left knee, he had "a question about, as far as the maxillary arch not fitting [Milam's teeth] uniquely and perfectly[.]" *Id.* at 66. As for the "other two,"[8] he testified "they seem to -- they fit to my subjective opinion." *Id.*

At that same hearing, the State informed Dr. Williams that the DNA analysis of swabs taken from some of the injuries was consistent with Milam's DNA profile. *Id.* at 50. The State emphasized the weight of this finding to Dr. Williams: "If there were swabs taken of some of these bite marks, okay, and if any of those swabs came out consistent DNA-wise with Blaine Milam and inconsistent with Jesseca Carson, would that further corroborate and confirm the results that you came up with?" *Id.* at 51. Dr. Williams responded that this was "a given." *Id.*

By the time of trial, and after being told that Milam's DNA was on certain injuries, Dr. Williams testified he could "match" *eight* of the injuries to Milam "to a reasonable degree of dental certainty," including the injury on A.C.'s left knee which he previously testified he had

---

[8] This appears to be a reference to the injury on the left lower arm and the injury on the left buttocks, as those were the other two injuries discussed during this exchange. 6 RR 66.

"questions" about. 43 RR 238. For several other injuries, he now testified that he could not exclude Milam. *See, e.g.*, 44 RR 266, 270, 273, 275; 45 RR 8. Critically, Dr. Williams testified that he could not exclude Milam— and even that he could match his dentition to a reasonable degree of dental certainty—to injuries he had previously assessed as being "not of evidentiary value." *See, e.g.,* 6 RR 60; *compare, e.g.*, 44 RR 234 *with* 45 RR 31.

Forensic analysis of physical evidence already compromised by law enforcement's poor processing of the scene was likewise infected with suspect-driven bias. SWIFS's analysts were told by the State that this case concerned the death of an infant, that Milam was the primary suspect, and that he was not A.C.'s biological father. Exs. 15 at 1; 16 at 1; 33 at 1; 36 at 1; 37 at 1. The impact of this biasing information is demonstrated by the inconsistency in SWIFS analyst Angela Fitzwater's methodology across various samples, for which there is "no scientifically supportable rationale[.]" Ex. 4 ¶39.

Notably, her interpretation of DNA results from item 20I, a swab from an injury on A.C.'s left elbow, emphasizes how evidence was interpreted to fit the State's theory that Milam was "the primary actor."

The electropherograms corresponding to item 20I established the presence of genetic markers corresponding to A.C., Milam, Carson, and Danny Milam. *See* Ex. 4, Attachment D. Many of these peaks corresponded to alleles shared by Milam and Carson, Carson and A.C. as mother and daughter, and Milam and Danny Milam as brothers. *See* Ex. 1 ¶31. Yet, contrary to SWIFS's SOPs and accepted standards of practice, Fitzwater selected which alleles to include in her calculations about the probability that Milam was a contributor based on whether those genetic markers were present in Milam's reference profile and without accounting for the degree of overlap between all possible contributors. Exs. 1 ¶¶32, 34; 4 ¶54. This approach is "categorically wrong" and amounts to "paint[ing] a target around the arrow." Ex. 1 ¶¶32, 34.

By adapting her process in this way, Fitzwater was able to testify—and the State to argue—that, although Carson could not be excluded in the DNA mixture present on a "bitemark," "the majority of the markers seen were consistent with Blaine Milam." 43 RR 75; 48 RR 39-40 ("[T]hat's the one that you heard from the lab that the DNA from the swab of that bite mark matches the defendant, that the alleles that are present are all his alleles, with a couple of small stray ones."). And, as set

out *infra*, this myopic focus on Milam continues to impact SWIFS's interpretation of the DNA evidence to this day.

The State's tunnel vision on Milam further dictated what testing was conducted. For example, based on Martin's observations of a large blood stain on the front of the jeans collected on December 11, 2008, the State speculated the jeans were worn by the perpetrator. 42 RR 203. Those jeans, however, were not in Milam's size. 48 RR 28-29. The State accordingly developed an unsupported theory that the jeans (which were in Danny Milam's size) belonged to Milam. *Id.* The State put the identity of the wearer of the blood-soaked jeans at issue. Yet, SWIFS did not swab the inside of the jeans to check for epithelial cells from the wearer or to obtain potential DNA. A SWIFS's forensic biologist testified that SWIFS "typically also take[s] a cutting from the inside of the waistband, since that's an area that would rub a bunch against whoever was wearing it, and send that off for DNA analysis." 43 RR 72. She agreed that she could have done so here but did not. *Id.* SWIFS thus omitted routine analysis to identify who may have worn the jeans.

### D. The State's Case at Trial

By the time of trial, witnesses and surveillance video established only that Milam and Carson were seen together at around 9:00 p.m. on December 1, 2008, at the National Truck Stop (where Carson falsely told law enforcement Milam went to purchase a metallic cross). 46 RR 99. A witness saw A.C. with them at that time. *Id.* at 96. The next time Milam and Carson were seen was around 9:00 a.m. on December 2, when they pawned items at Insta Cash Pawn. 42 RR 59-61. Sometime between 9:00 and 9:15, they stopped at On the Run gas station in Henderson, where Carson purchased cigarettes. 42 RR 96. Around 10:30 a.m., Milam called 911 from his mother's home to report that they had found A.C. injured and not breathing. 42 RR 105.

