No. _____

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

IN RE BLAINE MILAM,

MOVANT.

## EXHIBITS 18-41 IN SUPPORT OF MOTION FOR AUTHORIZATION

Jason D. Hawkins
Federal Public Defender
Jeremy Schepers
Supervisor, Capital Habeas Unit
Texas State Bar No. 24084578
Naomi Fenwick
Assistant Federal Public Defender
Texas State Bar No. 24107764
jeremy_schepers@fd.org
naomi_fenwick@fd.org
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
Tel: (214) 767-2746

Emily Follansbee
Texas State Bar No. 24124283
Jennae R Swiergula
Texas State Bar No. 24104466
efollansbee@texasdefender.org
jswiergula@texasdefender.org
Texas Defender Service
P.O. Box 82236
Austin, TX 78708
Tel: 512-320-8300
Fax: 512-477-2153

# EXHIBIT 18

## Rusk County Sheriff's Office

Offense: <u>08015807</u>

ON TUESDAY DECEMBER 2, 2008 AT ABOUT 10:37 A.M. I, SGT. KEVIN ROY WAS DISPATCHED BY RUSK COUNTY SHERIFF'S OFFICE TO 13717 COUNTY ROAD 2125 IN RUSK COUNTY IN REFERENCE TO A HOMICIDE. I CHECKED EN-ROUTE UTILIZING RUSK COUNTY SHERIFF'S OFFICE UNIT #8. MY REGULAR ASSIGNED UNIT #9 WAS IN THE SHOP FOR REPAIRS.

13717 CR 2125 IS A SINGLE FAMILY DWELLING SITUATED ON THE NORTH WEST CORNER OF THE INTERSECTION OF CR 2125 AND CR 2119D. THE RESIDENCE IS CREAM COLORED WITH A COMPOSITE ROOF. THE FRONT PORCH OF THE RESIDENCE APPEARS TO BE AN ADD-ON WITH A GREEN METAL ROOF.   THERE IS A WOODEN FENCE LOCATED ALONG THE ROADWAYS OF CR 2119D AND CR 2125. THERE IS A CARPORT WITH A GREEN ROOF LOCATED ON THE NORTH SIDE OF THE RESIDENCE. .   I NOTICED A RED COLORED FORD MUSTANG PARKED NEAR THE CARPORT BEARING TEXAS LICENSE PLATE LRZ-849.

UPON MY ARRIVAL AT ABOUT 10:57 A.M. I REALIZED THAT THERE WAS NO VIDEO CASSETTE TAPE INSTALLED IN THE DASHBOARD CAMERA SYSTEM OF THIS UNIT. I PARKED THE PATROL UNIT DIRECTLY IN FRONT OF THE RESIDENCE FACING THE FRONT PORCH AND ENTRANCE INTO THE RESIDENCE. I NOTICED TWO CHAMPION EMERGENCY MEDICAL VEHICLES AT THE RESIDENCE. THE VEHICLES WERE IDENTIFIED AS CHAMPION 4719 (DAVID DONALDSON AND MARCUS BROWN) AND CHAMPION 4106 (BRIAN WILKINSON AND RON RUSSELL). I THEN ENTERED THE RESIDENCE THROUGH THE FRONT DOOR. I HAD TO STEP OVER STREWN GARBAGE THAT WAS IN TRASH BAGS THAT ANIMALS HAD APPARENTLY TORN OPEN SEARCHING FOR FOOD. THE EMERGENCY MEDICAL TECHNICIANS WERE INSIDE THE RESIDENCE ALONG WITH THE VICTIM'S STEPFATHER BLAINE MILAM AND THE VICTIM'S MOTHER JESSICA CARSON.   THE VICTIM (IDENTIFIED AS AC                    , DOB          ) WAS LYING ON HER BACK JUST INSIDE A BEDROOM DOORWAY IN THE NORTH BEDROOM OF THE RESIDENCE.   I NOTICED BLAINE MILAM AND JESSICA CARSON KNEELING DOWN OVER THE VICTIM.   BLAINE MILAM WAS KNEELING DOWN OVER THE HEAD OF THE VICTIM AND JESSICA CARSON WAS KNEELING DOWN ON THE LEFT SIDE OF THE VICTIM. JESSICA CARSON WAS CRYING AND BLAINE MILAM'S HEAD WAS DIRECTLY OVER THE VICTIM'S HEAD.

I THEN REMOVED BLAINE MILAM AND JESSICA CARSON FROM THE BEDROOM AND ADVISED THEM TO STEP OUTSIDE THE RESIDENCE WITH THE EMT'S.   I THEN NOTICED THE VICTIM HAD SEVERE BRUISING COVERING THE VICTIM'S FACE. I ALSO NOTICED OTHER BRUISES AND ABRASIONS ON THE FRONT OF THE VICTIM'S BODY. THE BRUISES ON THE VICTIM'S BODY APPEARED TO BE CIRCULAR IN SHAPE. THE VICTIM'S

CLOTHING WAS OPEN EXPOSING THE CHEST AND STOMACH. I NOTICED THAT THERE WERE SEVERAL CIRCULAR BRUISES COVERING THE VICTIM'S BODY. THE VICTIM WAS MOTIONLESS AND NOT BREATHING. I THEN LIFTED THE VICTIM'S LEFT FOOT ABOUT THREE INCHES FROM THE FLOOR AND NOTICED THE ENTIRE LEG AND LEFT SIDE OF THE BODY MOVE. APPARENT RIGORMORTIS WAS SET IN THE VICTIM.

I THEN CLEARED THE RESIDENCE TO MAKE SURE NO OTHER PERSONS WERE INSIDE THE RESIDENCE. RUSK COUNTY SHERIFF'S OFFICE LT. REYNOLD HUMBER AND SGT. AMBER ROGERS THEN ARRIVED ON SCENE. I THEN SET AN OUTSIDE PERIMETER WITH YELLOW PERIMETER TAPE AND RELEASED THE SCENE TO SGT. ROGERS.

I OVERHEARD MILAM STATE THAT HIS HOUSE GETS BROKEN INTO ALL THE TIME AND THE POLICE DON'T EVER DO ANYTHING ABOUT IT.

I THEN SEPARATED BLAINE MILAM AND JESSICA CARSON. BLAINE MILAM STATED THAT HE FED THE VICTIM A BOTTLE AT ABOUT 8:30 A.M. AND HE AND HIS COMMON-LAW WIFE JESSICA CARSON WALKED NORTH ON CR 2125 TO MEET A MAN NAMED "CLARK" TO DISCUSS MOVING A MOBILE HOME ONTO THE PROPERTY. BLAINE MILAM STATED THAT HE AND JESSICA RETURNED TO THE HOME ABOUT AN HOUR LATER AND FOUND THE VICTIM DEAD. BLAINE MILAM STATED THAT THE VICTIM HAD NO BRUISES, MARKS OR ABRASIONS AT 8:30 A.M. WHEN THEY LEFT TO MEET "CLARK". BLAINE MILAM STATED THAT "CLARK" WAS SUPPOSED TO MEET THEM AT ABOUT 9:00 A.M., BUT NEVER SHOWED. BLAINE MILAM'S DEMEANOR DURING MY INTERVIEW WAS VERY CALM AND QUIET.

AT ABOUT 11:34 A.M. I READ BLAINE MILAM AND JESSICA CARSON THEIR MIRANDA WARNINGS. BOTH SUBJECTS STATED THAT THEY UNDERSTOOD THEIR RIGHTS. I CONTACTED THE RUSK COUNTY SHERIFF'S OFFICE DISPATCH TO LOG THE TIME OF MIRANDA.

I NOTICED AN ABRASION ON THE RIGHT HAND OF BLAINE MILAM. BLAINE MILAM STATED THAT THE ABRASION OCCURRED WHEN HE STRUCK THE WALL INSIDE THE RESIDENCE AFTER FINDING THE DECEASED BABY.

AT ABOUT 11:20 A.M. I LOCATED AND INSTALLED A VIDEO CASSETTE TAPE INTO THE PATROL UNIT #8'S VIDEO RECORDING SYSTEM.

MILAM COMPLAINED ABOUT BEING THIRSTY DUE TO A KIDNEY PROBLEM THAT HE HAS. I HAD NO BEVERAGE TO OFFER MILAM.

I RELEASED CHAMPION EMERGENCY MEDICAL TECHNICIANS AT ABOUT 11:30 A.M.

MILAM STATED THAT HIS BROTHER DANNY AND MOTHER SHIRLEY WOULD RETURN HOME SOON.

MILAM STATED THAT HE IS NOT THE BIOLOGICAL FATHER OF THE VICTIM. MILAM STATED THAT HE HAS BEEN WITH CARSON AND THE BABY FOR ABOUT ONE YEAR.

MILAM STATED THAT HIS BROTHER, DANNY, WAS RELEASED FROM JAIL LAST NIGHT (12-1-08). MILAM ASKED IF I WAS INVOLVED IN THE INCIDENT THAT OCCURRED ON SUNDAY 11-30-08 WHEN HIS BROTHER WAS ARRESTED. MILAM STATED THAT ON SUNDAY 11-30-08 DANNY "WENT CRAZY WITH A GUN AND MY DAUGHTER WAS IN THAT HOUSE". MILAM WENT ON TO SAY THAT DANNY TAKES ALL HIS DAD'S STUFF. MILAM SAID THAT DANNY PICKED UP HIS VEHICLE LAST NIGHT, BUT DID NOT KNOW WHAT TIME HE ARRIVED TO GET IT.

MILAM AND MYSELF WERE STANDING AT THE REAR OF MY PATROL UNIT AND MILAM ASKED FOR A CIGARETTE. CARSON WAS SITTING IN THE BACK SEAT OF MY PATROL UNIT WITH THE DOOR OPEN. CARSON TOLD MILAM THAT THE CIGARETTES WERE LOCATED IN THEIR VEHICLE. I ADVISED MILAM THAT THE VEHICLE HAS NOT YET BEEN PROCESSED BY THE INVESTIGATORS AND HE COULD NOT SMOKE AT THIS TIME.

AT ABOUT 11:48 A.M. DANNY MILAM AND SHIRLEY MILAM ARRIVE AT THE RESIDENCE. DANNY MILAM IS DRIVING A GREEN CHEVROLET Z71 PICKUP BEARING LICENSE PLATE TX-72SDS8. SHIRLEY MILAM IS IN THE PASSENGER FRONT SEAT. I ADVISE DANNY MILAM TO MOVE THE VEHICLE FROM WHERE HE HAD PARKED IT TO ANOTHER LOCATION DIRECTLY BEHIND MY PATROL UNIT TO ENSURE THAT IT WOULD NOT BE IN THE WAY OF THE INVESTIGATORS ON SCENE.

DANNY MILAM EXITED HIS VEHICLE AND APPEARED TO HAVE NO KNOWLEDGE OF WHY AUTHORITIES WERE AT HIS RESIDENCE. AN INVESTIGATOR HAD INFORMED HIM OF THE INCIDENT AND HIS DEMEANOR SEEMED EMOTIONAL. DANNY MILAM AND SHIRLEY MILAM THEN LEFT THE SCENE AND WAS ADVISED TO RETURN PROMPTLY.

JESSICA CARSON STATED THAT THE NAME OF THE VICTIM IS AC            , DOB         . JESSICA CARSON'S DEMEANOR WAS EMOTIONAL. JESSICA CARSON STATED THAT BLAINE HAD CONTACTED THE 911 OPERATOR BUT COULD NOT EXPLAIN THE SITUATION BECAUSE

HE WAS TOO UPSET.   MS. CARSON STATED THAT SHE TOOK THE TELEPHONE FROM BLAINE TO REPORT THE INCIDENT.

JUSTICE OF THE PEACE PRECINCT TWO JUDGE BONNIE MILLER WAS NOTIFIED AT ABOUT 11:47 A.M. AND RADAR FUNERAL HOME WAS NOTIFIED AT ABOUT 12:53 P.M.   JUDGE BONNIE MILLER AND JUSTICE OF THE PEACE JUDGE BOB RICHARDSON ARRIVE ON SCENE AT ABOUT 12:24 P.M.

DANNY MILAM AND SHIRLEY MILAM RETURN TO THE SCENE AT AN UNKNOWN TIME.

SHIRLEY MILAM STATED THAT BLAINE MILAM IS NOT THE BIOLOGICAL FATHER OF THE VICTIM.   SHIRLEY MILAM STATED THAT JESSICA CARSON BELIEVES THAT ARLEN MUTINA (DOB ▇▇▇) FROM LONGVIEW IS THE FATHER OF THE VICTIM. SHE ALSO STATED THAT SHE AND DANNY MILAM VISITED ATTORNEY PAUL NELSON'S OFFICE THIS MORNING.

DANNY MILAM REQUESTED TO ENTER THE RESIDENCE TO RETRIEVE HIS CELL PHONE TO CALL HIS SISTER.   I ADVISED DANNY MILAM THAT THE RESIDENCE HAS NOT YET BEEN RELEASED AND HE COULD NOT RETRIEVE HIS PHONE.

DEPUTY BRIAN BATHKE ARRIVED ON SCENE AND TRANSPORTED DANNY MILAM AND SHIRLEY MILAM TO THE RUSK COUNTY SHERIFF'S OFFICE FOR QUESTIONING WITH SGT. ROGERS AT ABOUT 12:30 P.M.

JESSICA CARSON STATED THAT ARLEN MUTINA OF LONGVIEW IS THE BIOLOGICAL FATHER OF HER DAUGHTER. SHE STATED THAT SHE HAS BEEN FIGHTING FOR CHILD SUPPORT FROM MR. MUTINA.

AT ABOUT 12:35 P.M. MILAM ASKED IF HE COULD SMOKE A CIGARETTE AGAIN. I ADVISED NOT AT THIS TIME.

I WALKED AROUND MILAM AND CARSON'S VEHICLE WHICH WAS LOCATED NEAR THE CARPORT. I NOTICED LOOSE DIRT IN THE DRIVE WAY BEHIND THE VEHICLE.   THE LOOSE DIRT APPEARED TO HAVE BEEN CAUSED BY A VEHICLE SPINNING ITS TIRES IN THE DRIVEWAY.

AT ABOUT 12:48 P.M. I ASSISTED JUDGE MILLER WITH INFORMATION FOR THE INQUEST. I ADVISED JUDGE MILLER THAT RADER FUNERAL HOME HAD ALREADY BEEN NOTIFIED.

MILAM REQUESTED ANOTHER CIGARETTE AT ABOUT 12:58 P.M.

AT ABOUT 2:04 P.M. I TRANSPORTED BLAINE MILAM TO THE RUSK COUNTY SHERIFF'S OFFICE FOR EVIDENCE COLLECTION AND QUESTIONING BY DIRECTION OF SGT. ROGERS. DURING THE TRANSPORT MILAM ASKED ME HOW HE COULD WORK FOR THE POLICE BY TURNING IN PEOPLE THAT USE DRUGS.  LATER DURING THE TRANSPORT, MILAM ASKED FOR SNUFF.  WHILE TRAVELING WEST ON FARM ROAD 2011 WE APPROACH A BLACK PICKUP TRUCK. THIS TRUCK HAD LOUD EXHAUST PIPES INSTALLED ON IT.  MILAM ASKED ME IF THE PIPES ON THAT VEHICLE WERE TOO LOUD.  MILAM ASKED AGAIN HOW HE WOULD GO ABOUT WORKING FOR THE POLICE.  AS WE PULLED UP THE SHERIFF'S OFFICE MILAM ASKED ME HOW LONG THE INTERVIEW WOULD TAKE.

I THEN RELEASED MILAM TO RUSK COUNTY SHERIFF'S OFFICE CASE AGENT SGT. AMBER ROGERS.

THE DASH BOARD VIDEO RECORDING OF RUSK COUNTY PATROL UNIT #8 IS TAGGED AND LOGGED INTO THE EVIDENCE ROOM OF THE RUSK COUNTY SHERIFF'S OFFICE.

**Rusk County Sheriff's Office**        Offense: 08015807

ON TUESDAY DECEMBER 2, 2008 AT ABOUT 10:37 A.M. I, SGT. KEVIN ROY WAS DISPATCHED BY RUSK COUNTY SHERIFF'S OFFICE TO 13717 COUNTY ROAD 2125 IN RUSK COUNTY IN REFERENCE TO A HOMICIDE.

13717 CR 2125 IS A SINGLE FAMILY DWELLING SITUATED ON THE NORTH WEST CORNER OF THE INTERSECTION OF CR 2125 AND CR 2119D. THE RESIDENCE IS CREAM COLORED WITH A COMPOSITE ROOF. THE FRONT PORCH OF THE RESIDENCE APPEARS TO BE AN ADD-ON WITH A GREEN METAL ROOF.   THERE IS A WOODEN FENCE LOCATED ALONG THE ROADWAYS OF CR 2119D AND CR 2125. THERE IS A CARPORT WITH A GREEN ROOF LOCATED ON THE NORTH SIDE OF THE RESIDENCE. .   I NOTICED A RED COLORED FORD MUSTANG PARKED NEAR THE CARPORT BEARING TEXAS LICENSE PLATE LRZ-849.

UPON MY ARRIVAL AT ABOUT 10:57 A.M. I NOTICED TWO CHAMPION EMERGENCY MEDICAL VEHICLES AT THE RESIDENCE.   THE VEHICLES WERE IDENTIFIED AS CHAMPION 4719 (DAVID DONALDSON AND MARCUS BROWN) AND CHAMPION 4106 (BRIAN WILKINSON AND RON RUSSELL). THE EMERGENCY MEDICAL TECHNICIANS WERE INSIDE THE RESIDENCE ALONG WITH THE VICTIM'S STEPFATHER BLAINE MILAM AND THE VICTIM'S MOTHER JESSICA CARSON. THE VICTIM (IDENTIFIED AS AC           , DOB        ) WAS LYING ON HER BACK JUST INSIDE A BEDROOM DOORWAY IN THE NORTH BEDROOM OF THE RESIDENCE.  I NOTICED BLAINE MILAM AND JESSICA CARSON KNEELING DOWN OVER THE VICTIM.

I THEN REMOVED BLAINE MILAM AND JESSICA CARSON FROM THE BEDROOM AND ADVISED THEM TO STEP OUTSIDE THE RESIDENCE WITH THE EMT'S.  I NOTICED THE VICTIM HAD SEVERE BRUISING (POSSIBLY LIVIDITY) COVERING THE VICTIM'S FACE.   I ALSO NOTICED OTHER BRUISES AND ABRASIONS ON THE FRONT OF THE VICTIM'S BODY. I THEN LIFTED THE VICTIM'S LEFT FOOT ABOUT THREE INCHES FROM THE FLOOR AND NOTICED THE ENTIRE LEG AND LEFT SIDE OF THE BODY MOVE. APPARENT RIGORMORTIS WAS SET IN THE VICTIM.

I THEN CLEARED THE RESIDENCE TO MAKE SURE NO OTHER PERSONS WERE INSIDE THE RESIDENCE. RUSK COUNTY SHERIFF'S OFFICE LT. REYNOLD HUMBER AND SGT. AMBER ROGERS THEN ARRIVED ON SCENE. I THEN SET AN OUTSIDE PERIMETER WITH YELLOW PERIMETER TAPE AND RELEASED THE SCENE TO SGT. ROGERS.

I THEN SEPARATED BLAINE MILAM AND JESSICA CARSON. BLAINE MILAM STATED THAT HE FED THE VICTIM A BOTTLE AT ABOUT 8:30 A.M. AND HE AND HIS COMMON-LAW WIFE JESSICA CARSON WALKED NORTH

ON CR 2125 TO MEET A MAN NAMED "CLARK" TO DISCUSS MOVING A MOBILE HOME ONTO THE PROPERTY. BLAINE MILAM STATED THAT HE AND JESSICA RETURNED TO THE HOME ABOUT AN HOUR LATER AND FOUND THE VICIM DEAD. BLAINE MILAM STATED THAT THE VICTIM HAD NO BRUISES, MARKS OR ABRASIONS AT 8:30 A.M. WHEN THEY LEFT TO MEET "CLARK". BLAINE MILAM STATED THAT "CLARK" WAS SUPPOSED TO MEET THEM AT ABOUT 9:00 A.M., BUT NEVER SHOWED. BLAINE MILAM'S DEMEANOR DURING MY INTERVIEW WAS VERY CALM AND QUIET.

AT ABOUT 11:34 A.M. I READ BLAINE MILAM AND JESSICA CARSON THEIR MIRANDA WARNINGS.

JESSICA CARSON STATED THAT THE NAME OF THE VICTIM IS AC              , DOB        JESSICA CARSON'S DEMEANOR WAS EMOTIONAL. JESSICA CARSON STATED THAT BLAINE HAD CONTACTED THE 911 OPERATOR BUT COULD NOT EXPLAIN THE SITUATION BECAUSE HE WAS TOO UPSET. MS. CARSON STATED THAT SHE TOOK THE TELEPHONE FROM BLAINE TO REPORT THE INCIDENT.

I NOTICED AN ABRASION ON THE RIGHT HAND OF BLAINE MILAM. BLAINE MILAM STATED THAT THE ABRASION OCCURRED WHEN HE STRUCK THE WALL INSIDE THE RESIDENCE AFTER FINDING THE DECEASED BABY.

DANNY MILAM AND SHIRLEY MILAM ARRIVED AT THE LOCATION AT ABOUT 11:50 A.M. THEY ARRIVED IN A GREEN CHEVROLET Z71 PICKUP BEARING LICENSE PLATE TX-72SDS8.

SHIRLEY MILAM STATED THAT BLAINE MILAM IS NOT THE BIOLOGICAL FATHER OF THE VICTIM. SHIRLEY MILAM STATED THAT JESSICA CARSON BELIEVES THAT ARLEN MUTINA (DOB 5-5-89) FROM LONGVIEW IS THE FATHER OF THE VICTIM.

JUSTICE OF THE PEACE PRECINCT TWO JUDGE BONNIE MILLER WAS NOTIFIED AT ABOUT 11:47 A.M. AND RADAR FUNERAL HOME WAS NOTIFIED AT ABOUT 12:53 P.M.

I THEN TRANSPORTED BLAINE MILAM TO THE RUSK COUNTY SHERIFF'S OFFICE FOR EVIDENCE COLLECTION AND QUESTIONING BY DIRECTION OF SGT. ROGERS.

THE DASH BOARD VIDEO RECORDING OF RUSK COUNTY PATROL UNIT #8 IS TAGGED AND LOGGED INTO THE EVIDENCE ROOM OF THE RUSK COUNTY SHERIFF'S OFFICE.

# Rusk County Sheriff's Office

Offense: <u>08015807</u>

## SUPPLEMENTAL NARRATIVE

On April 3, 2009 at about 9:55 a.m. this investigator (Inv. Kevin Roy) travelled to the Southwest Institute of Forensic Science in Dallas, Texas. This investigator arrived at this location at approximately 1:00 p.m. to retrieve property associated with Rusk County Sheriff's Office case number 09003247.

Staff personnel from this facility advised this investigator that there was property ready for release for Rusk County case numbers 08015807 (Capitol Murder) and 08008968 (Murder). This investigator took custody of all property related to these three case numbers. This investigator took possession of all property at about 1:45 p.m.

This investigator arrived at the Rusk County Sheriff's Office at approximately 5:30 p.m. and secured all evidence.

On April 20, 2009 this investigator released evidence from case number 08008968 to Lead Investigator Jack Tulley. At about 10:00 a.m. this investigator then logged evidence from case number 08015807 into the Rusk County Criminal Investigation Evidence Room (see attached evidence log sheets).

The items logged into the evidence room are labeled as follows:

Six trace envelopes of evidence collected from victim by SWIFS.

Blood standard from victim.

Catalina jacket size Large.

Clothing from Blaine Milam.

Claw hammer.

Skin swabs.

Swab taken from Red Mustang and swabs of bite marks of victim.

Buccal swabs of Danny Milam.

Pair of size 10 ½ boots from Blaine Milam.

Two bloody baby wipes.

Swab of master bedroom mattress and swab from doorway.

Mouth swab of Blaine Milam, two mouth swabs of Jessica Carson, and nail clippers/clippings.

Q-Tip.

Baby's bed clothes.

Bloody baby wipes.

White sheet, clothing and diaper.

Bottle of Astro-glide.

Bloody diaper.

The above items were logged into the Evidence room and placed on shelf B5. The items below were placed on shelf B2.

Clothing of Jessica Carson.

Clothing of Danny Milam.

KB 535

# EXHIBIT 19

08P02031-0005

8/11/2025

Timothy J. Sliter, PhD
Chief, Physical Evidence Section
Southwestern Institute of Forensic Sciences
2355 North Stemmons Fwy.
Dallas, TX 75207

timothy.sliter@dallascounty.org
214-920-5980

Disclaimer
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.
This message came from outside of Dallas County Government. Please be thoughtful before you click a link or provide your login information!

**03/31/2016 08:45 AM Inserted By: Stacy McDonald**

Communication With:        DA Jimerson

Synopsis of Communication:
From: "Micheal Jimerson" <mjimerson@co.rusk.tx.us>
Date: 03/31/2016 at 08:45 am
To: "'Stacy McDonald'" <Stacy.McDonald@dallascounty.org>
Subject: RE: Notification of Changes to DNA Statistical Calculation Methods

The only two cases where I recall your lab worked DNA both have defense attorney that we provided notice of the recalculation opportunity.

Micheal E. Jimerson

County & District Attorney

Partnering with citizens to protect our children, lives and property

**03/30/2016 11:43 AM Inserted By: Stacy McDonald**

Communication With:        DA Jimerson

Synopsis of Communication:
From: Stacy McDonald [mailto:Stacy.McDonald@dallascounty.org]
Sent: Wednesday, March 30, 2016 11:43 AM
To: mjimerson@co.rusk.tx.us
Subject: Notification of Changes to DNA Statistical Calculation Methods


Dear Mr. District Attorney:

You are receiving this email because our records indicate that during the period January 1, 2000, through February 22, 2016, the Southwestern Institute of Forensic Sciences in Dallas performed DNA analysis for one or more criminal cases that were investigated by police agencies in your county, and that this analysis may have been used by your office in judicial proceedings.

Please see the two attached documents:

1) A letter: Notification of Changes to DNA Statistical Calculation Methods

2) A spreadsheet: Summary of DNA Testing 01-Jan-2000 thru 22-Feb-2016


We are aware that some DA offices may be responsible for portions of some cities that overlap county borders. If your office is responsible for a portion of a city and that city is not included on the spreadsheet, please let us know, and we provide you with a supplemental listing of cases worked for that city.


If you have any additional questions, please do not hesitate to contact the Institute.


Regards,


Timothy J. Sliter, Ph.D.

Section Chief, Physical Evidence

tsliter@dallascounty.org

214-920-5980



**DALLAS COUNTY**

**SOUTHWESTERN INSTITUTE OF**

**FORENSIC SCIENCES**

**2355 North Stemmons Freeway**
**Dallas, Texas 75235**

PHYSICAL EVIDENCE SECTION

21 March 2016

**Notification of Changes to DNA Statistical Calculation Methods**

This notification is to provide information to prosecutors about changes in the procedures used by the Southwestern Institute of Forensic Sciences to calculate the statistical weight of DNA matches in mixtures. This statement applies to testing performed using the short tandem repeat (STR) method of DNA testing during the period of January 2000 to February 2016.

These changes in procedures are of two types:

1. Changes to a population database used to calculate statistical weights of DNA matches. These changes were made to correct errors in the Federal Bureau of Investigation's (FBI) population database that were communicated to laboratories in June 2015.

2. Changes to the methods used to calculate the statistical weight of DNA matches in DNA mixtures. These changes were made to implement corrections and improvements in DNA interpretation methods identified during the ongoing statewide mixture analysis review that is being conducted by the Texas Forensic Science Commission (TFSC).

**Background.** As part of the DNA testing process, statistical calculations are performed to describe the weight/significance of an association between a DNA profile obtained from an evidence item, and a known individual who is included as a possible source of, or contributor to, that DNA profile. In the statistical analysis process, a database of DNA allele population frequencies forms the basis of the mathematical calculation. Currently, there are several population databases in use by U.S. crime laboratories. One such database that has been used frequently by the Institute is the FBI's population database, which is provided as a component of the FBI's Combined DNA Index System (CODIS) software.

The allele frequencies in the FBI's database are sourced from data in the following peer-reviewed publication:

> Budowle B, *et al.*, Population data on the thirteen CODIS core short tandem repeat loci in African American, U.S. Caucasians, Hispanics, Bahamians, Jamaicans and Trinidadians, *Journal of Forensic Sciences* 1999;44(6):1277-86.

**Notification of database errors.** On May 11, 2015, the forensic science community was notified of an upcoming correction to the FBI's population database. The correction was necessitated by the identification of errors in the data that were published in the 1999 research

paper.  An erratum to the 1999 paper was published July 3, 2015, in the *Journal of Forensic Sciences*.  (Moretti TR, *et al.*, J Forensic Sci 2015;60:1114-1116).  At that time, the FBI also provided the corrected population frequency data to laboratories in an electronic format for use in the CODIS statistical calculation software.

**Identification of problems in mixture analysis in Texas**.  In late 2015, as laboratories in Texas began to issue corrected reports to address the database changes, problems were identified in some laboratories in the analysis of some samples with more than one contributor.  As a consequence, the Texas Forensic Science Commission (TFSC) initiated a statewide review of mixture interpretation procedures.  As a result of this effort, a group of experts were assembled by the TFSC from academic institutions, the U.S. National Institute of Standards and Technology (NIST) and the New Zealand Institute of Environmental Science & Research (ESR).  During the period of November 2015 to January 2016 these experts provided training, consultation, and recommendations to Texas laboratories on current best practices in mixture interpretation.  The TFSC has issued a number of notifications to the legal community regarding this review and its potential impact upon post-conviction case review.  These notifications are available on the Commission's website (http://www.fsc.texas.gov).

**SWIFS's Response**

The Institute implemented corrections to the FBI's population frequency data on June 6, 2015.  The Institute has now revised its interpretation procedures to incorporate recommendations arising from of the TFSC's mixture interpretation review.  These changes have the potential to impact the interpretation of some DNA mixtures that have been previously reported.

**Casework Plan and Corrected Reports**

1. <u>Current work</u>.  Work reported beginning February 23, 2016 use both the corrected FBI database, and SWIFS's revised mixture interpretation procedures.  Reports will include statements to this effect.

2. <u>Past work for pending trial adjudication</u>.  Upon receiving notification of an upcoming trial, the laboratory will recalculate the reported statistics using the FBI's corrected database.  Additionally, any statistical calculation that is impacted by the Institute's revised mixture interpretation procedures will be recalculated, and a corrected report will be issued.

3. <u>Past work for cases pending non-trial adjudication</u>.  The laboratory is not routinely made aware of the adjudication of cases outside the trial process.  In cases where a plea agreement is being considered, upon request of the prosecution or defense, the laboratory will. where appropriate, recalculate the reported statistics using the FBI's corrected database and the revised mixture analysis procedures, and will issue a corrected report.  In instances where the original report did not use the FBI's database, and/or where the original interpretation would be unchanged using SWIFS's revised interpretation procedures, the laboratory will issue an appropriate statement/affidavit to this effect.

4. <u>Past work for adjudicated cases</u>.  For any previously adjudicated case, upon request of the prosecution or the defense, the laboratory will review the work originally reported and

determine if any corrections are needed. In the event that a correction is needed, the laboratory will issue provide an appropriate statement/affidavit that communicates the corrections.

The Institute understands that identification of adjudicated cases that involved DNA analysis often presents logistical difficulties for prosecutors' offices. Therefore, the Institute will be providing to each county prosecutor's office a list of DNA cases that the Institute has performed for agencies in that county.

This list will include a) the complainant's name, b) the investigating agency and its service number, and c) the approximate date that the Institute provided DNA testing.

The list will not include the adjudication status of the case, defendant's name, or the court cause number, as this information is not tracked in our database, and is generally unknown to the laboratory. Also, the list will not indicate if the DNA testing was performed using the FBI's population database or if the analysis involved interpretation of a DNA mixture. That information will require a review of hardcopy case files.

We understand that there are important disclosure considerations that will be impacted by these changes. We would ask that you forward this letter to your staff and all applicable defense attorneys so that these disclosure considerations can be met.

I and my staff are available to discuss this matter further.

Regards,

Timothy J. Sliter, Ph.D.
Section Chief, Physical Evidence
timothy.sliter@dallascounty.org
214-920-5980

3

# EXHIBIT 20



COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

OFFICE OF THE MEDICAL EXAMINER
DALLAS COUNTY, TEXAS
INVESTIGATION REPORT

CASE #JP4098-08          ACCEPT CODE 9.2          INV. AGENCY RCSO
HOSPICE NO               DATE                     SERVICE NO. 0315807
I.D. PHOTO NO            BY

================================================================================

DECEASED AC
AGE 1      RACE White          SEX Female          DATE OF BIRTH ▮▮▮▮
ADDRESS 13717 County Road 2125                     CITY  Henderson
STATE  Texas 75652                                 PHONE 111-111-1111
OCCUPATION                     HOW LONG            EMP.
NEXT OF KIN Jessica Bain Carson  ADDRESS 13717 County Ro  PHONE 111-111-1111
CITY       Henderson                               STATE  Texas 75652
RELATIONSHIP Mother            NOTIF. Y            BY Present
FUNERAL HOME Pending JPV                           CITY

--------------------------------------------------------------------------------

                               IDENTIFICATION
POS Y     TENT     UNK      CONFIRMED Y    BY Mother
SOURCE OF ID Jessica Bain Carson

--------------------------------------------------------------------------------

PLACE OF DEATH 13717 County Road 21  CITY/PCT Henderson     CNTY Rusk
HOSPITAL       DOA              ER          OR
RR         IN-PATIENT          NURSING HOME          RES Y
OTHER

--------------------------------------------------------------------------------

LAST KNOWN ALIVE  @        BY                        OF
DEATH OCCURED     12.02.08                           @
WITNESS                                              OF
FOUND DEAD        @        BY                        OF
PRONOUNCED        12.02.08 @ 1000    BY JP Bonnie Miller    AT Scene
DCME NOTIFIED     12.02.08 @ 1552    BY JP Bonnie Miller    OF Rusk Co./Preci

--------------------------------------------------------------------------------

INCIDENT OF TRAUMA YES      DATE 12.02.08  TIME CA 1037  AT WORK NO
LOCATION 13717 County Road 2125
CITY/PCT Henderson          CNTY Rusk          STATE TX 75652
INSTRUMENT Unknown

--------------------------------------------------------------------------------

DCME AT SCENE No            ARRIVAL TIME          DEPT TIME
PHOTOS      BY
OFFICER AT SCENE Amber Rogers          BADGE #
ELEMENT # NA                AGENCY RCoSO          MICU

--------------------------------------------------------------------------------

ATTENDING DR/HOSP Unknown To Investigating Agency    CHART #
MEDICAL BRIEF     Bite Marks/Poss Struck By Hammer   BY C. Barber
CIRCUMSTANCES     Exorcism; Poss Sexually Assaulted  BY C. Barber
FIELD AGENT       Kennedy

_____          _____
FIELD AGENT                              MEDICAL EXAMINER



COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

CASE # JP4098-08

DISPOSITION CASE                    ORDERED TO MORGUE YES    ☺

POST PERMIT ASKED PRIOR TO DCME NOTIFICATION    TRANSPORTED BY Rader FH

=============================================================================

SCENE CONDITIONS :              RIGOR MORTIS :    LIVIDITY LOCATIONS

    TEMPERATURE                 JAW
    HUMIDITY                    ARMS
    OUTSIDE WEATHER             LEGS

C.A.P.              BADGE #          OF
P.E.S.              BADGE #          OF

=============================================================================

                        INVESTIGATION NARRATIVE
----------------------------------------------------------------------
File No: JP4098-08

Name:  AC


**The Rusk County Assistant DA (Carl Barber) has requested that the
bite marks are swabbed for comparison and a sexual assault kit is
done. It was further relayed that a search warrant was pending for
the following to be collected from the decd parents:
    -Dental Impressions
    -Blood Samples
    -Saliva Samples

**JP Bonnie Miller gave permission for the ME to discuss any
findings with the following individuals:
    -Kenny Ray; Texas Ranger; 903-655-3000
    -Carl Barber; Assistant DA; 903-657-2265 or 903-646-3700
    -William Brown; DA Investigator; 903-657-2265
    -Det. Amber Rogers; Rusk County SO; 903-646-1793


CONTACTS:
    -JP Bonnie Miller, Rusk County/Precinct 2, 903-947-6440 Office#
    -Carl Barber, Rusk County Assistant DA, 903-657-2265 Office#,
903-646-3700 Cell#
    -Det. Amber Rogers, Rusk County SO, Badge #534, 903-655-3000
Office#, 903-646-1793 Cell#
    -Lt. Reynold Humber, Rusk County SO, Badge #531, 903-655-3000
Office#



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

CONT PAGE 2

PAGE 2

INITIAL NOTIFICATION TO DCME:

Assistant District Attorney, Carl Barber, with the Rusk County SO, called the DCME and relayed information regarding the demise of a 1/W/F to Dr. Joni McClain. It was reported that the decd was the victim of an exorcism, which was performed by her parents. The decd was identified as "AC                ". At the time of this call, the death had not been reported to the DCME; therefore, no information was known, besides notes taken by Dr. Joni McClain. It was noted that per the decd parents, the decd was possessed by demons and an exorcism was performed. It's believed that the decd was sexually assaulted and possibly struck with a hammer; bites marks were observed.