To fill in the gaps and cast Milam as "the primary actor," the State relied on (1) bitemark opinion testimony, (2) DNA evidence, and (3) serology and blood pattern evidence. The State also called a jail nurse who testified that Milam told her he had done "it." It is now known, however, that all this evidence is unreliable and therefore prejudicial.

# PROCEDURAL HISTORY

Milam was convicted of capital murder and sentenced to death in the 4th Judicial District Court of Rusk County, Texas, in May 2010. The Texas Court of Criminal Appeals ("TCCA") affirmed Milam's conviction and sentence on May 23, 2021. *Milam v. Texas*, No. AP-76,379, 2012 WL 1868458 (Tex. Crim. App. 2012). In state habeas, the TCCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief. *Ex parte Milam*, No. WR-79,322-01, 2013 WL 4856200 (Tex. Crim. App. Sept. 11, 2013). Milam also sought federal habeas corpus relief, and this Court denied a Certificate of Appealability on May 10, 2018. *Milam v. Davis*, 733 F. App'x 781 (5th Cir. May 10, 2018).

The trial court set an execution date for Milam of January 15, 2019. On January 7, 2019, Milam filed a subsequent state habeas application raising, *inter alia*, a claim that his execution would violate the Eighth Amendment because he is intellectually disabled (*Atkins* claim) and a claim under Tex. Code Crim. Proc. art. 11.073 challenging the State's purported bitemark comparison evidence under then-current scientific standards. The TCCA stayed Milam's execution, authorized the *Atkins* and 11.073 claims, and remanded them to the trial court for merits

adjudication. *Ex parte Milam*, 2019 WL 190209 (Tex. Crim. App. Jan. 14, 2019). The TCCA adopted the trial court's Findings of Fact and Conclusions of Law with limited exceptions and denied relief on July 1, 2020. *Ex parte Milam*, No. WR-79,322-02, 2020 WL 3635921 (Tex. Crim. App. July 1, 2020).

The trial court set an execution date for Milam of January 21, 2021. On October 2, 2020, Milam filed a Motion for Authorization to proceed in district court on an *Atkins* claim, which this Court denied on October 27. *In re Milam*, 883 F. App'x 796 (5th Cir. Oct. 27, 2020). In January 2021, the State's expert at trial, Dr. Timothy Proctor, produced a Report Addendum in which he opined that based on the available information and current diagnostic and legal standards, Milam met the criteria for an ID diagnosis. On January 13, 2021, Milam filed a subsequent state habeas application raising an *Atkins* claim based on the fact that every expert to have evaluated Milam for ID agreed he met the diagnostic criteria. The TCCA stayed the execution and remanded the *Atkins* claim to the trial court. *Ex parte Milam*, No. WR-79,322-04, 2021 WL 197088 (Tex. Crim. App. Jan. 15, 2021). The TCCA adopted the trial court's Findings of Fact and Conclusions of Law and denied relief on July 31,

2024. *Ex parte Milam*, No. WR-79,322-04, 2024 WL 3595749 (Tex. Crim.
App. July 31, 2024).

The trial court set an execution date for Milam of September 25,
2025. On September 2, 2025, Milam filed a subsequent state habeas
application.

## STATEMENT REGARDING PENDING LITIGATION

Milam's subsequent state habeas application, which includes the
due process claim raised below, remains pending in the TCCA. He files
this Motion now to comply with Fifth Circuit rule 8.10.

## CLAIMS FOR RELIEF

Under 28 U.S.C. §2244(b)(3)(C), this Court "may authorize the
filing of a second or successive application only if it determines that the
application makes a prima facie showing that the application satisfies
the requirements of § 2244(b)." *In re Will*, 970 F.3d 536, 540-41 (5th Cir.
2020) (internal quotation omitted). At this stage, the petitioner need not
prove that he meets §2244(b), nor that he is entitled to relief on the merits
of his proposed claim. *Id.* at 541. Under §2244(b)(1)(B) specifically, he
must make a prima facie showing that he has not previously presented
his claim, that "the factual predicate for the claim could not have been

36

discovered previously through the exercise of due diligence," and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." The petitioner must also show that his claim has potential merit. *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006).

I.  **Milam can make a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to proceed on the claim that the introduction of prejudicial evidence rendered his trial fundamentally unfair, in violation of Due Process.**

New science establishes that Milam's conviction rests on unreliable and prejudicial forensic opinion testimony, the admission of which violates the Due Process Clause of the Fourteenth Amendment. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Kansas v. Carr*, 577 U.S. 108, 123 (2016); *Andrew v. White*, 145 S. Ct. 75, 80 (2025). False or unreliable forensic evidence has long been recognized as unduly prejudicial. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (observing that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it"); *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012) (remanding due process claim based "on what

new scientific evidence has proven to be fundamentally unreliable expert testimony" for evidentiary development); *In re Hill*, No. 20-3863, 2025 WL 903150, at **8, 14-15 (6th Cir. Mar. 25, 2025) (granting MFA and authorizing second or successive petition raising due process claim based on changes to interpretation of bitemark evidence).