At 1552 hours, FA phoned Carl Barber to obtain additional information regarding the demise. FA was informed that JP Bonnie Miller, of Rusk County was sending the body of a 1/W/F for a full autopsy. Per Mr. Barber, it's suspected that the decd was murdered by her parents while performing an exorcism. The decd was supposedly possessed by demons. It's also suspected that the decd was struck with a hammer and sexually assaulted. Bite indentations were visibly seen on the decd. According to Mr. Barber, the decd parents are both eighteen years of age. The decd father, Blaine Keith Milam, is currently on probation for sexual assault of a child. The condition of the residence was unknown, but it's suspected that the exorcism was performed in the bathroom. No other children were reported to live at the residence.

SCENE OBSERVATIONS:
    -None; Out Of County Demise.

OTHERS INTERVIEWED:

Lt. Reynold Humber, with the Rusk County SO, reported that the 911 call was placed by the decd parents at 1037 hours. The Rusk County SO arrived at the residence at 1057 hours; Champion EMS arrived at 1049 hours. Per. Lt. Humber, the two bedroom residence was filthy and had piles of trash throughout, as well as holes in the floor. Overall, the residence was in dire need of repair. It was further relayed that the incident location was the home of the following persons: Blaine Milam (step-father/suspect), Blaine Milam's mother (not home at time of incident), Blaine Milam's brother (not home at time of incident), Jessica Carson (decd mother), and the decd. The family also had three dogs. Per Lt. Reynold Humber, no illegal drugs were found at the residence; however, Blaine Milam's brother is a known meth addict and had obvious 'meth sores'.

Lt. Humber, further reported that two stories were told by the decd mother, Jessica Carson, before the confession was obtained.

                -1st Story: Decd was in car wreck yesterday
                -2nd Story: Decd left home alone; attacked by dogs
                -3rd Story: Exorcism by step-father, Blaine Milam



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

PAGE 3

The decd mother reported that 'this' all started in September when the step-father and decd were playing with a 'ouija board' and both became possessed. Per Lt. Humber, the mother could not recall any abnormal behavior by the decd. The decd mother further stated that she was in another room and was locked out of the bedroom where the exorcism was being performed. She stated that the exorcism began last night after dark and ended this morning before 0900 hours; however, the exorcism was on and off, not continuous. The mother further reported that the decd was hitting herself on the head with various object including a hammer, while the step-father was biting her; this was all going on at the same time in an effort to release the demons. No previous exorcisms were reported. The mother further relayed that the step-father stayed in the room the entire time until around 0900 hours. At that time, they both left the residence and went to a pawn shop to get money, so a priest could do the exorcism. Once back at the residence, the step-father informed her that it was too late for the priest to do anything. 911 was called shortly after.

Lt. Humber, further relayed that the decd step-father was currently being interviewed by the Rusk County SO. He stated that the step-father was evaluated by the Rusk County CPS a couple of weeks ago and underwent a mental assessment. Lt. Humber also relayed that the Rusk County SO was dispatched to the residence last week and a deputy was injured. Per the notes, the step-father's brother was threatening the family with a gun.

Det. Amber Rogers, with Rusk County SO, reported that the decd was found face up on the bedroom floor, with massive head trauma, bruising, and obvious bite marks. The decd was clad in a light blue onsie and diaper.

MEDICAL HISTORY:
- -Bite Marks
- -Massive Head Trauma
- -Possibly Sexually Assaulted

CASE JUSTIFICATION:
- -Homicidal Violence; Exorcism.

PROPERTY/EVIDENCE COLLECTED:
- -None.

FOLLOW UP:
- -None.

Kennedy

# EXHIBIT 21

## OFFICE OF

# SHERIFF SMITH COUNTY

**J. B. SMITH
SHERIFF**



P O BOX 90
TYLER, TEXAS 75710
CID  (903) 590-2690
FAX (903) 590-2679

### FAX TRANSMISSION SHEET

## CRIMINAL INVESTIGATION DIVISION

**DATE:** _04/06/2010_

**TO:** _Rusk Co. D.A.'s Office_

**FAX:** _903-657-0324_

**ATTENTION:** _William Brown_

**FROM:** _Noel Martin_

**NUMBER OF PAGES (COVER SHEET INCLUDED)** _5_

**REFERENCE:** _Case # 2008-29851_

_Capital Murder_

_Assist With Crime Scene Investigation_

# INCIDENT/OFFENSE REPORT

Case Number
**2008-29851**

| Incident ID | Received Date | Received Time | Received Method | Received By |
|---|---|---|---|---|
| **960246** | **12/17/2008** | **10:14AM** | **OFFICER INITIATED** | **ONUOHA, MONTAVIA** |

| Nature of Call Reported | Initial Call Reported By | Dispatched To |
|---|---|---|
| **ASSIST** | | **TX** |

| Officer(s)/Unit(s) Assigned | Date Notified | Dispatch | Arrive | Clear | Total | Disposition |
|---|---|---|---|---|---|---|
| **560354-MARTIN, NOEL** | **12/17/2008** | **10:14** | **10:14** | **10:14** | **24:00** | **NO REPORT** |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Investigator Assigned | Att/Compl | Area | Subdiv/Grid |
|---|---|---|---|
| **560354-MARTIN, NOEL** | | | |

| Incident/Offense Date | Incident/Offense Time | UCR Code | Status | Status Date |
|---|---|---|---|---|
| **12/17/2008** | | | **CLEARED BY EXCEPTION** | **06/20/2009** |

| Incident/Offense Address | City, State & Zip Code |
|---|---|
| | **TX** |

| Entry Point | Exit Point | Weapon/Force Used | Evidence Collected |
|---|---|---|---|
| | | | |

| Inc/Off Code | Incident/Offense Description |
|---|---|
| | |

| CATEGORY | CLASS | DESCRIPTION OF ITEM(S) | ESTIMATED VALUE | NCIC | DISP |
|---|---|---|---|---|---|
| | | | | | |

| YEAR | MAKE | MODEL | COLOR | LICENSE | DESCRIPTION |
|---|---|---|---|---|---|
| | | | | | |

| CONNECTION | NAME & ADDRESS | TELEPHONE | DESCRIPTION/IDENTIFICATION |
|---|---|---|---|
| | | | |

© 1999, The Software Group, Inc.

*Note: This report is furnished in compliance with the Texas Open Records Act, article 6252-17a Vernons Annotated Civil Statutes, case law, and published rulings relating to cases under investigation.*

CRIME SCENE UNIT SUPPLEMENT (960246.1)

Case Number: 2008-29851 by Officer 560354 (MARTIN, NOEL) 06/20/09
08:09pm


FORENSIC SERVICES REPORT
CASE:    2008-29851
OFFICER:       NOEL MARTIN / IRA EARLS
TYPE:    ASSIST OTHER / PROCESS HOMICIDE SCENE
DATE:    6/20/2009
STATUS:   CLOSED
On December 11, 2008 I was contacted by Missy Wolfe a representative
with the Texas Attorney Generals office. Missy Wolfe stated that she
was assisting Rusk County with the homicide investigation of a small
child that occurred in December of 2008. Missy stated that she needed
assistance with follow up at the crime scene. The crime scene was
located in the lake Cherokee Area of Rusk County at a private
residence. I had Missy contact Sgt. Meadows with the request for his
approval. The request was approved and Ira Earls and I responded to
the Rusk County Sheriff's Office, meeting with the lead investigator,
Amber Rodgers. We were briefed as to what was needed at the scene and
Ira Earls and myself followed Rodgers to the crime scene.
The crime scene when I arrived was secured by a uniformed deputy.
Rodgers stated that she had obtained consent from the home owner to
enter the residence and process the scene as needed. Rodgers showed
me photographs of the scene as it appeared when it was first
discovered by law enforcement. The scene is described as a single
family dwelling (double wide mobile home). The residence was tan in
color timed in dark tan. A wooden deck was attached to the front of
the residence and west side of the residence. Ira Earls, Amber
Rodgers and I entered the residence through the front door for an
initial walk-through and examination of the scene. The front porch
and deck was cluttered with discarded trash. Arrow templates were
visible on the front door pointing to what appeared bloodstains.
These were located on the exterior and interior of the door. The
front door opened into a common area or living room. A doorway was
located to the right just inside through the front door. The doorway
was to the master bedroom and the location where the deceased baby was
located by first responders. The residence was cluttered to point of
being filthy. Dog and Cat feces were present on the floor in every
room. Bare wood was visible where the carpet had been removed from
the floor. A strong odor of animal waste was present inside the
residence. A mattress was located on the floor in the living room.
This mattress was covered with assorted clothing and a suit case.
Baby diapers were also located on the mattress. A bed located in the
master bedroom had reddish in color stains on the mattress. The
mattress was not covered with any type of bedding. Numerous stains
were visible on the carpet at the foot of this bed. Attached to the
master bedroom was bathroom. Sheet rock was missing from one of the
walls and there was a large hole in the floor. Reddish color stains
were visible on the cabinet where the sink was located. The stains
were similar in appearance with bloodspatter. Located in the kitchen
area of the dwelling on the floor next to the wall was a small orange
in color electrical cord with one end missing and bare wires exposed
on one end. In the bathroom located on the end across from the
kitchen numerous stains were visible on the wall and door that were
consistent in appearance with blood. Numerous items of clothing were

observed on the floor and bed. Some of the clothing was the type worn by a small child. Bloodstains were visible on the child's clothing and on clothing that was located in floor. The mattress in this room was uncovered and stains were present on the surface that was consistent with blood. Numerous other items were located in the room that were consistent with this room being the room of a small child or where a small child might sleep. Some of these items included a baby bottle and discarded diapers.

After completing the walk-through of the scene I video taped the scene as it appeared. Det. Earls photographed the scene as it appeared. Upon completing the visual documentation of the scene a systematic search for evidence was done. Bloodstains and suspected bloodstains were tested using LMG and OBTI. The scene was processed with the chemical Blue Star then items of evidence were collected. The results of the processing are as follows:

1.      Stains located on the foot of the bed in master bedroom were negative for blood.
2.      Blue Star processing was conducted on this bed and stains that were not visible were located near the center on the surface of that mattress. These stains were positive for blood with LMG and OBTI.
3.      Stains on the carpet on both sides of the mattress were tested for blood using the chemicals LMG and OBTI. These stains were positive for the presence of blood.
4.      The chemical Blue Star was applied to the floor in the master bedroom and positive reactions to the presence of blood were observed on the floor on both sides of the bed on the foot end. This included stains that were not visible before the Blue star was applied.
5.      All of the stains in the master bath were tested for blood and all were negative.
6.      The chemical Blue star was used in this room and reactions were observed.
7.      Stains located on the front door of the residence were positive for blood. These had the appearance in shape of a patent fingerprint. The chemical amido black was applied to those stains in an attempt to recover friction ridge patterns for identification. Ridges were developed but lacked the detail for a comparison or Identification.
8.      Stains in the child's bedroom consistent with blood were located on clothing on the floor and clothing on the bed. Both tested positive for blood with the chemical LMG. Both tested positive for human blood with the chemical OBTI.
9.      Bloodstains were located on the mattress in the child's bedroom using the chemical blue star. These were photographed after being processed with blue star.
10.     Numerous items of evidence were collected as evidence by Amber Rogers. Each item was photographed as it was being collected.
11.     Bloodstains were visible on the wall of the bathroom near the child's room. Samples of this blood was collected as evidence and given to Amber Rogers.
12.     Blood was located in the hallway between the kitchen and the child's room on the tiled floor. These stains were consistent in appearance with a human foot print. These stains were photographed after being processed with the chemical blue star. Samples of the blood was collected as evidence and given to Amber Rogers. These bloodstains were also enhanced with the chemical Amino Black in an attempt to enhance the friction skin for a comparison. No identifiable friction ridge skin was developed. These stains were photographed after being enhanced with blue star and again after being processed with the blue star.

13.     The electrical cord located in the kitchen floor was collected
as evidence and given to Amber Rogers.
14.     Based on the evidence discovered at the scene the events that
caused the victim's death most likely occurred in the child's bedroom.
The evidence in the master bedroom room only suggests that a bloody
object came in contact with the bed and floor.
15.     Evidence was present that would indicate that an attempt was
made to stage the scene namely in an effort to support a story that
differs from the actual events that caused the child's death.
After completing the scene investigation I cleared and returned to
Smith County.
Noel Martin
Criminalist

# EXHIBIT 22

## OFFENSE REPORT
## DISTRICT ATTORNEY'S OFFICE
## RUSK COUNTY, TEXAS

OFFENSE; Capital Murder, Capital Felony
OFFENSE DATE; 12-02-08
PLACE OF OFFENSE; 13717 CR 2125, Henderson, Texas
INVESTIGATOR: WILLIAM H. BROWN

On Tuesday, December 2, 2008, Writer was contacted by Lt. Reynold Humber of the Rusk County Sheriff's Office and requested to assist in the investigation of the death of 13 month old AC . Humber advised the Writer that he was on the scene and it appeared that the baby had been beaten to death. Humber requested Writer and Texas Ranger Kenny Ray respond to assist.

Writer and Ranger Ray responded to the scene in Ranger Ray's vehicle and met with Humber, Investigator Canon Levoy, Investigator Amber Tyson, Investigator Charles Helton, Investigator Jack Tully, and patrol Sgt. Kevin Roy. Writer also saw a young white female and male on the premises. Sgt. Roy advised that the two adults other than officers on the scene were the mother and step-father to the deceased baby. Champion EMS was just leaving the scene and Writer and the Ranger arrived.

Lt. Humber briefed Writer and the Ranger as to the investigation so far and a written consent was obtained from each adult allowing officers to enter and search the crime scene. Writer assisted in the search of the interior of the residence. Writer noticed the deceased infant lying face up in the doorway of the master bedroom and was present as Investigator Levoy and Investigator Helton made pictures. Writer also noticed blood stains in the bathroom off the master bedroom, on the bed in the master bedroom, and on the floor of the master bedroom. Photographs were made by the above named Investigators of the blood observed by the Writer.

Writer then went outside and had a conversation with Jesseca Carson, the white female and mother of the victim. Writer asked Jesseca to show Writer where she and her husband had walked to and she did. That location was approximately 100 yards to the northeast of the residence. Jesseca told Writer that the baby was asleep so she and her husband walked up the road to look at a location for a trailer house. She advised they got to talking and stayed "too long" and when they returned home, they found the victim, her baby, dead. Writer and Jesseca then returned to the front yard of the residence.

Writer next met with JP# 2 Bonnie Miller and assisted Judge Miller in her inquest report and Autopsy Order. Judge Miller ordered the victim to be removed and transported by Rader Funeral Home of Henderson. Sgt. Roy contacted Rusk County dispatch to contact Rader.

Once Rader Funeral Home had arrived, the victim was removed via a body bag for transportation to Southwest Forensic Institute in Dallas, Texas for autopsy.

Ranger Ray then informed Writer that Jesseca Carson had admitted to him that she had been present when her husband killed her baby because the baby was 'demon possessed" Writer contacted HPD Detective David Marshall to contact the Insta-Cash Pawn Shop in Henderson in an attempt to verify Jesseca's story. Marshall contacted Writer back and confirmed that Jesseca Carson and Blaine Milam had been to Henderson the morning of Dec. 02, 2008 and pawned certain items. Marshall obtained copies of the pawn tickets and a copy of the video surveillance from inside the store which shows the two defendants.

Writer then traveled back to Henderson and prepared a Capital Murder Complaint against Blaine Keith Milam and Jesseca Bain Carson. Writer also prepared two search warrants, one for each defendant for DNA evidence and teeth impressions. Writer and Investigator Charles Helton executed the search warrant on Jesseca Carson. Dr. John Hillin DDS in Henderson made the dental impressions in his office and advised Writer they would be available at 8:00 AM Wednesday 12-03-08. Dr. Hillin also made the dental impressions of Blaine Keith Milam. Writer and Investigator Helton then transported Jesseca Carson to the Henderson Hospital ER where a blood sample was drawn. That sample was released to Investigator Helton.

Writer then met with other Investigators at the Rusk County Sheriff's office and held a debriefing of all investigators assigned.

On Wednesday, December 3, 2008, Writer met with all the assigned Investigators, Ranger Ray, Chief Deputy Darryl Norris, and Sheriff Glen Deason. Another debriefing was held and plan of action for the day discussed.

Writer prepared an evidentiary search warrant for the residence at 13717 CR 2125 (the crime scene). This warrant was based on new information received during interviews with the two defendants done the night of 12-02-08. The warrant was issued and served by the Writer, Investigators Helton and Tully, Chief Norris, and Lt. Humber. Danny Milam, the uncle of the victim and brother of the defendant, Blaine Milam, was home at the time officers arrived and assisted officers in the search for specific items. A copy of the completed warrant including return was left at the residence with Danny Milam.

Writer returned to Henderson and secured copies of aerial pictures from computer software generated by the Rusk County Appraisal District. The pictures show an aerial view of the crime scene including the surrounding acreage.

Investigation continuing......

WILLIAM H. BROWN
INVESTIGATOR
RUSK COUNTY DISTRICT ATTORNEY'S OFFICE

# EXHIBIT 23

## RE: Hi There

Angela Padgett-Thomas

**Sent:** Thursday, July 09, 2009 2:03 PM

**To:**    Missy Wolfe [Missy.Wolfe@oag.state.tx.us]

---

Sounds good.  Just let me know when to be expecting the evidence back for the additional testing.

Angel

---

From: Missy Wolfe [Missy.Wolfe@oag.state.tx.us]
Sent: Thursday, July 09, 2009 1:10 PM
To: Angela Padgett-Thomas
Subject: Re: Hi There

Shoot. I didn't know they picked that stuff up. I won't need to get those SA kits Thur. I'm just getting the stuff to have fingerprinte d then I'll return it for addit testing like we spoke about.
-----Original Message-----
From: Angela Padgett-Thomas <Angela.Padgett-Thomas@dallascounty.org>
To: Wolfe, Missy <Missy.Wolfe@oag.state.tx.us>

Sent: 7/9/2009 1:07:47 PM
Subject: RE: Hi There

Hi Missy,

It looks like the only evidence that we still have here are the SA kits (our items 19, 36 and 37).  The blood vials (our items 5 and 6) were given to the Toxicology Unit on 1/30/09 and the remainder of the items were (except the SA kits) were released to Rusk S.O. on 4/3/09.  Donald K. Roy is who picked up the items that were sent to Rusk S.O. and Justin Schwane is the analyst from the Toxicology Unit who picked up the blood vials.  If you need those vials back, you can contact him at 214-920-5831 so he can get them ready for you.  So, the SA kits will be ready for you to pick up Thursday.  Let me know if you need anything else.

Angel

---

From: Missy Wolfe [Missy.Wolfe@oag.state.tx.us]
Sent: Thursday, July 09, 2009 11:56 AM
To: Angela Padgett-Thomas
Cc: JimersonM@aol.com; Lisa Tanner
Subject: Hi There

Hope you are well. I was hoping that on the AC    Baby Case I could pick up those items we had discussed having printed before we did more extensive DNA work. I will be in Dallas next week and could collect them on Thursday if possible. I'll get a list together for the evidence custodian. Sorry I don't have the L # handy. I'm on the road. This is the case with the 13 month old baby who was beaten, sexually assaulted, you name it. Take care.

# EXHIBIT 24

12/02/08 Jessica Carson Revised 12/8/09



1
2
3
4
5
6
7        \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
8       TRANSCRIPTION OF VIDEO
9          CID INTERVIEW
10            OF
11     JESSICA BAIN CARSON
12     DECEMBER 2, 2008
13       \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
14
15    REVISED 12-8-09     **ORIGINAL**
16
17
18
19
20
21
22
23
24
25

DEFENDANT'S EXHIBIT 6

12/02/08 Jessica Carson Revised 12/8/09

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                       EXAMINATION

 3  BY SERGEANT RAY:

 4      Q.   I'm Sergeant Kenny Ray with the Texas Rangers out of

 5  Tyler.  It is Tuesday, December 2nd, 2008, and it is

 6  approximately 2:31 p.m., and I'm at the Rusk County Sheriff's

 7  Office in Henderson, Texas.

 8            And would you state your full name for me,

 9  please.

10      A.   Jessica Bain Carson.

11      Q.   And Jessica, I need you just to speak up a little

12  bit, okay, because I want you to understand we're videotaping

13  this.  Okay?  All right.  So will you tell me your full name

14  one more time.

15      A.   Jessica Bain Carson.

16      Q.   And what's your birthday?

17      A.   ████████, 1990.

18      Q.   Okay.  All right.  Now I've got to read you

19  something.  Let me tell you why.  We're in the sheriff's

20  office.  We're in a police station.  Okay?  Now, we've already

21  talked out there in the country.  And you told me the truth out

22  there, and I want you to do that again.  Okay?  Because I told

23  you then and I'm telling you now, I believe you, okay, and I

24  want you to do the right thing.  But I have to read you your

25  rights and I want to make sure you understand them.  Okay.
```

12/02/08 Jessica Carson Revised 12/8/09

1          You have the right to remain silent and not make

2 any statement at all, and any statement you make may be used

3 against you at your trial.  Do you understand that?

4     A.    Yes, sir.

5     Q.    Any statement that you make may be used as evidence

6 against you in court.  Do you understand that?

7     A.    Yes.

8     Q.    You have the right to have a lawyer present to advise

9 you prior to and during any questioning.  Do you understand

10 that?

11     A.    Yes, sir.

12     Q.    If you're unable to employ a lawyer, you have the

13 right to have a lawyer appointed to advise you prior to and

14 during any questioning.  Do you understand that?

15     A.    Yes, sir.

16     Q.    And here's what I want you to really understand.  You

17 have the right to terminate the interview at any time.  You can

18 stop talking to me whenever you want to.  Okay?  All right.

19 Now, having read you that, did you understand each one of those

20 rights?

21     A.    Yes, sir.

22     Q.    Okay.  Would you do something for me?  This is the

23 little card I just read.  Let me ask you, after I read you

24 those rights, do you knowingly, voluntarily, and intelligently,

25 are you willing to talk to me now?

12/02/08 Jessica Carson Revised 12/8/09

1     A.   Yes, sir.

2     Q.   And let's talk about what happened out there today.

3 Okay.  First thing I want you to do is initial beside each one

4 of those numbers showing that you acknowledge that you

5 understood that right that I read you.

6     A.   (Complies.)

7     Q.   Okay.  Now, turn the card over, please, ma'am, just

8 turn it over.  And all I want you to do is sign your name, your

9 regular signature, and you're just acknowledging I read you

10 those rights and you're voluntarily agreeing to an interview.

11 And would you go ahead and date it, please, and put the time.

12 It's now 2:33 p.m.

13     A.   (Complies.)

14     Q.   Okay.  I'll sign it, too.  Okay.  Jessica, let me ask

15 you first just a few questions about who you are so we can get

16 that established.  Your full name is Jessica Bain Carson; is

17 that right?

18     A.   Yes, sir.

19     Q.   Okay.  And you were born August 31st, 1990.  Would

20 you tell me your social security number, please.

21     A.   &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;.

22     Q.   Okay.  And what is the address where we were at

23 earlier, where you're living right now?

24     A.   13717 County Road 2125, Henderson, Texas.

25     Q.   Okay.  And the phone number out there?

12/02/08 Jessica Carson Revised 12/8/09

```
 1      A.    903-643-9101.

 2      Q.    Okay.  Very good.  All right.  Who owns that house?

 3      A.    Shirley Milam.

 4      Q.    And who is Shirley Milam?

 5      A.    My -- well, Blaine's mother.

 6      Q.    Okay.  And who is Blaine?

 7      A.    My fiance.

 8      Q.    And what is his full name?

 9      A.    Blaine Keith Milam.

10      Q.    Blaine Keith Milam.  And do you know Blaine's

11 birthday?

12      A.    ████89.

13      Q.    ████1989, okay.  Now, you and Blaine right now,

14 y'all are actually engaged.  Y'all both refer to each other as

15 your fiancees?

16      A.    (Nods head.)

17      Q.    When do you plan on getting married?

18      A.    Next year in March.

19      Q.    In March of 2009?

20      A.    Yes, sir.

21      Q.    Have you already got a date?  What date?

22      A.    The 21st.

23      Q.    21st or the 24th?

24      A.    21st.

25      Q.    Okay.  All right.  Okay.  And so who lives at the
```

12/02/08 Jessica Carson Revised 12/8/09

1 house?

2    A.   Me, Shirley Milam, Blaine Milam, and Danny Milam on

3 occasion.

4    Q.   Okay.  And one other person?

5    A.   AC

6    Q.   Would you state her full name for me.

7    A.      AC

8    Q.   Okay.  And that's your daughter?

9    A.   (Nods head.)

10   Q.   And what is AC    's birthday?

11   A.   ████████.

12   Q.   ████  of '█.  Okay.  Now, this morning, today is

13 Tuesday, December 2nd, okay.  This morning at the house, who

14 all was actually there?

15   A.   Me, Blaine, and AC    .

16   Q.   Okay.  That's you so that's Jessica Carson, Blaine

17 Milam who is your fiance, and your daughter AC

18 That's all that was at the house this morning?

19   A.   Yes, sir.

20   Q.   Okay.  All right.  Now, we talked out at the house

21 awhile ago, right?

22   A.   Yes, sir.

23   Q.   Okay.  And at first you told me a story that wasn't

24 the truth, and you and I both knew that it was not the truth.

25 But then you told me the truth.  And the reason you told me you

12/02/08 Jessica Carson Revised 12/8/09

1 were reluctant to tell me the truth -- and I'm not trying to

2 put words in your mouth.  I'm restating for the video what you

3 told me out there.  You looked at me and you said, nobody will

4 believe me.  And I told you I would believe you, didn't I?

5     A.   Yes.

6     Q.   Okay.  And you told me it dealt with God and the

7 devil, and I told you I was a Christian and I would believe

8 what you said.  Is that true?

9     A.   Yes, sir.

10     Q.   Okay.  Now, what I want you to do now is, I want you

11 to tell me the story again, and I do believe you.  Okay?  You

12 and I are just talking.  And I want you to speak up loud enough

13 that I can pick it up on the tape, but I want you to tell me

14 the story.  Tell me again what happened.

15     A.   Do you want me to start from the beginning or?

16     Q.   I want you to start from the very start, yes.  And I

17 need you to speak up for me, please.

18     A.   Okay.

19     Q.   You want a hanky?

20     A.   Huh?

21     Q.   Do you want a handkerchief?

22     A.   Uh-huh.

23     Q.   I have a clean one.  It's in my pocket, but it has

24 not been used, okay?  It's freshly laundered this morning, and

25 you're welcome to keep it.  I know you're upset.  So yes, start

Case 4:13-cv-00454-RC Document 13 Page 42 Date Filed 09/18/2025
Case 2:54-0579 Document 371-1 Filed 10/05/17 Page 139 of 178 PageID #: 5882

Page 8

12/02/08 Jessica Carson Revised 12/8/09

1 from the very start, and I need you to talk as loud as you can,

2 please.

3     A.    Okay.  Blaine, my fiance's dad died on September 10th

4 a couple of months ago, and we had bought a Ouija board to see

5 if it was really real or not, if we could talk to him or

6 whatever.

7     Q.    Okay.  When you say a Ouija board, are you talking

8 about the game --

9     A.    Yeah, the game --

10    Q.    -- that's got the board, and it's got that little

11 kind of heart --

12    A.    Indicator.

13    Q.    -- heart-shaped deal that you put your fingers on?

14    A.    Yes.

15    Q.    A Ouija board.  All right.  Go ahead.  So y'all

16 bought one of those?

17    A.    Yes, we bought one of those because people said it

18 could call back spirits and everything.  And we didn't know it

19 wasn't all right at the time that we played it.  If we did, we

20 never would have played it because all this stuff wouldn't have

21 happened, but we played it.

22            And the first time I played it, I wanted to talk

23 to my daddy because my daddy has been dead about eight years

24 now.  And I asked him a question only me and him would know.  I

25 asked him what did he always call me that nobody else called

12/02/08 Jessica Carson Revised 12/8/09

1 me, and he said Jezebel, and that was the name he always called
2 me. And Blaine didn't know that. And then Blaine asked his
3 dad a question that I didn't know, and his dad answered that
4 question, too.

5         And so we thought we were talking to our dads.
6 And we thought it was some kind of telephone to heaven kind of
7 thing. We talked about eight hours nonstop that night. We
8 didn't get up or anything. We just continually talked to them.
9 The first night was really good. Everything was great. And so
10 we hung it up for the night, and then the next day we wanted to
11 talk to them again and tell them good morning.

12    Q.  Okay. Hang on before we go to the next day. Where
13 did this happen? Where were y'all when this happened?

14    A.  It happened at our old apartment.

15    Q.  And where was that?

16    A.  In Longview.

17    Q.  In Longview. Okay. And who was there when that
18 happened?

19    A.  Me and Blaine were in our bedroom and AC  was
20 asleep in her own room.

21    Q.  Okay. And so basically, y'all got a Ouija board, and
22 I know there's a better way to -- how do you pronounce it?

23    A.  A Ouija.

24    Q.  Okay. Y'all got one of those, the game, and the very
25 first night y'all played it, the Ouija board answered a

12/02/08 Jessica Carson Revised 12/8/09

1  question for you that only you would have known, Blaine

2  wouldn't have known the answer to?

3      A.   (Nods head.)

4      Q.   And then Blaine asked it a question with his hands on

5  the indicator, and it spelled out the letters of the answer

6  that only he would have known, you wouldn't have known?

7      A.   Uh-huh.  Everybody -- everybody has to put their

8  hands on it.  It can't just be one person.

9      Q.   Understood.  Okay.  And so -- and y'all stayed on it

10 about eight hours that night, and y'all were both absolutely

11 convinced that each of you were speaking to your deceased

12 fathers?

13     A.   (Nods head.)

14     Q.   And basically, your dad was talking to you from

15 heaven?

16     A.   Uh-huh.

17     Q.   Okay.  That must have been a pretty cool feeling?

18     A.   Yeah, I was real happy that night.

19     Q.   I'll bet.  Okay.  All right.  So the next day?

20     A.   The next day we decided to wake up and tell them good

21 morning.  We were so happy we finally found something to talk

22 to our dads through.  And we kept talking to them for awhile

23 and we -- we thought it was our dads because, like, me and

24 Blaine couldn't find his truck keys, and his truck was about to

25 be towed because it had a flat and he was parked up front.  And

12/02/08 Jessica Carson Revised 12/8/09

1 they told us exactly where the keys were at, and neither one of

2 us knew.  So we knew it wasn't just for effect or anything.

3          But then we started talking some more and

4 things -- some things didn't make sense, or things that our

5 dads wouldn't say didn't make sense.  So we started talking to

6 more people about it who knew the Ouija board better.  And they

7 said it was an omen to God, that to play the Ouija board, it

8 calls up bad spirits, demons.  And so they told us, he told us

9 to get this Chinese music box which has people singing in

10 Chinese, "God will protect us, God is our Lord and Savior,

11 demons go away."  So we played it in the house and blessed the

12 apartment, blessed the Ouija board, and then we threw the Ouija

13 board away.

14          Well, even though we threw the Ouija board away,

15 the last time we came back there to get our stuff -- because we

16 were moving out because Blaine's mom was lonely and we decided

17 to go live with her -- we decided to play it one more time

18 before we threw it away.  And right when we did it, Blaine

19 yelled, stop.  And I said, what's wrong?  And he was like, I

20 don't know, I just have this bad feeling.  I said, okay.  He

21 said, it needs to be gone now.  I don't want to touch it, I

22 don't want to look at it.  I said, okay.  And that's when we

23 threw it away.

24          And ever since that day, he has had -- last

25 night was the first night it's happened in a pretty good while,

12/02/08 Jessica Carson Revised 12/8/09

1  and it only happened one time last night, but ever since that

2  day he's had the devil come into him talking to him, talking to

3  me through him, telling me that he put the Ouija board into a

4  man in the 1800s to collect souls and to let bad spirits in.

5  And it was scaring me really bad.

6           And a lot of it had to do with me and Blaine not

7  trusting each other every time we told each other something and

8  hiding stuff just because we didn't want to hurt each other

9  because that's against God's wantings.  Don't lie, don't hide

10 anything, tell the truth, be truthful, be honest.

11          And so it would start up for awhile, it would

12 get really bad, and then the devil would just go away for

13 awhile.  And then once we thought things were good, it would

14 all come back again.  And it was an on and off, on and off

15 thing.  And --

16     Q.   About what time -- his dad died in September.  When

17 did y'all get the Ouija board?

18     A.   We got it probably about a week later.

19     Q.   Oh, about a week after his dad died?

20     A.   It wasn't too much longer after his dad died.

21     Q.   Okay.  Now, go ahead.  Even after y'all blessed the

22 Ouija board and threw it away, after that, Blaine -- the devil

23 started coming and being in Blaine?

24     A.   Uh-huh.

25     Q.   And would talk to you through Blaine?

12/02/08 Jessica Carson Revised 12/8/09

1      A.    Would talk to me.

2      Q.    And what would the devil tell you?

3      A.    The first day he did it, we were going somewhere and

4 then just all of a sudden, Blaine -- I was driving my car and

5 Blaine looks over and starts looking at me, and it was a look

6 that wasn't Blaine's.  His eyes looked like he was about to

7 kill me.  I said, what's wrong with you, Blaine?  He said, this

8 isn't Blaine.  And the voice, it wasn't Blaine's voice either.

9 It was a really scary voice.  And I said, well, who are you?

10 And he said, well, you know who I am.  And then he just kept

11 talking and talking.

12            I said, I've got to get to a church.  And that

13 was when I had a cell phone at the time, and he grabbed the

14 cell phone out of my hand and he dialed a number.  He said, all

15 you got to do is press Send, and the number was 666.  I said,

16 no, I'm not going to do that.  He was like, if you ever want to

17 see Blaine again or keep him alive, you have to do one more

18 thing for me.  I said, what's that?  He said, you have to play

19 my Ouija board one more time.  I said, I can't do it.

20            And then he was telling -- he was putting stuff

21 into Blaine's head, saying he killed God a long time ago.  And

22 the only reason why it didn't stay in Blaine completely is

23 because Blaine kept fighting for it, saying, that's not true, I

24 know God's real, I know he will protect me from you.  And the

25 devil gave up and then tried to come back in again, and then he

12/02/08 Jessica Carson Revised 12/8/09

1  came back.  It just went on and on and on.  And stuff kept

2  hap -- kept coming on.

3          And night before last, I was asleep -- and we

4  had already been talking about this stuff, that the devil had

5  came back in him once more -- when Blaine woke me up.

6      Q.   So that was Sunday night?  Because last night was

7  Monday night, today is Tuesday, yesterday was Monday.

8      A.   Yeah, it was Sunday.

9      Q.   Sunday night?

10     A.   So it was Monday when he woke me up, Monday morning.

11     Q.   Monday morning he woke you up?

12     A.   Yeah.

13     Q.   Yesterday, December 1st?

14     A.   Uh-huh.

15     Q.   Okay.

16     A.   He woke me up yesterday morning.  He said, AC   is

17  walking.  I said, well, that's a good thing, isn't it?  He

18  said, it's not the walking that you think of.  I said, well,

19  what other kind of walking is there?  And he was like, have you

20  ever seen "Chucky" or "Pet Sematary" when the guy dies -- the

21  little boy dies and comes back to life evil and stuff?  He was

22  like, that's what it is.  And I was like, what are you talking

23  about?  He said, there is a demon or a devil or something in

24  her, possessing her to be evil.

25          I said, I thought that devils or demons couldn't

12/02/08 Jessica Carson Revised 12/8/09

1  be in babies.  And he said, well, they can now because the

2  devil is getting more power.  God is telling me he's getting

3  more power and he's making it to be in whoever he wants it to

4  be in.  And I said, okay, well, can't we do an exorcism or

5  something to get it out of her?  I mean, you know, she hasn't

6  done anything, she doesn't deserve this, you know.

7          And so I didn't want to see -- he didn't want me

8  to see her because he knew it would scare me.  He went in and

9  changed her diapers and gave her a bottle and everything.  He

10  didn't want me going.  I mean, I stood by the door because I

11  wanted to hear her and everything, even though it did scare me

12  because it wasn't her; it was the demon growling at Blaine.

13      Q.    Okay.  Now, what room, what room were y'all in?

14      A.    When?

15      Q.    When y'all had the conversation.

16      A.    We were in the bedroom because we sleep in the

17  bedroom.

18      Q.    Okay.  And where was the baby?

19      A.    She was -- I think by that time he had put her in the

20  back bedroom because that was when the demon had already

21  started coming in her.

22      Q.    That's the room, his mom's room?

23      A.    That we were in.  He put her in the back bedroom,

24  sitting on the bed, away -- like the furthest away from us, and

25  shut the door.

12/02/08 Jessica Carson Revised 12/8/09

1    Q.   Okay.  All right.  Now, let me make sure I get this

2 right.  I don't want to put words in your mouth.  Yesterday,

3 which was Monday, when y'all woke up, Blaine told you that

4 AC   was walking?

5    A.   (Nods head.)

6    Q.   And how old -- how old is AC   ?

7    A.   She's about to be 13 months.

8    Q.   13 months.  And so she wasn't walking at that time?

9    A.   She --

10    Q.   I mean, she's a little bitty baby?

11    A.   She could pull up by herself and crawl and

12 everything, but no, she could not walk by herself.

13    Q.   Okay.  So he told you she was walking.  And as a mom,

14 you got excited about that.  You said, well, that's a good

15 thing, isn't it?  And he told you, no, if you've ever seen

16 "Chucky" or ever seen "Pet Sematary," it's like that.  And so

17 he basically told you she was walking, but it's because a demon

18 was in her; is that correct?

19    A.   Yes.

20    Q.   Okay.  And then so you wanted to know what y'all

21 could do to get the demon out of her.  And he didn't want you

22 to see what that process was going to be, whatever it was, so

23 he took her to another room.  And I don't want to put words --

24 I want you to tell me, am I getting this right?

25    A.   Well, he didn't -- when he put her in the room, he

12/02/08 Jessica Carson Revised 12/8/09

1 didn't start the exorcism then.  He put her in a different room
2 because the demon that was in her was throwing stuff.  That
3 was when it had a knife in AC   's hand and was biting Blaine.
4 It made Blaine draw blood on his hand and his arms.

5    Q.   Okay.

6    A.   And it had made AC   have, like, two more teeth, and
7 she only had two bottom teeth.

8    Q.   Okay.

9    A.   And it put two top teeth in her, too.

10   Q.   Okay.

11   A.   And he was biting -- she was biting Blaine and
12 everything.  And he didn't want me going in there because he
13 didn't know -- like the demon was kind of calming down every
14 time he would go in there because it was used to seeing Blaine,
15 but right when it first happened, the demon, like, you know,
16 freaked out a lot or, you know, was trying to hurt Blaine.  So
17 he didn't want me going in there because he didn't know what
18 the first reaction of that demon seeing me through AC   would
19 be like.

20   Q.   So you stood outside the door so you could listen?

21   A.   Yeah.  The door was -- he closed the door every time
22 he came in there to change her diaper and give her a bottle.
23 Even though it was the demon, he still, you know, changed her
24 diaper and everything.

25   Q.   He closed the door?

1    A.    He would close the door so I wouldn't see it, and I
2 would stand outside and listen.  I was hearing the demon growl
3 and everything.

4    Q.    And as far as human beings, I understand there's a
5 demon in there, but no people were in there but Blaine and
6 AC  ?

7    A.    Yeah.

8    Q.    Is that correct?

9    A.    Yes.

10    Q.    All right.  So go ahead.

11    A.    And I was -- I'm a very curious person.  I love my
12 daughter.  I wanted to go in there.  I wanted to see how she
13 was, you know, and everything.  I wanted to see for myself.  I
14 believed Blaine because I knew after all the crazy crap that we
15 had been through and what we've seen since we played the Ouija
16 board, I knew he wouldn't be lying about something like that.
17 So, but I still wanted to see for myself.  And he told me he
18 didn't want me to because he knew I would get hurt seeing my
19 daughter like that.  And I said, I know, but I have to, this is
20 something I have to do, I have to see her.

21            And so I walked in there.  And that was the
22 first time when I said I wanted to see her.  He said, do you
23 want me to take a picture of it first so you can see kind of
24 what it looks like before you actually see her face to face?
25 And I said, yeah.  So he took his brother's cell phone in there

12/02/08 Jessica Carson Revised 12/8/09

1 and took a picture of her and then brought it back out to me.

2              And her face on this whole side was warped. And

3 I asked him, I said, well, why is her face warped then? He

4 said, because a demon or the devil is trying to fit into a

5 little baby's body, you know, and it's stretching her out. And

6 this whole side, like her eyelids were like this long on this

7 side, and her whole face on this side was stretched out. And

8 her lip, her top lip looked like she had a cleft palate.

9 That's when she started having bruises on her face because the

10 demon was making her hit herself with just random stuff.

11       Q.     Like what, what was she hitting herself with?

12       A.     Like there was stuff all in that room. I mean, I

13 know she hit it with a hammer, and I think she hit it with a --

14 with her bottles. And she'd throw them at Blaine, too, and

15 she'd throw them across the room. And -- well, I saw her and I

16 started crying. He said, see, that's why I didn't want you to

17 see her because I knew it would hurt you. I said, I know, I

18 knew it would hurt me, too, but I had to look for myself.

19              And so I went out and then he continued changing

20 her and giving her a bottle and everything. And she -- before

21 all that started, he crushed up a sleeping pill just to make

22 sure it wouldn't come out and try to attack one of us while we

23 were sleeping or anything, so the demon would go to sleep in

24 AC     s body.

25              And on top of that, AC     the regular AC   ,

12/02/08 Jessica Carson Revised 12/8/09

1 she was already running a cold and everything so we were giving

2 her Tylenol and some Motrin and stuff to reduce the fever. And

3 that demon was making her have a higher fever, too, so we were

4 giving her Motrin and everything. It just, it kept getting

5 worse. So it got to where, you know, he had been talking to

6 God. And he said, God said I can try to do an exorcism on her.

7 And I said --

8     Q.   And when did he tell you that?

9     A.   About the exorcism?

10     Q.   Yeah.

11     A.   It was about a couple -- a couple of times after I

12 had walked in there and heard and stuff. Because at first we

13 were talking about getting a priest to come, and he said God

14 told him to get the best priest that God has trained, but he

15 lives overseas. And I said, that is way too much time to waste

16 and a lot of money that we don't have. So God told him that he

17 could do it and God would walk him through it. And he told me

18 that, and I said okay. Well, the first time he tried to do it,

19 he was back in the back bedroom.

20     Q.   And when was that, the first time he tried to do it?

21     A.   It was yesterday.

22     Q.   Yesterday, about what time, do you remember?

23     A.   It was last night.

24     Q.   So it was already dark?

25     A.   Yeah, it was already dark.

12/02/08 Jessica Carson Revised 12/8/09