Milam's trial, based on what is now known to be unreliable forensic opinion testimony, was fundamentally unfair. Milam has not previously raised this claim in a prior federal habeas petition. Section 2244(b)(1) therefore does not preclude authorization.

## A. The Due Process Clause claim has potential merit.

### 1. There is now a scientific consensus that all bitemark opinion testimony is junk science.

With a dearth of evidence that Milam played any role in causing A.C.'s death, the State placed tremendous weight on the opinions of its bitemark expert, Dr. Williams. He repeatedly testified that Milam's "unique" dentition matched the patterned impressions he identified. *See, e.g.,* 45 RR 19, 27-28, 52. Dr. Williams opined that Milam's dentition matched eight of these impressions—including at least one which he previously testified had little evidentiary value—with "the highest degree of confidence that [he] [has] in a match of [a] particular dentition

to a bite mark"—a "reasonable degree of dental certainty." *Id.* at 25, 27-28.

The State described this testimony as "the most significant aspect of the evidence here" and "the smoking gun in this case." 48 RR 38. It was Dr. Williams's testimony that "more than anything" told the jury Milam was not an "innocent bystander here at all, that he is truly guilty of capital murder." *Id.* at 41. In the State's words, Dr. Williams's testimony established "proof beyond a reasonable doubt." *Id.* at 42. But Dr. Williams's opinions are junk science.

In 2023, the scientific community reached a consensus that *no* opinion derived from bitemark comparison analysis—regardless of how it is framed—is scientifically reliable. This consensus is rooted in the National Institute of Standards and Technology's ("NIST") 2023 report entitled "Bitemark Analysis: A NIST Scientific Foundation Review."[9] Ex. 8 ¶17. That report results from a five-year study of bitemark evidence led by "odontologists, statisticians, legal professionals, forensic scientists, experts in standards and communications," who "reviewed, synthesized

_____

[9] Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://nvlpubs.nist.gov/nistpubs/ir/2023/NIST.IR.8352.pdf.

and interpreted over 400 sources of information and considered input from a workshop" made up of "the forensic bitemark analysis community" itself. *Id.* ¶¶13-14. Based on this work, there is now a consensus that a*ny and all* opinions about the source of injuries on human skin based on comparing those injuries to human dentitions are not scientifically supportable. *Id.* ¶17. Specifically, "determinations made by experts in this area—including whether to exclude or not exclude an individual as the source of a bitemark as then-current ABFO guidelines permitted— are not scientifically reliable or valid." *Id.* ¶15.

Consequently, the NIST report "marks a shift from scientific scepticism towards bite mark comparison analysis to the establishment of a scientific consensus that no opinions purporting to individualize any given injury to a potential biter—whether to include or exclude—is scientifically supportable." Ex. 2 ¶27. As such, under "contemporary scientific understanding of bite mark evidence, none of the forensic odontology testimony . . . from Mr. Milam's trial purporting to include or exclude any person's dentition as having left injuries is scientifically reliable." *Id.* at 8. Thus, the State's "smoking gun"—the primary evidence

the State purported to have at his trial linking him to any participation in causing injuries to A.C.—is prejudicial junk science.

### 2. SWIFS has retracted DNA testimony relied on by the State to convict Milam.

To corroborate Dr. Willliams's opinion that Milam repeatedly bit A.C., the State presented extensive DNA testimony by SWIFS that Milam's DNA was on so-called bitemarks on A.C. 43 RR 133-35 (swabs 20A, 20Q, 20R). But, following a complaint to the Texas Forensic Science Commission that SWIFS's interpretations did not comport with current scientific understanding of DNA mixtures, SWIFS now concludes that the genetic markers detected on those swabs correspond to A.C. only. Ex. 12 at 9. Likewise, the State relied on SWIFS's testimony that only A.C.'s DNA was detected on a swab from Milam's shirt to argue that A.C.'s blood was on his shirt on the day of the offense. 48 RR 28. SWIFS now reports the presence of DNA from at least two contributors, with genetic markers corresponding to Milam, A.C., Carson, and Danny Milam. Ex. 12 at 7.

| | Trial | 2025 reinterpretation |
|---|---|---|
| 10AT1 (Milam's shirt) | Single-source profile corresponding to A.C. | Major-minor mixture. A.C., Carson, Danny |

| | | Milam, and Milam are included. |
|---|---|---|
| 20A (anterior neck) | Milam "possible contributor" | Single-source profile. A.C. is included. |
| 20Q (right upper forearm) | Milam "possible contributor" | Single-source profile. A.C. is included. |
| 20R (distal anterior right forearm) | Milam "possible contributor" | Single-source profile. A.C. is included. |

*See* Ex. 12. In short, by SWIFS's own admission, its trial testimony and the State's argument that DNA forensically linked Milam to the offense is false.

The State also emphasized SWIFS's testimony that Milam's DNA was present on a swab (20I) taken from an injury on A.C.'s left elbow. 48 RR 39. Notwithstanding that SWIFS did not conduct any testing to establish the presence of saliva, 43 RR 68-69, the State leaned into 20I as corroborative of Dr. Williams's bitemark opinion. 48 RR 39-40. At the time of trial, SWIFS reported that 20I was a mixture of "at least two contributors" and included Milam, A.C., and Carson as possible contributors. 43 RR 136. SWIFS now reports that 20I is a mixture of only two contributors: A.C. and Milam. Ex. 12 at 7.