```
 1      Q.   So it was Monday evening?

 2      A.   Uh-huh.

 3      Q.   Okay.  And when you say the back bedroom, is that his

 4 mom's room?

 5      A.   No, his mom's room is the front bedroom.  The back

 6 bedroom, all the way on the other side of the house.

 7      Q.   Okay.

 8      A.   Right when you walk in on the other side of the

 9 house.  That was the bedroom he kept the demon in most of the

10 time because it was the furthest away from where we sleep at

11 and everything.

12      Q.   Okay.

13      A.   And he tried it and everything, and it didn't work

14 the first time.  He said he wasn't doing something right.  He

15 needed a metallic cross because any other cross would burn once

16 he brought it close to that demon because that's how powerful

17 it was and everything.  So he got a cross that would work and

18 he tried it again.  And then they said it was gone.  And I was

19 still kind of scared to go around her because I knew --

20      Q.   Now, who said it was gone?  You said, they said it

21 was gone.

22      A.   Blaine, Blaine and God.

23      Q.   Oh, okay.

24      A.   So Blaine said that, and I said okay.  I mean, I

25 figured it was for good, but he didn't say for good so, I mean,
```

12/02/08 Jessica Carson Revised 12/8/09

1  I can't expect too much because he didn't say that, but I was

2  just thinking it in my head, you know.

3              And then we started talking about all the lying

4  and hiding and stuff, and that was a lot of it, that --

5      Q.   What did he accuse you of lying and hiding from him?

6      A.   Like -- like he always -- before me and him started

7  dating, he -- all his other ex-girlfriends had cheated on him

8  and left him, you know, because they didn't like him, and they

9  cheated on him.  They didn't have the nerve to say, I don't

10  want to be with you, and then just leave or whatever.  And so

11  that's what he's used to, and that's what I was used to, too.

12  So we always -- we don't -- we do more now, but we didn't

13  really trust one another because of what we're used to, you

14  know.

15              So we had a hard time trusting each other, and

16  we'd always think that someone was -- each other was hiding

17  things from us when they really weren't.  And we'd get mad at

18  each other because we'd keep accusing each other of stuff we

19  haven't done, and then it would just lead into more arguments

20  and everything.

21              And then so it was gone.  We brought AC    into

22  his mom's bedroom.

23      Q.   And that was last night?

24      A.   Yeah, it was last night.

25      Q.   And how did she look then?

12/02/08 Jessica Carson Revised 12/8/09

1    A.    She still looked warped.  They said -- Blaine said
2  that God told him that she couldn't be around much light for
3  the next couple of days because the demon or whatever hates
4  light and it would try to come back in.  So we kept it really
5  dark in there, and I had a lamp on the table that I put a shirt
6  over.

7    Q.    Was she crying all the time?

8    A.    Not all the time.  She was sleeping a lot of it.

9    Q.    But he had put that sleeping pill in her milk?

10   A.    Yeah.  That was -- that was like earlier, earlier in
11 the day.

12   Q.    Okay.  What was the sleeping pill?  Do you know what
13 it was?

14   A.    I can't remember.  I think it was something his mom
15 had.  It wasn't a strong one, though, I know.  Because she
16 don't -- I can't remember what it's called.

17   Q.    Okay.  So he brings her into the bedroom I'm calling
18 the mom's bedroom, that's when you walk through the front door,
19 it's that bedroom to the right there?

20   A.    Yeah, that bedroom right there.

21   Q.    Okay.

22   A.    That's his parents' bedroom.

23   Q.    So y'all brought -- y'all brought AC    into there
24 last night?

25   A.    Uh-huh.

12/02/08 Jessica Carson Revised 12/8/09

```
 1     Q.   And her head was still warped?

 2     A.   Yeah, her head was still warped.  It wasn't as bad,

 3 but it was still warped.  Her eye was puffy like it had been --

 4     Q.   Warped or?

 5     A.   Yeah, bit like by a wasp.  And it was still swollen

 6 and it was still big, but not as bad as it was.

 7     Q.   Okay.  And she was sleeping a lot?

 8     A.   Yeah, she was sleeping a lot.  But you know, Blaine

 9 could tell when it was coming in or out, but I couldn't tell

10 because, you know, I thought I could tell because of her cry.

11 But like I was telling you, when it was in her and they were in

12 the back bedroom, it had bitten through a battery in AC   s

13 body and the battery acid had started eating away at her

14 tongue.  And so she wasn't crying like AC  a usually does and

15 everything.  And --

16     Q.   So while the demon was in AC  i, the demon made her

17 bite into a -- you're talking about like a battery like in a

18 flashlight?

19     A.   Yeah, it was a flashlight battery, one of those

20 double or D batteries, those big ones.

21     Q.   So she actually got battery acid in her mouth?

22     A.   Got battery acid in her mouth and it started eating

23 away at her tongue and everything, and she wasn't crying the

24 same or anything.  And you know, I was scared to be in there at

25 the same time.  Blaine wanted to make sure that it was gone, so
```

12/02/08 Jessica Carson Revised 12/8/09

1 he was off in the kitchen, like talking to God and trying to

2 get, you know, think of everything he needed just to make sure

3 that it would all go away the next time he did it.  And I

4 stayed in there because I wanted to make sure that she didn't

5 fall off the bed.  I was trying to make her a little fort

6 around there so she wouldn't fall off if she tried to roll over

7 or crawl and stuff.

8          It was -- it made me feel bad that it was making

9 me very scared to be in there with her alone because of knowing

10 all that and everything that was in my daughter and stuff.  So

11 I kept wanting Blaine to come in there.  And then I said, I

12 can't tell, but I know you can; is it coming back?  And then it

13 started screaming out, you know.  And then he was like, yeah,

14 it's coming back.  And I said, I thought it was gone.  He said,

15 I thought it was, too.

16          And then so he went in there again and he kept

17 trying and kept trying and it never did work.  I said, well,

18 I'm going to go on the couch.  And it started turning daylight.

19 It was early, early hours of the morning, probably about 4 or 5

20 in the morning.

21      Q.   This morning?

22      A.   This morning.

23      Q.   Okay.  All right.

24      A.   I said, I'm going to go on the couch and lay down

25 while you do -- because he said, I'm going to try one more

12/02/08 Jessica Carson Revised 12/8/09

1 time, and this is going to be the last time. And he was
2 talking about if it wasn't, he was going to sell his soul to
3 the devil because that would be the only thing to save her.
4 And that's when I told you that I told him it was a trick. The
5 devil was trying to trick him to get more souls because it
6 would get him and then it would still get her, and it would
7 just keep on getting more and more. So I told him I was going
8 to lay down while he did that and try to get at least a couple
9 of minutes of sleep.

10          And I was watching TV, and then I fell asleep
11 for a little while. And the next thing I know, the door was
12 shut and locked, I hear stuff banging around in there, and I
13 hear Blaine drop to the floor. And under their -- under the
14 door, he's gasping for air.

15     Q.   Okay. Now, let me get this right. You're in the
16 living room?

17     A.   Uh-huh.

18     Q.   He's in what I'm calling his mom's bedroom?

19     A.   Yes.

20     Q.   And the door is closed?

21     A.   The door is closed and locked.

22     Q.   The door is closed and locked, and it's just AC
23 and him in that room?

24     A.   (Nods head.)

25     Q.   And you're outside and you can hear him under the

12/02/08 Jessica Carson Revised 12/8/09

 1  door breathing hard?

 2      A.   Uh-huh.

 3      Q.   Blaine?

 4      A.   Yes.

 5      Q.   Okay.  Keep going.

 6      A.   Yeah, he -- I heard him fall to the floor, gasping

 7  for air and everything.  I said, what's wrong with you?  He has

 8  a bad kidney.  One of his kidneys didn't grow when he did, and

 9  it doesn't function properly, and it hurts him really bad a lot

10  of times.  And he has a lot of heart problems and it runs in

11  the family.  And the demon that was in AC    hit him in his

12  kidney a couple of times and hit him in his heart, too, and he

13  said he couldn't breathe and he was hurting really bad.

14      Q.   Now, he told you this?

15      A.   Uh-huh.

16      Q.   Okay.  All right.

17      A.   And I know it hurt so bad because that scar, you

18  know, was like this long around his waist and it hurts him even

19  if you barely touch it.

20      Q.   Okay.

21      A.   And it was very sensitive.  So I asked him if he was

22  all right, and I (sic) said, no, she's trying to kill me.  I

23  said, well, get out of there, come on.  I was like, just shut

24  the door.  I was like, we've got to go find a minister or

25  somebody that could come back here and help us because this is

12/02/08 Jessica Carson Revised 12/8/09

1 getting like totally out of control.

2          He said, well -- and he was like, when I tried

3 to tie her up, hold her down while I was doing it so the demon

4 wouldn't come out and do something worse to AC ι, the demon

5 took it off of AC  s body and put it on me and tried to choke

6 me.  I said, well, come on.  I was like, let's just go.  And I

7 was like, let's try to go and get some money or whatever and

8 get somebody to come back and do this.

9          And then when it had started coming towards

10 Blaine trying to kill him or whatever, Blaine had pushed him,

11 pushed the demon over and it had knocked the demon out.  Not

12 like out of AC  , but you know, out -- it knocked AC  ι's

13 body, I guess you could say, out --

14     Q.   Okay.

15     A.   -- or whatever.  So he got out and then he got

16 dressed and everything.  I said, come on.  So we went to

17 Henderson.  We went to Insta-Cash Pawn and he pawned a chain

18 saw and he pawned something else, I don't know what it was.

19 And we got $20 for it.

20          And then on the way home, he started telling me

21 that God said there's nothing he could do.  And I said, there's

22 got to be something you can do.  He said, Babe, I know it's

23 hard, but -- and he was crying, too.  He said that any parent

24 in their right mind would rather have their child in heaven

25 than go through a life and have their child's soul for Satan

12/02/08 Jessica Carson Revised 12/8/09

1  whenever they die.  I said, yeah, they would, but also any
2  child wouldn't -- I mean, parent wouldn't like to see their
3  child die before they do, especially the way they did and how
4  young she was.  And then I said, but yes, I would like to see
5  her go to heaven now than to, you know, have Satan have her
6  soul and her go to hell when she gets older for -- when she
7  dies even if she hasn't even done anything.

8            And so we kept talking about it.  And I said,
9  well, since we're already talking about this, I guess that
10  she's gone?  And he was crying.  He said, I don't know.  I
11  really don't want to ask Him because I don't want to know the
12  answer.

13      Q.   He's talking about asking God?

14      A.   Yeah, he's talking about asking God.  And he didn't
15  ask God because he was crying, too, and he didn't want to know
16  then.  And so we went back there, and I went -- I went to the
17  kitchen for something.  And I heard her crying and then I went
18  into his mom's bedroom, and he was in the bathroom and then
19  AC   was laying there.  And she had the bruises and the blood
20  all over her face from where she was hitting -- the demon was
21  hitting herself with a hammer in the head that night before and
22  everything.

23            And she -- I don't know if it was my head
24  playing tricks on me or something, but I could have sworn that
25  I seen her stomach moving.  So I put my fingers on her throat

12/02/08 Jessica Carson Revised 12/8/09

1 and I put my fingers on her wrist, and I could have sworn I

2 felt a pulse. So I told Blaine I felt a pulse, and he ripped

3 her outfit and started giving her CPR and everything. And he

4 kept on giving it to her and kept on giving it to her, and it

5 would not work. And then I'm guessing that was when she died,

6 or either she had died before and it was my mind playing tricks

7 on me making me want to believe she was still alive. And

8 that's when we called the ambulance after that, after we were

9 holding her and everything.

10      Q. So when y'all went to Henderson, y'all went to

11 Henderson to pawn, what were you going to do with that money?

12      A. We were going to find a priest or try to raise money,

13 you know, to get somebody that could help.

14      Q. That could do an exorcism?

15      A. That could try to help and it would work.

16      Q. Okay.

17      A. But after he found that she was -- that there was no

18 use or there's nothing that we could have done about it and...

19      Q. You told me something about you realized that in

20 town, and so you just decided you needed to get a pack of

21 cigarettes. Now, tell me what that was about.

22      A. No, well, when we were on our way back to -- to Lake

23 Cherokee, I guess you could call it or whatever, we were

24 talking about it and then that's when Blaine told me that --

25      Q. It was already too late?

12/02/08 Jessica Carson Revised 12/8/09

```
 1    A.   Yeah, that it was already too late.

 2    Q.   And so what did you --

 3    A.   He said that money -- he said that money that we were
 4 trying to raise for the priest or whatever, he said it wouldn't
 5 have done any good.  And I was stressed, so I went and bought a
 6 pack of cigarettes.

 7    Q.   Where did you do that?

 8    A.   Huh?

 9    Q.   Where, where did you go buy the cigarettes?

10    A.   At a gas station in Henderson.

11    Q.   Okay.  So it was before y'all even left town?

12    A.   Uh-huh.

13    Q.   So you went to pawn the chain saw and whatever else
14 it was, and y'all only got $20?

15    A.   Yeah, it was 10 for each of them.

16    Q.   Okay.  And then he told you it was too late, and you
17 realized he was telling you AC   was already in heaven?

18    A.   Yeah.

19    Q.   And so then you realized the money wasn't going to be
20 able to help with a priest so you used it to buy cigarettes?

21    A.   (Nods head.)

22    Q.   I'm just making sure I get this right.

23    A.   (Nods head.)

24    Q.   Okay.  All right.  So y'all get back home and you get
25 out of the car.  Tell me what happens when you get out of the
```

12/02/08 Jessica Carson Revised 12/8/09

```
 1 car.

 2      A.    We get out of the car and we go inside.   Blaine,

 3 Blaine goes straight to the bedroom because he --

 4      Q.    And that's in his mom's bedroom?

 5      A.    Uh-huh.

 6      Q.    And where did you go?

 7      A.    I went to the kitchen.   I think I was getting

 8 something to drink or something because, I mean, I kind of knew

 9 in the back of my mind that it was true, but at the same time I

10 didn't want to believe that it was so I tried to push it off in

11 my mind as, you know, she's fine, you know, and everything.

12 So, and then I heard Blaine crying.   I go in there and then

13 he's holding her.

14      Q.    Where was he then?

15      A.    He was in the bathroom.

16      Q.    In the bathroom that's connected to his mom's

17 bedroom?

18      A.    Yeah.

19      Q.    Okay.   All right.

20      A.    He was in there holding her --

21      Q.    Okay.

22      A.    -- and everything.   And then I told him to put her

23 down on the floor, so he laid her down on the bathroom floor,

24 and that's when I thought I'd seen her breathing.   And then

25 that's when he ripped her shirt and was trying to do CPR on her
```

12/02/08 Jessica Carson Revised 12/8/09

1   and it just -- it didn't work.

2        Q.    About what time did y'all get back from the pawnshop?

3   What time did you get to the pawnshop?

4        A.    We got there about 8:57 because it opened at 9.

5        Q.    Okay.  Were y'all the first ones there?

6        A.    Uh-huh.

7        Q.    Okay.  And how long were you -- how long did y'all

8   have to be at the pawnshop?

9        A.    We weren't there very long, 20 minutes tops.

10       Q.    Okay.  And then you stopped and got cigarettes?

11       A.    And then we went straight back to the house.

12       Q.    Okay.  So how long do you think y'all were gone from

13   the house?

14       A.    Not even an hour.  Well, it takes about 30 minutes to

15   get here from there so, you know, probably just a little over

16   an hour.

17       Q.    She was there by herself for about an hour?

18       A.    (Nods head.)

19       Q.    Okay.  All right.  Now, what -- when you got back, he

20   went straight into the bedroom and you went into the kitchen to

21   get something to drink?

22       A.    Uh-huh.

23       Q.    And then you heard him crying?

24       A.    (Nods head.)

25       Q.    Okay.  And then you went in there and he was holding

12/02/08 Jessica Carson Revised 12/8/09

```
 1  her?

 2       A.    Uh-huh.

 3       Q.    And tell me what she looked like when you saw her

 4  when he was holding her.

 5       A.    She was -- she was very skinny.  I mean, she was

 6  always known for being a little piglet and eating a lot and

 7  stuff.  And her stomach was very flat.  She had bruises and

 8  stuff all over her face from where that demon was making her

 9  hit stuff into her head.  She had blood on it and everything.

10       Q.    What other kind of marks did you see on her?

11       A.    She had some bite marks on her.

12       Q.    How did she get bite marks?

13       A.    I really don't know.

14       Q.    Okay.  All right.  So you told him to do CPR on her?

15       A.    No, I didn't tell him to.  He did it.

16       Q.    Oh, he just started doing it?

17       A.    Yeah, he just started doing it because I said, I

18  think she might be still breathing, so he just ripped it open

19  and started trying.

20       Q.    And about how long did y'all wait before you called

21  911?

22       A.    We just -- after we realized that she was finally

23  gone, we just -- we sat there for a minute and we were just

24  crying and holding her and telling her that we loved her and

25  everything.  And it was probably about not even 20 minutes
```

12/02/08 Jessica Carson Revised 12/8/09

1  later we finally called 911.

2      Q.   Okay.  And what happened then, when you had the 911

3  operator on the phone?

4      A.   Blaine -- Blaine had dialed and told them it was

5  murder or whatever and then he started crying, and I got on the

6  phone.  And they told me to bring the phone to the baby, and

7  the phone cord wouldn't stretch that far from the kitchen all

8  the way to the bathroom, so Blaine brought AC   to the bedroom

9  door.  And I kept doing -- they told me to keep doing CPR on

10  her until she -- until the ambulance got there.  And I mean, it

11  was really kind of making me frustrated because I already knew

12  she was gone, and just to keep on doing that on her when I knew

13  there was no hope for it was just -- it was tearing me up

14  inside.

15      Q.   And then tell me what -- tell me about y'all's plan

16  to come up with that fake story.

17      A.   Right after we were holding AC  ı, we were -- we were

18  trying to get together a plan to tell that she had been

19  murdered or something because I know that a lot of people don't

20  believe in demon possessions and everything, and I didn't want

21  me or Blaine to be arrested for something we didn't do or

22  didn't have any control over because me and Blaine love that

23  baby to death and we would never do anything to hurt her.

24  (Crying.)

25      Q.   It's okay.  I'm so proud of you for telling the

12/02/08 Jessica Carson Revised 12/8/09

1 truth.  That's so important.  Now, when did you graduate from

2 high school?

3      A.    This year.

4      Q.    This year?  May of this year?

5      A.    (Nods head.)

6      Q.    At what high school was that?

7      A.    Longview.

8      Q.    And that's a 5A high school?

9      A.    Well, it's a 4A this year, but it was a 5A last year.

10     Q.    When you were there, it was 5A?  That's the largest

11 ranking in Texas.

12     A.    (Nods head.)

13     Q.    And you were an honor graduate?

14     A.    Yeah, I was a merit Texas scholar.

15     Q.    So you're very smart?

16     A.    I managed to keep my grades up, being pregnant and

17 having a baby and missing a month and a half of school.

18     Q.    This is going to sound like a dumb question, Jess.

19 But that camera can't film this entire room.  There's nobody in

20 this room other than you and me, is there?

21     A.    No.

22     Q.    That's all that's in here?

23     A.    (Nods head.)

24     Q.    Okay.  And you fully understand that we've been

25 videotaping this whole conversation?

12/02/08 Jessica Carson Revised 12/8/09

1    A.   Yes, sir.

2    Q.   All right.  I told you earlier I'm a Christian, and I

3 am, okay.  And I do believe in demon possession, and the only

4 reason I believe in demon possession is because the Bible says

5 it happens.  That's the only reason I believe in it, okay?  All

6 right.  But you were an honor graduate at a 5A high school.

7 Okay.  I want you to think about something with me for just a

8 second, okay?  You know that I talked to Blaine?

9    A.   (Nods head.)

10    Q.   Okay.  Blaine wanted you in his life, but he wanted

11 you without a baby.

12    A.   He loved that little baby.

13    Q.   I'm not sure about that.  In all the times he was

14 getting on you about not being truthful with him, about him

15 thinking you were sleeping around on him, he wasn't being

16 truthful with you.  He very much hated AC   s dad.

17    A.   I know.

18    Q.   And he wanted Jess without AC     I'm just going to

19 tell you.  And every time he would go in that room with that

20 baby, the reason he would close and lock the door, he was the

21 one in there throwing the baby bottles.  He was the one making

22 the sounds, and he was in there systematically beating --

23    A.   I heard AC   .

24    Q.   He was beating, yeah.

25    A.   I saw her, too --

12/02/08 Jessica Carson Revised 12/8/09

1    Q.   Yes.

2    A.   -- make those sounds.

3    Q.   Do you know why? Do you know why her face was
4 distorted like it was? Because he had hit her so hard in the
5 head that he broke her skull.

6    A.   (Crying.) I can't believe it.

7    Q.   I'm telling you. Listen, you're an honor graduate
8 from a 5A high school; 18-month-old (sic) babies don't pick up
9 hammers and hit themselves in the head with it. Let me just
10 tell you something out of the Bible, okay? The devil was a
11 fallen angel. The devil is a created being. The devil is not
12 as powerful as God. And there's no Biblical proof whatsoever
13 that the devil's power ever increases at all, none. So Blaine
14 was simply telling you a story so that the things that you saw
15 happen to AC would match the story he's telling you.

16    A.   But I've seen so many things. Like the devil coming
17 in Blaine, Blaine couldn't make that up.

18    Q.   You sure?

19    A.   The way his eyes looked and the way he was talking to
20 me, that was not Blaine. It was not his voice, that was not
21 his eyes.

22    Q.   There are bite marks all over your little baby girl's
23 body that are going to match Blaine's mouth. He was going in
24 that room and biting your little girl. You did have one thing
25 right when you said there was a demon in that room, but that

12/02/08 Jessica Carson Revised 12/8/09

```
 1  demon wasn't in your baby girl.  That demon was the guy that
 2  was going in there and beating your baby girl to death.
 3      A.   I don't think he'd do something like that.
 4      Q.   I think that in your heart you know he did.
 5      A.   I can't see him doing something like that.
 6      Q.   No, you couldn't see it because he arranged for the
 7  door to be closed and locked so you couldn't.
 8      A.   He loved that baby.  He always played with her.
 9  Every time she was around, he smiled.  Every time he was
10  around, she'd have a smile light up on her face, saying dada.
11      Q.   Did he catch you having an affair with somebody else?
12      A.   No.
13      Q.   He told me he did.
14      A.   No, I wasn't having an affair.  I was in our
15  apartment with my ex-boyfriend, and he thought we were having
16  an affair.  Because I mean, I told him, you know, that was a
17  mistake on my part, but if he knew the real me, he'd know I
18  would have never done something like that.  I mean, he was --
19  he was a good friend to me, and I was there talking to him.
20      Q.   Have you ever been treated for a mental illness of
21  any kind?
22      A.   No.
23      Q.   Do you have any idea what your IQ score was?  Did you
24  ever get that while you were in high school?
25      A.   Not in high school, but it was like 110, I think, in
```

12/02/08 Jessica Carson Revised 12/8/09

1  fifth grade.

2      Q.   Okay.  So you're clearly not crazy?  I mean, you're a

3  very smart young lady.  And I can say it and you can admit that

4  without being -- that's not arrogant or cocky.  You have test

5  scores to back that up.  You're a very smart young lady.  I

6  think what happened was you got conned by a guy that you fell

7  head over heels in love with, and he's actually a very evil

8  person.  I saw your little girl.  She's a beautiful baby.

9      A.   I know.

10      Q.   She's beautiful.  She was a beautiful baby.

11      A.   Yeah, she was.

12      Q.   And she is with the Lord now.  But she's not there

13  because she was possessed by a demon.  She's there because she

14  was beaten to death by a demon.  Did he tell you why he bit

15  her?

16      A.   He didn't tell me he bit her.

17      Q.   Well, you saw the bite marks on her.  Where did you

18  think those came from?

19      A.   I know.  He said -- he said, there are bite marks on

20  her, too.  I said, I know, I see them.

21      Q.   How did he explain those?

22      A.   He didn't.  He just said there -- there's bite marks

23  on her, too.  I said, I know, I see them.

24      Q.   Okay.  What else did he say or do that might have

25  given you a hint that he was really doing this and just trying

12/02/08 Jessica Carson Revised 12/8/09

1 to hide it behind this, this fantasy that he created of this
2 demon?

3    A.    I want -- I want to believe it, but I can't because
4 after all of the stuff that I've seen and I've been through
5 about demons and spirits and stuff.  I don't think Blaine would
6 do something like that.  He's not that kind of person.  He
7 loved that baby so much.  I mean, he -- he even liked me when I
8 was pregnant because he likes the idea of having -- he loves
9 the thought of having kids.  He said after all this stuff has
10 happened with AC   , he doesn't know if he wants to have any
11 more kids now.  I said, I don't know either.  I can't go
12 through this again.

13    Q.    Yeah.  Did you ever see him touch her or do anything
14 inappropriate with her like in the bathtub?

15    A.    No.  That's what I'm saying.

16    Q.    Did he ever bathe her?

17    A.    Yes, but I was always in there.  Even when I wasn't,
18 you know, I'd peek my head in just to -- I mean, I was already
19 a mom before I started dating him so I knew kind of, even
20 though it was my first child, I knew what to look for and
21 stuff.  I knew when we first started dating and then when we
22 got engaged and stuff and she'd take a bath with him.  You
23 know, I'd peek my head in when I was washing dishes or
24 something just to make sure she wouldn't fall over.

25    Q.    And she would take a bath with him?

12/02/08 Jessica Carson Revised 12/8/09

```
 1    A.    Yeah, she would take a bath with me sometimes and
 2 then she'd take a bath with him sometimes.  And then --
 3    Q.    Okay.  So Blaine would be in the bathtub?
 4    A.    Uh-huh.
 5    Q.    With AC  ?
 6    A.    Yeah.
 7    Q.    Okay.  And he would be bathing with her in there?
 8    A.    No, he wouldn't be bathing himself.  He would just be
 9 sitting in there and then like I would be in there bathing her.
10    Q.    But was he in the bathtub?
11    A.    Yeah.
12    Q.    I mean nude, taking a bath?
13    A.    Uh-huh.
14    Q.    And she was in the bathtub with him?
15    A.    Yeah.
16    Q.    But you would peek in?
17    A.    Yeah.  And I mean, I don't see anything wrong with
18 that.
19    Q.    I'm just asking.  There may not be anything wrong
20 with it, unless he was in there doing things to her he
21 shouldn't be doing.
22    A.    He wasn't.
23    Q.    How do you know that?
24    A.    Because I was in there.  If I wasn't in there, I was
25 looking, like I said, just to make sure, you know, because a
```

12/02/08 Jessica Carson Revised 12/8/09

1 lot of -- I mean, she hadn't taken a bath with him in a long
2 time.  Usually now, since she knows how to sit up by herself,
3 we give her a bath by herself.  We just let her go in there and
4 go play and everything.  But when she was taking a bath with
5 him, she didn't know exactly how to sit up by herself.  She
6 could, but it wasn't for that long a time.  And I wanted to
7 make sure, you know, as a mother, that she was caught if she
8 were to start slipping over.

9      Q.   Did he ever want you to do anything that you felt
10 uncomfortable about sexually?

11      A.   No, he hasn't, and that's the truth.

12      Q.   Did he ever use pornography with you?  Did y'all ever
13 use porn?

14      A.   We used it like once or twice, but I mean, it wasn't
15 like a big thing.  I told him I didn't like it, and he didn't
16 like it, and we just dropped it.

17      Q.   Okay.  Okay.  Let me ask you this.  If you found out
18 and if you were convinced beyond a shadow of a doubt that he
19 actually did do those things to AC  , if he did them, not the
20 demon, if he did them, why do you think he would have done
21 that?  What would have been his motivation for doing that?

22      A.   I couldn't give you one because I still don't think
23 he would do something like that.  I mean, I know Blaine and
24 that's not Blaine.  He loved that baby, and like I said to you
25 earlier, if you lived with us, you would know how much he loved

12/02/08 Jessica Carson Revised 12/8/09

1  that baby.  He was always playing with her.  He was always --

2  he would go to the store and if he had a little change extra,

3  he would go buy her a toy, a new toy to play with.  He was

4  always playing with her.  And her face lights up a smile every

5  time she saw him.

6      Q.   Okay.  Anything else we should have talked about that

7  we didn't?

8      A.   (Shakes head no.)

9      Q.   You realize that you're at the Rusk County Sheriff's

10  Department in Henderson?

11      A.   (Nods head.)

12      Q.   And that this entire interview has been videotaped, I

13  told you that from the very start, okay?

14      A.   (Nods head.)

15      Q.   And there's nobody else in the room other than you

16  and me.  And I fully explained your rights to you beforehand.

17  You said you understood each one of them, and you agreed to

18  talk to me voluntarily; is that correct?

19      A.   Yes.

20      Q.   Okay.  Is there anything else you want to say?  I've

21  asked you a bunch of questions.  Is there anything you want to

22  say before I turn off the tape?  Just anything you want to add

23  to the end that you want people to know?

24      A.   No, I told everything.

25      Q.   Okay.  Is everything that you told me the truth?

12/02/08 Jessica Carson Revised 12/8/09

1    A.    Yes, it is.

2    Q.    Okay.

3    A.    God's honest truth.

4    Q.    Okay.   Well, I appreciate you for being honest.

5  You've been a very brave young lady to do that, and I just hope

6  he will be a man and be truthful, too.   Because he's already

7  lied to me once, and so I have a hard time believing what he

8  says anyway.   Does that make sense?

9    A.    (Nods head.)

10   Q.    Okay.  All right.   It is still December 2nd, 2008 and

11 it is now approximately 3:22 p.m., and I have been conducting a

12 custodial interview with Jessica Bain Carson, white female,

13 8/31/1990, at the Rusk County Sheriff's Department in

14 Henderson, Texas, and at this time we will conclude the

15 interview.   Just sit right there for me, please.   Just stay

16 right there.

17              (Sergeant Ray exits the room.)

18              (End of proceedings.)

19

20

21

22

23

24

25

12/02/08 Jessica Carson Revised 12/8/09

```
 1                    REPORTER'S CERTIFICATE

 2

 3  THE STATE OF TEXAS  )
    COUNTY OF GREGG     )
 4

 5      I, Kim Robertson, Certified Court Reporter, State of

 6  Texas, do hereby certify that the above and foregoing contains

 7  a true and correct transcription of all portions of proceedings

 8  requested by counsel to be included in this Reporter's Record,

 9          I further certify that the total cost for the

10  preparation of this Reporter's Record is $275.00 and was

11  paid by Mr. Hagan.

12      WITNESS MY OFFICIAL HAND this the 7th day of December,

13  2009.