But this reinterpretation finds no support in current understanding of DNA mixture interpretation and is demonstrably suspect-driven. *See* Ex. 3A ¶3.[10] Indeed, in its request for reinterpretation on August 1, 2025, the State made its expectations clear to SWIFS: "I know you appreciate everything about this case is weighty; not only because the defendant faces the ultimate punishment, but because I submit it is the most horrific torture ever perpetrated on an innocent baby in our history." Ex. 10. Under current understanding of DNA mixture interpretation, sample 20I should not be interpreted. Exs. 1A at 33; 3A at 2.

SWIFS also now makes explicit that DNA interpretations "do not provide information" regarding "how" or "when" DNA evidence was transferred. Ex. 12 at 8. SWIFS further cautions that:

> It is important to note that an individual who had direct contact with an item may not necessarily leave behind detectable DNA. Alternatively, DNA from an individual who never had direct contact with an Item may still be detected. Therefore, the DNA results presented in this report should be considered within the context of the case facts.

---

[10] Cynthia Cale, a DNA expert, has filed a complaint with the Texas Forensic Science Commission requesting investigation of SWIFS's reinterpretation based on serious scientific and methodological flaws that undermine certain of SWIFS's conclusions. *See* Ex. 3_B. That complaint is pending before the Commission.

*Id.*; *see* Ex. 1A ¶31 ("No DNA tests are currently able to distinguish between secondary transfer (such as the transfer of DNA through contamination events) or DNA present due to direct contact with an object."). SWIFS's corrected report thus establishes that whatever the presence of Milam on A.C. and vice versa, the DNA evidence does not corroborate the bitemark opinion testimony.[11] In short, SWIFS's corrected report establishes that, as well as its own DNA testimony now being known to be false, the State's argument to the jury that DNA evidence tied Milam to A.C.'s injuries is unreliable and prejudicial.

### 3. Forensic testing never confirmed the presence of blood on any clothing known to be worn by Milam.

The State also relied on the testimony of Martin, presented as a BPA expert, and a SWIFS serologist to argue to the jury that presumed blood on Milam's shirt collected on the day of the offense and blood on a

---

[11] That the DNA analysis does not corroborate the "bitemark" opinion testimony is further established by SWIFS' reinterpretation of swab 20C taken from an injury on A.C.'s chin. SWIFS now reports that A.C. and Milam are included and that Carson and Danny Milam are excluded. Ex. 12 at 7. But Dr. Williams testified that Milam was excluded from the corresponding injury, but that Carson was not. 44 RR 285. Hence, while Dr. Williams' testimony purporting to include or exclude individuals from the injuries on A.C. is not scientifically valid, the DNA results from 20C further demonstrates that the State's arguments that the DNA provides evidence about who is responsible for the injuries on A.C.'s body are entirely unsupportable.

pair of jeans collected on December 11 implicated Milam as the primary actor. 48 RR 28-29, 30. Martin testified to these opinions and the State so argued notwithstanding the facts that there was no evidence that Milam ever wore those jeans; that SWIFS could not confirm the presence of blood on Milam's shirt; and that only Carson's jacket had enough blood on it for SWIFS to confirm the presence of blood. 42 RR 34, 42.

Moreover, due to improper scene processing and contamination (including by releasing the scene), BPA cannot establish that the blood supports any activity-level propositions—that is, it cannot determine how the blood was deposited or whether it resulted from any particular offense-related activity. *See* Ex. 6 ¶74 ("[T]he mere presence of blood does not indicate the activity which led to it being deposited."). Yet the State repeatedly conflated the presence of presumed blood with particular supposed actions of Milam's. *See*, e.g., 48 RR 28-29 (State arguing that the presence of presumed blood on Milam's shirt and on the jeans recovered from the south bedroom linked Milam to the bloodletting activity).

Martin testified that the bloodstain on the jeans was a "contact transfer stain," 42 RR 203, and the State argued that this opinion

established that Milam was holding A.C. on his lap while she was bleeding, 48 RR 29-30. But Martin's flawed methodology cannot be used to support this rank speculation as his opinion was not grounded in methodologically sound analysis of the evidence. To permit such a conclusion, Martin's opinion would have required a "careful and systematic examination" to determine whether the jeans were being worn "at the time the blood was deposited" or were merely "present as an object in the location during bloodshed," and whether the stain's characteristics were consistent with "blunt forces applied to a blood source or active bleeding," as opposed to "coming into contact with the blood source or resuscitation efforts." Ex. 6 ¶¶61, 62. Neither Martin's reports, nor SWIFS's documentation, contains such analysis. *Id.* Moreover, denim presents particular interpretive challenges in stain assessment that Martin ignored. Porous textiles, like denim, create "inher[en]t limitations" on reliable BPA conclusions. *Id.* ¶63. Additionally, any reliable BPA conclusions regarding the jeans is prohibited by the fact that they were collected on December 13, nine days after the offense, and were demonstrably not present on December 4 in the location from which they were recovered. *See id.* ¶60.