14

15      _____
                                          Kim Robertson
16      KIM ROBERTSON, CSR, RPR
        Texas CSR #6420
17      EXPIRATION DATE:  12/31/10
        GRETCHEN SHORE COURT REPORTING
18      & LITIGATION SUPPORT
        P.O. Box 1789
19      Longview, Texas 75606
        TEL: (903) 758-2183
20      Firm Registration No. 90

21

22

23

24

25
```

1   STATE OF TEXAS

2   COUNTY OF RUSK

3       I, Terri Boling, Official Court Reporter in and for the

4   4th District Court of Rusk County, State of Texas, do hereby

5   certify that the above and foregoing contains a true and

6   correct transcription of all portions of evidence and other

7   proceedings requested in writing by counsel for the parties to

8   be included in this volume of the Reporter's Record in the

9   above-styled and numbered cause, all of which occurred in open

10  court or in chambers and were reported by me.

11      I further certify that this Reporter's Record of the

12  proceedings truly and correctly reflects the exhibits, if any,

13  offered by the respective parties.

14      WITNESS MY OFFICIAL HAND, this the _____ day of

15  _____, 2010.

16

17

18      _____

19      Terri Boling, Texas CSR 1508
        Expiration Date: 12/31/11
20      Official Court Reporter
        4th District Court
21      Rusk County Courthouse
        115 N. Main Street
22      Henderson, Texas 75652
        Telephone:  (903) 657-0359

23

24

25

# EXHIBIT 25

*06-11-00112-CR*

FILED IN
The Court of Appeals
Sixth District

AUG 08 2011

Texarkana, Texas
Debra Autrey, Clerk

1
2

REPORTER'S RECORD
VOLUME 14 OF 22 VOLUMES
TRIAL COURT CAUSE NO. CR2009-067

3   THE STATE OF TEXAS            )   IN THE DISTRICT COURT

4   VS.                          )   OF RUSK COUNTY, TEXAS

5   JESSECA BAIN CARSON          )   4TH JUDICIAL DISTRICT

6

7   **JURY TRIAL, APRIL 7, 2011**

8

9   **APPEARANCES**

10  Mr. Micheal Jimerson              Mr. Donald Killingsworth
    SBOT NO. 00789406                 SBOT NO. 11409050
11  Mr. Richard Kennedy               Attorney at Law
    SBOT NO. 11296850                 P.O. Box 208
12  County Attorney's Office          Tyler, Texas 75710
    Rusk County Courthouse            Telephone:  (903) 593-9304
13  115 N. Main St.                   Attorney for Defendant
    Henderson, Texas 75652
14  Telephone:  (903) 657-2265        Mrs. Allison Biggs
    Attorneys for The State of Texas  SBOT NO. 24040465
15                                    Attorney at Law
    Mrs. Lisa Tanner                  300 W. Main Street
16  SBOT NO. 19637700                 Henderson, Texas 75652
    Attorney General's Office         Telephone:  (903) 657-8195
17  P.O. Box 12548                    Attorney for Defendant
    Austin, Texas 78711-2548
18  Telephone:  (512) 463-2170
    Attorney for the State of Texas

19

20

21       On the 7th day of April, 2011, the following proceedings

22  came on to be heard in the above-entitled and numbered cause

23  before the Honorable Clay Gossett, Judge Presiding, held in

24  Henderson, Rusk County, Texas.

25       Proceedings reported by computerized stenotype machine.

ORIGINAL

1    objection to the matter.

2         (State's Exhibit No. 6, the taped interview, was

3    played by the State, a transcript of which is provided here.

4    Jesseca Bain Carson is being questioned by Ranger Kenny Ray.

5    COURT REPORTER'S NOTE:  There were a few times where it

6    sounded like she was saying "I," when the context would have

7    better fit "he."  I typed what it sounded like Jesseca Carson

8    was saying on the tape in those instances, even when the

9    context didn't fit.)

10              **INTERVIEW OF JESSECA BAIN CARSON**

11   **BY RANGER KENNY RAY:**

12       *Q.*   Hey, come sit down.  You're Jess?  My name's Kenny

13   Ray.  I'm with the Texas Rangers.  Okay?  Will you talk to me

14   for a few minutes?

15       *A.*   Yes, sir.

16       *Q.*   Okay.  I'm going to record what we say, so I don't

17   forget anything, okay?  All right.  It is December the 2nd,

18   2008, and it's approximately 12:38 p.m.  What is the address

19   here?

20       *A.*   13717.

21       *Q.*   137 --

22       *A.*   717 County Road 2125.

23       *Q.*   2125.  Is that Henderson --

24       *A.*   Henderson.

25       *Q.*   -- or Tatum?  Henderson, okay.  Do you need a

1  kleenex?

2      A.   (Inaudible.)

3      Q.   Okay.  Do you know the zip?

4      A.   75652, I think.

5      Q.   Okay.  All right.  Tell me your last name.

6      A.   Carson.

7      Q.   C-a-r-s-o-n?

8      A.   Um-hmm.

9      Q.   And your full first name?

10     A.   Jesseca, J-e-s-s-e-c-a.

11     Q.   J-e-s-s-

12     A.   -e-c-a.

13     Q.   -e-c-a.  And your middle name?

14     A.   Bain, B-a-i-n.

15     Q.   And what's your birthday?

16     A.   ████90.

17     Q.   How old are you?

18     A.   18.

19     Q.   Okay.  Do you know your driver's license number?

20     A.   I don't know it by heart.

21     Q.   Do you know your social?

22     A.   It's ███ --

23     Q.   Okay.

24     A.   ███.

25     Q.   Oh, I'm sorry.

1    A.    -███████.

2    Q.    Did you graduate from high school?

3    A.    Yes, I did.

4    Q.    What year?

5    A.    '08.

6    Q.    Oh, just this past May?

7    A.    Um-hmm.

8    Q.    What high school?

9    A.    Longview.

10    Q.    Okay.  Are you working anywhere?

11    A.    I just got hired yesterday at Posada's.

12    Q.    In Longview?

13    A.    Um-hmm.

14    Q.    And what's a phone number, if I need to call -- a

15 cell phone, if I need to call you?

16    A.    I don't have a cell phone.  We use his mom's house

17 number.

18    Q.    What is it?

19    A.    ████████.

20    Q.    And does Blaine have -- what's Blain's cell phone

21 number?

22    A.    He doesn't have a cell phone either.

23    Q.    He doesn't have a cell phone?

24    A.    No, sir.

25    Q.    Okay.

1     A.    He did, but he doesn't anymore.

2     Q.    Okay.  All right.  Now, I want you to understand

3  something.  My name is Kenny Ray.  I'm with the Texas Rangers.

4  You're just sitting in my car.  You do not have handcuffs on.

5  You're not under arrest.  Do you understand that?

6     A.    Yes, sir.

7     Q.    All I'm wanting you to do is tell me what happened

8  this morning.  Okay?

9     A.    Okay.

10     Q.    And I need you to speak up just a little, because I

11  want to make sure I don't miss anything.  Are you warm enough?

12     A.    Yes, sir.

13     Q.    Okay, all right.  All right.  First of all, tell me,

14  this house we're looking at right now, we're sitting in the

15  front yard of this house at 13717 County Road 2125; is that

16  right?

17     A.    Yes, sir.

18     Q.    Okay.  Whose house is this?

19     A.    This is Blaine mother's house, Shirley Milam.

20     Q.    Shirley Milam.  Okay.  Now, who all lives here on a

21  reg- -- day-to-day basis?

22     A.    Day-to-day basis, me and Blaine and Shirley, and

23  AC   did.

24     Q.    Okay.  So it's Jess -- Jesseca?  Do your friends call

25  you Jess or Jesseca?

```
 1        A.    Jesse.
 2        Q.    Jesse, okay.  So it's Jesse, Blaine, Shirley.  And
 3   tell me your baby's full name.
 4        A.    AC
 5        Q.    AC -   --
 6        A.    -AC    .
 7        Q.    Okay.  Middle name?
 8        A.    AC  , same as mine.
 9        Q.    Last name?
10        A.    AC    .
11        Q.    Okay.
12        A.    And Danny, he goes in and out.  I mean, he stays one
13   night, and the next night he doesn't.
14        Q.    Okay.  All right.  And Danny is who?
15        A.    Blaine's brother.
16        Q.    Okay.  Okay.  How long have -- are you and Blaine
17   married?
18        A.    No, we're engaged.
19        Q.    Engaged.  When are y'all getting married?
20        A.    We were planning on next year.
21        Q.    When?
22        A.    In March.
23        Q.    Okay.  How long have y'all been together?
24        A.    Since March 22nd of this year.
25        Q.    Is he the baby's dad?
```

1    A.   No.

2    Q.   Okay.

3    A.   Biologically, we were trying to get in to a doctor.

4    Q.   Who's the baby's father?

5    A.   His name is Arlen Mutina.

6    Q.   Arlen?

7    A.   Mutina.  M-u-t-i-n-a.

8    Q.   Where is Arlen?

9    A.   He's in South Korea.  He's in the Army.

10   Q.   Okay.  Okay.  All right, tell me, just start off,

11   tell me the story about what happened this morning.

12   A.   Okay.

13   Q.   From the time y'all woke up.

14   A.   Okay.  Woke up and --

15   Q.   What time?

16   A.   I couldn't even tell you.  I didn't even look at the

17   clock when I woke up.

18   Q.   Still light or dark -- still dark or was it already

19   light?

20   A.   It was already -- it was light.  I mean, we didn't --

21   we both didn't get much sleep last night.  We were just up

22   talking and everything.  But we got up.  We started talking

23   about that we had been planning to put a trailer over there on

24   the property for months, and we were going to go over there

25   and start making plans, like where -- how to put it, and like

1   if we wanted to put a fence around it or, you know, add

2   details to it and everything.  And so the baby -- the baby was

3   asleep, and she's the kind of baby to where you do not want to

4   wake her up, because she gets really upset.

5        Q.   Okay.  Was Shirley home?

6        A.   No.  Shirley stayed the night at Blaine's sister's

7   house for the past two nights.

8        Q.   So when y'all woke up this morning, who all was in

9   the house?

10       A.   Me, Blaine and AC   .

11       Q.   Okay.  All right.  And it was already light when you

12  woke up.  Okay.

13       A.   It was already light.

14       Q.   All right.  And are you telling me the baby -- did

15  you wake up before Blaine or after Blaine?

16       A.   I usually wake up before Blaine.  He's -- he's hard

17  to wake up.  But we -- but he didn't get much sleep last night

18  either, so we were both in and out.  Like one time I would

19  wake up before him, and another time he would wake up before

20  me.  He wasn't -- he wasn't sleeping good last night at all.

21       Q.   Okay.

22       A.   But we were talking about the trailer and everything.

23  The baby was asleep, and she was in --

24       Q.   Now, were y'all still in the house when you were

25  having this conver-  -- were y'all still in bed, just laying

1    in bed, talking?

2         A.   Yeah, we were just talking.

3         Q.   Okay.

4         A.   And so we decided to go out to the property.  So we

5    walked down to the property, and we didn't plan on being there

6    that long, but we just got in -- started talking details about

7    everything, about the trailer and everything, and we --

8         Q.   All right, now, what -- tell me, before you -- before

9    you left, Jess, tell me, is the baby's bed in y'all's bedroom?

10        A.   No, the playpen was in the living room, because she

11   likes to watch TV --

12        Q.   Okay.

13        A.   -- when she goes to sleep and when she wakes up and

14   stuff.  She loves SpongeBob, so she stays right by the TV.

15        Q.   And so she was in the playpen in the living room?

16        A.   Yes.

17        Q.   Okay, but did you go check on her?

18        A.   Yes.  She was asleep.

19        Q.   Okay.  So she had not woke up this morning at all?

20        A.   I mean, she wakes up, you know, every now and then,

21   but then as soon as I give her a bottle, she would go right

22   back -- she goes right back to sleep.

23        Q.   But did you do that this morning?

24        A.   Yeah, I do it just about every single morning.

25        Q.   But did you do it this morning?

1    A.    Yes.

2    Q.    Tell me about that.

3    A.    She woke up early in the morning.  She'd had a couple

4    of cries, and I fixed her a bottle, and she took a couple of

5    sips and went right back to sleep.

6    Q.    And what time was that?

7    A.    It was in -- early hours.  Maybe a little after

8    midnight.  In between midnight and two.  I mean --

9    Q.    Okay.

10    A.    -- early, early in the morning.

11    Q.    Okay.  But from the time you woke up this morning --

12    A.    She was asleep.

13    Q.    And -- and didn't wake up?

14    A.    No, she was asleep.

15    Q.    But you checked on her?

16    A.    Yeah.  She was asleep.

17    Q.    And was okay?

18    A.    Uh-huh.

19    Q.    How do you know she was okay?

20    A.    She did not look like that, and you could see her

21    breathing.

22    Q.    Okay.

23    A.    I mean --

24    Q.    Okay.

25    A.    -- I've always been the one to check --

1  Q. Okay.

2  A. -- on her sleep --

3  Q. Okay.

4  A. -- on her sleeping.

5  Q. Did Blaine go in there at all?

6  A. In where?

7  Q. Where she was.

8  A. Well, I mean, occasionally.  To get to the kitchen,

9 you have to walk through the living room --

10  Q. Okay.

11  A. -- but, I mean -- but we went out to the property,

12 and we started --

13  Q. What time did y'all do that?

14  A. We left about a little after 8:00.

15  Q. Okay.

16  A. Not much after 8:00.

17  Q. Okay.  And where is -- is that where I saw you

18 walking while ago?

19  A. Um-hmm.  It's right -- you can't see it by those

20 trees, but it's right behind those trees.  There's a lot of

21 trees cleared out.

22  Q. Okay.

23  A. We had been clearing them out for a lot of months,

24 and we were talking about everything like that, and then we --

25 I mean, we didn't have a watch on us, or anything, so we

1    didn't know what time it was, and so we started heading back.

2    And then the baby wasn't in her playpen.

3        Q.    Did anybody call y'all while you were down there?

4        A.    We don't have a cell phone.

5        Q.    Okay.  Okay.

6        A.    And so we walked in there.  The baby's not in her

7    playpen, so we start looking everywhere and trashing the house

8    more.  I mean, the house was already messed up, because since

9    his mom's been at his sister's house for the past couple of

10   nights, we've been trying to redo it and clean it up for them.

11   And like he just did that new cabinet stuff last night, and we

12   were trying to redo it for her, but we were looking

13   everywhere, and then --

14       Q.    How long were y'all gone?

15       A.    No more than two hours.  It was probably in between

16   an hour and a half and two.

17       Q.    Okay.

18       A.    And we were just standing up there talking about the

19   trailer and everything, and -- and then I'm in the kitchen.

20   The next thing I know, I hear Blaine cry, and so I walk into

21   his mom's bedroom.

22       Q.    Now, wait.  All right, now, back up.  Tell me, from

23   the time y'all walked back from the property -- and I'm -- I'm

24   looking right now -- from the time you stepped up on that

25   porch, tell me what happened when you went in the house.

1      A.   We walked up to the porch.  We were going to go lay

2   down on the bed and smoke a cigarette.  And then I went to go

3   check on the baby, and the baby wasn't in her playpen.  And so

4   at first I was thinking, you know, maybe his mom might have

5   came home, and they took them to town, but she would have left

6   a note if she would have took her.  And so we started looking

7   all over the house, and we couldn't find her.  We started

8   really getting worried and everything.  And then they have

9   this little hole in his mom's bathroom where there's

10   insulation at.  And it's like maybe -- I guess it's a -- I

11   don't really look at it.  I guess it's like a foot deeper than

12   the rest of the floor.

13        But I heard Blaine crying when I was in the

14   kitchen, and I ran in there, and he's holding the baby.  And

15   he said, "The baby was in the hole," and he had puttin' her

16   out right there.  And then I was looking at her, and then

17   it -- it kind of -- I don't know if it was my head playing

18   tricks with my mind or something, but I thought that I still

19   saw her stomach moving, so I put my fingers on her throat, and

20   then I put it around her wrist, and it -- I -- it still felt

21   like she had a little bit, not much, but a little bit of a

22   pulse.  So Blaine ripped her shirt open and started pumping

23   her chest and giving her mouth-to-mouth and everything, and

24   then nothing was working and -- I mean, I don't know.  I mean,

25   we should have called 911 right when we knew that she wasn't

1    coming back or anything.  It's just -- I guess it's just the

2    natural instinct of that happening, we were just sitting there

3    holding her and crying and --

4        Q.    Okay.  When -- when did you call 911?

5        A.    Well, I mean, after we got through holding her and

6    crying, and finally, you know, realized that, you know, this

7    -- this is real, we called 911, and then --

8        Q.    About how long after you found her, do you think?

9        A.    20, no less -- no more than 30.  Probably about 20.

10   And then Blaine had called her, and then he was crying too

11   hard, so I got on the phone.  He went back in there to go look

12   at Amora and hold her again and everything.  And then she told

13   me to bring the phone to the baby, so we could keep trying

14   mouth-to-mouth and CPR and everything.  And then the phone

15   cook (sic) -- cord wouldn't reach to where she was at in the

16   bathroom, so he brought her up to where she was laying out

17   when they found her, which was right by the front door, by the

18   bedroom door, and then we kept on doing mouth-to-mouth and CPR

19   and everything while we were on the phone with 911, and then

20   that's when the ambulance and everybody showed up.

21       Q.    Did Blaine resent you having the baby?  Did that

22   cause a problem in y'all's relationship?

23       A.    No.  He was -- she was one of the main reasons that

24   we got together.  I mean, she loved that -- he loved that baby

25   like she was his own.  I mean -- I mean, that's not good to

1    hate anybody, but, I mean, he really does hate her biological

2    father for the way he treated me and her, because he denied

3    AC    for the longest time.  And Blaine wanted to adopt AC    ,

4    but her biological father wouldn't sign over his rights, and

5    so -- but, I mean, her first words were "Da-Da," and they were

6    directed towards him.  She's known him since she was about

7    four months old.  I mean, that's the only dad she's ever

8    known.

9        Q.    Yeah.

10       A.    He loved that little baby.

11       Q.    Why would he hurt her?

12       A.    Huh?

13       Q.    Why would he hurt her?

14       A.    He wouldn't.

15       Q.    Why would he lie to me, then?

16       A.    Huh?

17       Q.    Why would he lie to me?  He told me you were an honor

18   graduate in Longview High School.

19       A.    What --

20       Q.    You're a very smart girl.  Y'all were together this

21   morning for about an hour or an hour and a half, and your

22   stories do not match.  One of you's lying to me, or both of

23   you's lying.  And I'm going to tell you, Jess, listen to me

24   just a second.  Have you ever been in trouble?

25       A.    No.

1     Q.   I can tell you haven't.  I can tell you are a very,

2  very good girl.  Okay?  Right now is the time to tell the

3  truth about what happened, because I'm telling you, I talked

4  to -- you saw me.  He sat in that -- he sat in that chair you

5  sat in for an hour, and I have him on that recorder.  And he

6  told a different story than what you just told me.  And what's

7  going to happen is people are going to look at y'all, and

8  they're going to say y'all are liars, and they're also going

9  to say that you hurt that baby.  Now, right now is the time

10  for you to tell me the truth about what -- let's -- let's get

11  it out.  That's the only way that it, this thing -- this is

12  ever going to be right, is for us to get it out.  So right

13  now, just tell me what happened.

14     A.   (Crying.)  I would never hurt that baby.

15     Q.   Tell me what happened.

16     A.   He wouldn't either.

17     Q.   Tell me what happened.

18     A.   He loved that little baby.

19     Q.   Okay.  But sometimes things happen that we don't

20  intend to happen.  Sometimes they're accidents.  But just tell

21  me the truth about what happened.  As (inaudible) would say,

22  you can get it off your chest, because it's just going to eat

23  you up if you don't.  It's just going to eat you up.

24     A.   No, I don't --

25     Q.   Tell me what happened.

1    A.    I could tell you, but you wouldn't believe me.

2    Q.    I will.  I will believe you.

3    A.    No, you won't.

4    Q.    I will believe you.  I promise.

5    A.    If you do, none of the other cops won't --

6    Q.    I will --

7    A.    -- because it's something that they would not

8    believe.

9    Q.    I will believe you.  I promise you, I will believe

10   you.

11   A.    But they won't, and they're going to think we're

12   lying about it, and we're not.  That's why we made up this

13   story --

14   Q.    Okay.

15   A.    -- because --

16   Q.    Jess, let me tell you this.  They are all with the

17   Rusk County Sheriff's Office, and I'm not saying there's

18   anything wrong with that.  Okay?  I'm with the Texas Rangers.

19   I want you to understand.  They will believe me.  You just

20   tell me the story, you know.  Are you hot?

21   A.    Yeah.

22   Q.    Do you want me to turn the air on a little bit?

23   A.    No, that's fine.

24   Q.    Okay.  All right.  Tell me what really happened,

25   because this is the time to get it right.

1    A.    Um --

2    Q.    And speak up loud enough so I can hear it on the

3    tape.

4    A.    Let's see, when was it?  It was about -- it was in

5    Septem- -- Blaine's dad died in September, early September.

6    Q.    Okay.

7    A.    And right after he died, we bought a Ouija board.

8    Q.    Okay.

9    A.    And we didn't know they were bad, and it was an omen,

10   or anything like that.  Like, we're very strong believers of

11   God, and everything.  And we bought a Ouija board.  And then,

12   you know, we -- we had heard -- we heard that it worked, but

13   we never actually did believe people when they said it would

14   work, so we wanted to try it out for ourselves.  And then, you

15   know, I -- I -- my dad's dead, too.  He died when I was ten.

16   Q.    I'm sorry.

17   A.    And, you know, so I asked my daddy, that I thought --

18   you know, a question that him -- he would know that nobody

19   else would know.  And I had never told Blaine that.  And so

20   when he spelled it out and everything, I was like, you know,

21   this is my daddy.  And then Blaine asked his daddy a question

22   that he never told me, that only him and his dad knew, and he

23   answered it right.

24   Q.    And when -- when was this happening?  Was this last

25   night?

1    A.   No.  It was in September.

2    Q.   Oh, in Sep- --

3    A.   This is what --

4    Q.   Okay.

5    A.   -- first started it.

6    Q.   Okay.  Okay.  All right.

7    A.   And so we did that.  You know, like, this is like a

8 telephone to heaven, and we thought it was really cool and

9 everything, so we just -- we kept talking to our dads, telling

10 them how much we missed them and, you know, and we talked to

11 them for about eight hours straight that night.  And then, you

12 know, the next day we started to talk to them, but then, you

13 know, stuff -- the next -- the first night was fine.

14 Everything was fine.  They were making sense and everything,

15 but the next night, like every -- some stuff was making sense,

16 but other stuff wasn't making so much sense, like not

17 something we'd think, you know, our daddies would say.  They

18 just -- it just didn't make any sense at all.

19           And so we talked -- we started talking to more

20 people that knew about it, like what was going on and

21 everything, and then just weird stuff started happening.  And

22 then they said, "You know, that's an omen.  It's bad.  Don't

23 play with a Ouija board," and everything, so we started

24 getting really freaked.  And we -- we got this little music

25 box from one of his friends that's Chinese.  And it has these

1    Chinese people singing, you know, "God will protect us;

2    demons, leave this house," because they said our apartment was

3    possessed, because weird stuff started happening and

4    everything.  So we left, and we kept that music box there and

5    blessed it, and then we blessed the Ouija board, and then we

6    threw it away.

7              And, you know, kind of like "The Exorcist," you

8    know, have you ever seen -- you know, when demons come into

9    people or whatever.  And the devil had came into Blaine and,

10   you know -- I mean, it sounds crazy, but, I mean, I would not

11   be making this stuff up.

12        Q.    I'm a Christian.  I believe --

13        A.    Yeah.

14        Q.    -- in demon possession.

15        A.    Yeah.  And so -- and I am, too.  And, you know, I --

16   I kind of knew -- I mean, I knew about demon possession, but,

17   you know, you can't really believe something for sure until

18   you see it with your own eyes.  And so when the devil started

19   coming in me, talking to me, saying, you know, "I'm going to

20   take Blaine's soul tonight," you know, all this kind of stuff,

21   it started really freaking me out.  And every time Blaine

22   didn't know, was doing it, he -- it would be Blaine again.

23   And then I would be crying my eyes out, you know, and he would

24   be like, "Baby, what's wrong?  Why -- why are you doing this?"

25   You know, it was like, "You -- did you not understand what

1   just happened?" and stuff, and he didn't have any idea what

2   was going on.  And then, you know, as more time progressed or

3   whatever, it just -- it kept on happening more and more and

4   more, and then he finally -- he finally started realizing what

5   was going on.  He said that while it does it, he's just like

6   in this white room with this big music box playing like devil

7   music, and everything, and it's really weird.  And then we had

8   blessed him and everything, and then --

9       Q.   And when you keep saying "him," you're talking about

10  Blaine?

11      A.   Yeah, Blaine.

12      Q.   Okay.  All right.

13      A.   And then the devil, finally he went out of Blaine.

14      Q.   Okay.

15      A.   And then Blaine got to where he could talk to God.

16  And, you know, Blaine -- Blaine doesn't make this kind of

17  stuff up.  I mean, I'm not saying -- Blaine -- Blaine doesn't

18  lie like that, especially over something like that, because we

19  are very strong Christians and everything.

20      Q.   Um-hmm.

21      A.   And so, you know, he started talking to God and

22  everything, and then they were having -- you know, God and the

23  devil were having this battle and everything.  The devil

24  tried, kept trying to come in Blaine.  They were talking --

25  but God was pushing him out.  And every time -- every time the

1  devil would come in Blaine, coming after me, Blaine told me

2  that God told me just to put my hand, you know, and yell as

3  loud as I can, "In the name of Jesus Christ, Satan go to

4  hell." And every time I did it, it would work. And then his

5  eyes would roll back in the head, and then it would be Blaine

6  again.

7        And then finally, it started getting to where it

8  kept coming in so much that that wasn't working anymore, and

9  so I was just scared. I mean, he never touched me while he

10 was in it, but, I mean, it came close to looking like he was

11 going to kill me. And I even know, because I put a cross to

12 him one time, and then who -- whatever was in Blaine jumped

13 across -- like he was in the driver's seat, he jumped over to

14 the passenger seat until I put the cross around his neck. And

15 then his eyes rolled back into his head, and then it was

16 Blaine again. And then, you know, it's like it all happens at

17 once, and then it goes away for a little while. Once

18 everything's gone away, then it all comes back again.

19        And a lot of stuff that has to do with it is

20 that -- like me and Blaine hiding stuff from each other, not

21 to hurt each other, you know, and that had a lot to do with

22 it. And, you know, he was -- God was telling him that we

23 needed to tell each other the truth about everything. It

24 would make our relationship stronger, and just be honest. And

25 so we kept on being honest, and everything. And then it got

1  to where I woke up -- it was -- it was yesterday morning.  I
2  woke up.  And then Blaine woke me up, and then he said,
3  "AC  's walking."  And I had just had a dream about AC
4  walking, and it was a good thing.  You know, I was so excited
5  she was walking, and everything, and by herself.
6        And then he was like, "No, it's not the kind of
7  walking you like."
8        And I was like, 'What are you talking about?"
9        He said, "Something is in AC  now."
10       And I said, "How is that possible?"
11       He was like, "You remember when God was telling
12 me that, you know, we needed to be truthful to each other, or
13 this stuff would keep happening?" and everything.
14       And I said, "Yeah."
15       And he was like, "Well, we haven't been.  And,
16 you know, now it's gotten into AC  now."
17       And then I said, "Okay.  Well, can't we like
18 have an exorcism or something to get rid of it?"
19       And then he was like, "Yeah, God said we could,
20 but it's -- I've got to get the stuff to do it."  And then he
21 was like, "But you do not want to see her."
22       And I was like, "It's my daughter, you know.  I
23 want to see her."
24       He was like, "No."  He was like, "You know what
25 Chucky is?"

1          I was like, "It's kind of like that -- or 'Pet

2    Cemetery,' when the die -- boy dies and comes back to life all

3    evil and stuff?"

4          He was like, "It's like that.  She can walk.

5    She can throw things."

6          He -- whatever was in Amora was biting Blaine to

7    where it was drawing blood on his hands.  And so Blaine kept

8    her in the back bedroom.  And his mom had been staying out of

9    town for two nights or whatever, and we didn't really want to

10    say anything to his mom, because his mom don't really kind of

11    believe in that -- she does, but then she doesn't.  We never

12    told her about the demon possessing Blaine.  We tried to one

13    time, but she thought we were just making it up, so we just

14    didn't want to bother with it at -- anymore.  But every time

15    Blaine could feel that the devil was coming in, he would go

16    into the bathroom, because he didn't want to be around me,

17    because he knew it would scare me so much.  And he'd be in

18    there for a couple of hours fighting it off.  And, you know,

19    his mom would get mad, you know, like, "What are you doing in

20    the bathroom for so long?"  And he was like, "I cannot tell

21    you."  And then it started getting --

22    Q.   Hold on just a second.

23          *UNIDENTIFIED VOICE:*  I'm going to go ahead and

24    transport Blaine.

25          *RANGER KENNY RAY:*  Okay.

1      Q.    I'm sorry, go ahead.  Let me make sure that we're

2    still on here.  Okay.  That was an interruption from a officer

3    with the Rusk County Sheriff's Department.  Okay.  I'm sorry,

4    Jess.  Go ahead.

5      A.    Okay.  And so --

6      Q.    So Blaine's mom wouldn't believe.  Start back there

7    with me.

8      A.    Yeah, Blaine's mom, she kind of believed, you know,

9    that since his dad died, she said that his dad had came back

10   to her and called her name.  So she believes like in good

11   spirits coming back after they die, but she doesn't believe in

12   like the whole devil possession --

13     Q.    The evil spirits?

14     A.    Yeah, the evil -- well --

15     Q.    Okay.

16     A.    Yeah, because one night, me and -- me and his mom

17   were here all alone, and there was a bad spirit, and I saw --

18   I didn't see like a face or anything, but we both saw the

19   figure.

20     Q.    Okay.

21     A.    And she thought it was a real person, but I knew it

22   was a bad spirit.

23     Q.    Okay.

24     A.    But Blaine told me I didn't want to see AC    like

25   that.  And then I was like, "What -- how is it going to scare

```
 1   me?"

 2              I (sic) was like, "Because her face is, like,

 3   warped."

 4              And I was like, "What do you mean warped?"

 5              I (sic) was like, "Because this evil spirit is

 6   trying to get into a 13-month-old baby, and, you know, it's

 7   kind of warping her face, like stretching it and everything,"

 8   and I was like, "And whatever is in AC   , it growls, and it's

 9   not our daughter."

10      Q.   Now, he was telling you this?

11      A.   Yeah, he was telling me this and --

12      Q.   But you never saw it yourself?

13      A.   No, I saw it af-  -- this was like when it was first

14   started happening.

15      Q.   Oh, okay.

16      A.   When I first woke up, and he was telling me about it.

17   He was like, "You know, I didn't want you -- to tell you about

18   it.  I wanted to fix it before you knew, but, you know, you

19   have -- you needed to know."

20      Q.   Now, was that this morning?

21      A.   No, it was yesterday.

22      Q.   Yesterday, okay.  Go ahead.

23      A.   Yeah.

24      Q.   All right.

25      A.   And so he told me that, and everything, and then he
```

1   was like, "No, I'm about to go in there and change her
2   diaper."  And he was like, "I really don't want you to go in
3   there, because I know it's going to hurt you to see her."

4              And then I was like, "Okay."  And then so he
5   went in there, and then he came back out, and he said that she
6   got so powerful -- like he tried giving her a bottle.  He
7   tried getting her -- like he would crush up like one sleeping
8   pill, you know, and crush it up and put it in her bottle to
9   make it go to sleep, so it wouldn't, you know, like do
10  anything.  Because it -- it could stand up, run to the door,
11  off the bed, and open the door and come out.  And AC   , the
12  real AC   , she can't even walk by herself yet.  And she -- I
13  mean, she just crawls, and she can walk if somebody helps her.
14  And so he kept her on that bed the whole time.  And then
15  finally, you know, after time and time again of him going in
16  there, I was like, you know, "I want to see her."

17       Q.    But you never saw any of that stuff going on?
18       A.    Huh -- no, I saw stuff afterwards.
19       Q.    Okay.  Okay.
20       A.    And so he -- he was like, "Well, do you want me to
21  take a picture instead of you going in to see it?  Just in
22  case, you know, it scares you, you won't, you know, actually
23  see her, you'll just see a picture."

24              I said, "Yeah."  So he had his brother's camera
25  phone, and he took a picture of it.  And then he slid it

1    through the door -- or handed it to me through the door.  And

2    like this side of her face was like warped down, and her eye

3    was like stretched and stuff, and it was really freaky.  And

4    then it kept -- the demon or whatever that was in her kept

5    trying to go in and out, but it was in most of the time.  It

6    was, you know -- but, you know, every now and again it would

7    be AC   .

8           And it had gotten so bad to where whatever was

9    in AC    had bitten a flashlight and bitten into a battery and

10   got battery acid all in AC   .'s mouth, and so it was eating at

11   her tongue and everything, because Blaine had saw it.  And so

12   she was having this horrible cry.  It didn't even like sound

13   like her, you know.  And then it just kept getting so bad.

14   And then he would go in there, and he'd have -- he had -- he

15   had a metallic cross, I think he was calling it.  And then he

16   was trying to do like an exorcism and everything.  And he said

17   that God said that he could do it by himself since it was a

18   baby, and it wasn't like an adult or anything.  So he went in

19   there and tried, and then that didn't work out.

20           She -- he said he left the door open by

21   accident, and then she ran out.  And then I was in the back

22   bedroom, and Blaine comes in.  He was like, "Get off the bed."

23              And I was like, "Why?"

24              He was like, "Because she's under it."

25              I was like, "How did she get under it?  I didn't

1    even see her."

2          He was like, "She's fast."  Like the demon that

3    was in her or whatever.  And so Blaine went to his Dad's side

4    of the bed, and then -- and he was holding her.  And you could

5    tell he was holding her.  I mean, I didn't see it, but you

6    could hear her like moving around under there.  And so he

7    said, "Go."  And then so I left.  And then he ran right after

8    me and then shut the door and kept her in there.  And so he

9    kept on trying to do exorcisms on him, trying to get it out,

10   trying to get it out.

11          And then God told him that -- to get the best

12   priest that there is, but he lives somewhere, you know,

13   overseas, and it wouldn't take God knows how much money, you

14   know, to do that and to get him over.  And that -- that long

15   amount of time, you know, it just -- it wouldn't be that much

16   time.  And so I was like, "No."  I was like, "That -- that's

17   not going to work, you know.  Why can't we find a priest here

18   or a minister or something that could tell us what we could

19   do, you know, somebody that would believe us, and everything?"

20          He was like, "You know nobody's going to believe

21   us."  He was like, "The sheriffs and stuff are not going to

22   believe us," and everything, because when they had -- when we

23   had the Ouija board, they had -- my dad was telling me, you

24   know, that -- my dad got -- his file was he committed suicide,

25   but my dad told me on the Ouija board that my mom had planned