Martin also did not document the patterns upon which he based his blood-pattern conclusions. BPA is detail-dependent, requiring the precise shape, size, distribution, and patterned appearance of stains to be documented and photographed with scales for comparison. Ex.6 ¶48. But many key items central to the State's narrative were either not photographed—like the jeans the State argued linked Milam to A.C.'s death—or lacked scales for reliable analysis. *Id.* ¶¶61, 67, 76.

Notably, Martin opined on the significance of blood patterns in determining where "blood events occurred" without taking into account any subsequent serology or DNA testing. 46 RR 7-22. In formulating his conclusions, Martin never reviewed "any scientific lab reports." 46 RR 186. For example, he testified he had observed "free-falling" "blood drops," *id.* at 16-17, without confirming that what he observed was indeed blood or accounting for negative DNA testing results of those samples. Ex. 6 ¶52. In other words, Martin offered a BPA opinion without ever confirming that the stains he observed were in fact blood.[12]

---

[12] Presumptive testing for blood was originally developed to detect blood in fecal matter, Ex. 6 ¶53. As Martin described, by the time he went to the scene, "[i]t was obvious, to the fecal matter on the floors and whatnot," that dogs and cats had been inside the home for the past nine days. *Id.* at 155-56.

Martin's investigation demonstrates a lack of competency in BPA procedures, including improper evidence collection methods, inconsistent and selective methodology, and failure to incorporate laboratory testing results. These concerns are compounded by the fact that the Smith County Sheriff's Office was—and remains—an unaccredited laboratory. *Id.* ¶48. Martin's opinions dressed up as forensic science are unreliable and prejudicial.

## B. This claim is based on new science.

Under §2244(b)(2)(B)(i), "due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record." *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). Milam can make a prima facie showing that he was diligent in developing facts establishing his trial was rendered unfair by the admission of prejudicial evidence.

First, the consensus that all bitemark opinion testimony—however it is framed—is junk science did not emerge until the 2023 NIST Bitemark Analysis Report. This report marks "the establishment of a scientific consensus that no opinions purporting to individualize any given injury to a potential biter—whether to include or exclude—is

scientifically supportable." Ex. 2 ¶27. Indeed, in 2020, the CCA concluded

in Milam's case that bitemark opinions that purport to include or exclude

an individual as the source of alleged bitemarks was still admissible.[13]

The NIST report now definitively establishes as a matter of consensus

that such opinions are invalid.

Second, the State did not request reinterpretation of the DNA

evidence until August 2025 and SWIFS accordingly did not recant its

prior testimony until August 12, 2025. *See* Ex. 12. Notably, SWIFS

notified the State in March 2016 of the likely need for reinterpretation of

the DNA evidence in Milam's case based on changes in the interpretation

of DNA mixtures. Ex. 19 at 2-5. In that notice provided only to the State,

SWIFS both recommended reinterpretation and requested that the State

make the same known to Milam. *Id.* The State, however, neither

requested reinterpretation nor informed Milam of this notice.[14] Instead,

---

[13] *See* WR-79,322-02, Second Supplemental Clerk's Record, State's Proposed Findings of Fact and Conclusions of Law ("FFCL") ¶153.

[14] The State responded the next day that the Attorney General's office had provided notice to the defense in 2015. Ex. 19 at 1. But the State could not have notified counsel for Milam in 2015 of SWIFS's reinterpretation notice it received only the day before— in March 2016. Instead, the State had notified Milam of a different issue regarding the FBI's changes to its population database in June 2015. Ex. 38 at 1. Unlike the changes in the mixture interpretation methodology, the correction to the FBI

the State continued to rely on what it knew was unreliable DNA evidence to uphold Milam's conviction in subsequent litigation in 2019-2020. *See, e.g.,* WR-79,322-02, State's Proposed FFCL ¶161.g.1 ("[T]he Court concludes this DNA evidence taken from injuries on her body more strongly points to Applicant as the contributor."). Milam only learned of this notice when the State turned over 4,000+ pages of DNA records on August 13, 2025. Milam had requested—and the State successfully blocked—access to these records in 2018, 2024, and 2025.[15]

Third, the unreliability of the BPA evidence likewise hinges on the formalization of best practices in the field of BPA, Ex. 6 ¶29, as well as recent literature on the vulnerabilities of BPA to bias; *see* Itiel E. Dror, *Bloodstain Pattern Analysis (BPA): Validity, reliability, cognitive bias, and error rate,* 65 Sci. & Just. at 5 (2025) (BPA falls within a "bias danger

---

database had no impact on the inclusion or exclusion of any individual from a given DNA sample.

[15] Based on his inability to access the complete DNA records, Milam brought a civil action under 42 U.S.C. §1983 alleging that the discretion Texas's post-conviction procedural regime affords the District Attorney to withhold evidence in the State's possession that Milam seeks to help prove his innocence operated to deprive him of due process. That litigation is pending on appeal in this Court. *See Milam v. Jimerson,* No. 25-70015.

zone because of its overall subjective nature," where organizational or personal factors have "greater leeway to bias and impact" the outcome).

Milam has thus made a prima facie showing of diligence.