```
 1   to kill him.  He -- she hired somebody to kill him, and that
 2   was the truth, and the gun's buried like in Alabama.  And so I
 3   started doing all that kind of research.  But I couldn't tell
 4   the cops, because, you know, they would think I was crazy.
 5   And so I just had to act out as I go along or whatever, "What,
 6   you know, I heard from so-and-so," or "I really think that my
 7   daddy didn't do this," and I couldn't tell them, because they
 8   would think that I was crazy, and they wouldn't believe me,
 9   and they wouldn't have a case.
10       Q.    But you're not crazy.
11       A.    I know and, you know --
12       Q.    No, I'm asking.  You're --
13       A.    No, I'm perfectly sane.
14       Q.    Have you ever been treated for a mental illness of
15   any --
16       A.    No.
17       Q.    Okay.  All right.
18       A.    And so he did that.  And then we went outside last
19   night or whatever, and he -- he kept the hammer in the back
20   door, so she couldn't open it.  And it was down -- like it
21   wasn't like low-low, but obviously she could reach it, and so
22   he went outside.  And then he said, "AC  ι," and then he
23   started running back in.
24              And then I was like, "What?"  And then I started
25   running back in after him, and then -- but I didn't go back .
```

1  there, though, because it was frightening me to see her look
2  like that and to see how like mean-acting she was and
3  everything.  And then --

4    Q.    So really, any of the times where she was actually
5  possessed, like when her head was stretched, and she was --
6  you could hear her, but you never actually saw her.

7    A.    No, I saw her.

8    Q.    Okay.

9    A.    I saw her, but the first couple of times, he
10 didn't -- I didn't want to see her.  I mean, I saw her.  It
11 scared me, but I saw her.  And even like when it would come to
12 be her for a couple of minutes, her face was still warped, and
13 then, you know, it would go back to be the demon possessing
14 her or whatever.

15   Q.    Okay.

16   A.    But Blaine came back outside.  And I said, "What did
17 you run in the house saying 'AC    ' for?"

18        He said, "God told me she got the hammer and was
19 hitting herself on the head."  And those marks on her head
20 was, I think, from that hammer where she was hitting herself
21 -- or that demon was hitting herself on the head.  And I was
22 like, "Well, what did you do to keep the door shut then?"  He
23 just said, "I put the hammer up higher."  And then so all this
24 crap was happening.  He was trying to do it all last night.
25 We didn't get no sleep last night.  I got maybe like 20, 30

1    minutes, and that was like spaced out.  I -- I couldn't get

2    sleep.  He couldn't get sleep.  He was trying to think of ways

3    and talking to God how to fix this.

4                And he said -- he said the devil's telling him

5    the only way to do it was to sell his soul to the devil, and

6    then AC    would be fine again.  I was like, "You know what

7    the devil's doing?"  I was like, "He's going to get you to do

8    that," and then I was like, "And AC    won't be fine, and then

9    he's just going to have one more soul, and he's going to keep

10   on doing it and keep on doing it."  I was like, "Don't fall

11   into his tricks," I was like, "Because that's all it is, is a

12   trick."  I was like, "You listen to God and what he tells

13   you."  And so God was telling him try to do these exorcisms

14   and stuff.  And then it wasn't working.  And so God -- Blaine

15   was getting --

16       Q.    What was he trying to do?  How was he trying to do

17   the exorcism?

18       A.    I wasn't in there.  He didn't want me to go in

19   there --

20       Q.    Okay.

21       A.    -- during it --

22       Q.    Okay.

23       A.    -- because, you know, I've -- I mean, I've seen the

24   movies where they get all, you know, mad, and it was -- it was

25   hurting me enough to see that something was -- like that was

1    in my daughter, you know, regularly, so he would like close

2    the door and shut it, and then I would hear it out of AC    ,

3    like scream and everything.  And then this morning, he went in

4    there.  He said, "I'm going to try it one more time to see if

5    it works."  He was like, "If not, I'm doing what the devil's

6    telling me."  I was like, "Blaine, don't do it."  He was like,

7    "Okay."  And so he went in there.

8        Q.   All right.  Now, tell me -- all right, now, so start

9    this morning when y'all really woke up, instead of the stuff

10   about down at the --

11       A.   Well, we didn't --

12       Q.   -- property.

13       A.   -- we didn't wake up.  We --

14       Q.   Okay.

15       A.   We -- Blaine was asleep -- Blaine was awake all

16   night.

17       Q.   Was he going in there some without you?

18       A.   Huh?

19       Q.   Doing the exorcism?

20       A.   No, I was awake, too, but --

21       Q.   But he was going in there?

22       A.   I knew he was going in there, but he just didn't want

23   me going in there --

24       Q.   Okay.

25       A.   -- because he didn't want me to see it, because he

1   knew it would hurt me.

2       Q.   Right.

3       A.   But it had to be done, so he wanted to go do it.  And
4   so he kept going in there, and then it wouldn't work, and he
5   would come back out.  And then he would talk to God some more
6   and see what else was wrong, and then he would go back in.
7   And then he said he was going to try it one more time this
8   morning.  And I said, "Okay."  So I was laying on the couch
9   watching TV, waiting for him to get done.  And next thing I
10  know, like the bedroom door is right there and the couch is
11  right here, and I can hear him laying on the floor in the
12  bedroom gasping for air.

13              I said, "Blaine, are you okay?"

14              And then he said, "No, the rope I tried to tie
15  her up with, you know, to -- just to get her -- get the demon
16  still" -- you know, so it wouldn't attack him or everything,
17  the demon took it off of AC    and tried to choke Blaine with
18  it.  And then I could see like the marks that were around his
19  neck.  And then he has a bad kidney problem.  He has a scar
20  from back here all the way to his side, because one of his
21  kidneys didn't grow when he grew.  And the demon knew that and
22  started kicking him in his kidney like really hard, and it was
23  hurting him really bad.  And he has heart problems, too,
24  because his dad of 48 died of like his eleventh or twelfth
25  heart attack.  And so he has heart problems.  He said that the

1  demon, you know, was kicking in his heart and -- because if

2  you just hit him like that, and the heart -- his heart will

3  start hurting pretty bad, and everything.

4       And then it wasn't working, so we were going to

5  go try to round up money to pay for a priest or somebody that

6  could do like an actual exorcism, and everything.  And then so

7  we went -- we went today.  And we kept her in there.  He said

8  that he was trying to go after her -- or the demon was going

9  after her, so Blaine pushed the demon away, you know --

10      Q.   Hang on just a second.  Don't stop.  Just a second.

11           (Pause in the interview, and inaudible

12  discussion with other unidentified speaker or speakers.)

13      Q.   I'm sorry.  Okay.  Keep going.

14      A.   And he said the demon was trying to come after him

15  and try to kill him or whatever, so he pushed the demon away

16  that was in AC  's body, and he started crying afterwards.

17  He said he felt bad for it, because it was like he was pushing

18  AC  .  I said, "Blaine," I was like, "That is not AC  .

19  That is somebody -- that is just her body, and that's some

20  demon in there possessing her."  I was like, "You did not push

21  AC  .  You pushed the demon."

22      Q.   Okay.

23      A.   And so he felt bad about that, and I was trying to

24  make him not feel bad about it.  So we left, trying to get

25  money.  And then we were coming back, and then God was telling

1    him, you know, that there's nothing.  I was like, you know,

2    "There's got to be something else we can do."  I was like, "We

3    can get money.  We can go to our minister, see if he can help,

4    or go to a -- find a priest somewhere and see if, you know, we

5    can make payments on him doing an exorcism or something.  See

6    if we can do just anything.  There's got to be another way."

7              And he said, "God said it was too late."

8              And I was like, "What do you mean God said it

9    was too late?"

10             And then he was crying while he was saying this

11   and everything.  He was like, "Because if she doesn't go to

12   heaven now, she will live her life with Satan having her, her

13   soul, you know."  And then all -- and then he said, you know,

14   "God said in any -- in any parents' right mind, they would

15   want their child to go to heaven."

16             I was like, "Yeah, that's right.  I do want my

17   child to go to heaven, but, you know, a parent should not be

18   having to bury their child.  You know, she's barely had a

19   chance to live."  She was only 13 months old.  I was like,

20   "But, yes, I would rather her go to heaven now than spend a

21   life with Satan having her soul and her going to go to hell

22   afterwards for something she hasn't even done."

23             And then -- and so I said, I was like, "Okay,

24   well, you know, is -- is she already gone, you know?  I can't

25   even tell her goodbye or anything?"  He was like, "You know, I

1   really don't want to ask God, because I don't want to know
2   either." And I said, "Okay." So we got back to the house.
3   And then that was really what happened when we walked into the
4   house. He went to the bathroom, and I was in the kitchen. I
5   heard him crying. I went in there, and that's where -- that's
6   where he had pushed AC   with the demon in her, was in the
7   bathroom.

8        Q.   Down into that hole?

9        A.   Uh-huh.

10       Q.   Okay.

11       A.   And it just -- it just so happened to be down there,
12   you know. And then he -- he picked her up, you know, and then
13   I -- like, that was the truth, I thought I saw her belly
14   moving, and so I felt her throat, and then I swore it was a
15   pulse. It was not much, but it was something. And then I
16   could have sworn that when I grabbed her hand, like it was
17   slowly but surely clamping down on my finger. And so I told
18   him that, and he ripped her shirt open, you know, and started
19   giving her mouth-to-mouth and giving her CPR and everything.

20                And then we just -- we sat there and held her,
21   because we knew there was nothing else they could do. And
22   then when we called 911, the woman kept telling us to keep
23   giving her CPR, and, I mean, I was trying. I would get
24   frustrated because of what happened, but I was getting
25   frustrated because I knew she was already gone, and they kept

1   telling her -- telling me to just keep on doing it, keep on

2   doing it, and I already knew that she had died.

3          And -- but all those bruises and everything on

4   her face was that demon doing that to her.  Blaine would never

5   touch that baby.  He loved her too much.  And I would never

6   touch that baby.  I went through my senior year pregnant and

7   gave birth to her and still managed to keep my grades up and

8   take care of her.  I mean --

9       Q.   Yeah.

10      A.   -- I loved that baby to death.

11      Q.   I know.  Did he tell you how God had him do it, I

12  mean, actually do the final exorcism that sent her to heaven?

13  Did he tell you what God actually --

14      A.   He didn't tell me.  I mean, he said -- I mean, he's

15  been talking to God for a while, and he -- and, you know, a

16  lot of the problems that -- about the truth thing, you know,

17  he said God gets frustrated, because sometimes when Blaine

18  can't tell me something, then I get upset.  And I do, because

19  he kind of gets upset at me, too, when he has to repeat

20  things.  And I get upset, because I can't -- I don't

21  understand, because I don't know the full story.  And so we

22  kind of get upset and mad at each other over stupid stuff, you

23  know, and that causes more stuff to happen.  And then, you

24  know, he couldn't -- I don't think he could tell me that, but

25  I didn't ask.

```
 1        Q.    Yeah.

 2        A.    I just let him go in there, and I heard the demon cry

 3   out and scream out and everything, and then --

 4        Q.    Yeah.

 5        A.    -- I heard a lot of banging and stuff going around,

 6   and the next thing I know, Blaine's on the floor gasping for

 7   air.

 8        Q.    Um-hmm.

 9        A.    But --

10        Q.    Well, did -- so you never ever hit or hurt AC    --

11        A.    No.

12        Q.    -- in any way?

13        A.    I would never -- I mean, I popped her, you know, like

14   when she got in trouble, but I --

15        Q.    Well, just for discipline.

16        A.    Yeah.

17        Q.    Yeah.   But -- okay, so all of the violence, then,

18   that took place between AC     with the demon in her was

19   between her and Blaine?