## C. Milam can make a prima facie showing of innocence.

Innocence under §2244(b)(2)(B)(ii) has been described as "a strict form of 'innocence, roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley,* 505 U.S. 333 (1992)." *Will*, 970 F.3d at 544 (internal quotation omitted). At this stage, however, this Court does not need to determine whether Milam is actually innocent; instead, this Court considers "only [] whether there is possible merit to his claim that" §2244(b)(2)(B)(ii) is met. *Id.*

The State's evidence now establishes nothing more than Milam's presence in his home on the night of A.C.'s death. There is no reliable forensic evidence tying Milam to any injury on A.C. There is now a consensus that bitemark opinion testimony is junk science. SWIFS also recants much of the DNA analysis relied on by the State to corroborate the bitemark opinion testimony and rejects any assertion that DNA evidence establishes the "when" or "how" of events. And the BPA opinion testimony was unsupported by any methodology.

Milam's vague statement to a jail nurse at the county jail that he had done "it" also does not preclude a prima facie case of innocence. *See Will*, 970 F.3d at 548 (granting MFA pursuant to §2244(b)(2)(B) where movant had confessed to the offense). In closing, the State characterized this statement as "the gold standard of admissions." 48 RR 150. But, because of his low intellectual functioning, Milam was at heightened risk of doing exactly what he indicated to law enforcement he would do: take the blame for Carson. Indeed, he had openly contemplated doing so during his custodial statement. 59 RR SX E-2 (emphasis added) (And if I tell you, what if I tell you it was me *and I take the blame for somebody else*, will I be in trouble?).

Based on his IQ scores of 68 and 71, it was undisputed at Milam's trial that he had impaired intellectual functioning. *See infra* II. Research shows that individuals with deficits in intellectual functioning are at heightened risk for falsely admitting culpability. Notably, such persons have a propensity to be compliant and agreeable, which puts them at increased risk of "overstat[ing . . .] responsibility or involvement" or "eagerly assuming blame to please or curry favor." Ex. 5 at 4. This population also tends to be gullible, naïve, and overly trusting. *Id.* They

have a "reduced appreciation of the consequences of making false incriminating statements." *Id.* at 4. These characteristics contribute to an increased risk of false confessions, including protective false confessions, which are designed to protect someone else, such as a partner. *Id; see Hall v. Florida*, 572 U.S. 701, 709 (intellectually impaired persons are "more likely to give false confessions").

Milam possessed many of the core characteristics that make people in this population vulnerable to falsely admitting responsibility for something they did not do. A psychiatrist retained by the State at trial described Milam as "very naïve" and "extremely gullible." Ex. 29 at 12. Similarly, at Carson's trial, the State elicited testimony from Milam's former counsel that he was "one of the most naïve 17 or 18-year-old young men that [he] had ever met." *State v. Carson*, No. CR2009-067, 17 RR 141. And his custodial statement makes clear that he did not appreciate the consequences of "taking the blame" because he asked if he would "be in trouble" for doing so. SX E-2, 59 RR 58. Notably, in his vague statement, Milam did not provide any details of the facts of the offense by which a court can judge its reliability and veracity. *See* Ex. 5 at 5 (because of the risk of false confessions by those with intellectual

limitations, it is important for there to be "corroborating and credible evidence to accompany [a] confession").

There is no forensic evidence tying Milam to any of A.C.'s injuries, nor any evidence of a motive. By contrast, PMO evidence explains that Carson, experiencing immense fear from a visual perception disorder that caused her to believe her daughter was possessed, Ex. 24 at 28-29, lashed out and beat her child—or the demon—to death. That Carson was experiencing PMO-induced distortions in her daughter's face is corroborated by the ME's testimony, who described A.C.'s face injuries as one of "the first thing[s]" that "really jumped out" at him upon observing A.C.'s body. 41 RR 166-67.

Carson's genuine belief that A.C. was possessed by a demon—and the terror she experienced as a result—explain why she would harm A.C.[16] There is no comparable evidence about why Milam would commit

---

[16] Moreover, Carson's account of the events of that night—that Milam performed an exorcism that killed her daughter—is further undermined by her description of her behavior that night, which wholly lacks credibility. She insisted that, while Milam purportedly exorcised a demon from her infant daughter in the next room of their tiny trailer, she slept, watched television, and took a bath. Ex. 24 at 26; *State v. Carson*, No. CR2009-067, 16 RR 196. At Carson's trial, the State made clear her alleged behavior was inexplicable. *Id.* at 18 RR 39.

such an offense. Instead, the evidence supports that Milam tried to respond to the circumstances created by his highly distressed fiancée. Importantly, when Carson's blame-shifting statements—including her demonstrable lies that Milam purchased a metallic cross to use for an exorcism and that he locked himself and A.C. in a bedroom without a lock—are properly assessed through the lens of PMO evidence, only one reasonable interpretation of the evidence remains: Milam never attempted to perform an exorcism on A.C. Instead, he unsuccessfully tried to care for and protect A.C. while PMO caused her mother to believe that A.C. was possessed.[17] With this as her reality, Carson preferred that A.C. "go to heaven now [rather] than spend a life with Satan having her soul and her going to hell afterwards for something she hasn't even done." 40 RR 48.