20        A.    Yeah.

21        Q.    Blaine basically was having to fight her.

22        A.    Yeah.   But, I mean, the only thing Blaine did was he

23   pushed her away when he was trying -- when the demon was

24   trying to come after -- he didn't do all that stuff on her

25   face.   Like -- like I was telling you when Blaine -- when God
```

1   told Blaine that AC    was in trouble, or whatever, he ran

2   straight.  And then AC    had gotten up off the bed and got

3   the hammer and was hitting -- the demon was hitting --

4        Q.   But --

5        A.   -- AC    's face with a hammer.

6        Q.   -- but -- but every time that stuff happened, you

7   weren't actually in there to see that.

8        A.   He wasn't around either until God told him, and then

9   he came --

10        Q.   And then he went in?

11        A.   Yeah, he went in.

12        Q.   But he's always the one that went in there with her?

13        A.   Yeah, because he didn't want -- he knew --

14        Q.   He didn't want you to see --

15        A.   -- that it would scare me --

16        Q.   Yeah.

17        A.   -- because it would -- it did scare me.  Every time I

18   saw her, I just broke down and started crying, because I was

19   like, you know, "That's not my baby."

20        Q.   Um-hmm.

21        A.   And then he would start crying, too.  But he was

22   like, "You know, I've got to be strong."

23        Q.   Um-hmm.

24        A.   But he would never hurt that baby.  He loved that

25   baby too much.  I mean, if you lived with us, you'd -- you

1  would know how much he loved that baby.  He always played with

2  her.  He talked so --

3     Q.   But he was --

4     A.   -- much about that baby.

5     Q.   -- he was the one actually with her, though, when she

6  went to heaven?

7     A.   No, he was with me.  She died while we were going --

8  trying to get money for the priest.

9     Q.   But he had been -- went in there -- he had been in

10  there with her before.  So where did y'all go to try to get

11  the money for the priest?

12     A.   We went to -- he had some tools that he hawked, and

13  we got some money.  We had some money, and everything --

14     Q.   Where did y'all do that?

15     A.   It was in Henderson.

16     Q.   At the pawnshop?

17     A.   Um-hmm.

18     Q.   Which one?

19     A.   Insta Cash.

20     Q.   And was that this morning?

21     A.   Yeah, it was this morning.

22     Q.   Okay.  What time?

23     A.   I think we left about 8:30, because I remember the

24  doors open at 9:00, and we got there about 8:57.

25     Q.   Okay.

1      A.   So we were sitting in the parking lot, waiting for it

2  to open.

3      Q.   How much did y'all get?

4      A.   We got $20.  And then after he told that, I was so

5  stressed, I was like, "I'm just going to get a pack of

6  cigarettes."

7      Q.   Okay.

8      A.   But it's --

9      Q.   Okay.  So really then, this morning you didn't see

10  her --

11      A.   Huh?

12      Q.   -- because she was back --

13      A.   No, this morning, like I said, we didn't go to sleep

14  at all to-  -- last night --

15      Q.   Yeah.

16      A.   -- so I was --

17      Q.   But before y'all left?

18      A.   No, because I told him --

19      Q.   She was back there in that room.

20      A.   No, they were in the -- this bedroom this time.

21      Q.   She and --

22      A.   And Blaine were.  They -- they usually did it back in

23  the back bedroom, because that was the furthest away from the

24  house.  He always told me to go to the furthest bedroom, close

25  and lock the door.  But --

1    Q.   Now, did God tell him to bite her?

2    A.   Huh?  All right, he didn't say anything to me about

3  that.

4    Q.   Okay.  She had a bunch of bite marks.

5    A.   Yeah, I saw that on her.  And I don't -- I don't know

6  what that was.

7    Q.   Well, it's going to match up with his mouth, I can

8  tell you that.

9    A.   Okay.

10    Q.   So did he say anything about God telling him to bite

11  her?

12    A.   He didn't say -- I mean, lot of things he told me, he

13  said, "I can't tell you right now.  You know, I will tell you,

14  and I can't tell you."  And then I told him, "Okay."  And you

15  know, I just -- I got -- I got upset, because I can't

16  understand the full story, and I'm a very curious person --

17    Q.   Um-hmm.

18    A.   -- but --

19    Q.   Tell me a little bit about y'all's --

20    A.   -- (inaudible) about that.

21    Q.   -- yours -- and I know this is kind of a sensitive

22  subject, but I'm old enough to be your daddy, so just imagine

23  that, you know, that -- don't think I'm asking you this for

24  inappropriate reasons.  But tell me about yours and Blaine's

25  sex life.  Is it -- did he -- was there unusual things he

1    enjoyed doing to you, or with you?

2         A.   Hm-mm.  No, it was normal.

3         Q.   Okay.  He ever bite on you --

4         A.   No.

5         Q.   -- or want to tie you up or anything like that?

6         A.   Hm-mm.  He -- he's not that kind of person.

7         Q.   Okay.  Okay.

8         A.   That -- that's one thing -- if that -- if those bite

9    marks are Blaine's teeth, I know for a fact that it was that

10   demon, and he was trying -- because I know a lot of times, I

11   would hear stuff going on, and I said, "What is -- what's

12   going on?" you know.  He was like, "It's trying to attack me,

13   you know, it's trying to attack me."

14        Q.   Um-hmm.

15        A.   And there was a lot of times where that went on.  So

16   I know for a fact that if those are Blaine's teeth marks,

17   that's him trying to get the demon away from killing him,

18   because --

19                  (Interruption by unidentified voice.)

20                  *RANGER KENNY RAY:*  I really need to finish this.

21                  *UNIDENTIFIED VOICE:*  Okay.

22                  *RANGER KENNY RAY:*  Really.

23                  *UNIDENTIFIED VOICE:*  Well, you need to make a

24   phone call.

25                  *RANGER KENNY RAY:*  Okay.

1      *A.*    Because Blaine had told me one time, I'd -- before

2    I'd -- the first time I'd ever seen her or whatever, I said,

3    "What's she doing in there?"

4              He said, "She got a kitchen knife."

5              I was like, "What is she doing with a kitchen

6    knife?"

7              He was like, "I don't know."  He was like, "She

8    just got it."

9              And I said, "You don't know how she got it?"  I

10    was like, "No."  I was like, "She just had it.  I guess -- I

11    don't know."

12             And I said -- okay, and this was before I could

13    understand, like fully comprehend that she could -- that the

14    demon could make her walk and do all this kind of stuff.  So

15    then, you know, I was like, you know, "How did she get it?"

16    Because I was just thinking it was the same little AC    and

17    everything.  And I was like, "She can't get a kitchen knife

18    unless it's, you know, level with her or anything."

19             And he was like, "Oh, she can."

20             And I was like, "Well, take it away from her."

21             He was like, "No, because every time I try to go

22    near her, she -- she tries to stab me."  And then he was like,

23    "That is not AC    in there.  It's something else."

24             And then I was like, "Okay."  And then I just --

25    every time I went around -- I would always ask Blaine first if

1   it was her or if it was the demon.  And every time he said it

2   was her, then I would go in and talk to her and, you know,

3   everything like that, try to let her hear my voice.  And it

4   would be her for a little while, and then it would start

5   getting mean again.  And then I was like, "Is it coming back?"

6           And he said "Yeah, it's coming back," and so I

7   would just leave again, and then he would leave, too.

8       Q.   Okay.  Okay.

9       A.   So I'm saying, like -- but Blaine's not that kind of

10  person to do that to somebody.

11      Q.   Okay.

12      A.   So if -- if those are Blaine's bite marks, he was

13  doing that not intentionally to hurt AC   , but to get that

14  demon away from killing him, because Blaine's not that kind of

15  person at all.  And I'm not -- I'm not saying that to cover

16  him because I love him.  He really is not that kind of person.

17      Q.   Okay.  I believe you.

18      A.   He wouldn't do something like that, especially to

19  her.

20      Q.   Okay.  Okay.  So just to make sure, though, this

21  morning you didn't actually see her before y'all went to the

22  pawnshop?

23      A.   I saw her, but not -- I saw her before she did -- he

24  did the exorcism thing again, after --

25      Q.   And what time did he do the exorcism?

1    *A.*    It was seven something.

2    *Q.*    Okay. About how long did that last?

3    *A.*    Probably about 30 minutes.

4    *Q.*    Okay.

5    *A.*    And then he said, "Okay, I'm almost done." And so,

6 you know, I was like, yes, this stuff's finally going to be

7 over with, and then we can just go on, and happy lives and

8 everything, and then stuff. And then, you know, I started

9 hearing banging stuff going around in the room, and I was

10 like, "What is going on there?" But he said, you know --

11    *Q.*    And that was in his mother's bedroom?

12    *A.*    Um-hmm.

13    *Q.*    Okay.

14    *A.*    And he said, "Don't really say anything," because

15 that's -- that's going to, you know, distract him from working

16 or, you know, the demon might hear and then go off or

17 something. So I decided not to say anything. But then, you

18 know, when he fell to the floor and started gasping for air

19 and everything, I was like, you know, "Are you okay?"

20    And he said, "No, I'm not. She kicked me in my

21 kidney again." And that demon had done it to him quite a few

22 times, because he was hurting really bad, and he couldn't

23 breathe.

24    *Q.*    And why did he tell you to make up the story this

25 morning?

1    A.   He didn't tell me to.  I actually told him to,

2    because we -- like I told you about my daddy, and them cops

3    not believing, or whatever.  I knew that if we didn't, they

4    wouldn't believe us, and they would either take us to a mental

5    institution or they'd arrest us for murder, when neither one

6    of us would ever do that to that baby.

7    Q.   Okay.  Okay.  Now, Jess, let me ask you this.  After

8    -- after we finally got to the real story, is everything

9    you've told me the truth now?

10   A.   Yes, that -- that is the God's honest truth.

11   Q.   Okay.  And you told me that, because you wanted to

12   get it right.

13   A.   Yeah.

14   Q.   And you understand that you're not --

15   A.   The only reason why I didn't is because I was scared.

16   I didn't want to be sent to an in-  -- a mental institution,

17   or Blaine, and I didn't want me and Blaine getting arrested

18   for something we didn't do or have --

19   Q.   Okay.

20   A.   -- any control over.

21   Q.   Okay.  I understand.  I understand.  But you

22   understand now that you and I have just been talking.  You're

23   not under arrest.  You don't have handcuffs on.  You're just

24   sitting here in my car, and you've told me this voluntarily

25   because you wanted to.  And you understood that you were

1    talking to me and telling a policeman, and you understood that

2    I recorded all this; is that correct?

3    *A.*    Yes.

4    *Q.*    You're nodding your head, but I need you to say

5    yes --

6    *A.*    Yes, sir.

7    *Q.*    -- so the tape will hear it.  Okay.  Is there

8    anything else we should have talked about and didn't?

9    *A.*    No.  That was -- that was it.

10    *Q.*    Okay.  Okay, well, I'm going to turn this off then

11    and let you -- let's see.  All right, it is approximately

12    1:30.  Is it already 1:30?  It's actually 1:26 p.m., and

13    you're free to leave.  Thank you.

14    *A.*    Thank you.

15    *Q.*    Thank you for talking to me.

16    *A.*    Thank you.

17    (Pause in audio.)

18    *Q.*    Hey, come sit down.  You're Jess?  My name's --

19    (CD stopped.)

20    *MR. JIMERSON:*  It's just repeating it.  Okay, go

21    ahead and stop it.

22    (Conclusion of the playing of the CD audio of

23    the interview.)

24             **DIRECT EXAMINATION (CONTINUED)**

25    *Q.*    (BY MR. JIMERSON)  At the time of this interview, did

# EXHIBIT 26

**2008-10-04 04:49:00 PM**
**From 152923806**
**To 171125646**

ok listen here bitch. daddy told me everything. i know u and other ppl planned to have him killed for yrs.thats y u never wanted me to have an ouiji board b/c u knew how bad i wanted to talk to daddy and u knew he would tell me the truth about you. i cant believe all the times u cheated on him and with all those diff. ppl...and u called me trash???well fuck u i aint nothing like YOU.i would NEVER poison my family and especially kill my husband for fuckin money u golddiggin slut.and also i know he left me a hell of alot more money than that and he DID leave drake money too and you took it all. and he told me that house didnt foreclose. daddy left that house to me and u sold it for what??more fuckin MONEY!you money hungry bitch.yeh he told me about u poisonin us too. me blaine and especially AC    .what the fuck has that baby ever done to u huh??not a damn thing!! yeh he also told me u wanted to give me up for adoption. y the fuck would u even have me if you never wanted me?? he all told me how all of yall did it and everything. all that man wanted to do was to love u and take care of you me and drake and you wouldnt even let that happen. instead you had to have donnie kill him for the fuckin money. ok let me tell u something, idk if u know this but ppl in heaven can see the future and he told u for all the  shit you've done in you life and that goes for mimi as well, he told me where yall are goin and lets just say it doesnt start with a h and end with an n. so i hope ur fuckin happy killin ur husband for some fuckin money you cant even have for eternity in HELL, unless maybe you can pick out ur own whips. i already talked to cary and he wants to be a pussy fine i know hes already talked to you but let me tell you this bitch and listen up good, im on my way to alabama right now to get the gun and trust me he told me word 4 word where its at and im going to get it with fingerprints still on there. so if you dont want me 2 go 2 the cops u better fess up and make a deal about my money or all of u will go 2 jail 4 life!!



# EXHIBIT 27

**Interview of Charles Russell Taylor & Lisa Lee Taylor - December 3, 2008**
**Conducted by Inv. Andy Gunter of the Elba Police Department**
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Inv. Gunter:** The time is 12:30 p.m., this is Wednesday, December 3, 2008. We're at Elba Police Department in the Criminal Investigation Office. This is Inv. Andy Gunter of Elba Police Department. I'm talking to Lisa Lee Taylor, who is a white female; who's date of birth is ▋▋▋▋. And I show your Social as ▋▋▋▋▋. Is that correct, Ms. Lisa?

**L. Taylor:** Yes, sir. It is.

**Inv. Gunter:** Ah, also present is Mr. Charles Russell Taylor who is a white male; who's date of birth is ▋▋ ▋▋▋▋. And I show your Social as ▋▋▋▋▋, is that correct, Mr. Taylor?

**R. Taylor:** Yes, sir.

**Inv. Gunter:** Okay. Alright, the reason I've asked you to come here, Lisa, for the record, is this morning I received a call from the Texas Rangers in the State of Texas in Tyler, Texas, about a homicide that took place yesterday at 7:00 a.m. Ah, the persons involved is a Blaine Keith Milam, who is a white male who is 18 years of age. And Jessica Baine Carson, who is a white female. I'm looking at her date of birth. She's probably, well, she's probably 18, too. And a victim who is a white female, AC ▋▋▋. She's 14 months old. Ah, I'm going to direct this question at you, Lisa. And I'll ask you some questions in a few minutes, Mr. Charles or Russ. Lisa, ah, are you acquainted with these two individuals I just named? Blaine and Jessica?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** You are. How did you come to know them, please?

**L. Taylor:** I've known Jessie since she was little. Probably about 12 or 13. She was best friends with my daughter.

**Inv. Gunter:** Hang on. I have done something wrong. Okay, this one is picking it up. Keep going.

**L. Taylor:** I have known Jessie since she was probably 12-13. She was best friends with my daughter, Tiffany. And she used to come stay at the house with us a lot.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** And, ah, Blaine, I've met him the first time probably about a couple of months ago. They came down for the night. And Jessie was with him and she was telling us about her step-dad—I mean, yeah, her step-dad's killing. And, ah, they came back probably about two or three weeks ago. And, ah, that was on a Sunday. They said they were gonna move down here. And I was gonna help them get a place to live and stay. So, they stayed with us from that Sunday to that Thursday. And, when we finally told them that they had to find a place to live. That they—they just changed their mind and say they were gonna move back to Texas until they could get the money back—saved up to be able to move back down here.

**Inv. Gunter:** I understand. Ah, any idea, I mean you're saying a couple of weeks ago. Can you give me a pretty close date? Before Thanksgiving or after Thanksgiving?

**L. Taylor:** Ah, it was before Thanksgiving. It was probably Michele's birthday. The 16th of November.

**Inv. Gunter:** Okay.

**L. Taylor:** 'Cause they came down the evening—was that on a Sunday, I believe?

**Inv. Gunter:** Yes, ma'am, that's correct.

**L. Taylor.** November 16, 2008, they came down that Sunday night.

**Inv. Gunter:** And they went back on?

**L. Taylor:** That Thursday night. They left Thursday night 'cause they didn't have no money. And me and my neighbor, Wy, we did everything we could to get them up some money to make it back home on.

**Inv. Gunter:** That would be Wynona Campbell who lives across the street from you?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Okay. So y'all got them up some money for traveling expense.

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Ah, while they were there—well, I'm gone ask you this first, for the record. Do you have any knowledge of or do you practice any kind of demonology or exorcism stuff or any of that kind of devil worship?

**L. Taylor:** No, sir. No, sir.

**Inv. Gunter:** Do you have or have you ever used a Ouija board?

**L. Taylor:** No, sir.

**Inv. Gunter:** Okay. So, would it be fair to say you're not qualified to teach somebody how to do an exorcism to exorcized—which I suppose means to get evil spirits out of a person?

**L. Taylor:** No, sir.

**Inv. Gunter:** You have no idea how to do that?

**L. Taylor:** No, sir, I don't.

**Inv. Gunter:** If I told you that Blaine Milam, had told law enforcement authorities in Texas that you had taught him how to perform exorcisms, would that be the truth on his part or a lie?

**L. Taylor:** That would be a lie.

**Inv. Gunter:** Because you have no idea how to do any of this stuff.

**L. Taylor:** No, sir. I don't.

**Inv. Gunter:** Okay, ah, Russ can you verify that? Do y'all....

**R. Taylor**: Yes, sir. Yes, sir.

**Inv. Gunter**: You don't know nothing about....

**R. Taylor**: Not a thing about it.

**Inv. Gunter**: Okay. Tell me, during the times they stayed with you, particularly this last time. I mean, what were they like? How did they act? You know.

**L. Taylor**: Um, he—she acted pretty normal. She did. Jessie did. Blaine he—he acted weird. Like he slept most of the time. Ah, she slept a lot of the time, too. I guess she just laid down when he was laying down. But she did get up every now and then. But he slept a lot the first few days he was there.

**Inv. Gunter**: (Affirmation.)

**L. Taylor**: Ah, when he woke up he'd act jittery and stuff. So the last day when they started to leave I started talking to them. And I come out and I asked him. I said, 'You can take it the wrong way, if you want too,' but before they first got there I told them I don't allow drugs. I don't allow any kind of stuff in my house.

**Inv. Gunter**: Right.

**L. Taylor**: If they're gonna stay there.

**Inv. Gunter**: (Affirmation.)

**L. Taylor**: Because I asked them. I said, 'The first time you came down for that day,' I said, 'Ah, you looked like,' talking to Blaine, 'You were on something.'

**Inv. Gunter**: (Affirmation.)

**L. Taylor**: And then he came out and admitted that he had done something. And I asked him was it meth and he told me it wasn't meth. It was something like meth, but you smoke it. And it's just the same effect as meth.

**Inv. Gunter**: (Affirmation.)

**L. Taylor**: I think—I'm not for sure if it's ice.

**Inv. Gunter**: Ice.

**L. Taylor**: Whatever ice is, but I think....

**Inv. Gunter**: Ice is a variation of meth. Yes, ma'am.

**L. Taylor**: And he said you smoke it, but you can snort it too.

**Inv. Gunter**: (Affirmation.)

**L. Taylor**: And I told him flat out, I said, 'I'm not done,' because I've seen stuff like that before and I don't believe in it.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** And, ah, we were talking about him and her relationship. How he didn't trust her and how she didn't trust him. And I said, 'If y'all gonna make this work, Blaine, you have to get off whatever you're taking and stay away from the wrong people.' Because he was telling me about how his family had problems. His brother or something knew drug dealers or, you know.

**Inv. Gunter:** Yeah.

**L. Taylor:** And I told him that you have to stay off of this. Especially with that baby. I said, 'If you don't put anybody first, you need to put that baby first. Because that baby—if there's a drug dealer out there and you're doing wrong, you—they gone come for the baby and they gone come for Jessie.' I said, 'They ain't gonna worry about you.'

**Inv. Gunter:** Yeah.

**L. Taylor:** And I thought I was doing good by talking to him because he said, 'Yes, ma'am.' He was very polite and saying, 'Yes, ma'am.' And, I thought, you know, they were gonna get their lives straightened out, because, I mean, I lectured him about drugs. Period. Because that's the only way you're gonna make it work as far as them trust issues and stuff.

**Inv. Gunter:** Yes, ma'am.

**L. Taylor:** And that was pretty much it. I mean, he was telling me about, you know, they had done the Ouija board, and, ah, that they would stay away from it. But Jessie told me that they didn't do no more. And he told me that they done it one more time and that they found out I guess there was bad spirits or something, that was lying to them or something. And, ah, he—he seemed like he had listened to me because, I mean, I literally lectured to him about staying away from the wrong people.

**Inv. Gunter:** I see. Before I started the tape you mentioned something about them having used this Ouija board because Jessie's dad, I believe, is alleged to have committed suicide. But they supposedly found out he was murdered by whoever his wife was at the time. Or something like that.

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Was that the first time or the last time they was down here?

**L. Taylor:** That was the first time they came down.

**Inv. Gunter:** Okay.

**L. Taylor:** And Jessie was telling me that they got on the Ouija board. Him and Blaine—her and Blaine got on the Ouija board and they told me that basically a long story about the Ouija board told them they thought was his—her dad. And that they had proof that Jessie's mom was the one who had her dad, Jessie's dad, murdered.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** To make it look like a suicide. And she gave me names of who helped and that they were scared because her mom was threatening Jessie. And they told me that her mom had put rat poison in Blaine's food. They had put rat poison in Jessie's food. And they also—she had put rat poison in $AC$ 's bottle three

times. Jessie's mom.

**Inv. Gunter:** Right.

**L. Taylor:** And, ah, I said, 'Well, I don't know what to do.' And they told me where the gun was. They said that the Ouija board told them that the gun that shot her dad was in Dothan at his grandmother or his aunt's house. Buried beside the left side of the porch. And I told them, I said, 'Well, I don't know what to do.' I said, 'Do you mind if I ask somebody else?' So she said, 'No.' Well, I got in my vehicle and I went over to somebody else's house. Tim. And, ah,...

**Inv. Gunter:** Okay.

**L. Taylor:** And he told me that, you know, basically what the law said. That you have to get proof. But I told Tim not to say nothing, because, you know, that was just hearsay. And it was just the Ouija board and I didn't know to believe Jessie or Blaine anyway. And we just blew it off. Well, he gave me a name of Mr. Jeter. I think his name was.

**Inv. Gunter:** Jeter.

**L. Taylor:** Jeter.

**Inv. Gunter:** Sgt. Jeter.

**L. Taylor:** Yes, sir. And, ah,...

**Inv. Gunter:** For the record, Tim that you're talking about is Patrolman Tim Liles here at Elba PD.

**L. Taylor:** Yes, sir. And, ah, he, you know, he told me that, you know, basically, you know, there's nothing to do without proof. It's just hearsay, cause a lot of people won't, you know, believe a Ouija board, and, you know, you have doubts, you know, if it's the truth or not. So, I didn't want to go to somebody else and look like, I guess, a butt.

**Inv. Gunter:** Yeah.

**L. Taylor:** And that's the reason why I asked Tim.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** And, ah, whenever they wasn't around I told Tim, you know, I don't know to believe them or not, because I don't know them well enough to know if that's the truth.

**Inv. Gunter:** I understand. Ah, when is Jessie's dad supposed to have been killed or committed suicide or whatever, do you have any idea?

**L. Taylor:** I think it was like four years ago.

**Inv. Gunter:** In Enterprise?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Okay. Alright.

**R. Taylor**: I thought it was Level Plains.

**L. Taylor**: Or, wait, she....

**Inv. Gunter**: Level Plains?

**L. Taylor**: Well, no, he was found murdered in—ah, he committed suicide in his house is what they're saying. But, see, Jessie was telling me that he's left handed and the gun was in his right hand and all this stuff.

**Inv. Gunter**: I see.

**L. Taylor**: And that the murder is supposed to have happened in Level Plains, but they brought him back to his house or something.

**Inv. Gunter**: Well, I'm sure that Enterprise or Level Plains or whatever did a thorough job of that. And, ah, we may or may not present this to them, but I don't know yet. Anyway, ah, what was the child like whenever....

**L. Taylor**: AC  ?

**Inv. Gunter**: Yes, ma'am. I mean, both times. And let me go back to----let me back up just a minute. The first time they came here, when was that? Approximately?

**L. Taylor**: Two months. Three at the most. But two months for sure.

**Inv. Gunter**: Okay.

**L. Taylor**: So, let's see.

**Inv. Gunter**: August?

**L. Taylor**: Was it before Tiffany's birthday or around it? Probably September.

**R. Taylor**: Probably somewhere there.

**L. Taylor**: Probably around September.

**Inv. Gunter**: And they stayed the night and got gone.

**L. Taylor**: They came....

**R. Taylor**: The next day.

**L. Taylor**: They were there. They came that night and they said they had to leave by 7:00 in the morning.

**Inv. Gunter**: Okay.

**L. Taylor**: So it was just probably for—but he was up all night. So, he didn't sleep at all.

**Inv. Gunter**: And then the second time they arrived on the 16th and left on the 20th?

Nov

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Okay. Alright, anyway back to AC   I mean, what was she like? Was she—did look like she had been cared for or not? I mean, describe the child's condition for me.

**L. Taylor:** She looked—she was a very happy baby.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** Ah, the first time they came down, ah, me and my sister, Amanda, because she was there the first night, we took care of the baby, because she—she didn't cry during the daytime. But we got up with her at nighttime because she cried and they wasn't—they wasn't in the house. But, ah, she—she was a happy baby. She—she just stayed in the playpen a lot. Except what time me and my sister or my neighbor, Wy, picked her up. Or my daughter, Tiffany. Ah, when you picked her up the first thing she wanted to do was love on you. And she would just hold me. And when I was holding her she just kept loving me and she just kept loving me. And Jessie told me, she goes, 'You don't hug mommy like that.' And I said, 'I'm just special,' because I started calling me Aunt Li-Li to her. And, ah, my next door neighbor, I wanted her to meet her. So I took her over there and let her meet her. And Wy, she held her and she just started hugging Wy, and like, you know, just didn't want to let go.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** But she smiled. She laughed. She....

**Inv. Gunter:** Did she act like she didn't want to go back to mama?

**L. Taylor:** Well, her mama hardly never held her.

**Inv. Gunter:** I see. And what about, ah...

**L. Taylor:** Blaine never...

**Inv. Gunter:** Blaine.

**L. Taylor:** He held her a couple of times, but it was like, you know, but that was it. Like for a second and that was it.

**R. Taylor:** Out of the whole time.

**L. Taylor:** Out of the whole time they never hardly held her much.

**Inv. Gunter:** I see.

**L. Taylor:** Ah, they did leave a couple of times, because I made them get up to go look for a place. At least that's what they told me they were looking for a place to stay. So, during the time they were gone I don't know what happened.

**Inv. Gunter:** I see.

**L. Taylor:** But as soon as they got back. She put her back in the playpen and she stayed until I got her out or my sister or one of us got her out. Ah....

**R. Taylor:** And we told her to change the diaper.

**L. Taylor:** Yeah, we had to tell her to change her diaper. She was—she still was happy. She was—she was—she was just precious.

**Inv. Gunter:** (Affirmation.) Okay.

**L. Taylor:** She, I mean, I guess you couldn't ask for a better baby as far as not complaining. She didn't cry.

**Inv. Gunter:** (Affirmation.)

**L. Taylor:** My little nephew, he's 16 months old. He was there a lot during the daytime. And he just wanted to play with her. Ah, at her age I thought she was—she should have been able to walk, but she wasn't able to walk. Ah, she was fed normal. Ah, her bottles and stuff, because, you know, I made sure Jessie—and Jessie did make sure that her bottles were filled.

**Inv. Gunter:** Okay. Ah, Russ is there anything I've missed talking to you wife about this that you can think of? That you observed while they were present?

**R. Taylor:** Ah, just the first time they come down I did notice that he was, ah, very on edge. Just steadily moving something on his body or getting up and down.

**L. Taylor:** Fidgeting.

**R. Taylor:** Ah, real jerky. Fast talking. As if he was on something. And then the second time they come down it seemed to me like he was—talking about Blaine, that he was like on a down position. And basically the whole time he was there it seemed like he did nothing more than sleep more than he did anything. Like he was coming off of something to me, in my opinion. So, and then whenever he was awake he acted normal when he talked to me and my wife, both. And was very polite. But, ah, that's pretty much all I can say about him.

**L. Taylor:** You even talked to him about....

**R. Taylor:** Yeah, I've even said something to him about the drugs and the trust situation. They gotta trust each other if they're gone have a relationship. I told him the drugs ain't gone do nothing but interfere with all that.

**Inv. Gunter:** (Unintelligible.) Ah....

**R. Taylor:** But AC    was a sweet baby the whole time she was down.

**Inv. Gunter:** Okay, I'm gone tell you on the record that, ah—what about your daughter, Tiffany, does she have any, I mean, you know, does she live at home with y'all?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Does she talk with them very much or anything like that?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** She did. Would it be possible for me to talk to Tiffany?

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Under the same conditions as this right here.

**L. Taylor:** You can talk to my daughter, Michele, too. Matter of fact, I think what made them leave is 'cause, I'm gonna say it exactly how my daughter said it. Now, God forbid, she was only 16 at the time, she was, but she told Jessie and Blaine that if they didn't want to see after her baby, she shouldn't have spreaded her damn f–in' legs.

**Inv. Gunter:** You can say it.

**L. Taylor:** Fuckin' legs.

**Inv. Gunter:** Okay, I understand.

**R. Taylor:** She told her straight out that.

**L. Taylor:** She told her straight out, because $AC$ was crying that night.

**R. Taylor:** And she got school.

**L. Taylor:** And she had school. And I didn't hear $AC$ cry, but where they were sleeping, it was closer to her room so she heard her cry. And then I guess after that is when they—the next morning I told them let's get up. We were gonna go find a place to live. And then that's when they started telling me that they were gonna head back to Texas.

**Inv. Gunter:** You think that remark by your daughter is what prompted them to go ahead and get gone.

**L. Taylor:** Yes, sir.

**Inv. Gunter:** They didn't like that. Well, that's okay. Kids are a lot more aware today than you and I were when we were kids, okay. So, and she told them the truth. I tell you what I'm gone do. This gentleman that called me this morning is Sgt. Kenny Ray. He's with the Texas Rangers in Tyler, Texas. I am going to give him, if you don't mind, your mailing address and your telephone number in case I've missed something in this interview. I'm also going to get talk to your daughters as soon as possible.

**L. Taylor:** Yes, sir.

**Inv. Gunter:** And I'm going to give him a transcript of this interview. And hope that that helps him in his cause.

**L. Taylor:** Yes, sir. If there's anything that I can do, because that baby—I never would—never...

**Inv. Gunter:** Okay, I have ▮▮▮▮▮▮ as a telephone number for you.

**L. Taylor:** Yes, sir.

**Inv. Gunter:** Is that an all the time number?

**L. Taylor:** Yes, sir.

**Page 10**

**Inv. Gunter:** Okay, alright, well, having said all that, we're gone conclude this interview at 12:57.

* * * * * * * * * *

*Transcribed by: Christie C. Greer*
*897-0021*
*December 3, 2008*

# EXHIBIT 28

**08-21731**  Supplement No
ORIG

# Longview Police Department



P.O. Box 1952

Longview, Texas  75606
Nature of Call
INFORM

Main # 903-237-1199

Fax # 903-757-5560

Reported Data
10/03/2008

Officer
PICKERING, DOUG

## Administrative Information

| Agency | | Report No | Supplement No | Reported Data | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| Longview Police Department | | 08-21731 | ORIG | 10/03/2008 | | 16:59 | 082770304 |

| Status | Nature of Call | | | | | | |
|---|---|---|---|---|---|---|---|
| CASE DISPOSITION RECORD | INFORMATION REPORT | | | | | | |

| Location | | | | | City | Rep Dist | Beat |
|---|---|---|---|---|---|---|---|
| 3700 ROUNCIVAL DR | | | | | LV | LVG529 | 20 |

| From Date | From Time | To Date | To Time | Officer | | | |
|---|---|---|---|---|---|---|---|
| 10/01/2008 | 12:00 | 10/03/2008 | 16:00 | 63918/PICKERING, DOUG | | | |

| Assignment | | Entered by | Assignment | | RMS Transfer | Property? |
|---|---|---|---|---|---|---|
| OPERATIONS/THIRD WATCH | | 63918 | OPERATIONS/THIRD WATCH | | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 57800 | 10/06/2008 | 10:39:56 |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| INP | 1 | I | WILKES, HEATHER | 365408 | W | F | █████ |
| INP | 2 | I | POPE, MARGARET | 152137 | W | F | █████ |
| INP | 3 | I | CARSON, JESSICA | 365409 | W | F | █████ |

## Summary Narrative

Information report.

08-21731

Supplement No
ORIG

## Longview Police Department

### INVOLVED PARTY 1: WILKES,HEATHER

| Involvement | Invl No | Type | Name | | | MNI |
|---|---|---|---|---|---|---|
| INVOLVED PARTY | 1 | Individual | WILKES,HEATHER | | | 365408 |

| Race | Sex | DOB | Age | Ethnicity | | Juvenile? | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | | 37 | NOT OF HISPANIC ORIGIN | | No | 5'09" | 170# | Brown |

| Eye Color | Skin |
|---|---|
| BLUE | AVERAGE |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | LV | TEXAS |

| ZIP Code | Date |
|---|---|
| 75605 | 11/10/2008 |

| Phone Type | Phone No | Date | Phone Type | Phone No |
|---|---|---|---|---|
| CELL | | 11/10/2008 | HOME | |

| Date |
|---|
| 11/10/2008 |

| Employer/School | Position/Grade |
|---|---|
| AC CONTRACTORS | OFFICE |

### INVOLVED PARTY 2: POPE,MARGARET

| Involvement | Invl No | Type | Name | | | MNI |
|---|---|---|---|---|---|---|
| INVOLVED PARTY | 2 | Individual | POPE,MARGARET | | | 152137 |

| Race | Sex | DOB | Age | Ethnicity | | Juvenile? | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | | 62 | NOT OF HISPANIC ORIGIN | | No | 5'08" | 150# | BROWN |

| Eye Color | Skin |
|---|---|
| GREEN | AVERAGE |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | LV | TEXAS |

| ZIP Code | Date |
|---|---|
| 75605 | 11/10/2008 |

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | 02146041 | TEXAS |

| Phone Type | Phone No | Date |
|---|---|---|
| HOME | | 11/10/2008 |

| Employer/School |
|---|
| TEXAS BANK AND TRUST |

### INVOLVED PARTY 3: CARSON,JESSICA

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| INVOLVED PARTY | 3 | Individual | CARSON,JESSICA | | 365409 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? |
|---|---|---|---|---|---|
| WHITE | FEMALE | | 18 | NOT OF HISPANIC ORIGIN | No |

| Type | Address | City | State |
|---|---|---|---|
| HOME | | LV | TEXAS |

| ZIP Code | Date |
|---|---|
| 75602 | 11/10/2008 |

| Phone Type | Phone No | Date | Phone Type | Phone No |
|---|---|---|---|---|
| CELL | | 11/10/2008 | HOME | |

| Date |
|---|
| 11/10/2008 |

### Narrative

On 10/3/08 at 1746, I Ofc Pickering was dispatched to a harassment call at 3700 Rouncival Dr in Longview TX.

I arrived and spoke with the RP, Heather Wilkes. Heather stated that she was being harassed by her daughter, Jessica Carson, over the suicide of her father. Heather stated that her husband committed suicide approximately one year earlier.

Heather said that she and Jessica's relationship had been stable until the night of 10/1/08. That evening Jessica phoned Heather and told her that she had consulted with a Ouija board and had spoken to her deceased father through the device. Jessica stated that her deceased father had told her that he had committed suicide because of Heather and that she was responsible for his death. Jessica told Heather this and began to make vague non specific threats such as "you're gonna get whats coming to you" and "you'll pay for what you did to my Dad". Heather said that Jessica never would say specifically what she would do to Heather. Heather stated that she asked Jessica to stop calling her and Jessica continued calling approximately eight to ten times that night.

Heather stated that over the past two days Jessica has continued calling and texting her and Heather's mother

| Report Officer | Printed At | |
|---|---|---|
| 63918/PICKERING,DOUG | 12/04/2008 14:03 | Page 2 of 3 |

**08-21731**    Supplement No
ORIG

# Longview Police Department

## Narrative

Magaret Pope. Heather said that sometimes Jessica will not speak on the phone but she can hear her in the background talking to her boyfriend about Heather. When Jessica does speak the messages are about her deceased father and Heathers responsibility in his death. Heather said that she suspected Jessica was on drugs and that she was using the money she received to buy drugs. Heather stated that the calls were coming late at night and that she thought Jessica was high on drugs when she was calling.

Heather said that she had changed her phone numbers in an attempt to stop the harassment. Heather's mother Margaret stated that she was going to send Jessica a certified letter requesting that she stop contacting she and Heather. I advised Margaret that she could have the calls from Jessica blocked.

Heather and Margaret stated that they did not wish to file charges but only wanted to document the harassment. Heather said that she was concerned that if Jessica could not contact she or her mother by phone she would start to come to her residence.

There is no further information at this time.

| Report Officer | Printed At | |
|---|---|---|
| 63918/PICKERING,DOUG | 12/04/2008  14:03 | Page 3 of 3 |

**08-22868**  Supplement No
ORIG

# Longview Police Department



P.O. Box 1952

Longview, Texas  75606
Nature of Call
HARASS

Main # 903-237-1199

Fax # 903-757-5560

Reported Date
10/17/2008

Officer
LOUGHNEY, KELLY

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Longview Police Department | 08-22868 | ORIG | 10/17/2008 | 15:54 | 082910283 |

| Status | Nature of Call | City | Rep Dist | Beat |
|---|---|---|---|---|
| INVESTIGATE-SEND TO CID | HARASSMENT | LV | LVG529 | 20 |

Location

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| 10/17/2008 | 03:32 | 10/17/2008 | 12:22 | 63936/LOUGHNEY, KELLY |

| Assignment | Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|---|
| OPERATIONS/THIRD WATCH | 63936 | OPERATIONS/THIRD WATCH | Successful | None |

| Approving Officer | Approval Date | Approval Time | | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|---|
| 57800 | 10/20/2008 | 08:21:13 | | | C | N | 88 | 20 |

| # Offenses | Offence | | Description | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | PC42.07(C) | | HARASSMENT M/B | | | | | |

| #Pr | MOE | Act | Weapon/Force | IBRS | No |
|---|---|---|---|---|---|
| | | | | 90Z | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VI | VIC | 1 | POPE,MARGARET DIANE | W | F | |
| SU | INQ | 1 | CARSON,JESSICA | W | F | |
| SU | INQ | 2 | MILAM,BLAINE | X | M | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| INQ | 1 | I | CARSON,JESSICA | 365409 | W | F | |
| INQ | 2 | I | MILAM,BLAINE | 344658 | X | M | |
| VIC | 1 | I | POPE,MARGARET DIANE | 152137 | W | F | |

## Summary Narrative

Report of harassment in which an actor intentionally and knowingly caused the telephone of another to ring at all hours of the night and day.

| Report Officer | Printed At | |
|---|---|---|
| 63936/LOUGHNEY, KELLY | 12/04/2008 14:04 | Page 1 of 3 |

12/04/2008  03:22   9037575560              LPD                        PAGE  06/11

**08-22868**   Supplement No
                ORIG

# Longview Police Department

## INQUIRY ONLY 1: CARSON, JESSICA

| | | | | | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|---|---|---|
| Involvement | Invl No | Type | | Name | | | | | 365409 | WHITE |
| INQUIRY ONLY | 1 | Individual | | CARSON, JESSICA | | | | | | |
| Sex | DOB | | Age | Juvenile? | Height | To Height | Weight | Hair Color | Eye Color | |
| FEMALE | | | 18 | No | 5'06" | 5'07" | 145# | BLACK | BROWN | |
| Type | Address | | | | | | | City | | State |
| HOME | | | | | | | | LV | | TEXAS |
| Date | | | | | | | | | | |
| 11/10/2008 | | | | | | | | | | |
| Phone Type | Phone No | | | Date | | Phone Type | Phone No | | | |
| CELL | | | | 11/10/2008 | | HOME | | | | |
| Date | | | | | | | | | | |
| 11/10/2008 | | | | | | | | | | |
| Relationship | Name | | | | | | | | | |
| BOYFRIEND | MILAM, BLAINE | | | | | | | | | |
| Relationship | Name | | | | | | | | | |
| GRANDMOTHER | POPE, MARGARET | | | | | | | | | |
| Employer/School | | | | | | | | | | |
| UNEMPLOYED | | | | | | | | | | |

## INQUIRY ONLY 2: MILAM, BLAINE

| | | | | | | | | MNI | |
|---|---|---|---|---|---|---|---|---|---|
| Involvement | Invl No | Type | | Name | | | | 344658 | |
| INQUIRY ONLY | 2 | Individual | | MILAM, BLAINE | | | | | |
| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | | Eye Color |
| UNKNOWN | MALE | | 18 | No | 6'00" | 190# | BLONDE/STRAWBERRY | | BLUE |
| Type | Address | | | | | | City | | State |
| HOME | | | | | | | LV | | TEXAS |
| Date | | | | | | | | | |
| 11/10/2008 | | | | | | | | | |
| Phone Type | Phone No | | | Date | | | | | |
| CELL | | | | 11/10/2008 | | | | | |
| Relationship | Name | | | | | | | | |
| GIRLFRIEND | CARSON, JESSICA | | | | | | | | |

## VICTIM (GROUP A) 1: POPE, MARGARET DIANE

| | | | | | | | | | MNI |
|---|---|---|---|---|---|---|---|---|---|
| Involvement | Invl No | Type | | Name | | | | | 152137 |
| VICTIM (GROUP A) | 1 | Individual | | POPE, MARGARET DIANE | | | | | |
| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | |
| WHITE | FEMALE | | 62 | No | 5'08" | 150# | BROWN | GREEN | |
| Type | Address | | | | | | City | | State |
| HOME | | | | | | | LV | | TEXAS |
| Date | | | | | | | | | |
| 11/10/2008 | | | | | | | | | |
| Type | | ID No | | | | OLS | | | |
| OPERATOR LICENSE | | | | | | TEXAS | | | |
| Phone Type | Phone No | | | Date | | | | | |
| HOME | | | | 11/10/2008 | | | | | |
| Employer/School | | | | | | | | | |
| TEXAS BANK AND TRUST | | | | | | | | | |

### IBRS Info

| Victim Invl No | Offense Codes |
|---|---|
| 1 | 90Z |

### Modus Operandi

| Victim's Race | Victim's Sex | Victim's Age | Crime Code(s) |
|---|---|---|---|
| WHITE | FEMALE | ADULT | HARASSMENT |

### Narrative

I, Kelly Loughney, spoke with Margaret Diane Pope on the telephone while in this office (1122) on 10/17/08 at 1639.

Margaret advised that her granddaughter Jessica Carson and Jessica's boyfriend Blaine Milam have been calling and text messaging Margaret's cell phone at all hours of the day and night today from 0332 until 1222. Please reference CN 08-21731 for more history involving these actors.

Jessica's father committed suicide and Jessica and Blaine have been "contacting" him through a Ouija Board.

| Report Officer | Printed At | |
|---|---|---|
| 63936/LOUGHNEY, KELLY | 12/04/2008 14:04 | Page 2 of 3 |

**08-22868**

Supplement No
ORIG

## Longview Police Department

### Narrative

Jessica is convinced that her father committed suicide because of Margaret. Margaret sent a certified letter to Jessica and Blaine's residence on ██████████ asking them to stop contacting her on 10/07/08. This has been an ongoing problem and Margaret did not want to file charges in the past but wants to file them now.

EOR

12/04/2008  03:22    9037575560                    LPD                              PAGE  08/11

**08-22868**    Supplement No
0001

# Longview Police Department



P.O. Box 1952

Longview, Texas  75606

Nature of Call
HARASS

Main # 903-237-1199

Fax # 903-757-5560

Reported Date
10/20/2008

Officer
LEE, ROSE

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Longview Police Department | 08-22868 | 0001 | 10/20/2008 | 12:49 | 082910283 |

| Status | Nature of Call | | | | |
|---|---|---|---|---|---|
| INVESTIGATE-SEND TO CID | HARASSMENT | | | | |

| Location | | | City | Rep Dist | Beat |
|---|---|---|---|---|---|
| | | | LV | LVG529 | 20 |

| From Date | From Time | To Date | To Time | Officer |
|---|---|---|---|---|
| 10/17/2008 | 03:32 | 10/17/2008 | 12:22 | 59025/LEE, ROSE |

| Assignment | Entered by | Assignment |
|---|---|---|
| OPERATIONS/SECOND WATCH | 59025 | OPERATIONS/SECOND WATCH |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 57800 | 10/21/2008 |

| Approval Time |
|---|
| 10:53:07 |

## Summary Narrative
Supplement to the original report.

## REPORTING PARTY 1: POPE,MARGARET DIANE

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| REPORTING PARTY | 1 | Individual | POPE,MARGARET DIANE | 152137 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | | 62 | No | 5'08" | 150# | BROWN | GREEN |

| Phone Type | Phone No | Date |
|---|---|---|
| HOME | | 11/10/2008 |

## Narrative

On 10-20-08 Ms. Diane Pope called the station to report she is receiving continued calls from the suspects listed previously. Ms. Pope states she is getting calls from the actor number ▮▮▮▮ and also ▮▮▮▮ in which the actor is either leaving the line open or hanging up immediately.

| Report Officer | Printed At | |
|---|---|---|
| 59025/LEE, ROSE | 12/04/2008 14:04 | Page 1 of 1 |

**08-24870**          Supplement No
                       ORIG

# Longview Police Department

Reported Date
11/12/2008



P.O. Box 1952

Longview, Texas   75606
Nature of Call
BURG RES

Officer
CEAL, DAVID

Main # 903-237-1199

Fax # 903-757-5560

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| Longview Police Department | 08-24870 | ORIG | 11/12/2008 | 17:32 | 083170262 |

| Status | Nature of Call | | City | Zip Code | Rep Dist |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | RESIDENTIAL BURGLARY | | LV | 75605 | LVG414 |

| Area | Beat | From Date | From Time | To Date | To Time | | |
|---|---|---|---|---|---|---|---|
| B | 40 | 11/12/2008 | 07:30 | 11/12/2008 | 17:25 | | |

| Officer | | RMS Transfer | Prop Trans Stat | Assignment | | Entered by |
|---|---|---|---|---|---|---|
| 63496/CEAL, DAVID | | | | OPERATIONS/THIRD WATCH | | 63496 |

| Assignment | | | Property? | Solvability | | Score |
|---|---|---|---|---|---|---|
| OPERATIONS/THIRD WATCH | Successful | Successful | Yes | INVESTIGATE CASE | | 31 |

| Approving Officer | Approval Date | Approval Time | Description | | Complaint Type | AC | Use | Bias | Loc |
|---|---|---|---|---|---|---|---|---|---|
| 54900 | 11/24/2008 | 09:00:28 | BURGLARY OF HABITATI | | | C | N | 88 | 20 |

| # Offense | Offense | | | IBRS | No | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | PC30.02(C)(2) | | | 220 | 1 | | | |

| APF | MCE | Act | Weapon/Force | | | | | |
|---|---|---|---|---|---|---|---|---|
| | N | | | | | | | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| INQ | 1 | I | CARSON, JESSECA | 380646 | W | F | |
| INQ | 1 | I | MILAM, BLAINE | 344658 | W | M | |
| UKS | 1 | I | UNKNOWN | | W | M | |
| VIC | 1 | I | WILKES, HEATHER BAIN | 332738 | W | F | |

## Property Summary

| Involvement | Description |
|---|---|
| STN | Article: Computer/camera/photo/digital equipment COMPUT DELL  Blk Dell Computer |
| STN | Article: Radio, TV, and sound entertainment devices CD   40 computer disc |
| STN | Article: Other (none of the above) BOX   cat litter box |

## Summary Narrative

Unknown suspect entered the victims residence and stole several items.

**08-24870**

Supplement No
ORIG

# Longview Police Department

## INQUIRY ONLY 1: CARSON, JESSECA

| | | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|
| | | | | | | 380646 | WHITE |

| Involvement | Invl No | Type | Name | | | | |
|---|---|---|---|---|---|---|---|
| INQUIRY ONLY | 1 | Individual | CARSON, JESSECA | | | | |

| Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|
| FEMALE | | 18 | No | 5'08" | 140# | BROWN | BROWN | 826300 |

## INQUIRY ONLY 1: MILAM, BLAINE

| | | | | | | MNI | Race |
|---|---|---|---|---|---|---|---|
| | | | | | | 344658 | WHITE |

| Involvement | Invl No | Type | Name | | | | |
|---|---|---|---|---|---|---|---|
| INQUIRY ONLY | 1 | Individual | MILAM, BLAINE | | | | |

| Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|
| MALE | | 18 | No | 6'01" | 190# | BLONDE/STRAWBERRY | BLUE | 826301 |

## UNKNOWN SUSPECT **NO AGE OR DOB** 1: UNKNOWN

| Involvement | Invl No | Type | | | |
|---|---|---|---|---|---|
| UNKNOWN SUSPECT **NO AGE OR DOB** | 1 | Individual | | | |

| Name | Race | Sex | Ethnicity | Res Status |
|---|---|---|---|---|
| UNKNOWN | WHITE | MALE | NOT OF HISPANIC ORIGIN | RESIDENT |

| OPN_INVL | Vic/Ofnd Age | PRN |
|---|---|---|
| 1 | 00 | 826302 |

## VICTIM (GROUP A) 1: WILKES, HEATHER BAIN

| | | | | MNI |
|---|---|---|---|---|
| | | | | 332738 |

| Involvement | Invl No | Type | Name | | | |
|---|---|---|---|---|---|---|
| VICTIM (GROUP A) | 1 | Individual | WILKES, HEATHER BAIN | | | |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | | 37 | NOT OF HISPANIC ORIGIN | No | 5'09" | 170# | Brown |

| Eye Color | Res Status | Vic/Ofnd Age | PRN | | | |
|---|---|---|---|---|---|---|
| BLUE | RESIDENT | 37 | 826303 | | | |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | | | LV | TEXAS |

| Zip Code | Date | | | |
|---|---|---|---|---|
| 75605 | 11/12/2008 | | | |

| Type | ID No | OLS | |
|---|---|---|---|
| OPERATOR LICENSE | | TEXAS | |

| Phone Type | Phone No | Date | Phone Type | Phone No |
|---|---|---|---|---|
| BUSINESS | ( | 11/12/2008 | CELL | ( |

| Date | |
|---|---|
| 11/12/2008 | |

| Employer/School | Position/Grade |
|---|---|
| A/C CONTRACTORS | DISPATCHER |

### IBRS Info

| Victim Invl No | Offense Codes |
|---|---|
| 1 | 220 |

### Property

| Item | Agency | | Report No | Original Incident | Original Supplement | Involvement |
|---|---|---|---|---|---|---|
| 1 | Longview Police Department | | 08-24870 | 08-24870 | ORIG | STOLEN |

| Invl Date | In Custody? | Security | Value | # Pieces | | Typ |
|---|---|---|---|---|---|---|
| 11/12/2008 | No | No | $1,100.00 | 1 | | A |

| Description | | | | |
|---|---|---|---|---|
| Blk Dell Computer | | | | |

| Cat | | Article | Brand |
|---|---|---|---|
| Computer/camera/photo/digital equipment | | Computer | DELL |

| UCR Type | Entered Date | Entered Time | RMS Transfer | Control |
|---|---|---|---|---|
| COMPUTER HARD, SOFTWARE | 11/12/2008 | 19:31 | Successful | 54900  1124080901 |

| Item | Agency | | Report No | Original Incident | Original Supplement | Involvement |
|---|---|---|---|---|---|---|
| 2 | Longview Police Department | | 08-24870 | 08-24870 | ORIG | STOLEN |

| Invl Date | In Custody? | Security | Value | # Pieces | | Typ |
|---|---|---|---|---|---|---|
| 11/12/2008 | No | No | $50.00 | 40 | | A |

| Description | | | | |
|---|---|---|---|---|
| 40 computer disc | | | | |

| Cat | | Article | UCR Type |
|---|---|---|---|
| Radio, TV, and sound entertainment devices | | Disk, Music Disk | OTHER |

| Entered Date | Entered Time | RMS Transfer | Control |
|---|---|---|---|
| 11/12/2008 | 19:32 | Successful | 54900  1124080901 |

| Report Officer | Printed At | |
|---|---|---|
| 63496/CEAL, DAVID | 12/04/2008 14:05 | Page 2 of 3 |

12/04/2008  03:22    9037575560                    LPD                              PAGE  11/11

**08-24870**    Supplement No ORIG

# Longview Police Department

| Item | Agency | | | | Report No | Original Incident | | Original supplement | Involvement |
|------|--------|--|--|--|-----------|-------------------|--|---------------------|-------------|
| 3 | Longview Police Department | | | | 08-24870 | 08-24870 | | ORIG | STOLEN |

| Invt Date | In Custody? | Security | Value | | # Places | | | |
|-----------|-------------|----------|-------|--|----------|--|--|--|
| 11/12/2008 | No | No | $10.00 | | 1 | | | |

| Description | | | | | | | Typ |
|-------------|--|--|--|--|--|--|-----|
| cat litter box | | | | | | | A |

| Cat | | | Article | UCR Type | Entered Date | Entered Time | RMS Transfer |
|-----|--|--|---------|----------|--------------|--------------|--------------|
| Other (none of the above) | | | BOX | OTHER | 11/12/2008 | 19:33 | Successful |

| Control |
|---------|
| 54900 1124080901 |

## Modus Operandi

| Property Attacked | Method of Entry |
|-------------------|-----------------|
| COMPUTER EQUIPMENT/VIDEO EQUIPT, HOME COMPUTERS, ELECT. GAMES | UNLOCKED |

| Point of Entry | Entry Location | Premise Type | Theft Type | Victim's Race | Victim's Sex |
|----------------|----------------|--------------|------------|---------------|--------------|
| SLIDING WINDOW | FRONT | APARTMENT/CONDOMINIUM | FROM BUILDINGS | WHITE | FEMALE |

| Victim's Age | Victim's Action |
|--------------|-----------------|
| ADULT | WORKING |

| Suspect Action |
|----------------|
| ALONE |

| Crime Code(s) | Hate Date |
|---------------|-----------|
| BURGLARY RESIDENCE | 11/12/2008 |

## Narrative

On 11-12-2008 at approx 1730 hrs I Officer Ceal was dispatched to 2501 N. Eastman Rd. Apt. 100H in ref to Burglary of a Habitation.

Upon arrival I spoke to VIC Heather Wilkes who stated that on 11-12-2008 between 0730 hrs and 1730 hrs an unknown person had entered her apartment and stole several items.
Wilkes stated that when she arrived home that she opened the door with her key. Wilkes stated that she is unsure if the door was unlocked but she does know that she did lock the door when she left for work.

Wilkes stated that her black Dell Computer was taken and is valued at $1100.00, a box of computer disk with about 40 disk inside valued at about $50.00 and her cat litter box valued at $10.00 was also taken.

Wilkes suspects her daughter Jesseca Carson or her boyfriend Blaine Milam are the ones that broke into her residence. Wilkes thinks its her daughter because they are not getting alone any more and the computer and disk that were taken have pictures of them going to Disney World and plus her daughter does not have a computer.

I dusted for prints on the computer desk and on the bedroom door knob. I lifted a partial print off of the door knob and submitted it to the lab.

I could not find Milam on the Gregg County web site to get a DOB but Wilkes stated that he was on probation in Rusk County.

Dispatch found Milams possible DOB for me in RMS.

| Report Officer | Printed At | |
|----------------|-----------|--|
| 63496/CEAL, DAVID | 12/04/2008 14:05 | Page 3 of 3 |

# EXHIBIT 29

Court Coordinator
Annette Griffin

Official Court Reporter
Terri Boling



Telephone
903-657-0358

Fax
903-655-1250

## J. CLAY GOSSETT
### JUDGE
FOURTH JUDICIAL DISTRICT
RUSK COUNTY COURTHOUSE, SUITE 303
115 NORTH MAIN
HENDERSON, TEXAS 75652

# FAX COVER SHEET

**DATE:** _5-7-10_

**TO:** _Judge Gossett_

**FAX #:** _936. 538. 3767 3572_

**FROM:** Annette Griffin, Court Coordinator

**RE:** _CR09-066 Milam_

**TOTAL PAGES (INCLUDING COVER SHEET)** _15_

**COMMENTS:**

**NOTE:** If any of these fax copies are illegible, or you do not receive the same number of copies as stated above, please contact us immediately at (903) 657-0358. Thank you.

### Edward B. Gripon, M.D. P.A.

3560 DELAWARE STREET, SUITE 502
BEAUMONT, TX 77706

(409) 899-4472

April 21, 2010

4TH District Court
c/o The Honorable J. Clay Gossett -
Judge Presiding
Rusk County Courthouse
115 N. Henderson Street
Henderson, Texas 77652

RE: THE STATE OF TEXAS vs BLAINE K. MILAM
CAUSE NO: cr09-066

Dear Judge Gossett:

I am writing at this time in regard to the psychiatric evaluation of the above named 20 year old single Caucasian male who I had occasion to see at the Conroe County Correctional Facility on March 26, 2010.

I began the evaluation of Blaine Milam by explaining that there was no right to privilege and that confidentiality could not be maintained as a part of the examination process. I further explained that he had the right to avoid answering any specific question that he wished to omit. I further explained that the information that I would potentially glean from the examination process would serve as the basis of a report that would be filed with the 4th District Court of Rusk County, and that a copy would be potentially available not only to his own attorney of record, but also to the Prosecutor. He stated that he understood these stipulations and that he was willing to talk with me.

NATURE OF THE EXAMINATION: The examination consisted of a standard psychiatric interview with the formulation of a mental status examination. Any available collateral information, if any, was also reviewed.

FACTORS CONSIDERED IN THE EXAMINATION: The examiner considered, in addition to other issues determined relevant, the following:

1. The capacity of the Defendant during criminal proceedings to:

**PAGE II**
**BLAINE KEITH MILAM**
**April 21, 2010**

  (a). rationally understand the charges against the Defendant and the potential consequences of the pending criminal proceedings
  (b). Disclose to counsel pertinent facts, events and states of mind;
  © Engage in a reasonable choice of legal strategies and options;
  (d). Understand the adversarial nature of criminal proceedings;
  (e). Exhibit appropriate courtroom behavior; and
  (f). Testify, if desired/necessary

2. Whether the Defendant had a diagnosable mental illness or is a person with mental retardation
3. The impact of any mental illness or any mental retardation, if existent, on the Defendant's capacity to engage with counsel in a reasonable and rational manner
4. If the Defendant is taking psychoactive or other medication:

  A. Whether the medication is necessary to maintain the Defendant's competency, and
  B. The effect, if any, of the medication on the Defendant's appearance, demeanor, or ability to participate in the court proceedings.

This interview was conducted in the accompaniment of Tim Proctor, Ph.D.

This interview was videotaped and began at approximately 11:00 a.m. on Friday, March 26, 2010 and ended at approximately 3:00 p.m.

Tim Proctor, Ph.D. had spent some additional time with Blaine Milam prior to my time with him. This interview time was utilized to perform psychological testing, specifically IQ testing, earlier on the same morning.

I obtained some generic and historical information that allowed me to determine the extent to which Blaine Milam could give an understandable, rational, and coherent history.

I did find Blaine Milam to be a fair historian although he did have some difficulty with dates, specific details and certain facts associated with his history. However, he appeared to understand my questions and he did appear to make a legitimate and appropriate attempt to answer those questions.

Blaine Milam was born on or about ▇▇▇▇ 1989 in Longview, Texas.

**PAGE III**
**BLAINE KEITH MILAM**
**April 21, 2010**

He was reared in the area of Tatum, Texas, which is reportedly near Henderson, Texas, some 45 miles or so from Tyler, Texas.

EDUCATIONAL HISTORY: Blaine Milam did not have substantial formal education.

He reported that he attended formal school in Tatum thru the 6th grade. He stated, at that time, he began home schooling for a period of approximately one year. He stated that he was taught in the home school setting for about 6 months by his mother and another six months by an adult cousin.

After the attempt at one year of home schooling, Blaine Milam's formal education ended.

I asked him about the reason for the home schooling and he stated that his father had become angry with the school authorities because of corporal punishment, i.e., spanking/paddling.

He reports that he can read better than he feels he can write. He does report that he can only print and that he can only write his name in cursive. He reported significant difficulty even attempting to write anything else in cursive.

Blaine Milam reported that he wanted to obtain more formal schooling and had actually hoped that some day he would be able to go to college.

He stated that he never repeated a grade, as far as he could remember, but he thinks that he was told that he went to summer school on one occasion, possibly after the 5th grade.

He reported that he did not cause significant trouble in school and that his multiple absences from school were for medical reasons.

Blaine Milam has serious limitations in his ability to read and write. I/We asked him to write a sentence and he did print a short sentence. It was not grammatically correct and some of the words that should have ended in "ing" did not. However, he was able to sign his name but the rest of the short sentence was printed.

He states that he rarely reads for pleasure and that his last book that he even attempted

**PAGE IV**
**BLAINE KEITH MILAM**
**April 21, 2010**

to read was something about Johnny Cash in regard to "men in black". However, he did state that he had seen the movie so he knew something about the content of the book and therefore could follow its general message.

JUVENILE HISTORY: As a juvenile, he states that he has no juvenile record and he was never referred to Juvenile Probation.

WORK HISTORY: Blaine Milam states that at about age 13, he began working with his father on natural gas compressor maintenance. He did that, he states, for about 3 years, from age 13 to 16.

Blaine Milam reported that he began working in a lube shop at age 16. This shop was apparently named M & M Express Lube. He worked there for about 2 ½ years until the middle of 2008. He stated that he was a relatively good employee, in his opinion, until he started to use drugs, specifically methamphetamine. He stated that after starting to use methamphetamine, he would arrive to work late, and frequently not show up at all. However, he stated that when he was sober/abstinent from drugs, he was told that he was a "good employee".

In working at the lube shop, he stated that he had problems handling money. He reported that he had difficulty writing charge tickets. He could recognize many of the customers because they were from that area and he could frequently recognize their vehicle. He reported that he could tell his employers what work he had done, but if he had to write it down, he had difficulty completing the tickets and apparently they had an equal amount of difficulty reading his tickets.

In any event, he performed the following duties in the lube shop:

1. Changing oil
2. Changing filters
3. Changing vacuum hoses
4. Belt tension work
5. Changing spark plug
6. Replacing spark plug wires
7. Working on fuel filters, water pumps, etc

Basically, he did general auto mechanic work in the lube shop as well as oil changes.

**PAGE V**
**BLAINE KEITH MILAM**
**April 21, 2010**

He left the lube shop because he stated that Jessica told him he was not earning enough money. He reporting having learned mechanic work from his father and stated that if he was able to see something done, he could generally repeat the work/job.

From July of 2008 until September 2008, he worked at Big 5 Tire in Longview, Texas. Again, he did oil, lube, and tire changing work. He referred to that as tire "busting". He did relate, in his opinion, that tires were difficult and dangerous. In that job, he made $700 every two weeks, i.e., $1400 per month.

He then tried to get a job at Trinity Asphalt in Longview, Texas. He was going to work there in the tool area helping in the tool shack. However, this job was going to be from 4:00 p.m. until 4:00 a.m. He was told that he would make approximately $12.50 an hour, but he stated that he did not remain on that job for even day because "Jessica did not want me to work those hours".

From a financial standpoint, he stated that began working in lube shops at about $6.25 per hour and worked his way up to approximately $9-$9.50 per hour.

After attempting to get a job at Trinity Asphalt, he returned to Big 5 Tire and worked there for approximately one week.

FAMILY HISTORY: His father died September 10, 2008. He was 48 years of age and he died of complications of multiple cardiovascular problems.

He then went over with us, a strongly positive family history of heart attack/cardiovascular disease, involving uncles and essentially almost all the male members of the family.

His mother is 50 years of age. She lives in Lake Cherokee and manages a Family Dollar store in Longview. He has a half-brother who is 35 years of age and a half-sister who is 32. They are both children by his mother. He has one full brother, Danny, who is 28 years of age and currently in State Jail secondary to violating probation, although Blaine did not know why he was on probation in the first place. He stated that Danny was the individual who introduced him to drugs. He has one sister, Sherry, who is approximately 24 years of age. Blaine Milam reported that he is the youngest child in the family. He was able to tell us that his parents married in either 1977 or 1978.

**PAGE VI**
**BLAINE KEITH MILAM**
**April 21, 2010**

He does report that he was close to his father and that he was significantly bothered by his father's death and had significant emotional difficulty following the death of his father.

Blaine Milam stated that his father became ill in 2000, had a stroke and significant complications of a by-pass operation. He was apparently, for a period of time, in a coma. He was then in what Blaine Milam referred to as a "vegetative state". Blaine states that it took his father some 2-3 years to "get better".

He did report in the interview process, that his father had a problem with alcohol secondary to consuming whiskey and/or brandy.

Blaine Milam reported that he returned to utilizing drugs, specifically methamphetamine, after the death of his father because he was experiencing depression and he used the drugs to "cope".

SEXUAL ABUSE HISTORY: This young man does state that he was sexually abused by a male cousin who was some four years older than he. Blaine states that he was 9 or 10 years of age when this occurred and it occurred when he went to visit the cousin in Louisiana. He reported that the male cousin gave him gifts and introduced him to pornography. He acknowledges that he became "addicted" to pornography.

He reported that the nature of the sexual acts between he and the cousin included both oral and anal sex. He reported a frequency of the oral sex occurring many times and the anal penetration occurring approximately three or so times.

SEXUAL HISTORY: Blaine Milam stated that his first sexual experience with a female occurred when he was approximately 13 years of age. He stated that the female was approximately 12.

Blaine Milam reported that the sexual activity occurred for a few months and involved kissing and touching/fondling each other.

Blaine Milam reported his only other sexual experience prior to his relationship with Jessica as having been with a girl some 10 years older than he. He reported that he was 15 when this occurred and the girl was a friend of his brother (Danny) and that she was approximately 25 years of age at the time. He reported they had intercourse on at least one occasion.

**PAGE VII**
**BLAINE KEITH MILAM**
**April 21, 2010**

EXPLANATION OF HOW HE MET JESSICA: He states that he met Jessica on-line utilizing My Space.

He was able to explain to me, in a basic/fundamental way, how My Space communication might work.

He states that he met Jessica on-line in 2007 and they later met in person. Shortly thereafter, they began living together.

He discussed computers which he reported he can use to some extent. He was familiar with instant messenger.

He reported that after meeting Jessica on-line, he was able to determine that she actually lived in the Longview area, he telephoned her and ultimately scheduled going out to dinner. He described this process in some detail. Therefore, he was able to give fair detail in regard to his initial experience with Jessica.

He stated that at first, their relationship was great. He felt that he loved her, however, he states that she later began making fun of him and particularly tended to make fun of him from a sexual standpoint. She would taunt him about being physically small in regard to the size of his genitalia.

He described that their relationship, over time, gradually became significantly more distant and troubled. He reports that the relationship was very conflicted at the time of the instant offense.

DRIVER'S LICENSE: We talked with him, at that point in time, about driving. He stated that he did obtain a license in 2007, having passed the written exam on his first attempt. Also, he passed the driving exam on the first attempt.

He reported that he began driving at age 10 after having been initially taught to drive by his father.

In regard to the written driving exam, he reported missing only two questions. However, he did state that he spent a lot of time studying for the exam and that he had gotten some help to prepare for the exam.

Blaine Milam reports never having taken driver's education.

**PAGE VIII**
**BLAINE KEITH MILAM**
**April 21, 2010**

OTHER AREAS OF FUNCTION: Blaine Milam does state that at age 18, he obtained a voter registration card and actually voted in a local as well as national election.

In regard to a checking account, Blaine Milam reported that he once had a checking and savings account which was opened after he met Jessica.

He reported that although he had a credit card at one time, he also had an ATM card, but he could not keep up with the balance on these accounts and he frequently got into trouble trying to use them. He states that they were later "taken away".

He also described in some detail, the fact that he could not remember his own PIN number and that he had significant difficulty utilizing this type of card. As an example, in an area where he would purchase gas, he would actually give the people, whom he knew, his PIN number and they would actually operate the machine for him. He reports that he could not do this type of activity independently because of the need to remember and utilize various multiple step procedures and utilize memorized numbers.

MARITAL HISTORY: Blaine Milam has never been formally married and has no children.

HISTORY OF VIOLENCE: He denies a history of significant violence prior to this alleged offense. In addition, he states that he has been compliant in the two jails in which he has been incarcerated and that he has not been "in trouble in regard to any type of violent behavior while in jail".

LEGAL HISTORY: Blaine Milam reports that he has been incarcerated since 12/2/2008. He states that he has been continuously in jail, initially in Rusk County and later housed in Conroe.

Blaine Milam reported that he had experienced a prior legal problem when he was younger. He stated that while "high" on methamphetamine, he had placed some pornography in a minor female's clothing drawer. This girl was, at that time, approximately 11 years of age and he was, at that time, 17. He did state that he did lie to the police by telling them "someone else made me do it". He was able to discuss the fact that he was attempting to avoid getting into trouble.

PAGE IX
BLAINE KEITH MILAM
April 21, 2010

Blaine Milam reported that he had spent considerable time utilizing a computer pursuing pornography. In addition, he states that he has been "addicted" to pornographic videos and magazines.

He states that at the time of his arrest, he had been using amphetamines for a consistent three day period of time.

MEDICAL HISTORY: Blaine Milam reports kidney surgery when he was about 7 years of age in Longview, Texas. He also describes some problem with his scrotum at one point in time. He was unable to describe that in a way that I could clearly understand what he was talking about, but it appeared as though he may have been talking about some type of torsion of the testicle, but again, I do not have his medical history and have not reviewed the medical records, therefore, he was only able to state that he had some type of scrotal abnormality.

MENTAL HEALTH HISTORY: Blaine Milam reports that in November of 2008, he cut his left wrist. He states that he was depressed over the death of his father and was in a process of grieving. He stated that his father had died on or about 9/10/2008.

At that time, he states that Jessica was not supportive of his grief and was threatening to leave him.

He reports their problems had been associated with a number of issues. Specifically, he stated that she was very controlling and would frequently refer to him as a "cry baby". He reported having loved her and her child but stated that Jessica was "pushing me away". He reported that he became depressed, that he was sent for evaluation, and was ultimately evaluated at an outpatient mental health facility for one day only. He stated that prior to that, there had been a mental health warrant issued because he had threatened suicide. He was taken to jail but released after an overnight stay. He was apparently told that he would be placed in some type of group therapy but he states that he never went to that treatment.

In further regard to the relationship with Jessica, he states that he was upset over his belief that Jessica was cheating on him. He specifically discussed another young man by the name of Ryan whom he thought Jessica was romantically involved with. He stated that on one occasion or more, he had come in and seen Jessica and Ryan sitting on a couch and that he felt there was something "going on between them".

**PAGE X**
**BLAINE KEITH MILAM**
**April 21, 2010**

In regard to the mental health evaluation, he states that he was given a prescription for Zoloft but it was never filled.

CURRENT MEDICATION: He states that he is not on psychoactive medication in the Conroe Jail. Therefore, he is not on any current medication, from a mental health standpoint.

In the Rusk County Jail, he states that he was given Benadryl for allergies and was given medication for persistent headaches. He refers to his headaches as "migraines".

DRUG AND ALCOHOL HISTORY: Blaine Milam reports a significant drug history. He began using marijuana at approximately age 12. He reported his problems with drugs became much more significant when he began using crack cocaine at age 15. He reported only a brief interlude with crack cocaine and later stopped its use.

Blaine Milam later described his utilization of methamphetamine which he began at age 16. He reported initially using it on weekends but later began using this four or more times per week.

He states that he realizes the use of methamphetamine has been a substantial problem in his life. He states that by the time he was 17 years of age, he was injecting methamphetamine. He had begun utilizing meth by smoking it in a pipe but later began injecting it in his left forearm.

He stated that he was utilizing meth until March of 2008 when he stopped for a period of time. He reports having stopped until after his father died. He resumed using methamphetamine in September of 2008. He was able to give a specific date for the resumption of methamphetamine use. He stated that it was associated with a tattoo that he had placed on his right upper arm. The tattoo apparently is related to the loss of his father and says something to the effect of "rest in peace, daddy", has a cowboy hat on it and is associated with a remembrance of his father.

On his left arm, he has another tattoo which he had placed on his arm on or about 9/27/2008. He describes this as "Jessica with a heart". It has some pink coloring and apparently a blue rose.

He does report having obtained both of those tattoos while "high on meth".

**PAGE XI**
**BLAINE KEITH MILAM**
**April 21, 2010**

He gives, as a reason for using methamphetamine, utilizing the drug predominately when he was either "upset me or sad".

Again, he reported that his brother had introduced him to the use of methamphetamine. He states that when using methamphetamine he would feel "on top of the world". He also stated that he would feel "ten feet tall" and would have increased sexual activity/interest.

He reports having used ecstasy on one occasion.

Blaine Milam reports that he has never been involved in sales nor manufacture of methamphetamine, although he did report that he had obtained a recipe for manufacturing methamphetamine but he was afraid that he would "blow myself up".

In regard to the commercial aspect of obtaining methamphetamine, he states that he would usually purchase it for $50 at each time of purchase. On occasion, he would obtain Sudafed PE for the drug dealer. The drug dealer would, in turn, give him $50 per box.

Blaine Milam reports utilizing methamphetamine for as long as eight days. He reports staying up continuously and not sleeping. He reported "when I stopped using methamphetamine, I would be depressed, lonely, and hurt all over".

He also discussed the use of ICE/crystal meth.

In regard to alcohol utilization, Blaine Milam states that he would occasionally drink whiskey or cinnamon snapps. This occurred between the ages of 12 and 14. He reports little to no use of alcohol as an adult.

CERTAIN SPECIFIC BELIEFS: Blaine Milam reports that he does believe in "spirits" and that he has experimented, along with Jessica, with a Ouija Board. When he was using the Ouija Board, he was also utilizing methamphetamine and reports that he was "high".

He reports some type of paranormal experience. He went into detail of a time that he viewed some type of "spirit" when he was 9 years old, describing seeing someone out behind the house whom he believed may be his deceased paternal grandmother.

**PAGE XII**
**BLAINE KEITH MILAM**
**April 21, 2010**

In regard to the Ouija Board, he states that after significant discussion with Jessica, they purchased this Ouija Board at the mall. He and Jessica would hold on to the board and he does believe then and now, that he was able to communicate with his deceased father as well as one of her dead parents.

RELIGIOUS TRAINING: Blaine Milam states that he was reared in the Baptist Church, attended church when he was younger but left when he became older. He re-engaged briefly with the church but stated that basically drugs got in his way of attendance. He did not participate in church significantly as a young adult.

BASIC IMPRESSION OF BLAINE MILAM: In visiting with Blaine Milam for almost four hours, it becomes glaringly obvious that he is quite simplistic. He has very simplistic ideas, is very naive, extremely gullible, easily led, and has difficulty with authority figures. In addition, he has difficulty with people that he views as smarter than he.

Blaine Milam actually referred to himself as gullible. I would agree with that assessment.

Blaine Milam has clearly developed and accepted the role/persona of a person who has diminished mental capacity, i.e., low intelligence. He refers to himself as slow and states that most people he comes in contact with are, in his opinion, clearly smarter than he.

MENTAL STATUS EXAMINATION: Blaine Milam's mental status examination on March 26, 2010 reveals him to be oriented to place and person. He knew the date and year but was not specific as to the day of the week. His ability to report recent events was limited and consistent with his intellectual level.

His mood was essentially normal. His affect was generally appropriate, however, at times, he would smile somewhat inappropriately and on occasion, appeared to be almost mildly euphoric.

He presented himself as an individual who is not intellectually sophisticated and he gave the presentation of an individual who is aware that he has certain specific limitations.

Blaine Milam has no evidence of thought disorder. Specifically, he denied and I found

**PAGE XIII**
**BLAINE KEITH MILAM**
**April 21, 2010**

no evidence of hallucinations, illusions or delusions. He does not allege either visual nor auditory hallucinations. His judgement is poor. His insight is limited to fair.

His intelligence, based upon the interview alone, was estimated by this examiner to be in the range of higher mildly mentally retarded or borderline range.

I would estimate, based upon on the interview process alone, Blaine Milam's IQ to be in the range of 65-70.

DIAGNOSIS: From a diagnostic standpoint, Blaine Keith Milam represents the following diagnoses:

| | |
|---|---|
| Axis I: | Drug Abuse - predominately methamphetamine - currently in institutional remission |
| Axis II: | Mental Retardation vs Borderline Intellectual Potential |
| Axis III: | No Diagnosis |
| Axis IV: | 5 - currently charged with capital murder and awaiting trial |
| Axis V: | 65 - based upon his current ability to function in an incarcerated setting |

CONCLUSION: It is very difficult to determine the true intellectual potential of Blaine Keith Milam.

He clearly has intellectual limitations, and unfortunately also has minimal formal educational training.

In light of those two circumstances, it is very hard to discern whether he represents a higher functioning mildly mentally retarded individual or a lower functioning individual with borderline intellectual potential.

There is NO "white line" determination for mental retardation.

As a psychiatrist, I utilize DSM-IV-TR criteria. These criteria are somewhat "soft" as they are stated. Blaine Milam is certainly not intellectually gifted. He does not have normal intellectual potential.

I would estimate his intellectual level to be in the range of an IQ of 65 to 75.

I am not, based upon reasonable psychiatric probability, able to state with certainty,

PAGE XIV
BLAINE KEITH MILAM
April 21, 2010

whether this man's IQ is definitely in the higher range of mild MR or in the lower range of borderline intellectual functioning. My inability to do this is because of the basic nature of the diagnostic criteria, i.e., specifically, DSM-IV-TR recognizes that an IQ score has a range of plus or minus approximately five. In addition, DSM-IV-TR states that a mentally retarded person has an IQ of APPROXIMATELY 70 or below, as one of the criteria.

Unfortunately, as I stated previously, this man's intellectual potential associated with his lack of formal education creates a deficit that is in a range that could conceivably be between upper mildly mentally retarded and lower borderline intellectual functioning.

He does have some deficits in adaptive functioning. His primary adaptive deficit is in writing. However, he also has some significant difficulty with mathematics as it applies to handling money, etc.

DISCUSSION: I would be happy to answer any specific question that might arise in regard to this man's evaluation. If after you review this information, I can be of further assistance in this matter, please do not hesitate to contact me thru my office address listed above.

Sincerely,

Edward B. Gripon, M.D., P.A.

EBG:paa
DICTATED:NOT READ
SUBJECT to TRANSCRIPTION ERROR

BASIC IMPRESSION OF BLAINE MILAM: In visiting with Blaine Milam for almost four hours, it becomes glaringly obvious that he is quite simplistic. He has very simplistic ideas, is very naive, extremely gullible, easily led, and has difficulty with authority figures. In addition, he has difficulty with people that he views as smarter than he.

Blaine Milam actually referred to himself as gullible. I would agree with that assessment.

Blaine Milam has clearly developed and accepted the role/persona of a person who has diminished mental capacity, i.e., low intelligence. He refers to himself as slow and states that most people he comes in contact with are, in his opinion, clearly smarter than he.

# EXHIBIT 30

**STATE OF TEXAS**

**COUNTY OF RUSK**

### AFFIDAVIT OF CAROLYN MCILHENNY

BEFORE ME, the undersigned authority, on this day personally appeared Carolyn McIlhenny, who upon being duly sworn by me, testified as follows:

1. My name is Carolyn McIlhenny and I am a resident of Rusk County, Texas. I am over the age of eighteen and competent to make this affidavit.

2. I taught 2nd and 3rd grade at Tatum Primary School.  Blaine Milam was a student of mine.

3. Blaine struggled with everything he did academically and required significant one-on-one attention. I had to modify instructions and adapt exercises to his academic limitations. Blaine often did not understand what was going on in class. His intellectual functioning was the lowest of the class.

4. Blaine was a very shy child. He did not make eye contact, and I would have to tell him to look at me when I spoke to him. He was often alone in class.

5. Blaine was often sick. He was on crutches for part of the year and had a drain for urine. He wet his pants a few times throughout the year.

6. Attendance could be a factor in access to special education services. At the time, I attributed his struggles to his poor attendance, but I believe he had cognitive limitations. I think he would have still had academic difficulties if his attendance was better.

7. At the time that Blaine was in school, there were no state mandated criteria for determining whether a student should be passed or held back. I never held a student back without their parents' support.

8. Either a teacher or a parent could request that a student be tested for intellectual and developmental disabilities. However, a student could not be tested without the student's parents' consent.

_Carolyn McElhenny_
Signature

_11-29-18_
Date

SIGNED and SWORN before me this __29th__ day of November, 2018.

_____
Notary Public, State of Texas



CAITLIN PURCELL
Notary Public, State of Texas
Comm. Expires 05-10-2022
Notary ID 131662101

# EXHIBIT 31

**AB Applied Biosystems**
GeneMapper ID v3.2

AF_2009Feb25



| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

D3S1358    VWA    FGA

90    150    210    270    330    390

39
0

16
65

17
59

| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

D8S1179    D21S11    D18S51

90    150    210    270    330    390

90
0

X
130

Y
66

11
94

| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

D5S818    D13S317    D7S820

90    150    210    270    330    390

60
0

| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

90    150    210    270    330    390

600
0

100.0    139.0    160.0    200.0    245.9    300.0    340.0    400.0

150.0    350.0

*will reinject for 15 sec*

26/22 6

**AB Applied Biosystems**

GeneMapper ID v3.2

AF_2009Feb26_B

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



| | | | | |
|---|---|---|---|---|
| 16 187 | 14 61 | 17 54 | 21 82 | |
| 17 176 | | | 22 69 | |

| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



| X 360 | 8 99 | 11 283 | 14 97 | 28 94 | 31.2 61 | 12 52 |
|---|---|---|---|---|---|---|
| Y 185 | | | | 30 95 | | 13 55 |

*spike*

*not reproducible*

| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



N/R

| 9 122 | 12 129 | 11 64 |
|---|---|---|
| 11 75 | | 12 60 |

*not reproducible*

| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



| 100.0 | 139.0 | 160.0 | 200.0 | 245.92 | 300.0 | 340.0 | 400.0 |
|---|---|---|---|---|---|---|---|
| | | 150.0 | | | | 350.0 | |

*15 sec injection → reinjected*
*(data reported)*

27/226

**AB** Applied
Biosystems

AF_2009Feb26_B

GeneMapper ID v3.2

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



16
3833

17
3871

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



8
3799

*spike*

11
3910

14
4019

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



9
3942

11
4014

12
4050

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



139.0

150.0



**AB Applied Biosystems**

AF_2009Feb26_B

GeneMapper ID v3.2

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

*NR*



| Sample File | Sample Name | Panel | | |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



*15 sec reinjection
(Data reported)*

Fri Feb 27,2009 07:15AM, CST          Printed by: gmid          Page 1 of 1



15 sec reinjection
(Data reported)   168/226   Includes
B. Milam

2031

Fri Feb 27, 2009 07:15AM, CST          Printed by: gmid          Page 1 of 1

## Popstats 5.7.4 DNA Profile

Forensic Mixture Case: Probability of Inclusion

| | |
|---|---|
| Database: | d:\codis\Popdata\POPDATA\Texas DPS |
| Specimen: | 08P2031-20I |
| DNA Analyst: | AFITZWATER |
| Lab ID: | TX057013M |
| Date: | 2/27/2009     1:01:36PM |
| Page 1 of 1 | |

### Allele Frequency

| Locus | Allele | CAU | BLK | HIS |
|---|---|---|---|---|
| D3S1358 | 16 | 0.22242 | 0.2926 | 0.26257 |
| D3S1358 | 17 | 0.20072 | 0.21383 | 0.16201 |
| vWA | 14 | 0.10307 | 0.06913 | 0.06006 |
| vWA | 17 | 0.25678 | 0.19936 | 0.29888 |
| FGA | 21 | 0.18264 | 0.13987 | 0.13687 |
| FGA | 22 | 0.16275 | 0.1463 | 0.13128 |
| D8S1179 | 11 | 0.08499 | 0.03859 | 0.03771 |
| D8S1179 | 14 | 0.18535 | 0.32154 | 0.26117 |
| D21S11 | 28 | 0.16275 | 0.25723 | 0.07821 |
| D21S11 | 30 | 0.26673 | 0.19614 | 0.27374 |
| D21S11 | 31.2 | 0.09765 | 0.05466 | 0.12151 |
| D5S818 | 9 | 0.02893 | 0.01768 | 0.05028 |
| D5S818 | 11 | 0.3906 | 0.22026 | 0.43436 |
| D5S818 | 12 | 0.34539 | 0.3955 | 0.26397 |

CAU probability of inclusion 3.698E-05 = 1 in 27,040     27,000
BLK probability of inclusion 2.293E-05 = 1 in 43,610     43,600
HIS probability of inclusion 2.115E-05 = 1 in 47,280     47,200

*Includes*
*B. Milam*

*08Pd031*

*169/226*

**AB Applied Biosystems**

AF_2009Feb26_B

GeneMapper ID v3.2

| Sample File | Sample Name | Panel | SQO | SQ |
|---|---|---|---|---|
| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |



D3S1358 / VWA / FGA

90  150  210  270  330  390

130

16
200

17
175

14
70

17
60

21
82

22
68

| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

D5S818 / D21S11 / D18S51

90  150  210  270  330  390

230

X
372

Y
193

11
307

14
97

28
87

31.2
58

30
88

12
51

| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

D8S1179 / D13S317 / D7S820

90  150  210  270  330  390

80

NR

9
123

12
135

11
86

11
70

| B12-(10)10_08P2031_#20I_pp1.fsa | (10)10_08P2031_#20I_pp | Profiler_Plus_v1 | | ■ |

90  150  210  270  330  390

1700

100.0  139.0  160.0  200.0  245.93  300.0  340.0  400.0

150.0  350.0

*15 sec reinjection
(Data reported)*

*Includes
J. Carson*

*08P2031*

*170/226*

*Fri Feb 27,2009 07:15AM, CST*      Printed by: gmid      Page 1 of 1

# ₌Popstats 5.7.4 DNA Profi₊

Forensic Mixture Case: Probability of Inclusion
Database:              d:\codis\Popstats\POPDATA\Texas DPS
Specimen:              08P2031-20I
DNA Analyst:           AFITZWATER
Lab ID:                TX057013M
Date:                  2/27/2009     1:02:37PM
Page 1 of 1

### Allele Frequency

| Locus | Allele | CAU | BLK | HIS |
|-------|--------|---------|---------|---------|
| D3S1358 | 16 | 0.22242 | 0.2926 | 0.26257 |
| D3S1358 | 17 | 0.20072 | 0.21383 | 0.16201 |
| D8S1179 | 11 | 0.08499 | 0.03859 | 0.03771 |
| D8S1179 | 14 | 0.18535 | 0.32154 | 0.26117 |
| D5S818 | 9 | 0.02893 | 0.01768 | 0.05028 |
| D5S818 | 11 | 0.3906 | 0.22026 | 0.43436 |
| D5S818 | 12 | 0.34539 | 0.3955 | 0.26397 |

CAU probability of inclusion 8.111E-03 = 1 in 123
BLK probability of inclusion 1.396E-02 = 1 in 72
HIS probability of inclusion 9.507E-03 = 1 in 105

*Includes*
*J. Carson*

# EXHIBIT 32



**SOUTHWESTERN**

**INSTITUTE OF FORENSIC SCIENCES**

**AT DALLAS**

Physical Evidence Section

5230 Medical Center Drive
Dallas, Texas 75235

| | |
|---|---|
| **FL#:** | 08P2031 |
| **Agency/Agency#:** | Rusk Co. S.O./08-015807<br>DCME# JP-4098-08 |
| **Complainant:** | AC |
| **Offense:** | 01 |

| | |
|---|---|
| Call Rec'd: | K.Balagot |
| Conversation with: | Sgt. A. Rogers |
| Voice Mail: | |
| Telephone: | 903-657-3581 |
| Date and time: | 12/5/2008 ~ 09:10 |

**Synopsis of Conversation:**

- Sgt. Rogers inquired about toxicology testing on baby bottles collected. Referred Sgt. Rogers to the toxicology section.
- Sgt. Rogers then inquired about DNA testing.
- Went through the items that she may submit. Some clothing, a hammer, and some swabs collected from some bite marks.
- Clothing was collected from the residence that belonged to the male suspect's brother.
- Discussed the value of obtaining buccal swabs from any residents of the house, particularly if the clothing belonged to them.
- Discussed the testing itself, serology and DNA.
- Gave contact information to Sgt. Rogers if she had any other questions/concerns.
- Grand Jury is soon, however trial will be set for the beginning of March 2009.

Call transferred to: _OI-26  to  CASE FILE_
cc:

Analyst Initials _____

# EXHIBIT 33



SOUTHWESTERN
## INSTITUTE OF FORENSIC SCIENCES
### AT DALLAS

Trace Evidence Unit

5230 Medical Center Drive
Dallas, Texas 75235

# Telecon

FL #: 0872031
Service #: 08015807
DCME #: JP409808
Complainant: AC

Date: 1-9-09    Time: 1:17pm
Call received/made by: David W. Spence, Trace Evidence Supervisor
Call/Voicemail by/to: Amber Rogers    US
Agency: Rusk County S.O.
Phone #: (903) 657-3581
Fax #: (   )   -

Message:

13 mo Baby Case

Date 12/2/08

DNA evidence - Status.

Court hearing next week

Det. Rogers called to inquire about the status
of this case. I advised that I did not have
any evidence in the Trace Unit; however, I advised
that I would have an analyst from Forensic Biology

CC:    research the case and call her back today-

US 1-9-09

# EXHIBIT 34



**SOUTHWESTERN**

## INSTITUTE OF FORENSIC SCIENCES

**AT DALLAS**

**Forensic Biology Unit**

5230 Medical Center Drive
Dallas, Texas 75235

| | |
|---|---|
| **FL#:** | 08P2031 |
| **Agency/Agency#:** | Rusk Co SO/ 08015807 |
| **Complainant:** | AC |
| **Offense:** | Homicide |
| **DCME #:** | JP4098-08 |

| | |
|---|---|
| **Call Made/Rec'd by:** | **Angela Thomas** |
| **Conversation with:** | Missy Wolfe, Office of Attorney General |
| **Voice Mail:** | |
| **Telephone:** | In Person |
| **Date and time:** | 2/20/09 @ ~10:15am |

**Synopsis of Conversation:**

Ms. Wolfe came by so we could go over the evidence and the samples I had collected. She

Wanted to try and determine what samples would be best to try to get DNA testing on for

Grand Jury on March 10, 2009. The samples that she wants for DNA testing at this point are

as follows: #10AT1, 10FT1, 13DT1, 13ET1, 14AT1, 14AT2, 14AT3, 20I, 20J, 31AT1, 38T1,

39T1, 39T2, 40AT1, 40BT1 and 40BT2. She is also going to get a standard from Danny Milam

Submitted today.

Original transferred to: *Case file*
cc:                                *serology packet*

Analyst Initials

# EXHIBIT 35

## Bite Marks

Missy Wolfe [Missy.Wolfe@oag.state.tx.us]

**Sent:** Wednesday, November 18, 2009 7:54 PM

**To:** Angela Fitzwater; Angela Padgett-Thomas

**Cc:** micheal.jimerson@co.rusk.tx.us; Lisa Tanner [lisa.tanner@oag.state.tx.us]

---

Please test the following bite marks (in addition to 7A-F):

20a (A), 20q(Q), 20r(R), 20s(S), 20y(Y)

I know this is five, but there are several on her right forearm.  If you can't do five, just let me know.

I sure appreciate your hard work on this case.  Thanks.

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL

# EXHIBIT 36

# Evidence Pickup

## Missy Wolfe [Missy.Wolfe@oag.state.tx.us]

**Sent:** Thursday, December 10, 2009 10:27 AM

**To:**    Angela Fitzwater; Angela Padgett-Thomas; Sylvia Reyes

Hi. I should be there today around 12 or a little before. I will picking
up the following items on the baby case for transport to DPS Austin:

Steel Bar, 39.
Vag/Anal swabs from AC       .
Swabs taken from Bar after fingerprinting.
Boxers (10e).
29A-F, diaper and wipes.

Thanks

# EXHIBIT 37

## Discovery on AC   Baby Case

Missy Wolfe [Missy.Wolfe@oag.state.tx.us]

**Sent:** Monday, December 28, 2009 10:02 AM

**To:** Angela Fitzwater; Angela Padgett-Thomas; Sylvia Reyes

**Cc:** JimersonM@aol.com; Lisa Tanner [lisa.tanner@oag.state.tx.us]

---

Please hold whatever package you were mailing to Micheal Jimerson the DA today. He will come pick it up. The discovery deadline is actually the 30th rather than the 31st. I have tried reaching you all. Hopefully someone will see this. I spoke to Sylvia already. Thanks.

# EXHIBIT 38

**Heining, Tomee**

| | |
|---|---|
| **From:** | Heining, Tomee |
| **Sent:** | Wednesday, July 22, 2015 2:26 PM |
| **To:** | 'don bailey'; 'jhaas@tyler.net'; Scott Smith (smithlaw@airmail.net) |
| **Subject:** | Blaine Milam |
| **Attachments:** | DPS DNA letter.pdf |

Because there was DNA evidence presented at Milam's trial, I wanted you all to be aware of the attached notice regarding DNA testing from DPS.


Best Regards,

Tomee Heining
Assistant Attorney General
Criminal Appeals Division
(512) 463-2148

1





# TEXAS DEPARTMENT OF PUBLIC SAFETY

5805 N LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001
512/424-2000
www.dps.texas.gov

STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
MANNY FLORES
FAITH JOHNSON
STEVEN P. MACH
RANDY WATSON

June 30, 2015

The Texas Department of Public Safety Crime Laboratory system was informed by the Federal Bureau of Investigation in May 2015 of errors in the FBI-developed population database. This database has been used by the Texas DPS Crime Laboratory system as well as many other crime laboratories across the country for calculating match statistics in criminal investigations and other types of human identification applications since 1999.

Upon notification, the forensic DNA community immediately began corrective action. During implementation of corrective measures, minor discrepancies were discovered in additional data used exclusively by the Texas Department of Public Safety. All of the errors have been corrected and the changes have empirically demonstrated minimal impact on the calculations used to determine the significance of an association. **Further, the database corrections have no impact on the inclusion or exclusion of victims or defendants in any result.**

If requested in writing, the Texas DPS Crime Laboratory System will recalculate and report statistics previously reported in individual cases.

If you have any questions, please contact your local crime laboratory.

Brady W Mills
Deputy Assistant Director
Law Enforcement Support
Crime Laboratory Service

# EXHIBIT 39



**SOUTHWESTERN**
**INSTITUTE OF FORENSIC SCIENCES**
**AT DALLAS**

Criminal Investigation Laboratory

5230 Medical Center Drive
Dallas, Texas 75235

TX 20160

Submitting Agency Rusk County S.O.

Evidence Delivered by B. Bathke #512

(Signature)

Printed Name: BRIAN BATHKE

Rec'd in Laboratory by S Hernandez

Date 12-3-08    Time 1125

Laboratory # 08P2031

Agency # 08015807

Investigator Assigned to Case:
Name AMBER ROGERS #534
Address 210 CHARLEVOIX
Henderson TX 75652
Direct Tel. No. 903-646-1793 or 903-657-3581
DCME # P4098 08-DL    office

| Lab Use Only | EVIDENCE LISTING | ANALYSIS REQUESTED |
|---|---|---|
| #1 | 1 Swab of Mouth of Blaine Milam | DNA / Compare Bite on Vic |
| #2 | 2 Bag of Nail clippings | DNA / Compare Bites |
| #3 | 3 Swab of Jessica Carson | DNA / Compare Bites |
| #4 | 4 Swab of Jessica Carson | " " |
| #5 | 6 Blood Vials Jessica Carson 2 tube | " |
| #6 | 7 Blood Vials Blaine Milam 2 tubes | " |
| | | |
| | | SWIFS CRIM. INVEST. LAB. DALLAS 2008 DEC -3 PM 1:25 |
| | | |
| | | |
| | | |

Nature of Offense/Death Capital Murder

Complainant/Deceased AC

Suspect

Suspect

Date of Offense/Death 12-2-08

Race/Sex/Age

Race/Sex/Age

Race/Sex/Age

FL/PES Form, rev. 8/23/04