Milam has thus made a prima facie showing that he is innocent by clear and convincing evidence because, but for the State's prejudicial and

---

[17] Instead of letting Carson see A.C. in person, Milam took a picture of A.C. to show it to her "[j]ust in case, you know, it scares you, you won't, you know, actually see her, you'll just see a picture." Ex. 24 at 89-90. But Carson still saw her daughter's features warped down, and her eye was like stretched and stuff, and it was really freaky." *Id.* Carson also reported to authorities that Milam had given A.C. a bottle with sleeping pills so she would sleep, likely an effort to keep A.C. quiet and out of Carson's mind. *See* 41 RR 199.

unreliable evidence, no reasonable juror would have convicted him. Because Milam has made a prima facie showing that he meets §2244(b)(2)(B), this Court should authorize this claim to proceed in district court.

**II.    Milam has made a prima facie showing that he meets the requirements of 28 U.S.C. 2244 to receive authorization on the claim that his death sentence violates the Eighth Amendment because he is intellectually disabled.**

Milam is intellectually disabled and seeks authorization to proceed on an *Atkins* claim pursuant to §2244(b)(2)(B) because he is innocent of the death penalty. His death sentence therefore violates the Eighth and Fourteenth Amendments. To establish ID, a petitioner must show: (A) deficits in intellectual functioning, (B) deficits in adaptive functioning, and (C) the presence of these deficits in the developmental period. *See Moore v. Texas*, 581 U.S. 1, 20-21 (2017). In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court reasoned that intellectually disabled persons should not be sentenced to death because of their "diminished capacities to understand and process information, to communicate . . . to understand the reactions of others" and because of a heightened risk "of false confessions." *Id.* at 320. These risks were realized in this case: Milam is intellectually disabled and innocent.

Milam has not previously raised an intellectual disability claim in a prior federal habeas petition. Section 2244(b)(1) therefore does not bar authorization.

### A. The State's trial expert diagnosed Milam with intellectual disability in 2021.

In January 2021, the State's trial expert, Dr. Proctor, produced a report concluding that Milam met the criteria for an ID diagnosis. Ex. 41. Dr. Proctor had evaluated Milam pre-trial in 2010 and concluded that, under then-existing criteria, Milam did not meet ID diagnostic criteria because those deficits could be attributed to Milam's low level of education—now recognized to be a risk factor for ID. *See id.* at 5; *see also Moore*, 581 U.S. at 16 ("Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination."). In January 2021, Dr. Proctor revised that opinion based on "the information currently available to [him] and the relevant diagnostic nomenclature and law at this time." Ex. 41 at 6. Thus, every expert who evaluated Milam under current clinical criteria agreed that at the time of trial he had deficits in intellectual and adaptive functioning, and that those deficits were present in the developmental period. After Dr. Proctor revised his opinion, the State jettisoned him and

retained Dr. Antoinette McGarrahan to re-administer IQ testing to Milam in September 2021.

A defense-retained expert and Dr. Proctor administered the WAIS-IV to Milam pre-trial, and he obtained full-scale IQ (FSIQ) scores of 68 and 71 respectively. Ex. 41 at 4. On Dr. McGarrahan's re-administration, Milam obtained a FSIQ of 80, which Dr. McGarrahan adjusted to 75 to account for the WAIS-IV being 14 years past the norming date. 2 SHRR 64-66. [18] Drs. Proctor and McGarrahan, as well as Milam's experts, agree that all of Milam's FSIQ scores on the WAIS-IV fall within the range——75 or below—for establishing deficits in intellectual functioning under the DSM-5-TR. 1 SHRR 53, 150; 2 SHRR 45, 78.

In the course of his pre-trial evaluation and in accordance with clinical standards, Dr. Proctor assessed Milam's adaptive functioning across the three domains of adaptive functioning: conceptual, social, and practical. Dr. Proctor's assessment was based on a clinical interview of Milam, neuropsychological testing, and interviews with lay persons who knew Milam in the developmental period. 1 SHRR 41, 42, 48; 2021

---

[18] The convicting court held an evidentiary hearing over 2 days on Milam's *Atkins* claim in May 2023. He cites to the Reporter's Record from that hearing as [Vol.] SHRR [page].

Application, Ex. 15 at 2, 3, 16. Based on this comprehensive assessment, Dr. Proctor concluded that Milam had deficits in the conceptual domain. 1 SHRR 47-48; Ex. 41 at 5 (describing "significant deficits" in the conceptual domain). A defense-retained expert in post-conviction also administered standardized adaptive functioning testing to Milam's mother and sister, and concluded that Milam had deficits across all three domains of adaptive functioning. 2021 Application, Ex. 5.

Dr. McGarrahan likewise administered neuropsychological testing to Milam, on which she observed "difficulties with planning and problem solving, nonverbal abstract reasoning, making decisions, those sorts of things." 2 SHRR 48. She also reported the presence of moderate to severe impairments in executive functioning. *Id.* She concluded based on a partial IQ score—and despite a FSIQ that fell within the range for ID— that Milam did not have deficits in intellectual functioning. She also did not conduct an adaptive functioning assessment in accordance with current clinical criteria. She concluded that based on Milam's scores on a test of academic achievement, he did not have deficits in the conceptual domain. Her report does not include a discussion of the social and

practical domains. Dr. McGarrahan did "not dispute" Dr. Proctor's testing but ruled out ID.