```
CASE # 08015807          OFFENSE/INCIDENT REPORT - PAGE 1    LAW100 PAGE   1
DATE RUN 12/03/2008            RUSK CO. SHERIFF'S OFFICE
-------------------------------------------------------------------------
              CASE # 08015807                        CLASS: F-CAP
       RELATED CASE #                         TYPE OFFENSE: CAP MURDER
     OFFENSE/NATURE: CAPITOL MURDER  PC 19.03(A)(8)
          DISPATCH # 08015807                        UCR:
             VICTIM: JUVENILE
               RACE:     ETHNIC:    SEX:    AGE:    0    DOB:
        SOC SEC NO:    - -                          D-L NO:
   VICTIM EMPLOYMENT:

        COMPLAINANT: THE STATE OF TEXAS

                                                 PHONE: ██████████
               RACE:     ETHNIC:    SEX:    AGE:    0    DOB:
        SOC SEC NO:    - -                          D-L NO:
-------------------------------------------------------------------------
      REPORTED BY: MILAM,BLAINE       REPORTED TO: DISP
     HOW REPORTED: PHONE                 LOCATION: 13717 CR 2125
WEATHER CONDITION: COOL, CLEAR                     HENDERSON, TX 75654
    PREMISE TYPE: RESIDENCE              WEAPONS: UNKNOWN
OFFENSE DATE/TIME: 12/02/2008  0800         THRU: 12/02/2008  1030
  BODILY INJURIES? N                     TAKEN TO: NA
   TRANSPORTED BY: NA                    INJURIES: NA
        CONDITION: NA
-------------------------------------------------------------------------
          UCR OFFENSE CLASS
          UCR OFFENSE SUB-CLASS A
          UCR OFFENSE SUB-CLASS B
          PROPERTY TYPE ARSON/STOLE
          GRID LOCATION HORIZ
          GRID LOCATION VERT
          PREMISES TYPE
          CIRCUMSTANCES
          CRIMESTOPPERS
          ENTRY TYPE
          ENTRY LOCATION
          ENTRY WEAPON
          EXIT TYPE
          EXIT LOCATION
          PHYSICAL EVIDENCE
          PRECINCT
          JURISDICTION
          RELATIONSHIP TO OFFENDER

    INVESTIGATOR:                     REPORT BY: 506/ROY
     CASE FILED? Y                  REPORT DATE: 12/02/2008
 UCR DISPOSITION:                    UCR DISP DATE:   / /
  SO DISPOSITION:                     SO DISP DATE:   / /
    MINORS ONLY? N          HOMICIDE SITUATION? Y
       COMMENTS:


OFFICER SIGNATURE  _____  DATE  _____  APPROVED BY  _____  DATE
```



08P2031

```
CASE # 08015807          OFFENSE/INCIDENT REPORT - PAGE 1    LAW100 PAGE   2
DATE RUN 12/03/2008      RUSK CO. SHERIFF'S OFFICE
```

```
-------------------------         V E H I C L E        ----------------------------
        TYPE: WITNESS             MAKE: FORD                 LICENSE NO: LRZ849
        MODEL: MUSTANG            DOORS: 2                       STATE: TX
        YEAR: 1996 -               COLOR: RED  ON                 YEAR: 2009
        STATUS:                             VIN: 1FALP4048TF129338

LIENHOLDER:                               INSC CO:


        VALUE:

   COMMENTS:                         HAVE KEYS? N
-------------------------         E V I D E N C E      ----------------------------
QTY:   1  ITEM: S110  Miscellaneous                              VALUE:
              ITEM: VIDEO CASSETTE TAPE
       DESCRIPTION: DASH CAM VIDEO UNIT 8
              MODEL:                            ENTER TCIC?
              SERIAL #:                         ITEM IN USE?
                                                NCIC NO:
       ENTRY CODE: E   12/02/2008 OUT OF TOWN?  STORAGE ROOM:
DISPOSITION CODE:      / /  OUT OF TOWN?            BIN:
---------------------------V I C T I M / W I T N E S S-----------------------------
    WITNESS NAME: MILAM,DANNY WAYNE              BEST PHONE:
         ADDRESS:                               OTHER PHONE:
         CITY/ST/ZIP:              TX                   DL #:              TX
RELATION OF VICTIM: UNCLE                        SOC. SEC. NO.

   RACE: W      ETHNIC:      SEX: M  DOB:             HEIGHT: 6  3  -
   HAIR: BRO    EYES: BRO      GLASSES?                 AGE:   27  -
   S-M-T? Y     SKIN: FAR    FACIAL HAIR?             WEIGHT: 180  -
       PLACE EMPLOYMENT:
       OTHER DESCRIPTION:
---------------------------V I C T I M / W I T N E S S-----------------------------
    WITNESS NAME: MILAM,SHIRLEY                  BEST PHONE:
         ADDRESS:                               OTHER PHONE:
         CITY/ST/ZIP:              TX                   DL #:              TX
RELATION OF VICTIM: GRANDMA                      SOC. SEC. NO.

   RACE:        ETHNIC:      SEX:    DOB:             HEIGHT:      -
   HAIR:        EYES:          GLASSES?                 AGE:   49  -
   S-M-T? N     SKIN:        FACIAL HAIR?             WEIGHT:      -
       PLACE EMPLOYMENT:
       OTHER DESCRIPTION:
---------------------------V I C T I M / W I T N E S S-----------------------------
    WITNESS NAME: MILAM,BLAINE KEITH             BEST PHONE:
         ADDRESS:                               OTHER PHONE:
         CITY/ST/ZIP:              TX                   DL #:              TX
RELATION OF VICTIM: STEPDAD                      SOC. SEC. NO.