Dr. Proctor concluded that Milam's deficits in intellectual and adaptive functioning were present in the developmental period. He based this conclusion on the fact that he conducted his assessment in 2010, when Milam was 19 and therefore just beyond the developmental period. Under current clinical criteria, Milam has made a prima facie showing of ID: (A) There is consensus expert testimony that his full-scale IQ scores on the WAIS-IV fall within the range for establishing intellectual functioning deficits; (B) Based on a comprehensive assessment of all domains of adaptive functioning, Dr. Proctor found the presence of "significant deficits" in the conceptual domain; (C) And those deficits were present in the developmental period.

## B. Milam diligently pursued ID evidence.

Dr. Proctor's declaration that Milam did meet the criteria for a diagnosis of intellectual disability could not have been discovered previously through the exercise of due diligence. 28 U.S.C. §2244(b)(2)(B)(i). In prior *Atkins* litigation in 2019-2021, the State represented to the state courts, this Court, and the Supreme Court that

Dr. Proctor's opinion was that Milam did not meet the criteria for an ID diagnosis. Notably, the State argued that Dr. Proctor's opinion was more reliable and credible than opinions offered by Milam's experts to defeat Milam's *Atkins* claim. *See*, *e.g.*, WR-79,322-02, FFCL ¶232.

Milam reasonably relied on these representations by the State in state and federal courts. *See Banks v. Dretke*, 540 U.S. 668, 692-93 (2004). Milam was, of course, not privy to the State's communications with its expert and accordingly had no notice that Dr. Proctor's opinion had evolved since trial. Milam could not have known that the State had failed to confirm the veracity of its representations concerning its expert's opinion and he can therefore establish a prima facie case that he was diligent in obtaining this evidence. *See In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) ("[T]his claim rests not on the correctness of her testimony (which could have been disputed at any time) but on the State's interactions with its witness, which could not be known before her affidavit.").

### C. Milam can make a prima facie showing of innocence of the death penalty.

Milam acknowledges that §2244(b)(2)(B)(ii) envisages a showing of innocence of "the underlying offense" and that this Court has limited the

application of a like-provision accordingly. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) (holding that 28 U.S.C. §2255(h) requires evidence negating "guilt of the offense"). This Court's precedent was predicated on its assumption that the *Sawyer* exception did not survive AEDPA. *Webster*, 605 F.3d at 258. Two factors, however, weigh in favor of recognizing the application of §2244(b)(2)(B)(ii) to innocence of the death penalty. First, this category of innocence is well established in relevant case law. *See Sawyer v Whitley*, 505 U.S. 333, 344 (1992).

Second, and relatedly, this Court's relevant precedent predates the Supreme Court's holding in *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) that the miscarriage of justice exception based on innocence of the death penalty in *Sawyer v. Whitley*, 505 U.S. 333 (1992) *does* survive AEDPA. Milam therefore asks that this Court revisit its precedent accordingly.

Because Milam has made a prima facie showing that he meets §2244(b)(2)(B), this Court should authorize this claim to proceed in district court.

## III.  Milam is actually innocent.

Milam's conviction and sentence violate the Eighth Amendment prohibition against cruel and unusual punishment and the Fourteenth

Amendment's Due Process Clause because he is actually innocent. Milam acknowledges that the Supreme Court has previously rejected actual innocence as a basis for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 393 (1993); *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (accord). The Supreme Court, however, also assumed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. It cautioned that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. For all the reasons stated above, including the absence of any forensic evidence tying Milam to the offense and a clear motive for why Carson killed her daughter, there is potential merit to Milam's claim that he can meet that burden.

He incorporates by reference all evidence and arguments made, *supra*, Claim I in support of making a prima facie showing of diligence and innocence sufficient to satisfy §2244(b)(2)(B).

## IV. Milam can make a prima facie showing that the statute of limitations can be excused based on actual innocence.

Notwithstanding arguments that Milam can meet 28 U.S.C. §2244(d)(1), the statute of limitations may be excused because Milam can show that he is actually innocent. *McQuiggin v. Perkins*, 569 U.S. 383, 392–93 (2013); *see also*, *id.* at 399 (holding that statute of limitations may be excused where petitioner can show that "'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" (quoting *Schlup*, 513 U.S. at 327)). Milam incorporates here by reference all facts and legal arguments made above in support of making a prima facie showing that he can meet 28 U.S.C. §2244(b)(2)(B) as to his claims. Because Milam has alleged a "viable basis" for excusing the statute of limitations, this Court should permit him to proceed on his argument that the statute of limitations can be excused based on his actual innocence. *In re Campbell*, 750 F.3d 523, 533 (5th Cir. 2014).

## PRAYER FOR RELIEF

For the reasons stated, Milam respectfully requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. That this Court grant such other relief as law and justice require.

Respectfully submitted,

DATED: 17 September, 2025

/s/ Naomi Fenwick


Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
jeremy_schepers@fd.org
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
(214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
efollansbee@texasdefender.org
Jennae R Swiergula
Texas State Bar No. 24104466
jswiergula@texasdefender.org
Texas Defender Service
9390 Research Blvd., II, Ste. 210
Austin, Texas 78759
Tel: (512) 320-8300


*Counsel for Mr. Milam*