   RACE: W      ETHNIC:      SEX: M  DOB:             HEIGHT: 6   -
   HAIR: BRO    EYES: GRN      GLASSES?                 AGE:   18  -
   S-M-T? N     SKIN: LGT    FACIAL HAIR?             WEIGHT: 205  -
       PLACE EMPLOYMENT:
       OTHER DESCRIPTION:
```

OSP2031

```
   CASE # 08015807          OFFENSE/INCIDENT REPORT - PAGE 1     LAW100 PAGE   4
   DATE RUN 12/03/2008          RUSK CO. SHERIFF'S OFFICE
```

------------------------------V I C T I M / W I T N E S S------------------------------

```
   WITNESS NAME: CARSON,JESSICA                           BEST PHONE:
        ADDRESS:                                         OTHER PHONE:
     CITY/ST/ZIP:                       TX                   DL #:              TX
RELATION OF VICTIM: MOTHER                              SOC. SEC. NO.

   RACE: W          ETHNIC:        SEX: F  DOB:             HEIGHT:        -
   HAIR:            EYES:              GLASSES?               AGE:  18     -
   S-M-T? N         SKIN:          FACIAL HAIR?            WEIGHT:         -
        PLACE EMPLOYMENT:
        OTHER DESCRIPTION:
```

--------------------------        S U S P E C T        ----------------------------

```
   SUSPECT NAME: MILAM,BLAINE KEITH                       BEST PHONE:
        ADDRESS:                                         OTHER PHONE:
     CITY/ST/ZIP:                    TX75654                  D L:              TX
RELATION OF VICTIM: STEPDAD                             SOC. SEC. NO.

   RACE: W          ETHNIC:        SEX: M  DOB:             HEIGHT: 6      -
   HAIR: BRO        EYES: GRN          GLASSES?               AGE:  18     -
   S-M-T? N         SKIN: LGT      FACIAL HAIR?            WEIGHT: 205     -
        HOMICIDE OFFENDER? NO
        PLACE EMPLOYMENT:
        OTHER DESCRIPTION:
```

--------------------------        S U S P E C T        ----------------------------

```
   SUSPECT NAME: CARSON,JESSICA                           BEST PHONE:
        ADDRESS:                                         OTHER PHONE:
     CITY/ST/ZIP:                      TX                     D L:              TX
RELATION OF VICTIM:                                    SOC. SEC. NO.

   RACE:            ETHNIC:        SEX:    DOB: 08/31/1990  HEIGHT:        -
   HAIR:            EYES:              GLASSES?               AGE:  18     -
   S-M-T? N         SKIN:          FACIAL HAIR?            WEIGHT:         -
        HOMICIDE OFFENDER? NO
        PLACE EMPLOYMENT:
        OTHER DESCRIPTION:
```

08P2031

## Rusk County Sheriff's Office

Offense: <u>08015807</u>

ON TUESDAY DECEMBER 2, 2008 AT ABOUT 10:37 A.M. I, SGT. KEVIN ROY WAS DISPATCHED BY RUSK COUNTY SHERIFF'S OFFICE TO 13717 COUNTY ROAD 2125 IN RUSK COUNTY IN REFERENCE TO A HOMICIDE.

13717 CR 2125 IS A SINGLE FAMILY DWELLING SITUATED ON THE NORTH WEST CORNER OF THE INTERSECTION OF CR 2125 AND CR 2119D. THE RESIDENCE IS CREAM COLORED WITH A COMPOSITE ROOF. THE FRONT PORCH OF THE RESIDENCE APPEARS TO BE AN ADD-ON WITH A GREEN METAL ROOF. THERE IS A WOODEN FENCE LOCATED ALONG THE ROADWAYS OF CR 2119D AND CR 2125. THERE IS A CARPORT WITH A GREEN ROOF LOCATED ON THE NORTH SIDE OF THE RESIDENCE. . I NOTICED A RED COLORED FORD MUSTANG PARKED NEAR THE CARPORT BEARING TEXAS LICENSE PLATE ████.

UPON MY ARRIVAL AT ABOUT 10:57 A.M. I NOTICED TWO CHAMPION EMERGENCY MEDICAL VEHICLES AT THE RESIDENCE. THE VEHICLES WERE IDENTIFIED AS CHAMPION 4719 (DAVID DONALDSON AND MARCUS BROWN) AND CHAMPION 4106 (BRIAN WILKINSON AND RON RUSSELL). THE EMERGENCY MEDICAL TECHNICIANS WERE INSIDE THE RESIDENCE ALONG WITH THE VICTIM'S STEPFATHER BLAINE MILAM AND THE VICTIM'S MOTHER JESSICA CARSON. THE VICTIM (IDENTIFIED AS AC ████, DOB ████ WAS LYING ON HER BACK JUST INSIDE A BEDROOM DOORWAY IN THE NORTH BEDROOM OF THE RESIDENCE. I NOTICED BLAINE MILAM AND JESSICA CARSON KNEELING DOWN OVER THE VICTIM.

I THEN REMOVED BLAINE MILAM AND JESSICA CARSON FROM THE BEDROOM AND ADVISED THEM TO STEP OUTSIDE THE RESIDENCE WITH THE EMT'S. I NOTICED THE VICTIM HAD SEVERE BRUISING (POSSIBLY LIVIDITY) COVERING THE VICTIM'S FACE. I ALSO NOTICED OTHER BRUISES AND ABRASIONS ON THE FRONT OF THE VICTIM'S BODY. I THEN LIFTED THE VICTIM'S LEFT FOOT ABOUT THREE INCHES FROM THE FLOOR AND NOTICED THE ENTIRE LEG AND LEFT SIDE OF THE BODY MOVE. APPARENT RIGORMORTIS WAS SET IN THE VICTIM.

I THEN CLEARED THE RESIDENCE TO MAKE SURE NO OTHER PERSONS WERE INSIDE THE RESIDENCE. RUSK COUNTY SHERIFF'S OFFICE LT. REYNOLD HUMBER AND SGT. AMBER ROGERS THEN ARRIVED ON SCENE. I THEN SET AN OUTSIDE PERIMETER WITH YELLOW PERIMETER TAPE AND RELEASED THE SCENE TO SGT. ROGERS.

I THEN SEPARATED BLAINE MILAM AND JESSICA CARSON. BLAINE MILAM STATED THAT HE FED THE VICTIM A BOTTLE AT ABOUT 8:30 A.M. AND HE AND HIS COMMON-LAW WIFE JESSICA CARSON WALKED NORTH

08P2031

ON CR 2125 TO MEET A MAN NAMED "CLARK" TO DISCUSS MOVING A MOBILE HOME ONTO THE PROPERTY. BLAINE MILAM STATED THAT HE AND JESSICA RETURNED TO THE HOME ABOUT AN HOUR LATER AND FOUND THE VICTIM DEAD. BLAINE MILAM STATED THAT THE VICTIM HAD NO BRUISES, MARKS OR ABRASIONS AT 8:30 A.M. WHEN THEY LEFT TO MEET "CLARK". BLAINE MILAM STATED THAT "CLARK" WAS SUPPOSED TO MEET THEM AT ABOUT 9:00 A.M., BUT NEVER SHOWED. BLAINE MILAM'S DEMEANOR DURING MY INTERVIEW WAS VERY CALM AND QUIET.

AT ABOUT 11:34 A.M. I READ BLAINE MILAM AND JESSICA CARSON THEIR MIRANDA WARNINGS.

JESSICA CARSON STATED THAT THE NAME OF THE VICTIM IS AC ▮▮▮▮ , DOB ▮▮▮▮ JESSICA CARSON'S DEMEANOR WAS EMOTIONAL. JESSICA CARSON STATED THAT BLAINE HAD CONTACTED THE 911 OPERATOR BUT COULD NOT EXPLAIN THE SITUATION BECAUSE HE WAS TOO UPSET. MS. CARSON STATED THAT SHE TOOK THE TELEPHONE FROM BLAINE TO REPORT THE INCIDENT.

I NOTICED AN ABRASION ON THE RIGHT HAND OF BLAINE MILAM. BLAINE MILAM STATED THAT THE ABRASION OCCURRED WHEN HE STRUCK THE WALL INSIDE THE RESIDENCE AFTER FINDING THE DECEASED BABY.

DANNY MILAM AND SHIRLEY MILAM ARRIVED AT THE LOCATION AT ABOUT 11:50 A.M. THEY ARRIVED IN A GREEN CHEVROLET Z71 PICKUP BEARING LICENSE PLATE TX-72SDS8.

SHIRLEY MILAM STATED THAT BLAINE MILAM IS NOT THE BIOLOGICAL FATHER OF THE VICTIM. SHIRLEY MILAM STATED THAT JESSICA CARSON BELIEVES THAT ARLEN MUTINA (DOB ▮▮▮▮ FROM LONGVIEW IS THE FATHER OF THE VICTIM.

JUSTICE OF THE PEACE PRECINCT TWO JUDGE BONNIE MILLER WAS NOTIFIED AT ABOUT 11:47 A.M. AND RADAR FUNERAL HOME WAS NOTIFIED AT ABOUT 12:53 P.M.

I THEN TRANSPORTED BLAINE MILAM TO THE RUSK COUNTY SHERIFF'S OFFICE FOR EVIDENCE COLLECTION AND QUESTIONING BY DIRECTION OF SGT. ROGERS.

THE DASH BOARD VIDEO RECORDING OF RUSK COUNTY PATROL UNIT #8 IS TAGGED AND LOGGED INTO THE EVIDENCE ROOM OF THE RUSK COUNTY SHERIFF'S OFFICE.



# EXHIBIT 40



**DALLAS COUNTY**

**SOUTHWESTERN INSTITUTE OF FORENSIC SCIENCES**

**PHYSICAL EVIDENCE SECTION**

**2355 North Stemmons Freeway**
**Dallas, Texas 75235**

Date:   7/23/2025
To:      Texas Forensic Sciences Commission
From:   Timothy J. Sliter, Ph.D., Section Chief, Physical Evidence
Re:      Laboratory Response to Texas Forensic Science Complaint C25.40

The laboratory is in receipt of complaint C25.40 from Jennae Swiergula, Attorney for Blaine Milam.

The complaint concerns laboratory results and testimony in the areas of serological testing and DNA analysis on samples collected from submitted evidence items and the body of the decedent in laboratory case 08P02031.

This response will consist of three (3) sections:

Part 1.      General comments regarding DNA profile interpretation, including recommendations regarding reinterpretation of DNA profiles in this case

Part 2.      Summary of allegations

Part 3.      Responses to specific allegations


For the sake of timeliness, this response addresses <u>only</u> the specific content of the complaint. The response does not address the supporting declarations of Dan Krane or Simon Ford. In the event that the Commission requires specific responses to these declarations, please let me know.

In the event that any additional information is required from the laboratory for the Commission's initial review of this complaint, please let me know.

1

**Part 1. General comments regarding DNA profile interpretation**

The complaint presents concerns and criticisms of the interpretations applied by Angela Fitzwater to the DNA profiles obtained from five (5) referenced evidence items.

The testing in this case was performed in 2009 and 2010. The DNA evidence included low level DNA profiles and complex DNA mixtures. The DNA profiles were interpreted using laboratory procedures in effect at the time of the analysis. These procedures included methods that fall into the category of low-copy number (LCN) analysis, or enhanced methods for low template samples. These methods consisted of increased injection times. The methods were implemented by the laboratory in 2008, which was long before the first national guidelines for LCN analysis were published by SWGDAM in 2014.

The DNA interpretation procedures used in 2009 and 2010 were substantially revised in 2016 following a statewide review of DNA mixture interpretation procedures performed in 2015 at the direction of the Texas Forensic Science Commission. For all participating laboratories (which included SWIFS), the statewide review identified deficiencies in interpretation procedures. Like other Texas laboratories, following the statewide review, SWIFS implemented changes to its DNA interpretation procedures to meet best-practices for DNA profile interpretation available at the time.

Following the 2015 statewide review, SWIFS (along with other Texas laboratories) agreed to re-interpret previously reported DNA results for any convicted individual who requested the reinterpretation. This effort to perform as-requested DNA reinterpretations was widely disseminated by the Commission to the Texas legal community. SWIFS has performed a number such reinterpretations for defendants, and reinterpretations for pending judicial processes.

<u>Recommendations</u>

***The DNA profiles referenced by the complaint include low-level samples and complex mixtures. These are examples of DNA profiles that should be reinterpreted using the laboratory's current interpretation procedures, which were revised following the 2015 statewide review of mixture interpretation procedures.***

***The laboratory has preliminarily assessed the DNA profile evidence referenced in the complaint. A reinterpretation of these profiles using the laboratory's current procedures would result in changes to the conclusions and statistical weights for at least some of the DNA evidence.***

***To date, no request has been received by the laboratory for reinterpretation of DNA profiles in this case. It is our emphatic recommendation that the defendant request reinterpretation of the DNA evidence using the laboratory's revised procedures.***

**Part 2. Summary of Allegations**

The complainant makes the following allegations of professional negligence and/or professional misconduct by SWIFS DNA analyst Angela Fitzwater (AF) and serology analyst Angela Thomas (AT).

1. Suspect and victim-driven interpretation for the following items (Fitzwater):
    a. 20A: Swab – "anterior neck"
    b. 20I: Swab – "left elbow"
    c. 20Q: Swab – "right upper arm"
    d. 20R: Swab – "distal anterior right forearm"
2. No stochastic threshold for the analysis of the following items (Fitzwater):
    a. 20A: Swab – "anterior neck"
    b. 20I: Swab – "left elbow"
    c. 20Q: Swab – "right upper arm"
    d. 20R: Swab – "distal anterior right forearm"
3. Violations of SWIFS SOPs for the following items (Fitzwater):
    a. 20A: Swab – "anterior neck"
    b. 20I: Swab – "left elbow"
    c. 20Q: Swab – "right upper arm"
    d. 20R: Swab – "distal anterior right forearm"
4. Unreliable and suspect-driven CPI calculations for the following items (Fitzwater):
    a. 20I: Swab – "left elbow"
5. Misleading testimony regarding statistical calculation for the following items (Fitzwater):
    a. 20I: Swab – "left elbow"
6. Absence of testimony regarding statistics for the following items:
    a. 20A: Swab – "anterior neck"
    b. 20Q: Swab – "right upper arm"
    c. 20R: Swab – "distal anterior right forearm"
7. Absence of a substrate control and inadequate documentation of the source of the following test sample (Thomas):
    a. 10A-T1: Swabbing of shirt – "…Blaine Milam"
8. Inconsistent application of SWIFS SOPs regarding injection times for the following items (Fitzwater):
    a. 10A-T1: Swabbing of shirt – "…Blaine Milam"

**Part 3. Responses to specific allegations**

**1. Suspect and victim-driven interpretation for the following items (AF):**

   a. 20A: Swab – "anterior neck"

   b. 20I: Swab – "left elbow"

   c. 20Q: Swab – "right upper arm"

   d. 20R: Swab – "distal anterior right forearm"

<u>**Response**</u>

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. The complaint alleges that AF interpreted the referenced DNA profiles "despite the incompleteness and unreliability of the data and the inability to determine the number of contributors…based on the alleles present in the DNA profiles of known persons of interest." AF performed the analysis and interpretation following the procedures of the laboratory in effect at the time of the testing.

AF processed the samples between 2/23/2009 and 11/9/2010 using the Procedures for Multiplex STR Analysis. The following version of the manual were in effect during this time period.

- Version 1.2 (effective 6/24/2008)
- Version 1.3 (effective 3/12/2009)
- Version 1.4 (effective 10/1/2009)
- Version 1.5 (effective 3/17/2010)
- Version 1.6 (effective 5/7/2010)
- Version 1.7 (effective 6/29/2010)

The testing was performed using Profiler Plus kit (Applied Biosystems) and the ABI 310 capillary electrophoresis instrument using the standard analysis parameters of 5 sec injection, 50 RFU analytical threshold, and 85 RFU stochastic threshold. Four reports were issued on 3/5/2009, 1/12/2010 (corrected 4/27/2010 for an administrative error), 4/28/2010, and 11/9/2010.

Some samples were additionally injected for 15 seconds. The procedure manual included a provision for increased injection times of either 10 seconds or 15 seconds for low-level samples. The increased injection time procedure was an option, but not a requirement. The decision to use or not use the procedure was made by the primary analyst with the agreement of the technical reviewer.

Following collection of the data and identification of the authentic alleles in each profile, AF interpreted the profiles according to the laboratory's published interpretation guidelines and calculated statistical weights as described in the laboratory's procedure manual:

- Section 14.1, Addendum 1: Increased injection time for low level samples
- Section 17: STR Interpretation Guidelines
- Section 30, Appendix 10, Part 1 and Part 2: Application of Population Frequency Data

4

These protocols classified profiles as either single contributor or multi-contributor based upon the number of alleles present at the various loci. Mixture profiles were additionally categorized as follows for the purpose of statistical calculations:

- simple mixtures
- degraded simple mixtures
- low level simple mixtures
- simple mixtures with a known contributor
- simple major-minor mixtures with single major contributor and single minor contributor with all alleles above the stochastic threshold (no drop-out)
- major-minor mixtures with one major contributor and more than one minor contributor
- major-minor mixtures with more than one major contributor
- major-minor mixtures with some loci where major and minor contributors cannot be distinguished
- major-minor mixtures with minor alleles in the stochastic dropout range

All of the analysis performed by AF followed the required laboratory protocols.

***It is important to state that the laboratory procedures for mixture interpretation and statistical analyses changed significantly following the 2015 statewide review of mixture interpretation protocols. With the laboratory's revised procedures, the interpretation of the referenced profiles would be performed differently, and the statistical weights would be calculated differently. Therefore, we recommend that the defendant request reinterpretation of the DNA profiles using current procedures.***

2. **No stochastic threshold for the analysis of the following items (AF):**
   a. 20A: Swab – "anterior neck"
   b. 20I: Swab – "left elbow"
   c. 20Q: Swab – "right upper arm"
   d. 20R: Swab – "distal anterior right forearm"

**<u>Response</u>**

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. AF performed the analysis and interpretation according to the procedures of the laboratory in effect at the time of analysis. The interpretation of the profile data included the appropriate application of the stochastic threshold to the data obtained from the 5 second injection.

The referenced samples were first analyzed using the standard injection method of 5 seconds. This identified both peaks that fell above the stochastic dropout range, and within the stochastic dropout range.

In a follow-up analysis, the samples were re-injected for 15 seconds to detect low-level authentic alleles that may have dropped out in the 5 sec injection. However, if a peak fell in the stochastic

dropout range in the 5 sec injection, then it remained classified as in the stochastic dropout range regardless of the peak height in the 15 sec injection.

For example, a single allele at a locus in a single-source profile observed at 80 rfu in the 5 second injection would be interpreted as being in the stochastic range. It would not be classified as a homozygote. In the 15 second injection, the peak height would be expected to increase above 85 rfu. However, the peak would still be interpreted as being in the stochastic range based upon the results of the 5 second injection. If no additional allele was detected at the locus in the 15 second injection, then the locus would still not be classified as homozygous because the observed peak was below 85 rfu in the 5 second injection.

3. **Violations of SWIFS SOPs for the following items (Fitzwater):**
   a. 20A: Swab – "anterior neck"
   b. 20I: Swab – "left elbow"
   c. 20Q: Swab – "right upper arm"
   d. 20R: Swab – "distal anterior right forearm"

**<u>Response</u>**

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. AF performed the analysis and interpretation according to the procedures of the laboratory in effect at the time of analysis.

The allegation concerns the fact that there is a discrepancy in the procedure manual between a general policy-level statement in one section of the manual, and a detailed protocol described in another section of the manual (Procedures for Multiplex STR Analysis, Version 1.3 (effective 3-12-2009).

- STR Interpretation Guidelines, Section F.1.b (effective 1-21-2000) states: "The laboratory's current policy is that no statistical analysis is performed for simple mixtures."
- Appendix 10 Guidelines for STR Interpretation and Statistical Weight Calculation for DNA Matches (effective 3-12-2009) includes detailed procedures for calculating statistical weights for simple mixtures including mixtures with possible dropout (Part B) and major-minor mixtures (Part C).

The policy regarding no statistical calculation for simple mixtures was part of the original STR manual that was put into effect 1-21-2000. This policy statement was then superseded by a revision to the manual that was implemented 4-12-2000 with addition of procedures for statistical analysis of simple mixtures. The policy statement should have been removed from the manual.

**4. Unreliable and suspect-driven CPI calculations for the following items (Fitzwater):**

    a. 20I: Swab – "left elbow"

<u>**Response**</u>

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. AF followed the laboratory protocol that was in effect at the time of testing.

AF followed laboratory protocol in classifying the profile obtained from 20I as degraded simple mixture with at least two contributors, with Blaine Milam and Jessica Carson being possible contributors. AF also followed laboratory protocol in evaluating the loci in the profile to include in the statistical calculation. That protocol required a separate evaluation and a separate statistical calculation for each of the possible contributors.

*It is important to state that the laboratory procedure for statistical calculations of degraded simple mixtures with dropout changed significantly following the 2015 statewide review. With the laboratory's revised procedures, the evaluation of the profile for 20I for statistical calculation would be performed differently, and separate calculations for each of the possible contributors would not be performed.*

**5. Misleading testimony regarding statistical calculation for the following items (AF):**

    a. 20I: Swab – "left elbow"

<u>**Response**</u>

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. The complaint alleges that AF's testimony was misleading regarding the statistical significance of her conclusions regarding Item 20I, which "allowed the jury to overvalue the strength of the conclusions and find the evidence more incriminating than justified by the data." AF's testimony conformed to the laboratory's practices and expectations.

In her testimony AF provided an accurate and straight-forward description of the DNA profile obtained from 20I. She testified that:

- "low level amounts of DNA were obtained"
- "the partial DNA profile was a mixture of at least two contributors that could not be resolved into a major and minor contribution"
- "at least one of the contributors was male"

She testified to the comparisons she made of individuals to the DNA profile of 20I. She testified that "the partial DNA profile included genetic markers expected to be present if Blaine Milam was a contributor" and that "the partial DNA profile included genetic markers that would be expected to be present if Jesseca Carson was a contributor." This wording was to describe in layman's language the comparison of the individuals to the DNA profile data, and was completely consistent with the laboratory's practices at that time.

7

*It is important to note that the laboratory's revised procedures for profile interpretation and statistical analysis would result in a statistical result that would be different from the calculation testified to by AF at trial.*

6. **Absence of testimony regarding statistics for the following items:**
   a. 20A: Swab – "anterior neck"
   b. 20Q: Swab – "right upper arm"
   c. 20R: Swab – "distal anterior right forearm"

**<u>Response</u>**

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. Neither the prosecution nor the defense asked AF for the statistical weights that she calculated for the referenced samples and which were presented in her reports. In her answers to questions regarding these samples, AF adequately communicated that very limited genetic information was obtained from the samples.

Regarding 20A: On direct examination, AF verbally described the profile for 20A as giving a "limited amount of genetic information" with "uncertainty if the DNA originated from one or multiple people." She described that the profile included alleles that could have originated from the decedent, or from Jessica Carson, or from Blaine Milam. However, the prosecution did not ask AF for statistical weights. On cross examination, the questions dealt extensively with the detailed profile obtained from 20A and the uncertainty in that profile due to the limited amount of genetic information. However, the defense did not ask AF for the statistical weights.

Regarding 20Q and 20R: AF testified on direct that the results for 20Q and 20R were similar to the results for 20A, and that alleles were observed that could have originated from the decedent, or from Jessica Carson, or from Blaine Milam. On cross examination, there were questions specifically addressing 20Q and 20R. However, neither the prosecution or defense asked for the statistical weights that had been calculated and reported for these samples.

*It is important to state that the interpretation of these profiles (20A, 20Q, and 20R) would be different under the laboratory's revised mixture interpretation procedures that were implemented following the 2015 statewide review of mixture interpretation procedures. It is recommended that reinterpretation of these profiles be requested.*

7. **Absence of a substrate control and inadequate documentation of the source of the following test sample (AT):**
   a. 10A-T1: Swabbing of shirt – "…Blaine Milam"

**<u>Response</u>**

Regarding the allegation of professional negligence or misconduct on the part of the serologist AT, this allegation is unfounded. The complaint specifically alleges that in her testing of item 10A

(Shirt) AT: 1) did not adequately document which areas of the shirt she swabbed; and 2) did not take substrate control samples. A review of AT's case notes indicates that AT adequately documented the source of the 10A-T1 sample in accordance with laboratory protocols. No substrate control was collected. However, collection of substrate controls was not a required element of the laboratory's serological protocols, and was not mandated by any applicable quality assurance standards or guidelines.

AT's case notes record her observation of a "reddish stain @ inside front collar area" on item 10A – Shirt. Her case notes document the results of presumptive blood testing (leucomalachite green test) as follows:

- "CAT+ entire inside of item, excluding reddish stain and inside back of left sleeve"
- "CAT+ traces @ remainder of item, including reddish stain and inside back of left sleeve"

Her case notes document the collection of "one swab, T1, taken of all CAT + areas, QNSFAS." The abbreviations in the case notes are as follows:

- CAT+: positive presumptive blood test
- CAT+ traces: weakly presumptive positive blood test
- QNSFAS: Quantity Not Sufficient for Further Analysis

AT's testing, sample collection, and documentation of results all conformed to laboratory requirements.

8. **Inconsistent application of SWIFS SOPs regarding injection times for the following items (AF):**

      a. 10A-T1: Swabbing of shirt – "…Blaine Milam"

**<u>Response</u>**

Regarding the allegation of professional negligence or misconduct on the part of AF, this allegation is unfounded. The complaint alleges that AF "injected sample 10A-T1 for a shorter injection period so that she could characterize the sample as a single source profile despite the clear presence of a second contributor apparent from the initial injection and corresponding electropherogram." There is no basis for this allegation. The profile from 10A-T1 was classified as a major-minor mixture based upon relative peak height differences that were observed in the profile. The classification of the major contribution as being from a single individual was correct and in full accordance with laboratory interpretation protocols. The 15 second injection was performed to determine if the trace-level alleles in the profile were reproducible. Only one trace-level allele was determined to be reproducible. <u>An additional injection for 15 seconds would have increased all peak heights by the same proportion and would not have changed the classification of the profile as a major-minor mixture with a single major contributor.</u>

# EXHIBIT 41

## PRICE | PROCTOR

### Forensic & Clinical Psychology/Neuropsychology

11882 Greenville Avenue • Suite 107 • Dallas, Texas 75243
Telephone: 972-644-8686 • Facsimile: 972-644-8688
www.priceproctor.com

Timothy J. Proctor, Ph.D., ABPP
Board Certified in Forensic Psychology

# Report Addendum

Name:                          Blaine Keith Milam

Birth Date:                    12/12/1989

Addendum Date:                 1/8/2021

At the request of the State, I evaluated Mr. Milam, who was charged with Capital Murder, on 3/26/2010. The evaluation included an assessment of whether he is a person with intellectual disability (formerly known as mental retardation)[1]. Based on the information available to me then as well as the relevant diagnostic nomenclature, research, and law at the time, it was my opinion that he did not meet criteria for intellectual disability. The evaluation results were reduced to a written report dated 5/4/2010. Mr. Milam was convicted of Capital Murder and I testified during the sentencing phased of the trial. He was ultimately sentenced to death.

I had no further involvement in the case until 12/13/2018. On that date, Mr. Milam's attorneys requested records related to my evaluation of him. The State was aware of this request and had no objections. I provided the requested records. No other services were requested of me at that time.

My next involvement in the case occurred on 12/17/2020 when Mr. Milam's attorneys requested to speak with me regarding the case. The State, by whom I continue to be retained, had no objections to me speaking with Mr. Milam's attorneys. My conversation with Mr. Milam's attorneys occurred on 12/31/2020, and at that time they requested that I review additional materials. These materials were provided to me on 1/5/2021 and included the following Affidavits/Declarations:

    a.  Edward B. Gripon, M.D. (10/13/2014)

    b.  Kimberly Graham (11/29/2018)

    c.  Carolyn McIlhenny (11/29/2018)

---

[1] Intellectual disability replaced the previously used term mental retardation in the diagnostic nomenclature, and therefore, intellectual disability is the term used throughout this report. Intellectual disability and mental retardation are synonymous.

    d.  James "Jim" Wallace (11/29/2018)

    e.  Juanita Bradford (12/10/2018)

    f.  Milton Bennett (12/11/2018)

    g.  Dale G. Watson, Ph.D. (1/4/2019)

    h.  Jack M. Fletcher, Ph.D., ABPP (1/5/2019; addendum 9/17/2020)

    i.  Thomas Hodges (3/22/2019)

After reviewing these materials, I formed an opinion regarding whether Mr. Milam meets criteria for intellectual disability in light of the current diagnostic nomenclature, research, and relevant law. The current commonly relied upon definitions of intellectual disability, all of which are quite similar, include the following:

> Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains [Diagnostic and Statistical Manual of the American Psychiatric Association, Fifth Edition (DSM-5)].

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18 [American Association on Intellectual and Developmental Disabilities (AAIDD)].

> "Intellectual disability" means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period [§ 591.003 (17a) of the Texas Health & Safety Code].

Regardless of the definition considered, there are three elements to intellectual disability: 1) significantly subaverage intellectual functioning; 2) significant deficits in adaptive behavior/functioning; and 3) onset during the developmental period (i.e., before age 18). Regarding the current state of the law, relevant case law including the United States Supreme Court Moore v. Texas cases were considered.

The purpose of this addendum is to express my current opinions regarding this matter, which are as follows:

    1.  It continues to be my opinion that when considered in light of the diagnostic nomenclature, relevant research, and law in place at the time of my 2010 evaluation/testimony regarding Mr. Milam, the available evidence did not support

a diagnosis of intellectual disability, but rather was consistent with borderline intellectual functioning.

2. When considered in light of the current diagnostic nomenclature, relevant research, and law; however, my opinion differs from that previously. My current analysis of each of the aforementioned three elements of intellectual disability with respect to Mr. Milam is as follows:

   a. The first of these elements is significantly subaverage intellectual functioning. At present there is not a fixed intelligence quotient (IQ) cut-off score at which a person is considered to have significantly subaverage intellectual functioning. Generally, such is considered to be indicated by a Full Scale IQ score that falls two standard deviations below the mean while factoring in measurement error (i.e., generally 5 points). The current version of the DSM (i.e., the DSM-5) quantifies this by indicating that it involves a Full Scale IQ score of "65-75 (70 $\pm$ 5)." The DSM-5 also notes that "clinical training and judgment are required to interpret test results and assess intellectual performance."

   There are four known instances of Mr. Milam being administered a version of an intelligence test, all of which occurred in the time period between the Capital Murder offense and his 2010 trial. Paul Andrews, Ph.D., ABPP administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) on 11/20/09 and the Stanford Binet Intelligence Scales – 5th Edition (SB5) on 12/10/09. Then, on 3/26/2010, I re-administered the WAIS-IV while also administering the Reynolds Intellectual Assessment Scales (RIAS). Of the above, the results that warrant attention at present regarding an assessment of significantly subaverage intelligence are the WAIS-IV and SB5 administrations. The reason the RIAS is set aside at this time is concerns regarding the test overinflating scores of individuals with low intelligence.

   Before moving to a discussion of the other three test scores, it should be noted that while concern regarding the possible influence of suboptimal effort on Mr. Milam's IQ scores obtained via Dr. Andrews was raised previously, such does not appear warranted based on currently available evidence. This is because of the effort tests administered by Dr. Andrews and me, only the Green Word Memory Test, which Dr. Andrews administered twice, was elevated. Notably, concern about the use of the Green Word Memory Test with individuals with potentiality low intelligence has grown with time, and for this reason, I now rarely, if ever, see it used with this population. Rather, another version of this test that is more appropriate for this population tends to be used. In the case of the IQ scores, I obtained during my evaluation of Mr. Milam, I expressed some concern about the amount of background noise present at times during testing. While this warrants consideration, it does not appear to be a highly

relevant factor given the relative consistency between the scores, including in particular the two WAIS-IV administrations.

Turning to the IQ scores that warrant attention at present, on the WAIS-IV Mr. Milam obtained a Full Scale IQ of 71 when tested by Dr. Andrews, and a 68 when tested by me. On the SB5, he obtained a Full Scale IQ of 80; however, a scoring error was recently uncovered. When such is corrected, the score is reduced to a 78. Also of note when considering the SB5 score is the "Flynn Effect" (i.e., IQ score inflation resulting from outdated test norms), as available research includes strong support for the validity of such including that it is one of the "factors that may affect test scores" noted in the DSM-5. Although the SB5 was the most current version of the Stanford Binet Intelligence Scales when Dr. Andrews administered it, and concerns about the Flynn Effect tend to be less an issue in such a situation, the Flynn Effect nonetheless warrants consideration in this case given the length of time between when the SB5 was normed (2001) and when it was administered to Mr. Milam. Indeed, given this the possibility that the Flynn Effect led to somewhat of an overestimate of his SB5 IQ score warrants consideration. While it is not my practice to add or subtract points from IQ scores for any reason including the Flynn Effect, it is clearly appropriate to consider the possible influence of such on IQ scores produced by tests with potentially outdated norms. Before moving on from this topic, it is notable that in contrast to the SB5, the WAIS-IV was fairly recently normed (2006) at the time that it was administered by Dr. Andrews and me, so the Flynn Effect is not expected to have significantly impacted those test results.

Taken in total, Mr. Milam's WAIS-IV scores of 71 and 68 fall within the "65-75 (70 ± 5)" range noted in the DSM-5. While the SB-5 score, which we now know to be a 78 rather than an 80, falls above this level on the surface, it is likely an overestimate of his true abilities based on the Flynn Effect. When the above intelligence test data is considered in light of the current knowledge base, it is my opinion that the presence of significantly subaverage intellectual functioning is established.

b. The second element is adaptive behavior/functioning. The element is met when at least one domain of adaptive behavior/functioning – conceptual, social, or practical – is significantly impaired. The conceptual domain deals with aspects such as language; reading and writing; and money, time, and number concepts. The social domain pertains to interpersonal skills, social responsibility, self-esteem, gullibility, naïveté/wariness, following rules/obeying laws, avoiding being victimized, and social problem-solving. Finally, the practical domain includes activities of daily living/personal care, occupational skills, use of money, safety, health care, travel/transportation, schedule/routines, and use of the telephone. While all people including those with intellectual disability have relative strengths

and weaknesses, the focus of adaptive behavior/functioning assessment is whether at least one of these three domains, taken as a whole, falls in the significantly deficient range.

It is currently my opinion that the presence of significant deficits in the conceptual domain is supported. While I previously did not view his deficits in this area as rising to the significant level, this has changed in light of the current state of the diagnostic nomenclature, research, and law pertaining to intellectual disability. My opinion in 2010 was that Mr. Milam presented with deficits in functional academic functioning; particularly in the areas of number concepts, money management, etc. [e.g., when I assessed him via the Wide Range of Achievement Test – Fourth Edition (WRAT4) his Math Computation score was a 55 (0.1 %ile; 1.9 grade equivalent); there are various accounts of him struggling math related endeavors including money management in the free world]. Relatively speaking, his reading and spelling abilities were measured at a higher level than those involving math, including that his score on the WRAT4 Sentence Comprehension test was higher than is typically expected for an individual with intellectual ability. Taken in total, I viewed his functional academic abilities as representing a deficit, but not at the significant level. This was due in part to consideration of his extraordinarily low level of education (he was removed from school in around the 4th grade). In other words, I viewed his deficits in functional academics as at least partially attributable to his lack of education rather than being fully explained by intellectual deficiency and expected that had he benefitted from a more typical education his functional academic abilities would have been better. In the current conceptualization of intellectual disability, however, a lack of education is not viewed as a differential consideration regarding intellectual disability, but rather as one of many potential risk factors for such. In other words, Mr. Milam's lack of education is currently conceptualized as having placed him at increased risk for intellectual disability rather than being viewed as a potential alternate explanation for his deficits. Since it is my opinion at present that Mr. Milam presents with significant deficits in the conceptual domain, he therefore meets the second element of the criteria for intellectual disability.

c. The third element is onset of significant intellectual impairment and adaptive behavior/functioning during the developmental period (i.e., prior to the age of 18). I am aware of no indication of Mr. Milam having been exposed to any type of incident or event (e.g., a significant head injury) following the developmental period that resulted in a decline in functioning. Rather, evidence available at present supports an onset of significant intellectual impairment and adaptive behavior/functioning during the developmental period.

3. Based on the information currently available to me and the relevant diagnostic nomenclature and law at this time, it is my opinion that Mr. Milam meets criteria for intellectual disability.

The above findings, conclusions, and opinions found in this report are based on currently available information. If additional information becomes available in the future or if any factual errors were made, please let me know. Please note that I reserve the right to make adjustments or changes to the above diagnoses and opinions if new information becomes available that warrants such changes.

Respectfully Submitted,

Timothy J. Proctor, Ph.D., ABPP
Licensed Psychologist #32021
Board Certified in Forensic Psychology #6382